**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HAN KIM, YONG KIM, YONG HWA CHUNG KIM, CHUNG KOOK KIM, and DANI BUTLER, <br><br> Plaintiffs, <br><br> v. <br><br> THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, a.k.a. NORTH KOREA, <br><br> Defendant, <br><br> CIRCLE INTERNET FINANCIAL LLC, <br><br> Garnishee. | Case No. 25-MC-527 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TURNOVER**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT................................................................................ 1

II.   FACTS AND PROCEDURAL HISTORY ............................................................ 4

      A.    The Abduction And Murder of Reverend Dong Shik Kim ...................... 4

      B.    The Family Wins a Judgment Against North Korea............................. 4

      C.    The Ethereum Blockchain and the Market for Crypto Assets .............. 5

      D.    USDC and Circle's Business ................................................................ 6

      E.    Investigators Trace USDC to North Korea ......................................... 10

      F.    Circle Freezes 2.5 Million USDC But Keeps The Money And
            Ignores This Court's Writ of Execution ............................................... 11

III.  ARGUMENT......................................................................................................... 12

      A.    Summary of Argument and Legal Standards ...................................... 12

      B.    This Court May Exercise Personal Jurisdiction Over Circle .............. 14

            1.    New York is Circle's principal place of business ....................... 14

            2.    This suit arises from Circle's possession of assets in New
                  York on behalf of North Korea .................................................. 15

      C.    The USDC in The Wallet Addresses Are North Korea's Property
            And Not Immune From Execution........................................................ 17

      D.    North Korea's Property in The Wallet Addresses Is Subject To
            Turnover From Circle to The Kims...................................................... 18

            1.    USDC create assignable property interests in the
                  underlying balances because they are UCC securities.............. 18

            2.    USDC create assignable property interests in the
                  underlying balances by their own terms even if they are
                  not securities ............................................................................. 21

      E.    Circle Has The Ability to Produce The Assets it Holds For North
            Korea's Benefit and On North Korea's Behalf ................................... 23

i

        1.     Circle must turn over North Korea's interests by destroying its USDC and issuing new ones to the Kims ........... 23

        2.     Alternatively, Circle can pay the Kims U.S. dollars ................... 24

IV.     CONCLUSION ....................................................................................... 25

V.      CERTIFICATION OF COMPLIANCE ............................................................ 26

# TABLE OF AUTHORITIES

**Cases**

*ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976)............................ 21, 22

*All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16 (2d Cir. 1999) ................................................................................................. 2, 21, 22, 23

*Allegaert v. Chem. Bank*, 657 F.2d 495 (2d Cir. 1980) ............................................. 20

*Butler v. DRPK*, Dkt. No. 31, 20-cv-2514 (D.D.C. Nov. 04, 2025)............................... 5

*CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) ...................................................................................................................... 4, 13

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011) .................. 14

*Hanson v. Denckla*, 357 U.S. 235 (1958) ................................................................... 16

*Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408 (1984)................. 16

*Hertz Corp. v. Friend*, 559 U.S. 77 (2010) ................................................................ 14

*Highland Cap. Mgmt. LP v. Schneider*, 8 N.Y. 3d 406 (2007) ..................................... 3

*Highland Cap. Mgmt. LP v. Schneider*, 8 N.Y.3d 406 (2007) .................................... 19

*Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014) ............................................................................................................... 4, 12, 17

*Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29 (D.D.C. 2013) ..... 4

*Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009) .......................................... 12

*Marshak v. Green*, 746 F.2d 927 (2d Cir. 1984) ................................................... 13, 21

*Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024) .............................. 12, 16, 17

*Sec. & Exch. Comm'n v. Coinbase, Inc.*, 726 F. Supp. 3d 260 (S.D.N.Y. 2024 .......... 20

*St. Paul Fire & Marine Ins. Co. v. Scopia Windmill Fund, LP*, 87 F. Supp. 3d 603 (S.D.N.Y. 2015) ........................................................................................................ 15

*United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 (N.D. Ohio April 25, 2025) ............................................................. 3, 8, 21, 23

iii

*United States v. Approx. 1,694,395 Tether Cryptocurrency*, No. 24-cv-2828 (D.D.C. 2025) .................................................................................................................. 24

*Ventura v. Circle Internet Fin., LLC*, No. N25C-01-109 CLS, 2025 WL 2390518 (Del. Super. Ct. Aug. 18, 2025) ............................................................................ 3, 19

*Walden v. Fiore*, 571 U.S. 277 (2014) ...................................................................... 16

**Statutes**

28 U.S.C. § 1610 ................................................................................... 2, 5, 12, 17

N.Y. C.P.L.R. § 302................................................................................................ 14

N.Y. C.P.L.R. § 5201.......................................................................................... 13, 18

N.Y. C.P.L.R. § 5240........................................................................... 3, 13, 23, 24

N.Y. C.P.L.R. §§ 5225............................................................................................ 3, 13

N.Y. U.C.C. § 8-102 ......................................................................................... 19, 20

N.Y. Unif. Comm. Code § 8-112 ................................................................. 18, 20, 21

**Other Authorities**

Caroline Hill, *Testimony Before the House Financial Services Subcommittee on Digital Assets, Financial Technology and Inclusion* (Feb. 15, 2024), ................... 23

David Gray Carlson, *Critique of Money Judgment (Part Two: Liens on New York Personal Property)*, 83 ST. JOHN'S L. REV. 43 (2009) .............................................. 11

