**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HAN KIM, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, a.k.a. NORTH KOREA, *et al.*,<br><br>          Defendants,<br><br>TETHER INTERNATIONAL *S.A. de C.V.*,<br><br>          Garnishee. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case No. 25-MC-527 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION DIRECTING
SERVICE ON GARNISHEE TETHER INTERNATIONAL *S.A. de C.V.***

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     FACTS AND PROCEDURAL BACKGROUND ....................................................3

        A.      The Abduction And Murder of Reverend Dong Shik Kim........................3

        B.      The Family Wins a Judgment Against North Korea...............................4

        C.      The Ethereum and Tron Blockchains and the Market for Crypto
                Assets ...................................................................................................5

        D.      USDT and Tether's Business...................................................................6

        E.      Despite Sanctions, North Korea Uses USDT to Fund its Nuclear
                Program .................................................................................................7

        F.      Tether Freezes USDT And Keeps The Money Backing It, And
                The Kims Are Entitled To Turnover of North Korean Assets ................8

        G.      The Need For An Order of Service ..........................................................8

III.    ARGUMENT ......................................................................................................9

        A.      New York Law Applies Directly To The Process of Executing a
                Judgment Against Property Held by a Garnishee.................................10

        B.      Service on The Secretary of State is Proper Under New York
                Law.......................................................................................................12

        C.      Service on The Secretary of State Does Not Violate Any
                International Treaties ...........................................................................15

        D.      In The Alternative, Service by Mail And Email to Counsel Is
                Appropriate..........................................................................................16

IV.     CONCLUSION.................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976) ................................13

*Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16 (2d Cir. 1999)..................................................................................12

*Butler v. DPRK*, No. 20-cv-2514, Dkt. No. 31 (D.D.C. Nov. 4, 2025)..........................4

*Don King Prods., Inc. v. Thomas*, 945 F.2d 529 (2d Cir. 1991)........................... 13, 14

*Giuffre v. Andrew*, 560 F. Supp. 3d 744 (S.D.N.Y. 2021) ...........................................19

*Hanson v. Denckla*, 357 U.S. 235 (1958) ................................................................ 16, 17

*Harrison v. Republic of Sudan*, 802 F.3d 399 (2d Cir. 2015) ......................................14

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ...................16

*Herman v. Siegmund*, 415 N.Y.S.2d 681 (2d Dep't 1979) ............................................14

*In re GLG Life Tech. Sec. Litig.*, 287 F.R.D. 262 (S.D.N.Y. 2012) ...............................19

*Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29 (D.D.C. 2013)...............................................................................................3, 4

*Kim v. DPRK*, 774 F.3d 1044 (D.C. Cir. 2014) ........................................................3, 4

*Kim v. DPRK*, 87 F. Supp. 3d 286 (D.D.C. 2015) ........................................................4

*Marshak v. Green*, 746 F.2d 927 (2d Cir. 1984)...........................................................13

*Meehan v. Vipkid*, No. CV 20-6370 (JS) (ARL), 2023 U.S. Dist. LEXIS 152703 (E.D.N.Y. Aug. 29, 2023) ...........................................................18

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ...........................19

*NYKCool A.B. v. Pacific Intern. Services, Inc.*, No. 12-cv-5754 (LAK), 2015 U.S. Dist. LEXIS 27434 (S.D.N.Y. Mar. 5, 2015) ...........................................19

*Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), *cert. denied sub nom. Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025) ........................................................................................... 2, 16, 17

*Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002)..................................19

*United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386 (N.D. Ohio April 25, 2025) ........................................................7

*Walden v. Fiore*, 571 U.S. 277 (2014) ...............................................16

*Water Splash, Inc. v. Menon*, 581 U.S. 271 (2017) .............................19

## STATUTES

28 U.S.C. § 1610(c) ....................................................................4

28 U.S.C. § 1610(f)(1)(A) ............................................................9

N.Y. Bus. Corp. Law § 307 ................................................... 15, 17

