**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAN KIM, *et al.*, Plaintiffs, )<br>)<br>    *v.* )<br>)<br>THE DEMOCRATIC PEOPLE'S )<br>REPUBLIC OF KOREA, a.k.a. NORTH )<br>KOREA, Defendant )<br>)<br>   ~~~~~ )<br>)<br>IN RE CENTRAL BANK OF THE )<br>ISLAMIC REPUBLIC OF IRAN, et al. )<br>)<br>   ~~~~~ )<br>)<br>RUTH CALDERON-CARDONA, et al., )<br>Plaintiffs, )<br>)<br>    *v.* )<br>)<br>THE DEMOCRATIC PEOPLE'S )<br>REPUBLIC OF KOREA, et al., )<br>Defendants )<br>)<br>& )<br>)<br>ARBITRUM DAO, )<br>)<br>   Garnishee (as to all cases) )<br>) | Case Nos. 25-MC-527-MMG<br>26-MC-033-MMG<br>26-MC-094-MMG |

**EMERGENCY MOTION FOR ORDER AUTHORIZING ALTERNATIVE
SERVICE OF RESTRAINING NOTICE, WRIT OF EXECUTION, AND
FORTHCOMING TURNOVER MOTION AND MEMORANDUM OF LAW IN
SUPPORT**

## TABLE OF CONTENTS

MOTION AND NEED FOR EMERGENCY ACTION ....................................................1

PRELIMINARY STATEMENT ........................................................................2

FACTS...........................................................................................4

    A.    Background on Decentralized Autonomous Organizations .....................4

    B.    Arbitrum DAO Freezes Assets in Its Possession That Belong to North Korea ..................................................................................5

    C.    Some Users Begin Asking For Immediate Transfer................................9

ARGUMENT.....................................................................................10

    A.    Plaintiffs May Restrain And Execute Against These Assets, And This Court May Order Alternative Service Of Relevant Documents .......................................................................11

    B.    Alternative Service of The Restraining Notice And Forthcoming Motion Is Appropriate Here....................................................13

    C.    The Proposed Methods of Service Will Reasonably Ensure Actual Notice of the Restraint, Execution, And Motions .......................14

    D.    Alternative Service of The Writ of Execution Is Appropriate...............15

CONCLUSION ..................................................................................16

CERTIFICATE OF COMPLIANCE .............................................................17

## MOTION AND NEED FOR EMERGENCY ACTION

Plaintiff Judgment-Creditors in these related Actions respectfully request this Court expeditiously grant the request to permit Plaintiffs to serve a Restraining Notice, Writ of Execution, and forthcoming Turnover Motion by alternative service on Arbitrum DAO using the means specified in the attached Proposed Order. Alternative service is authorized by Federal Rule of Civil Procedure 4(f), N.Y. C.P.L.R. § 308(5), and additional authorities as explained here.

Plaintiffs respectfully request the Court order this relief on an emergency basis because there is an imminent threat the relevant assets may be moved in days. As described below, Plaintiffs seek to restrain the movement of assets that have been identified as belonging to North Korea. Gerstein Decl. Ex. A (describing the hack at issue and noting that the "attacker" was "preliminarily identified as North Korea's Lazarus Group"). The proposed transfer of North Korean assets is slated to occur no later than June 13, 2026, 49 days from the original proposal date. Gerstein Decl. Ex. C at 4 ("Timeline"). However, recent comments have indicated that those involved may wish to expedite this transfer and modify the timeline so that the asset transfer may occur even earlier. Gerstein Decl. ¶¶ 7–9. Accordingly, so that Plaintiffs have an opportunity to serve the Restraining Notice (which operates as an injunction) before any transfer occurs and preserve the status quo, Plaintiffs respectfully request the Court grant the request as soon as possible. *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 76 ("Whether issued by a court or an attorney acting as an officer of the court, a restraining notice is an injunction." (quotation marks omitted)). Plaintiffs will then serve the Notice as soon as practicable after an order issues.

1

## PRELIMINARY STATEMENT

As this Court is aware, these related Actions are efforts by the victims of international terror attacks, including the Kim family, the Calderon-Cardona family, and the victims of the attacks giving rise to *Kaplan v. Democratic People's Republic of Korea* (collectively "Plaintiffs") to collect their judgments against crypto assets held by the perpetrators of those attacks and their state sponsors, Iran and North Korea.

