UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAN KIM, et al., Plaintiffs,<br><br>*v.*<br><br>THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, a.k.a. NORTH KOREA, Defendant<br><br>~~~<br><br>IN RE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, et al.<br><br>~~~<br><br>RUTH CALDERON-CARDONA, et al., Plaintiffs,<br><br>*v.*<br><br>THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, et al., Defendants<br><br>&<br><br>ARBITRUM DAO,<br>Garnishee (as to all cases) | Case Nos.    25-MC-527-MMG<br>26-MC-033-MMG<br>26-MC-094-MMG<br><br>**ORAL ARGUMENT REQUESTED** |

**NON-PARTY AAVE LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO FRCP 69 AND CPLR 5240 TO VACATE THE RESTRAINING NOTICE SERVED ON ARBITRUM DAO**

Jason Gottlieb
Michael Mix
Daniel Isaacs
Genny Ngai
William Roth
Vani Upadhyaya
Emma McGrath
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022
212-735-8600
*Attorneys for Aave LLC*

i

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................................. 1

RELEVANT BACKGROUND............................................................................................... 6

    A.    The Aave Protocol, Its Users, and Its Relation to Arbitrum .............................. 6

    B.    The rsETH Incident.............................................................................................. 7

    C.    The Deleterious Effects of the April 18 Exploit and the Global DeFi Community's Coordinated Recovery Efforts For the Aave Protocol Victims.......................... 8

    D.    Plaintiffs' Restraining Notice Against the Immobilized Assets ....................... 10

ARGUMENT.........................................................................................................................11

    I.  The Restraining Notice Improperly Restrains Assets That Belong to Aave Protocol Victims, And It Must Be Vacated Pursuant to CPLR 5240................................. 14

        A.    The Assets Were Temporarily Held by the Thief, Who Did Not Acquire Legal Possession During That Time ................................................................... 15

        B.    Even if The Thief Had Temporary Possession, The Assets Were Then Recovered by a Good Samaritan, Depriving the Thief of Possession ............................ 17

        C.    Plaintiffs Represented That the Thief Was Their Judgment Debtor, but That Unproven Conjecture Is Insufficient to Uphold the Restraining Notice in the Face of a Challenge............................................................................................ 18

    II. Vacatur of the Restraining Notice Is Necessary to Prevent Unreasonable Prejudice and Unjust Consequences to the Aave Protocol Victims, and the Broader Global Digital Assets Community .............................................................................................. 18

    III.   The Restraining Notice Should Be Immediately Vacated to Prevent Immediate and Irreparable Harm ............................................................................................... 21

CONCLUSION.................................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

### STATE CASES

*Cascade Automatic Sprinkler Corp. v. Chase Manhattan Bank (Nat'l Ass'n)*,
   60 A.D.2d 901 (2d Dep't 1978) ..................................................................................14

*Claymont v. Levitt,*
   140 A.D.2d 578 (2d Dep't 1988) .................................................................................13

*Costello v. Casale*,
   39 A.D.3d 797 (2d Dep't 2007) ...................................................................................18

*Distressed Holdings, LLC v. Ehrler*,
   113 A.D.3d 111 (2d Dep't 2013) .................................................................................11

*Friedman v. Mayerhoff*,
   156 Misc. 2d 295 (N.Y. Civ. Ct. Kings Cnty. 1992) ...................................................14

*Guardian Loan Co. v. Early*,
   47 N.Y.2d 515 (1979) ..................................................................................................11

*Paz v. Long Island R.R.*,
   241 A.D.2d 486 (2d Dep't 1997) .................................................................................18

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*,
   37 N.Y.3d 591 (2021) ..................................................................................................12

*Sanders v. Mfrs. Hanover Trust Co.*,
   229 A.D.2d 544 (2d Dep't 1996) .................................................................................19

*Save Way Oil Co. v. 284 E. Parkway Corp.*,
   115 Misc. 2d 141 (N.Y. Civ. Ct. Kings Cnty. 1982) ..................................................13

*In re Stein's Estate*,
   60 Misc. 2d 544 (N.Y. Sur. Ct. Westchester Cnty. 1969) ..........................................14

*Sumitomo Shoji New York, Inc. v. Chemical Bank New York Trust Co.*,
   47 Misc. 2d 741 (Sup. Ct. N.Y. Cnty. 1965), *aff'd mem.*, 25 A.D.2d 499 (1st
   Dep't 1966) ..................................................................................................................12

*Taag Designs, Inc. v. Grant*,
   46 Misc. 2d 505 (N.Y. Sup. Ct. Kings Cnty. 1965)....................................................14

## FEDERAL CASES

*Acmetel USA LLC, v. PTGi Intl. Carrier Services Inc.,*
2024 WL 4467174 (S.D.N.Y. Oct. 10, 2024) ....................................................................16, 20

*AG Worldwide v. Red Cube Mgmt. AG,*
2002 WL 417251 (S.D.N.Y. Mar. 15, 2002) ...........................................................................12

*Havlish v. Hegna,*
673 F. App'x 34 (2d Cir. 2016) ...............................................................................................14

*Heiser v. Islamic Republic of Iran,*
735 F.3d 934 (D.C. Cir. 2013) .................................................................................................15

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,*
295 F. Supp. 2d 366 (S.D.N.Y. 2003)......................................................................................13

*Kitchen v. Boyd (In re Newpower),*
233 F.3d 922 (6th Cir. 2000) ...................................................................................................15

*Samuels v. Lido DAO, et al.*
757 F.Supp.3d 951 (N.D. Cal. 2024).......................................................................................10

*Sarcuni v. bZx DAO,*
664 F.Supp.3d 1100 (S.D. Cal. 2023)......................................................................................10

*S.E.C. v. Pentagon Cap. Mgmt. PLC,*
2013 WL 5815374 (S.D.N.Y. Oct. 29, 2013) .........................................................................20

*Smart Study Co. v. Bichha123,*
505 F. Supp. 3d 322 (S.D.N.Y. 2020)......................................................................................22

*U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.,*
775 F.3d 128 (2d Cir. 2014).....................................................................................................22