UCC § 8-102, Official Cmt. 15 .............................................................................. 20

**Treatises**

David D. Siegal, *New York Practice* § 547 (5th ed. 2017).......................................... 14

## I.   PRELIMINARY STATEMENT

In 2000, Reverend Dong Shik Kim, who had moved to China from the U.S. seven years earlier to minister to refugees and people with disabilities, was kidnapped by a North Korean agent and taken into North Korea, where he was tortured and murdered by the state. In 2015, the Reverend's brother, Yong Seok Kim, and the Reverend's son, Han Kim, won a $330,000,000 money judgment against North Korea; and in 2025 the Reverend's widow, Yong Hwa Chung Kim, and two of his children, Dani Butler and Chun Kook Kim (collectively "the Kims"), won a $366,000,000 money judgment against North Korea. North Korea has yet to pay a cent towards the judgment. The Kims now seek turnover of North Korean property held by Garnishee Circle Internet Financial LLC ("Circle").

Circle is a New York–headquartered company that issues a crypto asset called U.S. Dollar Coin (USDC) on the Ethereum blockchain. Circle calls USDC a "stablecoin" because, according to Circle's terms of service, Circle "backs [every USDC with] an equivalent amount of U.S. Dollar-denominated assets held by Circle . . . on behalf of, and for the benefit of, [the coin-holders]." Circle holds those U.S. Dollar-denominated assets at Bank of New York Mellon in this District.

North Korea, as part of a long-running international campaign of hacking and fraud, holds at least 2,522,419 USDC in three Ethereum wallets. In September 2024, Circle learned that North Korea possessed USDC and implemented something that Circle calls "access denial," colloquially known as "freezing," on the North Korean wallet addresses. When Circle freezes a wallet address, it ensures that the USDC balance of that address will remain the same until the freeze is lifted. Circle has

therefore ensured that the 2,522,419 USDC in North Korea's wallets will never be sold or redeemed. This Motion requests that Circle be ordered to transfer the value underlying the 2,522,419 USDC to the Kims by reissuing new coins or paying the underlying dollars, just as any other U.S. business would be ordered to turn over North Korean assets to the Kims in similar circumstances.

On November 26, 2025, Plaintiffs served on the Marshal of this District a writ of execution to Circle commanding it to do just that. Circle has not turned over the property that it holds "on behalf of" North Korea. It thus continues to earn interest on the reserves it holds. Circle's refusal frustrates the Kims' right to execute their judgment against North Korean property, and it also means that Circle profits each day that the North Korean USDC remain frozen, from both the interest accruing (which Circle keeps for itself) and, potentially, from the use of funds that back the 2,522,419 USDC that Circle knows will never be redeemed.

This turnover motion will correct that injustice. Under federal law, the Kims may execute a judgment against the blocked assets of a terrorist party for an act of terrorism. 28 U.S.C. § 1610 (f)(1)(A). Under New York law, which applies here under Rule 69(a), "property" must be turned over by a garnishee where a judgment creditor shows that (a) the property sought has been made available for execution because it is an assignable interest of the judgment debtor and (b) the garnishee is capable of turning it over. *All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 21 (2d Cir. 1999). USDC give their holders a clear and assignable interest in the reserves that Circle holds "on behalf of, and for the benefit of," coinholders for two

2

alternative reasons. First, USDC are state-law "securities" within the meaning of Article 8 of the New York Uniform Commercial Code because they are obligations of Circle that are divisible and that trade on securities exchanges. *See Ventura v. Circle Internet Fin., LLC*, No. N25C-01-109 CLS, 2025 WL 2390518, at *3 (Del. Super. Ct. Aug. 18, 2025) (denying Circle's motion to dismiss claim that USDC are securities). Alternatively, even if USDC are not state-law securities, they create assignable property interests by their own terms, which read: "sending USDC to another address automatically transfers and assigns to the owner of that address . . . the right to redeem USDC for USD funds" under certain circumstances. And Circle is capable of turning over North Korea's property either by cancelling North Korea's USDC and issuing new ones to the Kims or paying over to the Kims the assets it holds on North Korea's "behalf." *E.g.* N.Y. C.P.L.R. §§ 5225(b) (requiring turnover of property that garnishee holds for judgment debtor); 5240 (giving courts broad supervisory power to effect a turnover order). Other stablecoin issuers routinely comply with court orders requiring the turnover of stablecoins, and Circle is no different. *E.g., United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 at 3 (N.D. Ohio April 25, 2025) ("[P]ursuant to a federal seizure warrant . . . Tether Limited 'burned' the USDT tokens . . . [and] reissued the equivalent amount of USDT tokens . . . to a U.S. law enforcement-controlled virtual currency wallet."). This Court should grant turnover.

## II.    FACTS AND PROCEDURAL HISTORY[1]

### A.    The Abduction And Murder of Reverend Dong Shik Kim

In 1993, Reverend Dong Shik Kim moved from the U.S., where he was a lawful permanent resident, to China to work as a missionary providing humanitarian and religious services to North Korean families who had fled across the Sino–Korean border. *Kim v. Democratic People's Republic of Korea ["DPRK"]*, 950 F. Supp. 2d 29, 36 (D.D.C. 2013). In 2000, Reverend Kim was abducted by a North Korean agent and secreted across the border into North Korea. *Kim v. DRPK*, 774 F.3d 1044, 1049 (D.C. Cir. 2014). No one outside North Korea has heard from Reverend Kim since. *Id.* Experts in North Korea's human-rights violations testified that North Korea sends those whom it deems to be "opponents of the . . . regime" to torture camps called *kwan-li-sos*. *Id.* at 1050. Experts further testified that Reverend Kim "suffered an untimely death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51.