N.Y. C.P.L.R. § 308(5) ..............................................................18

N.Y. C.P.L.R. § 5201 ..................................................................9

N.Y. C.P.L.R. § 5232 ........................................................... 13, 14

N.Y. C.P.L.R. § 5239 ................................................................14

## RULES

Fed. R. Civ. P. 4(f)(3)........................................................... 18, 19

Fed. R. Civ. P. 5(b)(2)(C)..........................................................14

Fed. R. Civ. P. 69(a) ............................................................ 2, 12

## OTHER AUTHORITIES

Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 20 U.S.T. 361........................................................................................18

Hague Conference on Private International Law, El Salvador: Declaration/Reservation/Notification ......................................18

Hannah Lang, *Tether Is in Talks With "Big Four" Firm About Reserve Audit, CEO Says*, Reuters (March 21, 2025) ..................... 7, 17

Multilateral Sanctions Monitoring Team, *The DPRK's Violation and Evasion of UN Sanctions Through Cyber and Information Technology Worker Activities* (2025) ....................................7, 8

## I.    INTRODUCTION

In 2000, Reverend Dong Shik Kim, who had moved to China from the U.S. seven years earlier to minister to refugees and people with disabilities, was kidnapped by a North Korean agent and taken into North Korea, where he was tortured and murdered by the state. In 2015, the Reverend's brother, Yong Seok Kim, and the Reverend's son, Han Kim, won a $330,000,000 money judgment against North Korea; and in 2025 the Reverend's widow, Yong Hwa Chung Kim, and two of his children, Dani Butler and Chun Kook Kim (collectively "the Kims"), won a $366,000,000 money judgment against North Korea. North Korea has yet to pay a cent towards the judgment. Plaintiffs now seek to collect their judgments against North Korean property held by Garnishee Tether International *S.A. de C.V.*

Tether is a Salvadoran company that issues a crypto asset called Tether (USDT) on the Ethereum and Tron blockchains (among others). Tether calls USDT a "stablecoin" because, according to Tether's terms of service, "[e]ach Tether Token in circulation is 100% backed by an amount of assets . . . equal to the stated value of the Tether Token." On November 20, 2025, the Kims (Han and Yong Seok) registered their judgment in this Court, ECF No. 1, and, on December 10, 2025, they served writs of execution on the U.S. Marshal directed to Tether. The Kims have evidence that North Korea holds USDT and, therefore, intend to pursue turnover motions against Tether as they have against Circle Internet Financial LLC. *See* ECF No. 4-1, Memo. of Law in Support of Turnover. Because Tether holds U.S. Dollar-denominated assets backing USDT at Cantor Fitzgerald in this District, under clear Second Circuit

1

law personal jurisdiction over Tether will be proper in this Court. *Peterson v. Bank Markazi*, 121 F.4th 983, 1005 (2d Cir. 2024).

The Kims respectfully request that this Court direct the Marshal to serve Tether by serving the New York Secretary of State and mailing a copy of the writ of execution to Tether. This form of service is authorized by New York state law, which applies here. *See* Fed. R. Civ. P. 69(a) ("[T]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located."). Service is authorized by this method because Tether is an unregistered foreign corporation, against which service on the Secretary of State is proper under New York law. El Salvador, where Tether is headquartered, has not objected to service by postal channels and, therefore, mailing service documents to Tether does not offend the Hague Convention.

Accordingly, this method of service is a statutory form of service under New York law—it is not a form of alternative service. But because this is an unusual method of service, in the context of turnover proceedings, the Marshal's office stated that it would follow the statutory procedures only after an order from this Court authorizing them. This Motion thus respectfully requests an order directing the Marshal to serve the writ of execution on the Secretary of State as the agent of Tether and to mail a copy of the writ of execution to Tether. The Kims will provide the Marshal with pre-paid envelopes and a certified Spanish copy of all documents to be served.