On April 19, 2026, starting at 9:00 AM Pyongyang time, North Korean hackers used fraudulently created crypto assets as collateral in an automated lending protocol to borrow approximately $290 million worth of crypto assets. Approximately $71 million worth of those assets were transferred to a crypto service provider called Arbitrum, which is run by Garnishee Arbitrum DAO (standing for "decentralized autonomous organization"). On April 21, 2026, Arbitrum DAO, acting through its "security council," froze North Korean assets that Arbitrum DAO evidently planned to use to compensate people who loaned assets to North Korea backed by its worthless collateral. Meanwhile, a coalition of crypto businesses called "DeFi United" committed to make whole much of the bad collateral using outside funds. Accordingly, on April 25, 2026, Arbitrum DAO proposed to transfer the $71 million worth of North Korean assets to a wallet controlled by members of DeFi United for the ostensible purpose of defraying the cost of restoring the bad collateral. The transfer proposal will be put to a vote of Arbitrum DAO members on May 12, 2026, and voting will be complete on May 26, 2026. But Arbitrum DAO's Security Council is empowered to move the funds immediately and Arbitrum DAO participants appear to be considering that process, which necessitates this Court's urgent assistance.

The Plaintiffs will eventually seek turnover of the frozen North Korean assets, but first the Plaintiffs need to ensure that the assets remain frozen—instead of being transferred away to restore crypto lenders' bad debts, as Arbitrum DAO proposes to do—and so the Plaintiffs seek an order authorizing alternative service on Arbitrum DAO of necessary papers. Courts have uniformly held that DAOs relevantly identical to Arbitrum DAO are general partnerships. *Samuels v. Lido DAO*, 757 F. Supp. 3d 951, 960 (N.D. Cal. 2024); *Sarcuni v. bZx DAO*, 664 F. Supp. 3d 1100, 1109 (S.D. Cal. 2023). And so courts have routinely granted motions for alternative service on DAOs, *e.g.*, *Kim v. Railgun DAO*, 26-CV-179, ECF No. 7 at 1 (D.D.C. Feb. 9, 2026); *Samuels v. Lido DAO [Samuels II]*, No. 23-cv-06492-VC, 2024 U.S. Dist. LEXIS 170796, at *3 (N.D. Cal. June 27, 2024); *Commodity Futures Trading Comm'n v. Ooki DAO*, No. 22-cv-05416, 2022 U.S. Dist. LEXIS 228820, at *13 (N.D. Cal. Dec. 20, 2022), and have indeed *required* alternative service instead of service on alleged partners, *Samuels v. Lido DAO*, Trans. of Hearing, ECF No. 78 at 7, No. 23-CV-6492-VC (N.D. Cal., July 7, 2024).

Plaintiffs respectfully request that this Court promptly do the same and authorize alternative service. This will ensure that Arbitrum DAO is immediately on notice of Plaintiffs' attempt to restrain and eventually execute against these assets but will leave for another day the effect of that notice and the disposition of those assets. Plaintiffs respectfully request that this Court grant this motion as quickly as possible so that Arbitrum DAO does not transfer away North Korea's assets before receiving notice that doing so may violate Plaintiffs' rights.

3

## FACTS

Plaintiffs have previously described the background of this case, *see, e.g.*, 25-mc-527, ECF No. 4-1 at 4–5,[1] and the Ethereum blockchain and the market for crypto assets, *id.* at 5–6. This Motion thus begins with background on DAOs and then explains the facts giving rise to the property interests at issue here.

### A.     Background on Decentralized Autonomous Organizations

Ethereum blockchain users can create programs called "smart contracts," which, as their name suggests, automatically execute transactions when certain conditions are triggered. *E.g.*, ECF No. 4-10 (NIST report on blockchain technologies). These smart contracts can together create "protocols," which are the rough equivalent of software on a personal computer. *Id.* Some protocols allow for machine-executed borrowing, lending, and asset exchanges. *Id.* And together these protocols created something called "DeFi," or "decentralized finance," which uses blockchains ostensibly to remove third parties, like traditional banking institutions and regulators, from financial transactions. *Id.*

In the place of those traditional institutions, DeFi entrepreneurs created "DAOs" (pronounced "dows"), or "decentralized autonomous organizations." In a DAO, there is no formal corporate structure, no explicit liability protection, and no formalized distinction between, say, managers and directors. *E.g.*, *Samuels I*, 757 F. Supp. 3d at 957–58 (explaining founding of a DAO). Instead, holders of specific