*United States v. Brimberry,*
779 F.2d 1339 (8th Cir. 1985) .................................................................................................15

*United States v. Emor,*
785 F.3d 671 (D.C. Cir. 2015)..................................................................................................16

## STATUTES & RULES

CPLR 5222................................................................................................................... *passim*

CPLR 5240................................................................................................................... *passim*

Fed. R. Civ. P. 69.....................................................................................................................1, 20

Interested non-party Aave LLC ("Aave LLC") respectfully moves this Court pursuant to Federal Rule of Civil Procedure 69 and New York Civil Practice Law and Rules (CPLR) Section 5240 for an emergency order to (i) immediately vacate the Restraining Notice to Arbitrum DAO that the Court permitted Plaintiffs to serve on Arbitrum DAO via alternative means (Dkt. No. 34); (ii) if the Court is minded to hear Plaintiffs further, to schedule an expedited briefing and hearing schedule on Aave LLC's emergency application but grant a temporary vacatur of the Restraining Notice in the interim pending the decision on Aave LLC's motion; (iii) if the Court is not minded to immediately vacate the Restraining Notice, to schedule an expedited briefing and hearing schedule on Aave LLC's emergency application, and require Plaintiffs to post a cash bond immediately, in an amount no less than $300 million, as a condition to maintaining the Restraining Notice; and (iv) for such other and further relief as is just and proper.[1]

## PRELIMINARY STATEMENT

Plaintiffs' Restraining Notice against Arbitrum DAO stems from their underlying lawsuits against North Korea. Plaintiffs' grievances against North Korea may well be righteous. But Aave LLC emphatically rejects the notion that those grievances can be lawfully addressed by restraining and seizing assets that belong to completely blameless third parties – namely, users of the Aave software protocol (the "Aave Protocol"), who are wholly unconnected to any alleged wrongdoing, and who have no known relationship to North Korea.

---

[1] Aave LLC appears solely for the limited purpose of seeking the relief requested. By filing this motion, Aave LLC does not waive, and expressly reserves, any and all defenses available to it, including but not limited to defenses based on lack of personal jurisdiction and improper venue that may apply to it, or to any of its affiliates. In addition, Plaintiffs assert that their Restraining Notice was properly served, but Aave LLC disputes that contention. In particular, Aave LLC does not believe that the Arbitrum DAO is a juridical entity – let alone a partnership – capable of being served with legal process. Serious questions therefore exist as to whether service was effective as against the Immobilized Assets (defined below). Without seeking to litigate service issues in the present motion, Aave LLC expressly preserves all objections to service and leaves any dispute regarding the validity or effect of service to be addressed, if necessary, by the parties directly concerned with enforcement.

Here's what happened, in a nutshell:  a thief stole approximately $180 million (at the time of the exploit) worth of cryptocurrency assets from the Aave Protocol.  Those assets belonged to an unknown (but significant) number of users of the Aave Protocol software who had done nothing more than to deposit their assets to earn interest.  Some individuals associated with the Arbitrum "Layer 2" blockchain community were able to prevent the thief from escaping with the full value and intercepted $71 million worth of those assets; the Arbitrum community was in the process of returning those assets to Aave, so that Aave could make affected users whole.

Then, Plaintiffs in this case showed up, contending – based on conjecture from posts on the internet – that the thief was North Korea, and that by stealing the assets for a few hours, North Korea somehow became the rightful owner of those assets such that Plaintiffs here could restrain them for their own purposes.  Plaintiffs convinced this Court to serve a Restraining Notice on "Arbitrum DAO," an undefined group of people, thus preventing the return of the assets to their rightful owners, and endangering hundreds of millions (and perhaps billions) of dollars of value belonging to blameless third parties.

To avoid catastrophic injuries to the Aave Protocol, its users, and the DeFi system writ large, Aave LLC seeks immediate vacatur of the Restraining Notice.

In more detail:  on May 1, 2026, Plaintiffs, through their counsel Gerstein Harrow LLP ("Gerstein Harrow") obtained permission from this Court to serve a Restraining Notice, writ of execution, and a forthcoming turnover motion, against Arbitrum DAO.  Specifically, the Restraining Notice purports to restrain approximately $71 million worth of frozen Ethereum (ETH) that Plaintiffs contend are in Arbitrum DAO's control (the "Immobilized Assets") on the theory that these assets belong to, or are owned by, North Korea.  Plaintiffs claim that because

2

they have unpaid money judgments against North Korea, they are now entitled to restrain the Immobilized Assets to satisfy judgments obtained against North Korea many years ago.

The allegations in the Restraining Notice and Plaintiffs' motion for alternative service are incorrect, misleading, and unsupported by any verifiable fact or evidence. The Immobilized Assets do not belong to North Korea or any affiliated entities. Instead, the Immobilized Assets belong to *the users of the Aave Protocol*, who were victimized when a third-party thief effectively stole their assets during a cyber exploit on April 18, 2026. Since the exploit, teams from the Aave Protocol community, the Arbitrum community, and others in the DeFi community worldwide have worked frantically around the clock, in an effort that became known as "DeFi United," to return the Immobilized Assets and other value to the Aave Protocol victims, to restore stability and security to the Aave Protocol and other protocols in the decentralized finance ecosystem, and to ensure that similar exploits do not occur in the future.

In the midst of the DeFi community's coordinated recovery efforts to aid the victims of the April 18, 2026 cyber exploit, Plaintiffs filed the Restraining Notice against the Immobilized Assets. Gerstein Harrow's declaration claimed that because some on the internet surmised that the hacker may have been associated with the Lazarus Group, "North Korea obtained ownership, not just possession, of the borrowed assets," and the Immobilized Assets were therefore subject to restraint to satisfy Plaintiffs' judgments. Dkt. No. 33, at 7.

So this is Plaintiffs' theory: suppose that a thief who happened to be a judgment debtor walked into Tiffany's, smashed a jewelry case, and grabbed three diamonds – but was then intercepted by a Good Samaritan bystander while on his way out the door, who managed to grab one of the stolen diamonds back before the thief escaped. Plaintiffs assert that the thief "owns" that diamond, such that the thief's judgment creditor is permitted to restrain *Tiffany's* from using

3

or selling that one recovered diamond, and that judgment creditor is entitled to seize that recovered diamond that very clearly and obviously belongs to Tiffany's. Plaintiffs' theory defies logic, common sense, and the law.