### B.    The Family Wins a Judgment Against North Korea

In 2009, the Kim family sued North Korea for the abduction and murder of Reverend Kim. *Kim v. Democratic People's Republic of Korea*, No. 09-CV-648, Dkt. 1

---

[1] This Court applies the familiar summary-judgment standard to determine whether the material facts beyond genuine dispute show that the Kims are entitled to turnover as a matter of law. *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 473 (2d Cir. 2018) (explaining that turnover may be sought by motion and incorporating summary-judgment standard). The facts drawn from the judgment in this case are established as true by that judgment and the remaining facts are not subject to genuine dispute.

(D.D.C. April 8, 2009). North Korea, after being properly served, did not appear to defend. *Id.* Dkt. No. 12 (entry of default). And so the Kims sought a default judgment. *Id.* Dkt. No. 46. The district court denied that request, reasoning that the Kims had not presented evidence sufficient to meet the Foreign Sovereign Immunity Act's special provision for proof when a defendant defaults. *Kim*, 950 F. Supp. 2d at 34. The Kims appealed and the D.C. Circuit reversed, holding that "[t]he Kims . . . make a compelling case that North Korea" tortured Reverend Kim and murdered him outside of the normal legal process. 774 F.3d at 1050. On remand, the district court entered a default money judgment of $15,000,000 in compensatory damages for each of the Kims and $300,000,000 in punitive damages to be divided between them. *Kim v. DPRK*, 87 F. Supp. 3d 286, 291 (D.D.C. April 9, 2015). The Kims served the default judgment on North Korea, and on July 23, 2019, the court granted the Kims permission to enforce the judgment under 28 U.S.C. § 1610(c). In 2020, the remaining plaintiffs sued and won a similar default judgment, *Butler v. DRPK*, Dkt. No. 31, 20-cv-2514 (D.D.C. Nov. 04, 2025), and their request for leave to enforce that judgment is currently pending, *id.*

### C.    The Ethereum Blockchain and the Market for Crypto Assets

A blockchain is a system for a distributed network of machines to keep a ledger of transactions publicly and securely. Statement of Undisputed Material Facts (SUMF) ¶ 13. To maintain a blockchain, a distributed network of machines uses a cryptographic function called a "hash" to validate a series of transactions (a "block") and connect it to all prior series of transactions (hence "chain") in a way that is verifiable and practically immutable. SUMF ¶ 14.

The blockchain at issue in this case is called Ethereum. SUMF ¶ 15. Users participate in the Ethereum blockchain using wallet addresses, which are digital representations of the sending and receiving ends of transactions on the blockchain. SUMF ¶ 16. Ethereum can record transactions in many different assets using something called the "ERC-20 standard." SUMF ¶ 17. This standard enables anyone on the Ethereum blockchain to create a "token" using something called a "smart contract." *Id.* The token can then be traded from one wallet address to another. All ERC-20 tokens have some core functions—all of them have a fixed total supply at any time, may be transferred from one wallet address to another, and are fungible. SUMF ¶ 18. But some ERC-20 tokens have additional functions encoded by their creators, including, for example, the ability for the creator to freeze tokens. SUMF ¶ 19. Issuers of ERC-20 tokens, then, can freeze them and make them worthless.

Trading directly on the Ethereum blockchain can be technically demanding. For this reason, most retail crypto users rely on companies called centralized exchanges. At least two U.S.-based crypto exchanges describe themselves as "securities intermediaries" for purposes of the Uniform Commercial Code; declare that users' accounts are "securities accounts"; and agree that the assets in them are governed by Article 8 of the UCC. SUMF ¶ 31. USDC trades on these exchanges. *Id.*

### D.    USDC and Circle's Business

Circle is an LLC formed under Delaware law and headquartered in New York City. SUMF ¶¶ 5–12. Circle's business is straightforward: It issues USDC in exchange for dollars and redeems them on demand, always on a one-to-one basis. SUMF ¶¶ 24, 25. Circle's Terms of Service provide that each USDC is backed by one

U.S. dollar, and that Circle holds U.S. Dollar–denominated assets "on behalf of, and for the benefit of," coin-holders. SUMF ¶ 24; Ex. N, Circle USDC Terms at 1. For this reason, USDC are called "stablecoins": ideally the value of 1 USDC token is always one U.S. dollar. SUMF ¶ 25.

Circle issues USDC as an ERC-20 token on the Ethereum blockchain. SUMF ¶ 21. To get USDC on the Ethereum blockchain in the first instance, users create something called a "Circle Mint" account, transfer dollars to Circle, and Circle transfers USDC to the users' Ethereum wallet address. SUMF ¶ 24. The USDC is then freely negotiable: Users may send it to any address they please in exchange for goods, services, or other crypto assets. SUMF ¶¶ 22, 24. Although Circle requires anyone who purchases USDC directly from Circle or redeems it directly with Circle to maintain a Circle Mint account, Circle imposes no limit on who may hold and trade USDC once it is in the market (except, as detailed below, entities that are sanctioned or otherwise prohibited from holding USDC by law), *see* SUMF ¶ 24; Ex. N at 2, 4, and it explicitly agrees with *everyone* who holds USDC to hold an equivalent amount of U.S. Dollar–denominated assets on that person's "behalf," *id;* Ex. N at 1.