This Court is also authorized to permit service to be carried out by alternative means. Were this Court inclined to do so in lieu of directing the Marshal to effect service, Plaintiffs respectfully request the Court to authorize the Kims to effect service by mailing a copy of the writ of execution (in English alongside a certified Spanish copy) by registered mail to Tether, and by emailing and mailing those documents to their counsel who represent Tether in connection with this matter.[1]

## II.    FACTS AND PROCEDURAL BACKGROUND

### A.    The Abduction And Murder of Reverend Dong Shik Kim

In 1993, Reverend Dong Shik Kim moved from the U.S., where he was a lawful permanent resident, to China to work as a missionary providing humanitarian and religious services to North Korean families who had fled across the Sino–Korean border. *Kim v. Democratic People's Republic of Korea ["DPRK"]*, 950 F. Supp. 2d 29, 36 (D.D.C. 2013). In 2000, Reverend Kim was abducted by a North Korean agent and secreted across the border into North Korea. *Kim v. DPRK*, 774 F.3d 1044, 1049 (D.C. Cir. 2014). No one outside North Korea has heard from Reverend Kim since. *Id.* Experts in North Korea's human-rights violations testified that North Korea sends those whom it deems to be "opponents of the . . . regime" to torture camps called *kwan-li-sos*. *Id.* at 1050. Experts further testified that Reverend Kim "suffered an untimely

---

[1] In addition to two phone conversations, in the latter of which Tether's counsel declined to accept service in this matter, on February 18, 2026, undersigned counsel sent a draft copy of this motion to counsel for Tether and asked for Tether's position. At the time of this filing, on February 20, 2026, undersigned counsel has not heard back from Tether's counsel.

death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51. Reverend Kim is thus presumed dead.

### B.    The Family Wins a Judgment Against North Korea

In 2009, the Kim family sued North Korea for the abduction and murder of Reverend Kim. *Kim v. Democratic People's Republic of Korea*, No. 09-CV-648, Dkt. 1 (D.D.C. April 8, 2009). North Korea, after being properly served, did not appear to defend. *Id.* Dkt. No. 12 (entry of default). And so the Kims sought a default judgment. *Id.* Dkt. No. 46. The district court denied that request, reasoning that the Kims had not presented evidence sufficient to meet the Foreign Sovereign Immunity Act's special provision for proof when a defendant defaults. *Kim*, 950 F. Supp. 2d at 34. The Kims appealed and the D.C. Circuit reversed, holding that "[t]he Kims . . . make a compelling case that North Korea" tortured Reverend Kim and murdered him outside of the normal legal process. 774 F.3d at 1050. On remand, the district court entered a default money judgment of $15,000,000 in compensatory damages for each of the Kims and $300,000,000 in punitive damages to be divided between them. *Kim v. DPRK*, 87 F. Supp. 3d 286, 291 (D.D.C. April 9, 2015). The Kims served the default judgment on North Korea, and on July 23, 2019, the court granted the Kims permission to enforce the judgment under 28 U.S.C. § 1610(c). In 2020, the remaining plaintiffs sued and won a similar default judgment, *Butler v. DPRK*, Dkt. No. 31, 20-cv-2514 (D.D.C. Nov. 04, 2025), and their request for leave to enforce that judgment is currently pending, *id.*

### C.    The Ethereum and Tron Blockchains and the Market for Crypto Assets

A blockchain is a system for a distributed network of machines to keep a ledger of transactions publicly and securely. ECF No. 4-2, Statement of Undisputed Material Facts in Support of Turnover Motion Against Circle (SUMF) ¶ 13.[2] To maintain a blockchain, a distributed network of machines uses a cryptographic function called a "hash" to validate a series of transactions (a "block") and connect it to all prior series of transactions (hence "chain") in a way that is verifiable and practically immutable. SUMF ¶ 14.