---

[1] ECF references are to the *Kim* docket, No. 25-mc-527, unless otherwise specified.

tokens—such as the ARB token at issue here—have governance rights that allow them to suggest actions that the associated DAO will take. *Id.* at 958. Those suggestions are then voted on and implemented if the required number of tokenholders support the actions. *Id.* Actions include many of those typically done by corporate officers, boards, or employees, such as spending treasury funds to hire people; changing organizational goals and policies; and even distributing treasury assets to tokenholders, like how corporations can authorize distributions to owners. Holders of governance tokens thus may participate in the governance of a protocol and have a potential claim on its profits.

### B. Arbitrum DAO Freezes Assets in Its Possession That Belong to North Korea

The facts underlying this Motion begin with something called Kelp DAO, a "decentralized finance" protocol operating as a "bridge" between the Ethereum blockchain and at least 20 "Layer Two" blockchains. Gerstein Decl., Ex. A, Research Report, at 2.[2] The precise details are not necessary for this Motion (and will be explained in potentially excruciating detail in the Plaintiffs' forthcoming motion for turnover), but, briefly for now, a "Layer Two" blockchain is a software protocol that allows users to transact crypto assets more efficiently than Ethereum does and then later to record batches of those transactions to Ethereum. *Id.* One such blockchain is called Arbitrum. *See* ARBITRUM, docs.arbitrum.io (last accessed April 28, 2026, at 9:20 AM). Like other Layer Two blockchains, Arbitrum allows users to transact with each

---

[2] References to exhibits are to exhibits attached to the Gerstein Declaration filed with this Motion.

other quickly and inexpensively, *id.* (click "Arbitrum: introduction"), and then batches those transactions and records them to Ethereum, *id.* Kelp DAO, meanwhile, allows users to deposit crypto assets on Ethereum and trade convertible assets on Layer Two blockchains. Ex. A at 3**.**

Arbitrum was founded in 2018 by a New York–headquartered company called Offchain Labs. Ex. B, Offchain Labs' "Built in New York" Site. In 2023, though, Offchain Labs transferred control of Arbitrum to an organization called Arbitrum DAO, a supposedly decentralized autonomous organization governed by the holders of ARB, an Ethereum token. ARBITRUM GOVERNANCE, https://docs.arbitrum.foundation/gentle-intro-dao-governance (last accessed April 29, 9:00 AM). Any ARB tokenholder can propose a change to Arbitrum DAO's business by introducing an "AIP," for "Arbitrum Improvement Proposal," and that change will be implemented if, after a process lasting between 27 and 37 days, a majority of ARB voters approves. Ex. D, Constitution of Arbitrum DAO.

Every six months, Arbitrum DAO elects a "Security Council." *Id.* The Security Council is composed of 12 ARB-holders, and, if any nine of them vote to do so, they can "execute any software upgrade or perform other required actions with no delay in order to respond to a security emergency." *Id.* Arbitrum DAO's "constitution" provides that although any nine members of the Security Council *can* do this whenever they want, they *should* do this only "in a true security emergency, such as a critical vulnerability that could significantly compromise the integrity, confidentiality, or availability of a chain governed by the ArbitrumDAO." *Id.* at 8.

Although ARB tokenholders *can* introduce and approve anything they wish as an AIP, the Arbitrum Constitution provides "[n]o AIP may be in violation of applicable laws, in particular sanctions-related regulations." *Id.* at 3. And, although several legal entities associated with Arbitrum DAO have physical offices, Arbitrum DAO itself—operated, as it is, by holders of ARB, who may be anywhere—does not. Gerstein Decl. ¶ 1.

On April 19, North Korean hackers initiated a fraudulent transaction on Kelp DAO, which allowed them to create 116,500 rsETH, a crypto asset. Ex. A at 2. The hackers then deposited some of that rsETH as collateral into a lending protocol called Aave running on Arbitrum. *Id.* This transaction allowed the hackers to instantly borrow 29,782 wETH and 821 wstETH (both similar crypto assets whose value usually tracks that of Ethereum's native ETH) on Arbitrum. Even though North Korea's collateral was worthless, North Korea obtained ownership, not just possession, of the borrowed assets. *E.g.*, *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 930 (6th Cir. 2000) ("[I]f a thief steals funds and uses them to purchase other property the owner cannot follow the funds, and he is left to his remedy against the thief, who, although he had no title to the stolen funds, *does have title to the property purchased therewith*." (emphasis added) (citing and quoting *United States v. Brimberry*, 779 F.2d 1339, 1347–49 (8th Cir. 1985) (observing that "when an embezzler purchases property with stolen funds, the property may be subjected to a constructive trust in favor of the victim," but concluding that until this occurs, the victim merely has a claim to—rather than an interest in—such property)); *see also*