As applied here, Plaintiffs' novel theory threatens to harm countless blameless third parties, and it compounds the already-significant harm arising from the April 18, 2026 exploit – harm that Aave LLC and other actors are working tirelessly to resolve, through, among other channels, the Arbitrum DAO voting process that Plaintiffs have now interrupted. What Plaintiffs fail to mention – presumably because it would give the Court significant pause with respect to any of Plaintiffs' requested relief – is that the theft from the Aave Protocol has caused a myriad of direct and indirect harms (including resulting liquidity constraints) that have rippled through the DeFi community, which need to be mitigated and addressed ***immediately***, with as much speed as possible.

If the Immobilized Assets remain subject to a freeze and are not made available to restore value to the Aave Protocol users, the entire DeFi ecosystem risks being destabilized. While Aave Protocol users cannot retrieve their assets from the Aave Protocol, if those assets were being used for collateral for other positions elsewhere (a common occurrence in finance as a whole, and DeFi specifically), then continued restraint on the Immobilized Assets may render those Aave Protocol users unable to meet their related collateral obligations. Thus, by restraining the victims' assets and premising the Restraining Notice on speculative theories that the Immobilized Assets are somehow owned by North Korea, Plaintiffs' efforts are causing time-sensitive, irreparable harm to Aave Protocol users, to the Aave Protocol operations, and to a larger decentralized finance community – none of which can be later cured by monetary damages.

Beyond this immediate risk, Plaintiffs' approach, if adopted, would lead to unconscionable incentives. Specifically, it would disincentivize any recovery effort concerning an exploit

4

allegedly associated with North Korea or any other actor subject to default judgments. No one would dare to stop a thief from stealing funds or property if the reward for being a Good Samaritan was a legal battle with the thief's judgment creditors over whose interests over the stolen property was valid or superior. In fact, Plaintiffs' theory would *encourage* hostile actors with judgments against them, including hostile state actors, to engage in further thefts, if assets stolen in those exploits could be used to satisfy past judgments, or even simply to inflict costly legal battles on innocent third parties for political gain.

Time is of the essence. *Immediate* vacatur of the Restraining Notice is warranted here. Absent an immediate vacatur, Plaintiffs and their counsel have effectively helped themselves to the equivalent of a temporary restraining order without even attempting to meet any of the criteria so required. The situation does not allow a "freeze of the current status quo" for weeks, or even days, to have an evidentiary hearing before the Restraining Notice is vacated. The Restraining Notice is causing immediate harm, right this very moment, to blameless third parties based on (1) their unsupported conjecture that the thief in this case is the very same governmental entity against whom they have a judgment, and (2) their flatly wrong legal theory that a momentary theft triggers possession rights such that the thief can satisfy his judgments through that momentary robbery, at the expense of the victims of that theft.

In light of the above exigencies, we respectfully urge the Court to grant an immediate vacatur of the Restraining Notice. If the Court wishes to schedule an expedited hearing on this matter, the Restraining Order should be vacated in the interim. And if for some reason the Court decides to re-instate or maintain that Restraining Notice, Aave requests that as a condition of that Restraining Notice, Plaintiffs immediately post a cash bond in the amount of damage that their Restraining Notice is likely to cause: $300 million. Absent such measures, irreparable harm is

about to occur to an untold number of users of the Aave Protocol, who have already been victimized. Plaintiffs should not be allowed to re-victimize those users.

**RELEVANT BACKGROUND**

**A. The Aave Protocol, Its Users, and Its Relation to Arbitrum**

Aave LLC is a software development and services company that contributes to the open-source software known as the Aave Protocol. May 3, 2026 Declaration of Luigi DeMeo ("DeMeo Decl.") ¶10. The Aave Protocol, however, is not a company or legal entity. *Id.* It is a decentralized, open-source system of smart contracts deployed on public blockchains. *Id.* Blockchains are distributed digital ledgers maintained by a decentralized network of computers around the world. *Id.* ¶¶11-12. The Aave Protocol has been deployed on Ethereum and other public blockchains such as Arbitrum. *Id.*

Aave Protocol users are located throughout the world, and anyone may interact directly with the blockchains on which the Aave Protocol is deployed using their own digital wallet. *Id.* Critically, users interacting with the Aave Protocol supply digital assets and borrow digital assets using their own wallets and their own funds. *Id.* ¶¶11-14. For example, users may supply one eligible digital asset to the Aave Protocol as collateral and borrow a different digital asset against that collateral. Such transactions execute automatically on-chain once protocol conditions are met, without requiring the approval, intervention, or control by Aave LLC or any other company. *Id.* ¶13. Neither Aave LLC nor any other third-party custodies users' assets or directs users' transactions. *Id.* ¶11. Instead, any changes to the configurable parameters of the Aave Protocol occur only through decentralized, on-chain governance processes involving a global community of participants, and users' transactions execute directly on-chain once protocol conditions are met. *Id.*

6

### B. The rsETH Incident

Kelp is a decentralized "restaking" protocol within the Ethereum ecosystem that enables users to stake Ethereum (ETH) and receive a "liquid restaking token" known as rsETH. *Id.* ¶17. rsETH is designed to represent a user's staked ETH position, together with accrued staking rewards, while remaining transferable and usable within decentralized finance protocols. *Id.* ¶¶18-19. In ordinary operation, rsETH is intended to be redeemable or economically backed by ETH that is staked or locked within Kelp's underlying system, subject to the protocol's rules and risk parameters. *Id.* ¶18. To allow rsETH to move across different blockchain networks, Kelp relies on a cross-chain bridge architecture provided by LayerZero. In the case of rsETH, the bridge operated on a "lock-and-mint" model: rsETH is locked in an adapter contract on Ethereum, and a corresponding amount of rsETH is minted on another supported chain where the user wishes to receive it. To move rsETH back to Ethereum, the remote chain rsETH is burned, and the adapter on Ethereum releases the corresponding amount of locked rsETH on Ethereum. For this system to function safely, the amount of rsETH locked or accounted for on Ethereum must be at least equal to the total amount of rsETH circulating across all connected chains. *Id.* ¶19.