When Circle created USDC, it gave itself the power to implement something it calls "access denial." SUMF ¶ 23. Pursuant to its access-denial powers, Circle can place any Ethereum wallet address on a list of addresses forbidden to transact in USDC. *Id.* If a wallet currently holding USDC is placed on the list, the USDC will remain frozen in that wallet until the address is taken off the list. *Id.* Although Circle treats frozen USDC as removed from circulation, *see, e.g.*, SUMF ¶ 30 (citing Ex. AG,

Deloitte Report, at 2 ("USDC In Circulation is defined as the total USDC supply . . . less . . . Access Denied Tokens."), *available at* https://perma.cc/A5SN-CUKU, it keeps the money underlying access-denied tokens in its reserve accounts, SUMF ¶ 24, Ex. N at 4.

Circle cannot directly move a balance from one address to another without changing the smart contract that it wrote to govern USDC, SUMF ¶ 19, but it can produce the exact same result by permanently freezing the coins at one wallet address and reissuing the equivalent amount to another, *id.* A company called Tether, which operates an identical business to Circle's, does this frequently. *See, e.g., United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 at 3 (N.D. Ohio April 25, 2025) ("[P]ursuant to a federal seizure warrant issued by U.S. Magistrate Judge Jonathan D. Greenberg on August 21, 2024, Tether Limited 'burned' the USDT tokens associated with the cryptocurrency address and, on or about November 20, 2024, reissued the equivalent amount of USDT tokens (namely, 4,340,000 USDT) to a U.S. law enforcement-controlled virtual currency wallet."). Circle makes clear in its policies that it will freeze stablecoins if, but only if, required to by law. SUMF ¶ 23; Ex. AF, Circle Access Denial Policy; Ex. N at 4.

To understand how freezing works, consider an analogy from the more established financial sector: A payor cancelling a check and reissuing one for the same amount to another person. The cancelled check remains in circulation—it is not as if a bank or check-writer can physically destroy a check not in its possession—but it is unusable and worthless, and replacing it with one any bank will honor for the same

amount is the equivalent of transferring its value to the new holder. The same cancellation and reissuance process permits Circle and other stablecoin issuers to "cancel" coins and issue new ones for the same amount, *see, e.g,, 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 at 3, even if they cannot cause the balance of the wallet address containing the first coins to read "zero."

USDC are used in commerce on several blockchains all over the world and are generally regarded in the crypto community as a safe, reliable means of trading dollar-denominated assets on blockchains. *See* SUMF ¶ 25; Ex. O, Circle, What is USDC?, at 3. The reason the market generally regards USDC as a stable asset is because Circle continually and publicly reassures the market that it will always redeem valid USDC for a dollar. SUMF ¶ 25 (collecting public statements by Circle CEO); Ex. O, Circle, What is USDC? at 2, 3.

To ensure the coins maintain their value and that Circle can meet its redemption obligations, Circle holds one dollar of "cash and highly liquid cash-equivalent assets" for each USDC in a money-market fund. SUMF ¶ 26. This money-market fund is kept separate from Circle's general assets so that USDC are always redeemable for cash on demand. *Id.* As of November 20, 2025, there were approximately $73.79 *billion* USDC in circulation and $74.07 *billion* in Circle's reserves. SUMF ¶ 27; Ex. AH, Circle, USDC, www.circle.com/usdc (last accessed Nov. 20, 3:05 PM). According to Circle's website, "[t]he portfolio of the Circle Reserve Fund, which can contain short-dated US Treasuries, overnight US Treasury repurchase agreements, and cash, is custodied at The Bank of New York Mellon and is managed

9

by BlackRock." SUMF ¶ 28; Ex. AH, Circle, USDC at 5, www.circle.com/usdc (last accessed Nov. 20, 2025). Both BNY Mellon and BlackRock are headquartered in this District. SUMF ¶ 29. From approximately 2015 until the beginning of 2025, Circle's headquarters were in Boston, Massachusetts. Circle is now headquartered here. SUMF ¶¶ 6–12.

E.    **Investigators Trace USDC to North Korea**

North Korea does not maintain diplomatic or economic relations with much of the world but nonetheless maintains a very expensive nuclear-weapons program. SUMF ¶ 32. To fund this program, as well as basic services, North Korea has turned to a widespread and extremely aggressive campaign of cyber-attacks. *Id.; see also, e.g.*, MULTILATERAL SANCTIONS MONITORING TEAM, THE DPRK'S VIOLATION AND EVASION OF UN SANCTIONS THROUGH CYBER AND INFORMATION TECHNOLOGY WORKER ACTIVITIES 11 (2025). These include hacks of crypto exchanges, *id.* at 7; ransomware attacks on hospitals to extort money, *id.* at 11; and hacks of American companies, *id.* at 15. North Korea uses USDC to launder its funds and evade international sanctions. *Id.* at 83 ("[I]n 2025, some North Korean IT workers sought to convert fiat funds into cryptocurrency, suggesting that they perceive cryptocurrency as more convenient and less risky than using banks or other fiat-based payment service. . . . IT workers . . . converted [funds] to U.S. dollar-pegged stablecoins USDC or USDT."); SUMF ¶ 39. North Korea conducts its operations through several state instrumentalities, all controlled by the North Korean government. MULTILATERAL SANCTIONS TEAM, *supra* at 11–23; SUMF ¶¶ 33, 34.