The blockchains at issue in this case are called Ethereum and Tron. SUMF ¶ 15; Ex. A, Tron Whitepaper. Users participate in both blockchains using wallet addresses, which are digital representations of the sending and receiving ends of transactions on the blockchain. SUMF ¶ 16; Ex. A at 7. Ethereum and Tron can record transactions in many different assets using protocols called, respectively, the "ERC-20 standard" and the "TRC-20 standard." SUMF ¶ 17; Ex. A at 29. These standards enable anyone on the Ethereum or Tron blockchains to create a "token" using something called a "smart contract." *Id.* All standard tokens have some core functions—all of them have a fixed total supply at any time, may be transferred from one wallet address to another, and are fungible. SUMF ¶ 18. But some ERC-20 or TRC-20 tokens have additional functions encoded by their creators, including, for

---

[2] Although this Motion does not concern Circle Internet Financial LLC, for the convenience of the Court the Kims incorporate their statement of undisputed fact and exhibits by reference here. Tether-specific exhibits have been attached separately.

example, the ability for the creator to freeze tokens or to decrease their balances, which allows the issuer to transfer token balances from one wallet address to another. SUMF ¶ 19.

### D.    USDT and Tether's Business

Tether International *S.A de C.V.* is a Salvadoran company that issues USDT, the world's largest stablecoin by volume. *See* Ex. B, Tether International, S.A. de C.V., Independent Auditors' Report on the Financials Figures and Reserves Report (Sept. 30, 2025). Tether's USDT-related business is straightforward: It issues USDT in exchange for dollars, Ex. C, How to Acquire Tether Tokens at 1, and redeems USDT on demand for dollars, always on a one-to-one basis, *see* Ex. D, Tether Terms at 4.1.

Tether's Terms provide that each USDT is backed by "cash, cash equivalents and other assets and may include loan receivables and other assets from [Tether] Affiliates." *Id* at 4.1. Tether holds reserves for all USDT holders and gives them the right to redeem USDT for reserves provided that they establish a relationship with Tether and prove their identity. *See id.* For this reason, USDT are called "stablecoins": ideally the value of 1 USDT token is always one U.S. dollar. *Id.*

To ensure the coins maintain their value and that Tether can meet its redemption obligations, Tether holds reserve assets to support USDT holders' right of redemption. *Id.* Cantor Fitzgerald, which is headquartered in this District, *see* Ex. E, Cantor Locations, serves as a custodian for and manages more than 99% of Tether's treasury assets. *See* Hannah Lang, *Tether Is in Talks With "Big Four" Firm About Reserve Audit, CEO Says*, REUTERS (March 21, 2025) ("Of the U.S. Treasury bills, 99% are held with Wall Street brokerage company Cantor Fitzgerald, [Paolo]

Ardoino[, Tether CEO] said."). There are approximately $186 *billion* USDT outstanding today. *Id.*

There is no dispute that Tether is capable of turning over the USDT balance of any wallet address. *United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 at 3 (N.D. Ohio April 25, 2025) ("[P]ursuant to a federal seizure warrant . . . Tether Limited 'burned' the USDT tokens . . . [and] reissued the equivalent amount of USDT tokens . . . to a U.S. law enforcement-controlled virtual currency wallet.").