7

*United States v. Emor*, 785 F.3d 671, 679 (D.C. Cir. 2015) (explaining that perpetrator acquires title to property obtained by fraud). The lenders thus may have claims against North Korea for fraud, but they have no property interest in the wETH and wstETH North Korea borrowed on Arbitrum.

On April 21, 2026, after this transaction came to light, the Arbitrum Security Council voted to implement an emergency freeze on a batch of 30,766 ETH that the Council identified as belonging to the North Korean hackers and that were trading on Arbitrum. Ex. A at 9. "The funds are now in a frozen intermediary wallet that can only be moved by a subsequent governance vote of ARB tokenholders." *Id.*

The Security Council's plan appears to be to transfer these identified North Korean assets to DeFi businesses that have decided to use their own money to collateralize the bad debt. On April 25, 2026, Aave Labs (the company behind the Aave Protocol) and Kelp DAO, alongside other "decentralized finance" businesses collectively calling themselves "DeFi United," DEFI UNITED, defiunited.world (last accessed April 30, 8:50 AM), filed an AIP that, if passed, would take North Korea's 30,766 ETH and "route" it to a "coordinated recovery" process: "Aave service providers are working with the KelpDAO team . . . and other ecosystem parties on a recovery effort for rsETH [North Korea's worthless collateral] holders," the proposal reads, and "[t]his proposal is intended to route already-secured funds into that coordinated recovery process." Ex D, DeFi United AIP. The proposal further reads:

> Aave Labs, together with its affiliates, subsidiaries and successors-in-interest (collectively, "Aave Labs"), jointly and severally agree to unconditionally indemnify, defend, and hold harmless The Arbitrum Foundation, Offchain

8

Labs, Inc., the Arbitrum Security Council and each member thereof and each of their officers, directors, agents, employees, advisors, contractors, representatives, and successors (each, an "Indemnified Party") from and against any and all claims (including any claims brought by tokenholders, DAO participants, counterparties, or governmental authorities from any jurisdiction), regulatory inquiries . . . and expenses . . . known and unknown claims . . . or otherwise, directly or indirectly arising out of, arising from, resulting from or in connection with (1) the Arbitrum Security Council's action to freeze the 30,766 ETH being held in the address on Arbitrum One that was connected to the KelpDAO exploit at the time of such action and its movement to a new address ("Frozen ETH") [and] (2) the release and movement of the Frozen ETH to the designated recovery address pursuant to this proposal (the "Delivery").

*Id.*

## C.    Some Users Begin Asking For Immediate Transfer

The proposal is supposed to be discussed in the Arbitrum DAO governance forum for two weeks, and then it will be submitted "on chain" for 14 days of voting after a three-day waiting period. Ex. C at 4 ("Timeline"). If approved by ARB holders, the proposal will be implemented on June 13, 2026, which is 49 days from the proposal. *Id.*

As of this writing, commenters in the Arbitrum Governance forum are currently asking that Arbitrum move even faster, Gerstein Decl. ¶¶ 7–9, and, after all, the Security Council is empowered to move the funds whenever it wants to, Ex. D at 3. In response to a question about expediting the voting of ARB tokenholders, a commenter referenced "other means of expediting the process that I imagine may be under consideration," which may refer to a security council vote. Gerstein Decl. ¶ 8. Accordingly, it is possible that the assets could be moved even sooner than June 13.

9

## ARGUMENT

There are, by Arbitrum DAO's own accounting, 30,766 ETH belonging to North Korea or its agencies that (1) have been recently frozen on a blockchain controlled by Arbitrum DAO and (2) can be transferred elsewhere by Arbitrum DAO. The Plaintiffs, who hold hundreds of millions of dollars worth of judgments against North Korea, *see* ECF No. 1, seek to now restrain and eventually to turnover North Korea's ETH in Arbitrum DAO's possession to satisfy their judgments.