On April 18, 2026, a failure occurred in the rsETH cross-chain bridge when a forged cross-chain message caused 116,500 rsETH to be released from the Ethereum-side bridge adapter without any corresponding source-side burn. The result was rsETH that appeared valid on-chain, but was not fully backed by rsETH held in the Ethereum adapter. *Id.* ¶21. The hacker then used that rsETH as collateral on the Aave Protocol to remove – essentially steal – approximately $230 million worth of a different cryptocurrency, ETH, from the Aave Protocol. *Id.* ¶¶26-28; *see also* May 4, 2026 Declaration of Jason Gottlieb ("Gottlieb Decl.") ¶ 10, Exhibit A. That ETH belonged

to some unknown (but large) number of blameless third-party users of the Aave Protocol, who had supplied that ETH to the Aave Protocol to earn interest on it.  *Id.* ¶28.

However, the hacker was not wholly successful.  Persons associated with the Arbitrum Layer 2 blockchain were able to take back approximately $71 million worth of ETH and transfer it to a different address.  *Id.* ¶35.  As discussed further below, a widespread community of individuals associated in various ways with the Arbitrum Layer 2 blockchain are currently collaborating and contemplating the return of the $71 million to their rightful owners – the users of the Aave Protocol.  However, the Restraining Notice now seeks to restrain these assets and subject them to future turnover to the Plaintiffs.  *Id.* ¶¶36-37.

To date, the identity, nationality, and affiliation of the person or persons who initiated the rsETH-related April 18 exploit remains unknown.  Although Plaintiffs' motion and accompanying declaration cites to an online article identifying that the attacker behind the incident was "preliminarily identified as North Korea's Lazarus Group," Dkt. No. 33-2, at ¶ 2, Ex. A, there has been no official admission by the Lazarus Group or North Korea, or any independent verification or corroboration of this alleged attribution.

C. **The Deleterious Effects of the April 18 Exploit and the Global DeFi Community's Coordinated Recovery Efforts For the Aave Protocol Victims**

The harm to Aave Protocol users and the collateral consequences to the decentralized finance ecosystem stemming the April 18 incident cannot be overstated.   First, the influx of unbacked rsETH into the system immediately devalued each individual rsETH in the system. DeMeo Decl. ¶23.  Second, the use of unbacked rsETH as collateral created a large shortfall across the Aave Protocol, estimated in the hundreds of millions, depending on how those losses were allocated.  *Id.* ¶33.  These losses were borne by blameless Aave Protocol users who had supplied liquidity to the affected markets and who had no involvement in the underlying incident.  *Id.* ¶¶34,

40, 47.

But that was not all.  Affected lending markets came under extreme strain, and in some cases, all available liquidity was exhausted, meaning any user who wanted to withdraw their assets could not do so.  *Id.* ¶32.  That meant that if these blameless third-party users were using their staked ETH as collateral for any other position they held, but they then could not withdraw that ETH, there was a danger that these other positions could be liquidated.  *Id.* ¶¶28-30.  In a worst-case scenario, such liquidations could cause a chain reaction of other liquidations, causing untold damage to cryptocurrency markets worldwide.  *Id.* ¶34.

Confronted with these potential consequences, Aave LLC (and others) immediately undertook coordinated efforts to stem the harm caused by the April 18 exploit.  After the exploit, the Aave Protocol activated built-in safeguards and the Aave Protocol markets involving rsETH were frozen to stop further damage while the situation was evaluated.  *Id.* ¶32.

On April 21, 2026, the Arbitrum Security Council also froze the 30,765.6675 ETH, valued at approximately $71 million, associated with the rsETH incident – the Immobilized Assets – and transferred those digital assets to a designated address so that the Immobilized Assets could be used to restore rsETH's backing and improve conditions for the blameless affected users of the Aave Protocol.  *Id.* ¶¶35-37.  Only by applying the Immobilized Assets toward restoring rsETH's backing will the outstanding impairment affecting the Aave Protocol users, and users across the broader decentralized finance ecosystem, be reduced.  *Id.*

In addition to the above remedial measures, for the last two weeks, the global digital assets community has engaged in ongoing, daily, round-the-clock efforts to help restore the backing that could allow the affected blameless Aave Protocol users to withdraw their funds.  Other projects, companies, and individuals around the world have contributed ETH to the recovery efforts, in an

effort that became known as the "DeFi United" movement.  These coordinated ongoing efforts reflect the critical importance of restoring rsETH's backing on the Aave Protocol and the exigency of the recovery work: once cascading liquidations, sustained liquidity outflows, or prolonged withdrawal constraints take hold, their effects are not reversible or capable of full remediation.  *Id.* ¶42.  The Arbitrum community has publicly expressed its intent to restore the Immobilized Assets to Aave Protocol users within days.  *Id.* ¶37.  However, the Restraining Notice has now halted and jeopardized all of these recovery efforts.

### D.  Plaintiffs' Restraining Notice Against the Immobilized Assets

Despite the losses incurred by the Aave Protocol victims as a result of the April 18 exploit and the immense recovery efforts by the global digital assets community to restore the victims' losses, on May 1, 2026, Plaintiffs obtained permission from the Court to serve a Restraining Notice, writ of execution, and a forthcoming turnover motion by alternative service on Arbitrum DAO.[2]

To be clear, the objective of the Restraining Notice against Arbitrum DAO is not to aid in the global recovery efforts to help the Aave Protocol victims.  Instead, it does the opposite.  The Restraining Notice purports to freeze the $71 million in Immobilized Assets – the same assets that are needed to restore rsETH's backing for the benefit of the Aave Protocol victims – on the theory that the Immobilized Assets are somehow "North Korean assets" and should be applied towards

---

[2]     In their motion to this Court seeking emergency service of a Restraining Notice on "Arbitrum DAO," Plaintiffs asserted that "DAOs like Arbitrum DAO have been held to be general partnerships," Dkt. No. 33 at 13 (citing *Samuels v. Lido DAO,* 757 F.Supp.3d 951 (N.D. Cal. 2024) and *Sarcuni v. bZx DAO*, 664 F.Supp.3d 1100 (S.D. Cal. 2023)).  That assertion is flatly false.  Neither of those cases, nor any other contested case, has determined that a DAO was a general partnership, much less that *all* DAOs are general partnerships.  At most, cases have shown that on a motion to dismiss under the plaintiff-friendly standards of Rule 8, it is *plausible* that a certain DAO *might* be found to be a partnership after discovery, based on its individual characteristics.  But Plaintiffs are simply misrepresenting the law to "pull a fast one" on this Court.