10

**F.    Circle Freezes 2.5 Million USDC But Keeps The Money And Ignores This Court's Writ of Execution**

On September 14, 2024, Circle froze the USDC balances of two wallet addresses—0x12ED7f6ed0491678764c2b222A58452926E44DB6                  and 0x36f2D3871edd59d5C06DB8F0b12bE928d5922A70—which together have a USDC balance of 2,144,505. SUMF ¶ 37. Circle later froze the North Korean wallet address 0xDa2e12E94060720581994eEc870F83d9C7200c2c, which has a balance of 377,914 USDC. SUMF ¶ 38 (This Memorandum will refer to these as "the Wallet Addresses.") Circle froze the balances of these addresses because these funds belonged to North Korea or the Lazarus Group, a North Korean instrumentality. SUMF ¶¶ 35–39.[2]

On November 20, 2025, the Kims registered their judgment in this Court. ECF No. 1. They promptly served a writ of execution on the Marshal (regarding the 2015 judgment only) and simultaneously served a restraining notice on Circle forbidding it to make or suffer any assignment or sale of North Korea's interests in the Wallet Addresses or of any other property in which they may have an interest. The Kims immediately notified Circle of the writ by email and also emailed a copy of this Memorandum of law alongside a letter requesting Circle's cooperation. Circle has not

---

[2] Circle may have frozen more wallet addresses, and the Kims will serve an information subpoena on Circle to determine the exact scope of North Korea's property interests with Circle. Although the writ of execution in this case operates as a levy on all North Korean assets of which Circle is aware, *see* David Gray Carlson, *Critique of Money Judgment (Part Two: Liens on New York Personal Property)*, 83 ST. JOHN'S L. REV. 43, 87–89 (2009), this turnover motion concerns only the Wallet Addresses.

agreed to turn over any property, and so this motion follows. The parties will meet and confer on any potential factual disputes before this Motion is fully briefed.

## III.   ARGUMENT

Although the technology underlying this case is novel, the relevant features of the technology are easy to understand, and the legal rules and their application here are straightforward. Circle holds property belonging to North Korea. New York and federal law require that North Korean property possessed by anyone be turned over to those like the Kims who hold money judgments against North Korea. Granting turnover will permit the Kims to satisfy at least some part of their outstanding judgment and, because Circle is a mere garnishee, granting turnover will not harm Circle' legitimate interests: If this Court grants this motion, Circle will be required to freeze 2,522,419 USDC in North Korea's addresses and reissue the same amount to the Kims, or alternatively to pay money currently backing coins that will never be redeemed, either way leaving it in exactly the same economic position it is in today.

### A.   Summary of Argument and Legal Standards

The legal framework of this Motion aligns with common sense. First, this Motion arises from Circle's possession of property in New York "on behalf of" North Korea, as Circle's own terms of service put it, and Circle is at home in New York, and so personal jurisdiction is proper. *See, e.g.*, *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024); *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 537 (2009); *infra* § B.

Second, as a matter of federal law, blocked assets of a state sponsor of terrorism are subject to the execution of a judgment resulting from an act of terrorism "notwithstanding any other provision of law," 28 U.S.C. § 1610(f)(1)(A); North Korea

12

is, and was at the time of the complaint in *Kim*, a state sponsor of terrorism, *Kim*, 774 F.3d at 1046; and this Action seeks to turn over North Korea's property. No sovereign immunity protects the assets. *See infra* § C.

Third, under New York law, which governs the procedures for execution and the definitions of North Korea's property rights, *Marshak v. Green*, 746 F.2d 927, 930 (2d Cir. 1984), people who hold property for judgment debtors, called "garnishees," are compelled to turn over any interests of the judgment debtor that they are capable of turning over, N.Y. C.P.L.R. § 5225(b), and courts are empowered to make any reasonable order necessary to effect a good turn over, *id.* § 5240. Thus, under New York law, Circle must turn over any interest North Korea has "whether it consists of a present or future right or interest and whether or not it is vested," N.Y. C.P.L.R. § 5201, and Circle can, and must, do that by either permanently freezing North Korea's coins and issuing identical ones to the Kims or paying over the property it admits it is holding "for the benefit" and "on behalf of" North Korea to the Kims. *See infra* § D.

Procedurally, New York law enables a judgment creditor to commence a "special proceeding" against a third party who "is in possession or custody of money or other personal property" in which the judgment debtor has an interest. *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 469 (2d Cir. 2018). And, under Second Circuit authority, that proceeding is properly brought by motion, *id.*, and decided under a summary-judgment standard where, as here, the material facts are not in any genuine dispute, *id.* at 469 ("A special proceeding is . . . as plenary

13

as an action, culminating in a judgment, but is brought on with the ease, speed, and economy of a mere motion." (quoting David D. Siegal, *New York Practice* § 547 (5th ed. 2017)). Where there are disputed facts, this Court tries them and decides by a preponderance of the evidence. *Id.*

**B.      This Court May Exercise Personal Jurisdiction Over Circle**

This Court may exercise general personal jurisdiction over Circle because it is headquartered here and may exercise specific personal jurisdiction over Circle because this action arises from its possession of property in New York on behalf of the judgment debtor, North Korea.