**E.    Despite Sanctions, North Korea Uses USDT to Fund its Nuclear Program**

North Korea does not maintain diplomatic or economic relations with much of the world but nonetheless maintains a very expensive nuclear-weapons program. SUMF ¶ 32. To fund this program, as well as basic services, North Korea has turned to a widespread and extremely aggressive campaign of cyber-attacks. *Id.; see also, e.g.*, MULTILATERAL SANCTIONS MONITORING TEAM, THE DPRK'S VIOLATION AND EVASION OF UN SANCTIONS THROUGH CYBER AND INFORMATION TECHNOLOGY WORKER ACTIVITIES 11 (2025). These include hacks of crypto exchanges, *id.* at 7; ransomware attacks on hospitals to extort money, *id.* at 11; and hacks of American companies, *id.* at 15. North Korea uses USDT to launder its funds and evade international sanctions. *Id.* at 83 ("[I]n 2025, some North Korean IT workers sought to convert fiat funds into cryptocurrency, suggesting that they perceive cryptocurrency as more convenient and less risky than using banks or other fiat-based payment service. . . . IT workers . . . converted [funds] to U.S. dollar-pegged stablecoins USDC or USDT."). North Korea

7

conducts its operations through several state instrumentalities, all controlled by the North Korean government. *Id.* at 11–23; SUMF ¶¶ 33, 34.

### F. Tether Freezes USDT And Keeps The Money Backing It, And The Kims Are Entitled To Turnover of North Korean Assets

Tether has frozen the USDT balances of at least 75 wallet addresses that have some known links to North Korea. Publicly available data from Elliptic, a blockchain analysis firm, reveals that no less than 80,209,753 USDT are frozen in wallets with more than 50% exposure (through sending or receiving transaction) to known North Korean wallet addresses, which creates a very high likelihood that these addresses are North Korean. Gerstein Decl. ¶ 6. Tether additionally froze the USDT balances of wallets with some exposure to known North Korean wallet addresses that together contain more than 531 million USDT. *Id.* Which of these assets are attributable to North Korea or its agencies or instrumentalities will be proven in forthcoming proceedings in this case, and the Kims will seek turnover of the USDT balance of any wallet address that the Kims prove to be property of North Korea. *See* 28 U.S.C. § 1610(f)(1)(A) (blocked assets of a state sponsor of terrorism are subject to the execution of a judgment resulting from an act of terrorism "notwithstanding any other provision of law"); N.Y. C.P.L.R. § 5201 (under New York law, garnishee must turn over any interest judgment debtor has "whether it consists of a present or future right or interest and whether or not it is vested").

### G. The Need For An Order of Service

On November 20, 2025, the Kims registered their judgment in this Court. ECF No. 1. They promptly served a writ of execution on the Marshal (regarding the 2015

judgment only). The Kims immediately notified Tether of the writ by email to an attorney who represents Tether in other matters. Gerstein Decl. ¶ 1. Tether has not agreed to turn over any property and has not agreed to accept service of motions, subpoenas, or writs. *Id.*

Because Tether has not voluntarily agreed to accept service, even through reliable U.S. counsel at the major law firm Gibson Dunn, the Kims communicated with the Marshal about serving under the procedures outlined here, since the Marshal is the agent responsible for service under a combination of federal and state law and rules, as explained more fully below. *See infra* § III.A. The Marshal, understandably, requires an order of this Court to effect service by the uncommon means applicable under New York law. Gerstein Decl. ¶ 3.The Kims thus move the Court for such an order. In the alternative, should the Court conclude that relieving the Marshal from his obligation to effect service is more efficient and reliable for all involved, the Kims propose that the Court authorize them to directly serve Tether by mail and serve its counsel by email and mail.

## III.   ARGUMENT

This Court should order the Marshal to effect service of the writ of execution on Tether by serving the Secretary of State and mailing a copy of the writ to Tether, as provided by New York law, which applies here. In the alternative, the Kims respectfully request that this Court order alternative service on Tether by authorizing the Kims to serve the writ of execution by certified mail to Tether and certified mail and email to its counsel at Gibson Dunn and Crutcher in New York.

9

The Kims will provide all necessary documents and pay all necessary fees to effect any order this Court enters.