As a necessary first step, this Court should expeditiously grant Plaintiffs permission to use the proposed methods of alternative service to serve the restraining notice and other documents that begin this process. Serving the restraining notice will operate as an injunction that, if complied with, would prevent the transfer and preserve the status quo. *E.g., Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 76 ("Whether issued by a court or an attorney acting as an officer of the court, a restraining notice is an injunction and disobedience is punishable as a contempt of court." (quotation marks omitted)).

To be clear, the Plaintiffs do not ask this Court in this Motion to determine the *effect* of the papers they seek to serve. Rather, this Motion requests only that this Court authorize the Plaintiffs to serve those papers via alternative service, since the holder of the North Korean assets is a general partnership with no known registered agent or other traditional means of receiving legal process.

10

**A.     Plaintiffs May Restrain And Execute Against These Assets, And This Court May Order Alternative Service Of Relevant Documents**

The procedures for enforcing a judgment registered in this Court begin with the Federal Rules. Rule 69(a) directly incorporates New York law by providing that, absent a governing statute (which does not apply here), "the procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a). Those procedures, in turn, are specified in New York Civil Practice Law and Rules Article 52. Under Article 52, "those property interests of the judgment debtor 'which by law the debtor may assign or transfer, may be sought for application to the judgment.'" *All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 24 (2nd Cir. 1999) (citing David Siegel, *New York Practice*, § 486, at 742; *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674 (1976)). Where those interests are capable of being turned over by a third party—called a "garnishee"—who holds them on the judgment debtor's behalf, the judgment creditor's process begins by serving a writ of execution on the executing officer (in this case the U.S. Marshal), which establishes a lien over the judgment debtors' property. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991) ("Under New York law, a judgment creditor becomes a 'judgment lien creditor' as to personal property . . . after execution is delivered to the sheriff").

Where, as here, the property constitutes interests that cannot be picked up and carried by the sheriff—in other words, property "not capable of delivery"—the Marshal levies the property by serving the writ of execution that the judgment debtor

11

served on the Marshal on the garnishee. N.Y. C.P.L.R. § 5232. Absent exceptions not relevant here, the Marshal serves the writ of execution "in the same manner as a summons," i.e., in the same manner as a summons may be served under New York law. *Id.* If there are any disputes about whether the property belongs to the judgment debtor or whether the garnishee is capable of turning it over, the judgment creditor may file a motion for turnover, *see, e.g.*, ECF No. 4, or a motion under C.P.L.R. § 5239, which is "an all-inclusive tool for the settlement of almost any problem that may arise in connection with the enforcement of money judgments," *Herman v. Siegmund*, 415 N.Y.S.2d 681, 682 (2d Dep't 1979), specifically to "determine rights in the property" at issue in the turnover motions, N.Y. C.P.L.R. § 5239. Such filings occur after the writ of execution is served, and the judgment creditor may then serve the turnover motion and subsequent papers as any other motion would be served. *E.g.*, *Harrison v. Republic of Sudan*, 802 F.3d 399, 406 (2d Cir. 2015) ("Service of . . . post-judgment motions . . . [i]s required to adhere only to the notice provisions of the federal rules . . . . [under which a] 'paper is served' by 'mailing it to the person's last known address—in which event service is complete upon mailing.'" (quoting Fed. R. Civ. P. 5(b)(2)(C)).

Meanwhile, an attorney for the judgment creditor may, as an officer of the court, issue a restraining notice, which operates as a court order forbidding the garnishee to "to make or suffer any sale, assignment or transfer of, or any interference with, any such property" in which the judgment debtor has an interest. N.Y. C.P.L.R.

12

§ 5222(b). A restraining notice may be served by certified or registered mail or "in the same manner as a summons." *Id.* (a).

Under state law and Federal Rules, where service by ordinary means is impracticable, this Court may authorize alternative service of a summons and, therefore, of a restraining notice or motion. *See* Fed. R. Civ. P. 4(f)(3) (so authorizing); N.Y. C.P.L.R. § 308(5) (also authorizing alternative service). This Court may authorize service by any means reasonably calculated to give actual notice of the action. *See, e.g.*, *Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002) (holding that service under Rule 4(f)(3) must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

### B.    Alternative Service of The Restraining Notice And Forthcoming Motion Is Appropriate Here

First, the Plaintiffs seek authorization to serve Arbitrum DAO with the attached restraining notice, which the Plaintiffs are permitted to serve as they would serve a summons under New York law and which would operate as an injunction to prohibit the transfer, C.P.L.R. § 5222(a). Second, the Plaintiffs seek authorization from this Court to use the same means to serve any motion for turnover they seek to file in the future even though such a motion need only be served as required by Rule 5.