Plaintiffs unpaid money judgments against North Korea. *See* Restraining Notice, Dkt. No. 33-7, (seeking to prohibit Arbitrum DAO from allowing "any sale, assignment, transfer or interference with any property in which the Democratic People's Republic of Korea, a/k/a North Korea, has or is known or believed to have an interest").

*     *     *

In sum, Aave LLC and related parties have spent the past two weeks working to mitigate the unprecedented harm of a third-party attack on the Aave Protocol and its users, including by recovering the Immobilized Assets. There are now plans in place, including through the Arbitrum DAO, to help Aave Protocol's blameless users recover their stolen assets, but the Plaintiffs' Restraining Notice has completely jeopardized all of these remedial efforts, and threatened the viability of Aave LLC's platform going forward. Against this backdrop, the Restraining Notice cannot stand. The Immobilized Assets belong to Aave Protocol users and any restraint on these third-party assets is improper and must be vacated.

## ARGUMENT

Pursuant to CPLR 5240, the Court "may at any time, on its own initiative or the motion of any interested person, and upon such notice as it may require, make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure." CPLR 5240 "grants the courts broad discretionary power to control and regulate the enforcement of a money judgment under Article 52 to prevent 'unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts.'" *Guardian Loan Co. v. Early*, 47 N.Y.2d 515, 519 (1979). Courts have "substantial authority to order equitable relief," *Distressed Holdings, LLC v. Ehrler*, 113 A.D.3d 111, 120 (2d Dep't 2013), and "craft flexible and equitable

11

responses" to protect against undue harassment and prejudice. *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 37 N.Y.3d 591, 601 (2021).

Critically, when a restraining notice is challenged, courts evaluate whether the notice complies with CPLR 5222, which authorizes restraints **only** on property in which the judgment debtor has an "interest." Subdivision (b) of CPLR 5222 provides, in pertinent part:

> A restraining notice served upon a person other than the judgment debtor is effective **only** if, at the time of service … **he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor has an interest**, or if the judgment creditor has stated in the notice … that the judgment debtor has an interest in specified property in the possession or custody of the person served.

(emphasis added). Where the restrained property belongs to a third party, or where the judgment debtor's connection to the property is merely indirect, contingent, or speculative, the restraining notice is ineffective as a matter of law and must be vacated. Courts have held that restraining notices "only reach property and debts with such a connection to the judgment debtor" and are ineffective where the garnishee does not possess property in which the debtor has a legally cognizable interest. *AG Worldwide v. Red Cube Mgmt. AG*, No. 01 Civ. 1228, 2002 WL 417251, at *8 (S.D.N.Y. Mar. 15, 2002). Put differently, "[i]f the third parties do not have property or debts in which the judgment debtor has an interest, the restraining notices are not effective." *Id.* "If the notices are ineffective, respondents cannot violate them." *Id.*

To the extent a judgment debtor claims "interest" in the restrained property, New York law requires that the debtor's interest be direct and presently leviable, and not derivative or inferential. *See Sumitomo Shoji New York, Inc. v. Chemical Bank New York Trust Co.*, 47 Misc. 2d 741, 263 (Sup. Ct. N.Y. Cnty. 1965), *aff'd mem.*, 25 A.D.2d 499 (1st Dep't 1966) (explaining that a judgment debtor's "interest" in property under CPLR 5222 "must be understood to mean a direct interest in the property itself which, while it may require a court determination, is leviable and not

12

an indirect interest in the proceeds of the property."). In *Claymont v. Levitt*, the Appellate Division vacated a restraint where, after the recipient challenged the restraining notice, the creditor relied on a "vague, nonspecific" assertion that certain property belonged to the debtor, holding that such conjecture did not satisfy the creditor's burden of showing a restrainable interest. 140 A.D.2d 578 (2d Dep't 1988); *see also Save Way Oil Co. v. 284 E. Parkway Corp.*, 115 Misc. 2d 141, 143 (N.Y. Civ. Ct. Kings Cnty. 1982) ("the affidavits posit no identity of interest between the judgment debtors and the individuals whose bank accounts were restrained, nor have fraudulent conveyances been established. Thus, there is no certainty of the debt … In sum, no event or condition which would justify the issuance of these restraining notices has been set forth.").

Thus, CPLR 5222 does not permit restraints based on conjecture or the mere possibility that assets might someday be found attributable to the judgment debtor. Nor does the statute permit assets of third parties to be restrained "in anticipation of a finding that those third parties are alter egos or hold assets of alleged alter egos of the judgment debtor." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 366 (S.D.N.Y. 2003). Allowing restraints based on such rampant speculation would not only exceed the text of CPLR 5222, but would also "pose significant due process problems." *Id.*

Consistent with these principles, third parties affected by restraining notices have standing when their property or rights are impacted, and New York courts have repeatedly vacated restraining notices where the property restrained belongs to third parties, and not to the judgment debtor. *See Save Way Oil Co.*, 115 Misc. 2d at 142 (orders to show cause were brought seeking to vacate restraining notices issued against bank accounts of persons who were not judgment debtors); *JSC Foreign Econ. Ass'n Technostroyexport*, 295 F. Supp. 2d at 393 (holding that the restraining notices were improper "to the extent that [they] affect solely the property of [third