**1.      *New York is Circle's principal place of business***

This Court may exercise personal jurisdiction in this turnover action against Circle because Circle's headquarters is in New York City. Personal jurisdiction over a defendant is proper as to any cause of action under New York law where the defendant is incorporated elsewhere but "transacts business" in New York, N.Y. C.P.L.R. § 302(a)(1), and personal jurisdiction is proper as to any cause of action under the due process clause where the defendant is at home in New York (and thus necessarily satisfies New York law), *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). To be "at home" in New York, an entity may either be formed under New York law or keep its "principal place of business" here, *id.*, and "'principal place of business' refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities," *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010), sometimes called its "nerve center," *id.* This "test focuses on where a corporation's 'high-level' decisions are made, not where day-to-day

14

activities are managed." *St. Paul Fire & Marine Ins. Co. v. Scopia Windmill Fund, LP*, 87 F. Supp. 3d 603, 605 (S.D.N.Y. 2015).

Here, although Circle claims in some regulatory filings that Circle Internet Financial LLC is headquartered in Boston, the nerve center of the LLC is New York. In January 2025, Circle's parent corporation, Circle Internet Group, Inc., moved its headquarters from Boston to the World Trade Center in Manhattan. SUMF ¶ 11. It announced this move publicly, discussing its new multi-floor offices in the financial capital of the world. *Id.* In its regulatory filings, Circle concedes that this New York headquarters is the "mailing address" of the LLC—that is, the place where someone is actually physically present to receive the mail—and the LLC's Boston address appears to be a WeWork coworking space. SUMF ¶¶ 6, 8. Circle has registered to do business in New York, SUMF ¶ 7, and its registration does not list a Boston address, *id.* Circle has filed several dozen H1-B applications on behalf of its incoming employees since January 1, 2025, and the plurality of its incoming employees list New York City as their work address and no incoming employee lists a Boston or Massachusetts work address. SUMF ¶ 12.

2.    *This suit arises from Circle's possession of assets in New York on behalf of North Korea*

Although personal jurisdiction is proper over causes of action unrelated to Circle's New York activities because it is at home here, jurisdiction is also proper because this turnover action arises from Circle's possession of reserves on behalf of North Korea in New York. For specific personal jurisdiction to be proper, the defendant must have acted in the forum state and that act must give rise to the suit.

Specifically, the defendant must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Those acts must show that the defendant deliberately "reached out beyond" its home—by, for example, "exploi[ting] a market" in the forum State or entering a contractual relationship centered there. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (internal quotation marks and alterations omitted). And the plaintiff's claims "must arise out of or relate to the defendant's contacts" with the forum. *See, e.g.*, *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 (1984).

In *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), *cert. denied sub nom. Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025), the Second Circuit explained that turnover actions arising from in-state banking activity give rise to personal jurisdiction. There, plaintiffs "[sought] turnover . . . of the contents of an account with Clearstream Banking, a Luxembourg-based financial institution," *id.* at 990, which "[held] securities on behalf of and for the benefit of its clients," *id.* at 991, one of whom was the Central Bank of Iran against whom the plaintiffs held a money judgment, *id.* The court held that Article 52 provided a cause of action in favor of the plaintiffs against the bank and that the turnover action arose from the defendant's New York contacts because the "right to payment . . . reflects the proceeds of transactions that [the bank] undertook using [a] New York Account." *Id.* at 1005.

So too here. Circle purposefully chose to keep property on behalf of and for the benefit of its coinholders, and it chose to do that in New York: Its reserves are

16

custodied at the Bank of New York Mellon and managed by Blackrock in New York. SUMF ¶¶ 28–30. And the basis of this Action is straightforwardly Circle's purposeful decision to possess property "on behalf of" and "for the benefit of" North Korea in New York. To prevail in this suit, the Kims will have to prove that the target of the action is North Korea's property interests and that Circle is capable of turning those interests over. To do that, the Kims contend that North Korea's USDC give them an interest in Circle's reserves—namely that those reserves are held "on behalf of" and "for the benefit of" North Korea—and those reserves are held in New York, SUMF ¶ 29; Ex. N at 1. As in *Peterson*, this Court may exercise specific personal jurisdiction over Circle to compel it to turn over property it possesses on behalf of North Korea.

**C.    The USDC in The Wallet Addresses Are North Korea's Property And Not Immune From Execution**

The USDC in the Wallet Addresses belongs to North Korea or its agency or instrumentality and is frozen for that reason. SUMF ¶¶ 37, 38. Although some property of foreign governments is immune from execution, the property here is not because North Korea has been designated a state sponsor of terrorism, *Kim*, 774 F.3d at 1046 (describing "North Korea as long a mainstay on the State Department's list of terror sponsors—in fact, one of a small handful of bad actors that spurred Congress to adopt the terrorism exception in the first place" (cleaned up)), its assets are blocked, *id.*, and the Kims hold a judgment against North Korea for the torture and extrajudicial killings inflicted on their family member, *id.*; *see also* 28 U.S.C. § 1610(f)(1)(A) (foreign governments not immune from judgment creditors' attempts to

17

reach property of state sponsors of terrorism or their agencies or instrumentalities to execute judgments for torture or extrajudicial killings).

> **D.    North Korea's Property in The Wallet Addresses Is Subject To Turnover From Circle to The Kims**

North Korea's property interests currently in the Wallet Addresses are subject to turnover in favor of the Kims. Although the exact analytical category for stablecoins has not been conclusively established, they are either state-law securities under Article 8 of the UCC, or other assignable property interests subject to turnover. Either way, Circle possesses what is North Korea's, and it must turn it over.