### A. New York Law Applies Directly To The Process of Executing a Judgment Against Property Held by a Garnishee

The procedures for enforcing a judgment registered in this Court of course begin with the Federal Rules. Rule 69(a) directly incorporates New York law for the procedures for judgment execution by providing that, absent a governing statute (which does not apply here), "the procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a). Those procedures, in turn, are specified in New York Civil Practice Law and Rules Article 52. Under Article 52, "those property interests of the judgment debtor 'which by law the debtor may assign or transfer, may be sought for application to the judgment.'" *All. Bond Fund*, 190 F.3d at 24 (citing *New York Practice*, *supra*, § 486, at 742); *Marshak*, 746 F.2d at 931; *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674 (1976). Where those interests are capable of being turned over by a third party— called a "garnishee"—who holds them on the judgment debtor's behalf, the judgment creditor's process begins by serving a writ of execution on the executing officer (in this case the U.S. Marshal), which establishes a lien over the judgment debtors' property. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991) ("Under New York law, a judgment creditor becomes a 'judgment lien creditor' as to personal property . . . after execution is delivered to the sheriff").

10

Where, as here, the property constitutes interests that cannot be picked up and carried by the sheriff—in other words, property "not capable of delivery"—the Marshal levies the property by serving the writ of execution that the judgment debtor served on the Marshal on the garnishee. N.Y. C.P.L.R. § 5232. Absent exceptions not relevant here, the Marshal serves the writ of execution "in the same manner as a summons," i.e., in the same manner as a summons may be served under New York law. *Id.*

If there are any disputes about whether the property belongs to the judgment debtor or whether the garnishee is capable of turning it over, the judgment creditor may file a motion for turnover, *see, e.g.*, ECF No. 4, or a motion under C.P.L.R. § 5239, which is "an all-inclusive tool for the settlement of almost any problem that may arise in connection with the enforcement of money judgments," *Herman v. Siegmund*, 415 N.Y.S.2d 681, 682 (2d Dep't 1979), specifically to "determine rights in the property" at issue in the turnover motions, N.Y. C.P.L.R. § 5239. Such filings occur after the writ of execution is served, and so the judgment creditor may then serve the turnover motion and subsequent papers as any other motion would be served. *E.g.*, *Harrison v. Republic of Sudan*, 802 F.3d 399, 406 (2d Cir. 2015) ("Service of . . . post-judgment motions . . . [i]s required to adhere only to the notice provisions of the federal rules . . . . [under which a] 'paper is served' by 'mailing it to the person's last known address—in which event service is complete upon mailing.'" (quoting Fed. R. Civ. P. 5(b)(2)(C)). Only service of the writ of execution is at issue here.

11

**B.    Service on The Secretary of State is Proper Under New York Law**

Here, the Kims have already effected service of the writ of execution on the Marshal, thus establishing a lien, *Don King Prods.*, 945 F.2d at 533. But to levy the property, the Marshal must serve the writ of execution "in the same manner as a summons" on Tether, C.P.L.R. § 5232. That, according to the Marshal, requires an order of this Court in this unusual case: the Marshal cannot serve the writ of execution personally where the garnishee is located abroad even where, as here, personal jurisdiction is proper; and the Marshal's office has indicated that it will not serve the writ of execution on the Secretary of State absent an order from this Court. Gerstein Decl. ¶ 3. Therefore, an order from this Court is necessary.

Under Business Corporations Law § 307, "[i]n any case in which a non-domiciliary would be subject to the personal or other jurisdiction of the courts of this state . . . , a foreign corporation not authorized to do business in this state is subject to a like jurisdiction. In any such case, process against such foreign corporation may be served upon the secretary of state as its agent." NY Bus. Corp. Law. § 307(a). That provision authorizes service in this case, because Tether is a foreign corporation not authorized to do business in New York, and because it is subject to personal jurisdiction in this Court for this matter.

The first requirement is easily dispatched here: Tether is not registered to do business in New York. Gerstein Decl. ¶ 4. And Tether's address in El Salvador is *Edificio Torre Futura, Oficina 6, Nivel 11, entre 87 y 89 avenida norte, Colonia Escalón, San Salvador, El Salvador*. Ex. F, Tether Relevant Information at 1.