DAOs like Arbitrum DAO have been held to be general partnerships, *e.g. Samuels*, 757 F. Supp. 3d at 960, *Sarcuni*, 664 F. Supp. 3d at 1109, and Arbitrum

13

DAO is no exception: it is a general partnership. And, like other DAOs, Arbitrum DAO has not designated a registered agent for service of process, has no publicly listed physical headquarters, and has no publicly listed officers, directors, or partners. Gerstein Decl. ¶ 1. In similar circumstances, all courts to have considered the issue (to counsel's knowledge) have granted requests for alternative service on DAOs. *E.g.*, *Kim v. Railgun DAO*, No. 26-CV-179, ECF No. 7 at 2; *Samuels v. Lido DAO*, No. 23-cv-06492-VC, 2024 U.S. Dist. LEXIS 170796, at *3 (N.D. Cal. June 27, 2024); *Commodity Futures Trading Comm'n v. Ooki DAO*, No. 22-cv-05416, 2022 U.S. Dist. LEXIS 228820, at *13 (N.D. Cal. Dec. 20, 2022).

This Court should do the same. As explained below, this Court should authorize the Plaintiffs to serve the restraining notice and forthcoming motion by posting those documents to the Arbitrum DAO governance forum and, for good measure, notifying alleged Arbitrum DAO partners and mailing copies to the addresses of legal entities associated with the DAO. This is the most practicable way to ensure that those involved with the governance of the DAO will be apprised of legal documents served on the DAO.

### C. The Proposed Methods of Service Will Reasonably Ensure Actual Notice of the Restraint, Execution, And Motions

Means of alternative service must be reasonably calculated to put the recipient on notice of the content of the document. *Samuels II*, 2024 U.S. Dist. LEXIS 170796, at *3. The Plaintiffs propose to serve the papers described in this motion by (a) posting them to Arbitrum DAO's governance forum specifically as a response to the proposal to transfer North Korea's assets to Aave and its collaborators; (b) mailing copies of

14

the papers to the Arbitrum Foundation and Offchain Labs, legal entities that do not control Arbitrum DAO but may facilitate notice; and (c) mailing copies to several companies that are currently members of the Security Council or large holders of ARB tokens and emailing copies to attorneys for those companies.

Together, these means are clearly sufficient to notice Arbitrum DAO of the restraint on its permissible ability to transfer North Korea's assets and of the Plaintiffs' eventual attempts to collect those assets. Arbitrum DAO members use the governance forum to discuss business decisions and, indeed, are currently using it to discuss the decision to transfer the assets at issue in this case. Gerstein Decl. ¶¶ 7–9. Posting the documents there will, therefore, give Arbitrum DAO notice of those documents. *Id.* ("As another court in this district has already held, service on a DAO by posting to the Governance Forum is reasonably likely to put the DAO on notice of ongoing litigation." (citing *Ooki DAO*, 2022 U.S. Dist. LEXIS 228820, at \*13)). The remaining methods of service are therefore unnecessary but may help to bring prompt notice of the restraint to the attention of the DAO.

### D.    Alternative Service of The Writ of Execution Is Appropriate

Finally, the Plaintiffs seek leave to serve a writ of execution directly on Arbitrum DAO, as they have previously sought leave to serve Garnishee Tether International *S.A. de C.V.* ECF Nos. 13, 24. Although it remains Plaintiffs' belief that New York law authorizes service of a writ of execution on Arbitrum DAO by directing the Marshal of this Court to serve the Secretary of State of New York, *compare* ECF No. 13 at 12–15, given the Marshal's stated resistance to this means of service, ECF No. 24 at 1, the Plaintiffs respectfully submit that alternative service of the writ of

execution in the same manner as the restraining notice is appropriate, *id.*

## CONCLUSION

For the foregoing reasons, this Court should grant the Plaintiffs' motion for alternative service on Arbitrum DAO.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1629 Columbia Road NW, Suite 302
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
401 Park Ave. S. 10th Floor
New York, NY 10016
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that the forgoing motion contains 4,195 words using Microsoft's word count tool.

/s/ Jason Harrow

17