13

parties]," and emphasizing that CPLR 5222 "may not be used as an end-run around the requirements of the prejudgment attachment statutes."). Similarly, in *Friedman v. Mayerhoff*, the court denied leave to serve a second restraining notice because the notice sought to restrain bank accounts "which are not the debtors' property," independently warranting vacatur. 156 Misc. 2d 295, 298 (N.Y. Civ. Ct. Kings Cnty. 1992). Other courts have reached the same result in a variety of contexts. *See, e.g.*, *Havlish v. Hegna*, 673 F. App'x 34, 40-41 (2d Cir. 2016) (explaining, in a civil forfeiture proceeding, that the judgment creditors did not have an ownership interest in a building because their judgment was not against the building's owner, and thus did "not create a legal interest in the [b]uilding"); *In re Stein's Estate*, 60 Misc. 2d 544, 545 (N.Y. Sur. Ct. Westchester Cnty. 1969) (notice was vacated as improper where an executor was restrained in a representative capacity despite lacking any personal property interest in estate assets); *Taag Designs, Inc. v. Grant*, 46 Misc. 2d 505, 506–07 (N.Y. Sup. Ct. Kings Cnty. 1965) (restraining notice was legally insufficient where rents were assigned to a mortgagee upon default, the mortgagee held the funds in its own right, and the judgment debtor had no present interest); *Cascade Automatic Sprinkler Corp. v. Chase Manhattan Bank (Nat'l Ass'n)*, 60 A.D.2d 901, 902 (2d Dep't 1978) (funds collected by a bank as mortgagee were not property in which the judgment debtor had an "interest" under CPLR 5222).

## I.    The Restraining Notice Improperly Restrains Assets That Belong to Aave Protocol Victims, And It Must Be Vacated Pursuant to CPLR 5240

The Restraining Notice must be vacated because the Immobilized Assets do not belong to the thief. They belong to Aave Protocol users, and are being held by Arbitrum (a "Good Samaritan" here). And Plaintiffs have failed to provide any admissible evidence that the thief is

14

even their Judgment Debtor.

A.    **The Assets Were Temporarily Held by the Thief, Who Did Not Acquire Legal Possession During That Time**

Like our hypothetical diamond thief in Tiffany's who did not acquire title to the diamond he tried to grab, there is no legal principle providing that property briefly stolen by a thief "belongs" to that thief such that it is subject to judgment enforcement by a completely unrelated judgment creditor. *See generally Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 939-40 (D.C. Cir. 2013) (finding that funds blocked on their way to Iranian Banks were not "the property" of such banks and that because the owner of such funds "could, and very well might, be an innocent person," allowing a creditor to satisfy a judgment against such funds would cause that third party to "unjustly bear[] the costs of the debtor's wrong.")

Plaintiffs cite no law supporting their claim that "North Korea obtained ownership, not just possession, of the borrowed assets" here. Dkt. No. 33, at 7. The cases they cite are not from this Circuit or otherwise binding, and in any event, none advance Plaintiffs' argument. In *Kitchen v. Boyd (In re Newpower)*, the Sixth Circuit acknowledged that when a thief purchases assets with stolen funds, a constructive trust may be imposed on those assets to provide a remedy to the thief's victims. 233 F.3d 922, 930 (6th Cir. 2000). The Sixth Circuit, however, specifically rejected the proposition that a thief has a legal interest in stolen funds (or goods) themselves, reasoning that the victim "never intended to pass title in the appropriated funds to debtor." *Id.* Since no one – including Plaintiffs – have alleged that the thief gained legal title to the cryptocurrency in question by purchasing it with ill-gotten gains, *Boyd* is inapposite. *United States v. Brimberry*, 779 F.2d 1339, 1348 (8th Cir. 1985) – which also involved an embezzler who purchased property with stolen

15

funds – is unavailing for the same reason.[3]

The nature of the Immobilized Assets here further disproves Plaintiffs' theory. While blockchain transactions may allow movements of digital assets to be traced on-chain, such traceability does not establish ownership or valid title. DeMeo Decl. ¶49. From the standpoint of the Aave Protocol, on-chain traceability reflects the movement of value between blockchain addresses, not adjudicated property rights. The Immobilized Assets are funds that were taken from Aave Protocol users, not assets owned by any alleged wrongdoer. *Id.* ¶50.

Moreover, the DeMeo Declaration explains that the Aave Protocol does not account for the Immobilized Assets as property validly belonging to the wallet address that initiated the exploit. *Id*. ¶51. Because the rsETH collateral was not fully backed, positions created using that collateral produced protocol-level shortfalls, not legitimate asset or value transfers. *Id.* From the standpoint of the Aave Protocol, the Immobilized Assets are economically offset by the losses borne by the affected rsETH markets; losses absorbed by users who had no involvement in the underlying incident. In this context, characterizing the Immobilized Assets as the property of a thief or judgment debtor does not reflect the Aave Protocol's accounting reality or users' economic experience. In substance, the Immobilized Assets function as recovery value held for the benefit of those same users. *Id.*

---

[3]     The remaining case Plaintiff cites, *United States v. Emor*, 785 F.3d 671, 679 (D.C. Cir. 2015), is also inapposite. The case – far from assessing when a terrorist organization may be found to have ownership of assets – instead focuses on the intricacies of 21 U.S.C. § 853 and answers the question of when the U.S. government may be found to have ownership of assets subject to civil forfeiture. The United States Government's ability to obtain ownership of assets through forfeiture proceedings cannot be analogized to North Korea's ability to obtain ownership of digital assets stolen in connection with the exploit of DeFi protocols. *See Acmetel USA LLC, v. PTGi Intl. Carrier Services Inc*., No. 23-cv-11027 (LJL), 2024 WL 4467174, at *7 (S.D.N.Y. Oct. 10, 2024) (granting vacatur where "the premise on which the notice was issued no longer holds").

The above deficiencies are fatal and warrant immediate vacatur of the Restraining Notice.

**B.      Even if The Thief Had Temporary Possession, The Assets Were Then Recovered by a Good Samaritan, Depriving the Thief of Possession**

If taking funds and maintaining possession of them, even temporarily, is sufficient to confer legal possession for this purpose, as Plaintiffs claim, then Plaintiffs are still wrong, because the thief no longer has possession of that $71 million.  It is in the hands of individuals affiliated with the Arbitrum blockchain community.  These individuals performed a heroic act, stopping the thief from escaping with $71 million of other people's money.  If grabbing the assets is, as Plaintiffs claim, enough to "obtain ownership," then the Arbitrum blockchain community's "grab-back" of those assets means that they are owned by those individuals in the Arbitrum blockchain community – obviously not North Korea, the judgment debtor in Plaintiff's case.  Put simply, if possession were enough to confer title – if the kindergarten adage "finders' keepers" were actually the law – then the Arbitrum blockchain community has title, not North Korea.