> **1.    *USDC create assignable property interests in the underlying balances because they are UCC securities***

USDC create assignable property interests because they are securities governed by Article 8 of New York's uniform commercial code and, therefore, North Korea's property interest in those securities may be reached by its creditors through legal process on Circle, the issuer of the security. *See* N.Y. C.P.L.R. § 5201(c)(4) ("[S]ection 8-112 of the uniform commercial code shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process."); N.Y. Unif. Comm. Code ["U.C.C."] § 8-112 (a) ("The interest of a debtor in an uncertificated security may be reached by a creditor only by legal process upon the issuer at its chief executive office in the United States, except as otherwise provided in subsection (d).").

USDC are state-law "securit[ies]" for the purposes of UCC Article 8. To be a "security" under Article 8, an asset must be an "obligation of an issuer"

18

(i) which is represented by a security certificate in bearer or registered form, . . .;

(ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations;

and (iii) which:

(A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; *or*

(B) is a medium for investment and by its terms expressly provides that it is a security governed by this Article.

N.Y. U.C.C. § 8-102(a)(15) (emphasis added). An asset that is an "obligation of an issuer," then, "must [also] fulfill the requirements of subparagraphs (i) (the transferability test), (ii) (the divisibility test), and (iii) (the functional test)." *Highland Cap. Mgmt. LP v. Schneider*, 8 N.Y.3d 406, 412 (2007). USDC meet this test.

*First*, USDC are "obligations" of Circle. *Id.* Under the plain language of the USDC terms of service, Circle is required to "back[] [USDC with] an equivalent amount of U.S. Dollar-denominated assets held by Circle with U.S. regulated financial institutions in segregated accounts apart from Circle's corporate funds, on behalf of, *and for the benefit of*, Users." SUMF ¶ 24 (emphasis added). Circle's Terms make clear that "Circle commits to redeem 1 USDC for 1 USD, subject to these Terms, applicable law, and any fees where applicable." *Id.* If that does not meet the definition of "obligation," it is hard to understand what would. *See, e.g.*, *Ventura*, 2025 WL 2390518, at *3 (denying Circle's motion to dismiss claim that USDC are securities).

*Second*, USDC are divisible. To be "divisible," a financial asset must comply with the "minimum . . . formality that there be at least two instruments in a specified

19

class or series." *Allegaert v. Chem. Bank*, 657 F.2d 495, 507 (2d Cir. 1980). The "divisibility" test serves to distinguish securities from "individual obligations of the sort governed by ordinary contract law." UCC § 8-102, Official Cmt. 15. This requirement is very easy to meet, so much so that where billions of identical copies of an asset like USDC freely trade among millions of people "that [this] element is satisfied is so obvious that it does not warrant discussion." *Allegaert*, 657 F.2d at 507.

*Third*, USDC meet the functional test for securities because they are in fact traded on securities exchanges. *Compare* SUMF ¶ 31, *with* N.Y. U.C.C. § 8-102(a)(15)(iii)(A). USDC are traded on Coinbase and Gemini, which call themselves securities intermediaries and function as marketplaces for the exchange of securities, as this Court's prior decisions recognize, *Sec. & Exch. Comm'n v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 279 (S.D.N.Y. 2024) (holding that Coinbase, on which USDC trades, is plausibly alleged to be a securities exchange). USDC are securities within the meaning of the UCC.

The UCC distinguishes between "certificated" and "uncertificated" securities, but this Court need not reach that question because North Korea's interests in the USDC may be reached by an action against Circle regardless. If USDC are uncertificated, this action is straightforwardly governed by Section 8-112(b), which permits creditors to access the asset by serving legal process on the issuer—here, Circle. And if USDC are certificated, this action may proceed against Circle because it has the power to cause the USDC to be surrendered to it through freezing and reissuing, aided by any orders of this Court as necessary. *See* N.Y. U.C.C. § 8-112(3).

20

This is what Circle's competitor, Tether, regularly does in similar circumstances. *United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 at 3 (N.D. Ohio April 25, 2025) ("[P]ursuant to a federal seizure warrant . . . Tether Limited 'burned' the USDT tokens . . . [and] reissued the equivalent amount of USDT tokens . . . to a U.S. law enforcement-controlled virtual currency wallet.").

2.      *USDC create assignable property interests in the underlying balances by their own terms even if they are not securities*

Even if USDC are not state-law securities under UCC Article 8, North Korea's interests with Circle are nonetheless "property" and, therefore, subject to turnover here. Under New York law, "those property interests of the judgment debtor 'which by law the debtor may assign or transfer, may be sought for application to the judgment.'" *All. Bond Fund*, 190 F.3d at 24 (citing *New York Practice, supra*, § 486, at 742); *Marshak*, 746 F.2d at 931; *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674 (1976). "New York law contains 'no threshold requirement that the attaching creditor show the value of the attached property or indeed that it has any value.'" *All. Bond Fund*, 190 F.3d at 24 (quoting *ABKCO*, 39 N.Y.2d at 674). In *ABKCO*, for example, the plaintiff sought turnover of an English creditor's interest in the as-yet-unrealized profits of a contract to produce a film in New York. 39 N.Y.2d at 674. The Court of Appeals held that this inchoate interest was "property" that could be ordered turned over—the point of New York law is that the judgment creditor gets to decide whether it is commercially reasonable to pursue collection of a property interest and, so long as that interest is assignable, it must be turned over. *All. Bond Fund*, 190 F.3d at 21 ("If from the judgment creditor's point of view the asset is worth pursuing

21

as a matter of economics, *ABKCO* authorizes the pursuit notwithstanding the contingent nature of the asset, and even though nothing may come of the chase.").