12

The second requirement is also met: this Court may exercise specific personal jurisdiction over Tether because this action arises from its possession of property in New York on behalf of the judgment debtor, North Korea. For specific personal jurisdiction to be proper under New York law and the Due Process Clause, the defendant must have acted in the forum state and that act must give rise to the suit. Specifically, the defendant must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Those acts must show that the defendant deliberately "reached out beyond" its home—by, for example, "exploi[ting] a market" in the forum State or entering a contractual relationship centered there. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (internal quotation marks and alterations omitted). And the plaintiff's claims "must arise out of or relate to the defendant's contacts" with the forum. *See, e.g.*, *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 (1984).

In *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), *cert. denied sub nom. Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025), the Second Circuit explained that turnover actions arising from in-state banking activity give rise to personal jurisdiction. There, plaintiffs "[sought] turnover . . . of the contents of an account with Clearstream Banking, a Luxembourg-based financial institution," *id.* at 990, which "[held] securities on behalf of and for the benefit of its clients," *id.* at 991, one of whom was the Central Bank of Iran against whom the plaintiffs held a money judgment, *id.* The court held that Article 52 provided a cause of action in favor

13

of the plaintiffs against the bank and that the turnover action arose from the defendant's New York contacts because the "right to payment . . . reflects the proceeds of transactions that [the bank] undertook using [a] New York Account." *Id.* at 1005.

*Peterson* makes clear that jurisdiction is proper here. Like *Peterson*, this is an action to compel turnover of property reflecting a right to payment of money in New York. Indeed the case for personal jurisdiction here is even stronger than it was in *Peterson*—here, the Kims seek turnover of property reflecting interests in New York that, unlike the foreign bank accounts Clearstream held in Luxembourg, is not located abroad. The vast majority of Tether's reserves are in the custody of and managed by Cantor Fitzgerald in New York. Hannah Lang, *Tether Is in Talks With "Big Four" Firm About Reserve Audit, CEO Says*, REUTERS (March 21, 2025). Thus, Tether "purposefully avails itself of the privilege of conducting activities within" New York, *Hanson*, 357 U.S. at 253, and the Kims' forthcoming turnover motion "arises from" that activity, *Peterson*, 121 F.4th at 991. Thus, as in *Peterson*, this Court may exercise specific personal jurisdiction over Tether to compel it to turn over property it possesses on behalf of North Korea.

Since the two requirements are met, the Secretary of State is Tether's agent for service, and "[s]ervice of such process upon the secretary of state shall be made" in accordance with the further instructions of § 307(b). That section provides that service can be made either personal delivery in Albany or electronic service, *see id.*; Plaintiffs are agnostic as to that choice, but the Marshal should be directed to choose one option to be completed within a reasonable time of the Court's order. And notice

14

must also be sent by registered mail to Tether at its mailing address, which is *Tether International S.A. de C.V., Edificio Torre Futura, Oficina 6, Nivel 11, entre 87 y 89 avenida norte, Colonia Escalón, San Salvador, El Salvador*; again, the Marshal should be directed to carry out such a mailing in accordance with Bus. Corp. Law § 307(b). To keep the case moving, the Marshal should be directed to begin this process within 14 days of the Court's order and to file proof of service consistent with Bus. Corp. Law § 307(c)(2).