Unlike the thief's attempt at seizure, which was for malicious reasons, the Arbitrum blockchain community's seizure was for righteous reasons:  to return the value of the assets to their owners.  Indeed, the Arbitrum DAO governance proposal referenced in Plaintiff's court submissions does not rest on any determination of ownership.  The immobilization of assets associated with the rsETH incident was undertaken as a temporary security and containment measure to prevent further harm while remediation options were evaluated.  The proposal frames any potential release of those assets as part of a coordinated recovery effort intended to restore rsETH's backing and mitigate losses affecting users across the broader decentralized finance ecosystem, rather than as a transfer from the Arbitrum community to any third party based on ownership.  The Arbitrum community has overwhelmingly supported the return of the Immobilized Assets to Aave Protocol users.  *See* DeMeo Decl. ¶37.

17

C.      **Plaintiffs Represented That the Thief Was Their Judgment Debtor, but That Unproven Conjecture Is Insufficient to Uphold the Restraining Notice in the Face of a Challenge**

Although Plaintiffs' papers repeat the public conjecture that the Lazarus Group, an organization associated with North Korea, hacked Kelp DAO, and make claims that the Immobilized Assets are "North Korean assets," those claims are unproven. No individual or entity has admitted responsibility, or been found guilty for the hack. No court has determined that the incident was carried out by North Korea, the Lazarus Group, or any actor legally connected in any way to the judgment debtors. It may well turn out to have been actors affiliated, in some way, with the government of North Korea; many such actors have been involved in many such attacks, and that theory appears to be a prevailing conjecture. But ***Plaintiffs*** failed to prove, with admissible evidence (not just other people's internet-post hearsay opinions) that the assets presently belong to Plaintiffs' particular judgment debtor, the Democratic People's Republic of North Korea, and not any other actor.

II.     **Vacatur of the Restraining Notice Is Necessary to Prevent Unreasonable Prejudice and Unjust Consequences to the Aave Protocol Victims, and the Broader Global Digital Assets Community**

Even apart from the substantive defects with Plaintiff's Restraining Notice under CPLR 5222, the Court should exercise its "broad discretionary power" to vacate the Restraining Notice pursuant to CPLR 5240. Here, equitable considerations – unfair prejudice and irreparable harm to both the Aave Protocol victims and other members of the digital assets community – warrant intervention and vacatur. *See Paz v. Long Island R.R.*, 241 A.D.2d 486, 486 (2d Dep't 1997) (courts are empowered to vacate restraining notices where they cause "unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts"); *see also Costello v. Casale*, 39 A.D.3d 797, 797 (2d Dep't 2007); *Sanders v. Mfrs. Hanover Trust Co.*, 229 A.D.2d 544, 544 (2d Dep't 1996).

18

As discussed above, the Immobilized Assets are not commercial assets of a judgment debtor, but ETH immobilized by the Arbitrum Security Council, and subject to further action by the Arbitrum community, as part of an emergency containment and recovery response to the April 18, 2026 rsETH bridge failure. DeMeo Decl. ¶¶50-52. As established in the DeMeo Declaration, that incident caused a structural impairment of rsETH collateral used within Aave Protocol markets, producing immediate and irreparable harm to thousands of blameless users who supplied liquidity or borrowed assets in good faith. *Id*. ¶40. The immobilization of ETH by Arbitrum was undertaken not as an adjudication of ownership or as a transfer to any alleged wrongdoer, but as a temporary security measure designed to preserve value and enable coordinated remediation aimed at restoring collateral backing and mitigating ongoing user losses. *Id.* ¶52.

Permitting Plaintiffs' Restraining Notice to restrain the Immobilized Assets and impede the Arbitrum DAO proposal poses immediate, ongoing, and compounding risks to Aave Protocol users and the broader decentralized finance ecosystem. As the DeMeo Declaration explains, the rsETH bridge incident did not result in ordinary market volatility, but in a structural impairment caused by the creation of claims that exceeded available backing. That impairment disrupted collateral mechanics across multiple Aave Protocol markets, restricted user withdrawals, and produced conditions analogous to a liquidity freeze. These effects worsen with continued delay.

Any continued restraint of the Immobilized Assets materially aggravates that harm. As Mr. DeMeo explains, the ETH immobilized on Arbitrum represents a critical source of recovery value that is intended to be deployed as part of a coordinated remediation effort to restore rsETH's backing and normalize market conditions. Preventing those assets from being applied toward remediation prolongs the existing shortfall, deepens stress on affected lending pools, and increases the likelihood of cascading liquidations, sustained liquidity outflows, and irreversible changes to

19

user positions.    These harms are time-sensitive and non-linear; later monetary compensation cannot restore users to their prior economic positions.

The risks extend beyond the Aave Protocol to the broader DeFi ecosystem. As the declaration describes, protocols rely on rapid, coordinated responses when external exploits occur, including emergency containment measures and governance-driven remediation. Treating assets immobilized for security and recovery purposes as subject to judgment enforcement would undermine those mechanisms by discouraging timely intervention and incentivizing inaction during future incidents. That outcome would increase systemic contagion, magnify losses from external exploits, and ultimately impose greater harm on blameless users across interconnected protocols – precisely the opposite of what equitable relief is intended to achieve.

Each of these inevitable harms would be sufficient to defeat Plaintiffs' restraining notice but together, they are precisely the kinds of "harsh and unfair results" that CPLR 5240 exists to prevent, and courts applying CPLR 5240 have intervened to prevent far less severe consequences. *See S.E.C. v. Pentagon Cap. Mgmt. PLC,* No. 08 CIV. 3324 RWS, 2013 WL 5815374, at *5 (S.D.N.Y. Oct. 29, 2013) (collecting cases recognizing the court's authority under CPLR 5240 to limit or vacate restraints). Similarly, in *Acmetel USA LLC, v. PTGi Intl. Carrier Services Inc.,)*, this Court confirmed its jurisdiction to vacate a restraining notice, relying both on CPLR 5240's broad equitable authority and Federal Rule of Civil Procedure 69(a).  No. 23-cv-11027 (LJL), 2024 WL 4467174, at *7 (S.D.N.Y. Oct. 10, 2024).