Here, the Kims seek turnover of any and all interests North Korea has or may have under its user agreements with Circle. That is straightforwardly the interest that any USDC holder would have to redeem 2,522,419 USDC for that many U.S. dollars. Perhaps Circle will contend that its terms of service give it discretion to deny redemption in certain circumstances and, therefore, that it has no valuable obligations to its coinholders. But under New York law, that does not matter—Circle is required to turnover any assignable interest, *All. Bond Fund*, 190 F.3d at 21, and whatever rights USDC give their holders those rights are unquestionably assignable: "[S]ending USDC to another address automatically transfers and assigns to the owner of that address (a "Holder"), and any subsequent Holder, the right to redeem USDC for USD funds so long as the Holder is eligible to, and does, register a Circle Mint account." SUMF ¶ 24; Ex. N at 1–2.

The contrary conclusion would lead to absurd results and unjust enrichment for Circle. If the frozen USDC are not considered North Korean property interests held by Circle and subject to turnover, then they will remain frozen at the Wallet Addresses indefinitely. This would mean that Circle could continue to pocket the interest on the assets that back those coins indefinitely. It may mean that at some point Circle could keep the full assets for itself—after all, if the frozen USDC can never be moved, their value is zero because they can never be bought, sold, or redeemed. And it would mean that North Korea could continue to evade collection on

its outstanding judgments in the U.S., even though it took the risk of holding stablecoins issued by a publicly listed U.S. company that keeps its backing assets at reputable Wall Street firms here in New York.

**E.     Circle Has The Ability to Produce The Assets it Holds For North Korea's Benefit and On North Korea's Behalf**

North Korea's assets must be turned over if Circle, as garnishee, "has the ability to produce the asset," *All. Bond Fund*, 190 F.3d at 21, and this Court may issue all orders reasonably necessary to effectuate that production, C.P.L.R. § 5240. The novelty of crypto makes the actual turnover process less familiar than if this Action were against, say, JP Morgan Chase. But Circle can produce North Korea's assets to the Kims in either of two ways: It can freeze North Korea's coins permanently and reissue new ones to the Kims, or it can pay over the money it holds on North Korea's behalf and for North Korea's benefit to the Kims.

### 1.     *Circle must turn over North Korea's interests by destroying its USDC and issuing new ones to the Kims*

Circle has the established capacity to cancel North Korea's coins and reissue new ones to the Kims and, therefore, transfer North Korea's assets to the Kims. Indeed, Circle boasted to Congress of its ability verifiably to comply with U.S. sanctions orders, *see* Caroline Hill, *Testimony Before the House Financial Services Subcommittee on Digital Assets, Financial Technology and Inclusion* (Feb. 15, 2024), https://democrats-financialservices.house.gov/uploadedfiles/hhrg-118-ba21-wstate-hillc-20240215.pdf, and Courts routinely order—and companies routinely effect—transfers just like the one requested here, *United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 at 3 (N.D. Ohio April 25, 2025)

("[P]ursuant to a federal seizure warrant . . . Tether Limited 'burned' the USDT tokens . . . [and] reissued the equivalent amount of USDT tokens . . . to a U.S. law enforcement-controlled virtual currency wallet."); *United States v. Approx. 1,694,395 Tether Cryptocurrency*, No. 24-cv-2828 (D.D.C. 2025) (same).

To the extent that Circle resists this as not consistent with its existing practices, this Court is empowered to make any reasonable "order . . . extending or modifying the use of any enforcement procedure" to effectuate New York law's goal of making creditors whole where practically possible. C.P.L.R. § 5240. An order requiring Circle to reissue coins in an amount equal to those that it has permanently frozen and, thus, that can never be used or redeemed again is, at the very least, a reasonable order. It is the practical equivalent of cancelling and reissuing checks.

### 2. *Alternatively, Circle can pay the Kims U.S. dollars*

In the alternative, if Circle argues it is somehow unable to produce new USDC to the Kims for the purpose of transferring North Korea's interests to the Kims, this Court may order Circle to turnover the U.S.–dollar denominated assets that it holds on North Korea's behalf. As explained above, the correspondence between each USDC and each backing dollar is one-to-one, and Circle commits to redeeming each USDC on a one-to-one basis if presented with a USDC by someone holding an account with Circle. Using this Court's power to make orders under C.P.L.R. § 5240, this Court could require Circle to turn over the assets it holds "on behalf of" North Korea to the Kims.

24

## IV.   CONCLUSION

For the foregoing reasons, this Court should order Circle to issue 2,522,419 USDC to a wallet address to be specified by undersigned counsel. In the alternative, this Court should order Circle to pay $2,522,419 to the Kims. If Circle knows of additional coins held by North Korea, this Court should order that additional amount to be issued to a wallet address to be specified by undersigned counsel or, in the alternative, should order Circle to pay an equivalent amount of dollars to the Kims after a subsequent turnover motion is filed.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1629 Columbia Road NW, Suite 302
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
401 Park Ave. S. 10th Floor
New York, NY 10016
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*

25

## V.    CERTIFICATION OF COMPLIANCE

I hereby certify that, according to the word-count function on Microsoft Word, the foregoing memorandum of law (excluding the caption, tables, and signature blocks) contains 7,022 words.

> */s/ Charles Gerstein*
> Charles Gerstein
> GERSTEIN HARROW LLP
> 1629 Columbia Road NW, Suite 302
> Washington, DC 20004
> charlie@gerstein-harrow.com
> (202) 670-4809