### C.    Service on The Secretary of State Does Not Violate Any International Treaties

As explained, under New York law, if the Kims were the party serving the writ of execution, service would be appropriate by (a) serving the Secretary of State and (b) mailing notice of that service to Tether by certified mail. Some courts have held that mailing notice of service constitutes part of service (rather than mere notice) and, therefore, is barred by the Hague Convention (officially the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 20 U.S.T. 361, 363) where the receiving state has objected to service by postal channels. *E.g.*, *Meehan v. Vipkid*, No. CV 20-6370 (JS) (ARL), 2023 U.S. Dist. LEXIS 152703, at *31 (E.D.N.Y. Aug. 29, 2023) (collecting cases). Here, El Salvador is a signatory of the Hague Convention and has not objected to service by postal channels, *see* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, *El Salvador: Declaration/Reservation/Notification*, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=1530&disp=resdn (March 21, 2024) (listing no Article 10

15

objection); therefore, under Article 10, nothing in the convention interferes with "the freedom to send judicial documents, by postal channels, directly to persons abroad."

## D.    In The Alternative, Service by Mail And Email to Counsel Is Appropriate

In the alternative, if this Court concludes that service by the Marshal in the manner explained above is impracticable (or otherwise undesirable), under state law and Federal Rules, this Court may authorize alternative service. *See* Fed. R. Civ. P. 4(f)(3) (so authorizing); N.Y. CPLR or C.P.L.R. § 308(5) (also authorizing alternative service). This Court may thus authorize service by any means (a) reasonably calculated to give actual notice of the action, *see, e.g.*, *Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002) (holding that service under Rule 4(f)(3) must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); and (b) not prohibited by any applicable treaty or foreign law, *Water Splash, Inc. v. Menon*, 581 U.S. 271, 284 (2017) (holding that service by mail is appropriate where "first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law").

Courts have routinely held that service on a foreign party's known attorney in the United States constitutes valid alternative service of a summons. *E.g.*, *Giuffre v. Andrew*, 560 F. Supp. 3d 744, 745 (S.D.N.Y. 2021) (granting alternative service on counsel, and citing and quoting *NYKCool A.B. v. Pacific Intern. Services, Inc.*, No. 12-cv-5754 (LAK), 2015 U.S. Dist. LEXIS 27434, (S.D.N.Y. Mar. 5, 2015); *In Re GLG Life*

16

*Tech. Sec. Litig.*, 287 F.R.D. 262, 267 (S.D.N.Y. 2012) ("In many instances, courts have authorized service under Rule 4(f)(3) on an unserved party's counsel.")). Here, two attorneys at Gibson Dunn have identified themselves to the Kims as Tether's counsel in this specific matter, have communicated with the Kims by email, and are required to list (and have listed) physical addresses with the New York bar where they are available to receive process. Gerstein Decl. ¶ 5. There is no question that service on Gibson Dunn by certified mail to those addresses and email will apprise Tether of this action. And although under New York law the marshal (or, in Supreme Court cases, the Sheriff) effects service himself, nothing in federal or New York law forbids an alternative method under which the Kims serve the notice with this Court's authorization.

## IV.    CONCLUSION

For the foregoing reasons, this Court should order the Marshal to serve the writ of execution on the Secretary of State as the agent of Tether International *S.A. de C.V.* and to mail a copy of the writ of execution to Tether International *S.A. de C.V.*, Edificio Torre Futura, Oficina 6, Nivel 11, entre 87 y 89 avenida norte, Colonia Escalón, San Salvador, El Salvador. The Kims will provide the Marshal with pre-paid envelopes and a certified Spanish copy of all documents to be served.

In the alternative, this Court should authorize the Kims to effect service by mailing a copy of the writ of execution (in English alongside a certified Spanish copy) by registered mail to Tether International *S.A. de C.V.*, Edificio Torre Futura, Oficina 6, Nivel 11, entre 87 y 89 avenida norte, Colonia Escalón, San Salvador, El Salvador; by emailing those documents to bberke@gibsondunn.com and

17

dketani@gibsondunn.com; and by mailing them, by registered mail, to Barry H. Berke
and Daniel M. Ketani, Gibson Dunn & Crutcher LLP, 200 Park Ave., New York, NY
10166.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1629 Columbia Road NW, Suite 302
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
401 Park Ave. S. 10th Floor
New York, NY 10016
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*

18