These cases underscore that CPLR 5240 exists precisely to prevent enforcement mechanisms from being used in a manner that exceeds their statutory purpose or imposes unjustified burdens on judgment debtors or blameless third parties, such as Aave Protocol users here.  The Restraining Notice purports to freeze assets that, as a matter of economic reality,

20

represent pooled user-supplied liquidity earmarked for remediation of protocol-level losses – not property of any identified judgment debtor.  It interferes with an ongoing, good-faith emergency response to mitigate systemic harm, and imposes escalating prejudice on blameless Aave Protocol users worldwide.  Vacatur under CPLR 5240 is necessary.

**III.    The Restraining Notice Should Be Immediately Vacated to Prevent Immediate and Irreparable Harm**

Against this backdrop, the Court should immediately vacate the Restraining Notice.  If the Court is not inclined to grant an immediate vacatur, we respectfully urge the Court to schedule an expedited hearing (with expedited briefing) and grant a temporary vacatur of the Restraining Notice pending the decision on this motion (or further process on the motion).  Equitable relief is warranted here, where there is sufficient proof (i) that the Immobilized Assets belong to the Aave Protocol users, and not North Korea; and (ii) there is immediate, irreparable, and cascading harm to the users and the DeFi community that worsens the longer the Immobilized Assets are frozen. DeMeo Decl. ¶42.    Moreover, failure to provide temporary relief under these exigent circumstances would reverse all of the recovery efforts that the DeFi community has been tirelessly working towards in the aftermath of the April 18 incident.

If the Court is not inclined to vacate the Restraining Notice pending this motion, then Aave LLC respectfully requests that the Court set an expedited briefing and hearing schedule on the motion, such that the hearing can be held as early as practicable, preferably within a few days.  In the meantime, the Court should exercise its broad discretionary power under CPLR 5240, and impose a condition on the Restraining Notice requiring that the Plaintiffs post a cash bond in an amount not only in value equivalent to the Immobilized Assets ($71 million), but more appropriately in the full amount of the damages that Plaintiffs' Restraining Notice is likely to cause, an amount no less than $300 million.  (Further precision is difficult because of the

21

fluctuation of ETH prices.)   Such a bond is warranted because Aave LLC's users are currently unable to access the Immobilized Assets, and continued imposition of the Restraining Notice risks catastrophic, cascading effects on the Aave Protocol.  *See* DeMeo Decl. at ¶¶32-39.

"Courts sitting in equity have long required movants to post bonds before they would issue ex parte TROs.  The bond shifts from defendants to plaintiffs some of the risk that a TRO granted after only one side has been heard might be wrongfully granted."  *Smart Study Co. v. Bichha123*, 505 F. Supp. 3d 322, 325 (S.D.N.Y. 2020).  Accordingly, "a party subjected to a [TRO] in district court who is later found to have been 'wrongfully enjoined' may recover against the security bond damages suffered as a result of the injunction."  *Id.* (citing *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1051 (2d Cir. 1990)).  The Second Circuit has held that a defendant's recovery from the TRO security requires only a determination that the defendant was "wrongfully restrained," not a full final adjudication on the merits.  *See U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 140 (2d Cir. 2014).

Absent immediate vacatur, Plaintiffs have improperly utilized post-judgment procedures to help themselves to the equivalent of a TRO while doing an end-run around Rule 65.  It would be deeply inequitable to maintain the current status quo (the Restraining Notice) while the parties prepare for an evidentiary hearing that could be weeks away.  The users of the Aave Protocol do not have the luxury of weeks, or even days.  The entire DeFi community has been working feverishly, around the clock, ever since the April 18 Incident to prevent widespread damage. Plaintiffs' Restraining Notice – improperly served, based on untruths, lacking evidence, and ignoring the balance of equities entirely – cannot be allowed to serve as a *de facto* Rule 65 TRO, particularly on the incredibly weak idea that a thief's momentary possession of a blameless third-

party's asset is sufficient for a judgment creditor to re-victimize the third-party and grab that asset themselves. Accordingly, the Court should grant immediate relief.

## CONCLUSION

For the foregoing reasons, Aave LLC respectfully requests that this Court:

(i)    immediately vacate the Restraining Notice to Arbitrum DAO that the Court permitted Plaintiffs to serve on Arbitrum DAO via alternative means (Dkt. No. 34);

(ii)   if the Court is minded to hear Plaintiffs further, to schedule an expedited briefing and hearing schedule on Aave LLC's emergency application but grant a temporary vacatur of the Restraining Notice in the interim, pending the decision on Aave LLC's motion;

(iii)  if the Court is not minded to immediately vacate the Restraining Notice, to schedule an expedited briefing and hearing schedule on Aave LLC's emergency application, and require Plaintiffs to post a cash bond immediately, in an amount no less than $300 million, as a condition to maintaining the Restraining Notice; and

(iv)   for such other and further relief as is just and proper.

23

Dated:  New York, New York
       May 4, 2026

**MORRISON COHEN LLP**


By: _/s/ Jason Gottlieb_
    Jason Gottlieb
    Michael Mix
    Daniel C. Isaacs
    Genny Ngai
    William Roth
    Vani Upadhyaya
    Emma McGrath

909 Third Avenue
New York, NY  10022
Telephone: 212-735-8600
Facsimile:  212-735-8708

_Attorneys for Non-Party Aave LLC_

24

## WORD COUNT CERTIFICATION

Pursuant to Section II.B.2 of the Court's Individual Rules & Practices, the undersigned hereby certifies that this memorandum of law contains 7,809 words.  I utilized the word count of the word-processing program used to prepare the document in order to obtain that word count.

/s/ Jason Gottlieb
Jason Gottlieb
