**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CHAIM KAPLAN, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE ISLAMIC REPUBLIC OF IRAN, *et al.*,<br><br>    Defendants,<br><br>TETHER INTERNATIONAL *S.A. de C.V.*,<br><br>    Garnishee (as to all cases). | Case Nos. 25-MC-527, 13-MC-126, 13-MC-323, 16-MC-94, 16-MC-95, 26-MC-33, 26-MC-34, 26-MC-35, 26-MC-36, 26-MC-81, 26-MC-82, 26-MC-83, 26-MC-84, 26-MC-85, 26-MC-86, 26-MC-87, 26-MC-88, 26-MC-80, 26-MC-90 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TURNOVER OF ASSETS DESIGNATED AS BLOCKED ASSETS ON OR ABOUT APRIL 24, 2026 AND HELD BY GARNISHEE TETHER INTERNATIONAL S.A. DE C.V.**

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ...........................................................................................................1

FACTS AND PROCEDURAL HISTORY.......................................................................3

      A.    Background on the Judgments And Their Execution ..............................3

      B.    The Ethereum and Tron Blockchains and the Market for Crypto
            Assets ...................................................................................................4

      C.    USDT and Tether's Business.................................................................5

      D.    Iran Uses USDT to Evade Sanctions ....................................................11

      E.    Tether Freezes USDT in Response to an OFAC Designation ...............11

ARGUMENT...................................................................................................................12

      A.    Summary of Argument and Legal Standards .........................................12

      B.    This Court May Exercise Personal Jurisdiction Over Tether ...............14

      C.    Iranian USDT Are The "Blocked Assets" of a "Terrorist Party"
            And so Subject to Execution Here .........................................................16

      D.    Iran's Property in The Wallet Addresses Is Subject to Turnover
            From Tether to The Plaintiffs................................................................18

      E.    The USDT in The Wallet Addresses Belong to Iran..............................21

CONCLUSION ...............................................................................................................22

CERTIFICATE OF COMPLIANCE ..............................................................................23

# TABLE OF AUTHORITIES

## CASES

*ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976) .........................passim

*All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo*, 190 F.3d 16 (2d Cir. 1999)...............................................................................................passim

*Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025)..................................14

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) ...............................................................................................passim

*Don King Prods., Inc. v. Thomas*, 945 F.2d 529 (2d Cir. 1991)....................................4

*Estate of Levin v. Wells Fargo Bank N.A.* ("Levin II"), 156 F.4th 632 (D.C. Cir. 2025) .............................................................................. 3, 13, 17

*Freeman v. Giuliani*, No. 24-MC-353 (S.D.N.Y. Aug. 30, 2024) .................................20

*Hanson v. Denckla*, 357 U.S. 235 (1958)................................................................. 14, 15

*Harrison v. Republic of Sudan*, 802 F.3d 399 (2d Cir. 2015) .....................................16

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ..................14

*Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107 (2d Cir. 2016) ...................................18

*Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009) ...........................................12

*Marshak v. Green*, 746 F.2d 927 (2d Cir. 1984)..........................................................13

*Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024) ....................................passim

*Reich v. Casabella Landscaping, Inc.*, 2024 U.S. Dist. LEXIS 219588 (S.D.N.Y. Dec. 3, 2024).......................................................................................16

*Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018) ............................................22

*United States v. 13.98 Million ("USDT") Cryptocurrency*, No. 25-CV-3943 (D.D.C. Nov. 14, 2025) ...............................................................................3

*United States v. 164,545 USDT*, No. 25-CV-417 (D. Ariz. Jan. 26, 2026) ....................9

*United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386 (N.D. Ohio Apr. 25, 2025) ......................................................................... 8, 18

*Walden v. Fiore*, 571 U.S. 277 (2014) .............................................................................14

## STATUTES, RULES, AND OTHER PROVISIONS

28 U.S.C. § 1605A ........................................................................................passim

28 U.S.C. § 1610 ...................................................................................................18

28 U.S.C. § 1610(f)(1)(A).............................................................................. 2, 12, 17

28 U.S.C. § 1610(g)...............................................................................................22

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et
    seq. ...................................................................................................passim

Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322 ...................17

Fed. R. Civ. P. 4....................................................................................................16

Fed. R. Civ. P. 5....................................................................................................16

Fed. R. Civ. P. 5(b)(2)(C)......................................................................................16

Fed. R. Civ. P. 69(a) ........................................................................................ 3, 16

N.Y. C.P.L.R. § 5201 .............................................................................................13

N.Y. C.P.L.R. § 5222(a).........................................................................................4

N.Y. C.P.L.R. § 5222(b).........................................................................................4

N.Y. C.P.L.R. § 5225 .............................................................................................21

N.Y. C.P.L.R. § 5225(b).........................................................................................13

N.Y. C.P.L.R. § 5240 .............................................................................................13

N.Y. U.C.C. § 12-105.............................................................................................20

## OTHER AUTHORITIES

Angus Berwick & Tom Wilson, *Crypto Giant Tether Used Fake
    Documents and Shell Companies to Access Banking*, Wall St. J.
    (Mar. 3, 2023)..............................................................................................7

BitOK, *Analysis of Illicit Flows on the Tron Blockchain* (June 27, 2023) ..................11

David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 St. John's L. Rev. 43 (2009)....................................................4

Coinbase, *A Guide to the Digital Asset Listing Process at Coinbase* (Sept. 10, 2025) ........................................................................................10

Coinbase, *Tether Price*, coinbase.com/price/tether ......................................................10

CoinGecko, *Tether*, coingecko.com/en/coins/tether .....................................................21

Elliptic, *How Terrorist Groups Are Exploiting Crypto to Raise Funds and Evade Detection* (Aug. 17, 2023) ..........................................................11

Gemini, *Tether Price*, gemini.com/prices/tether ..........................................................10

H.R. Subcomm. on Nat'l Sec., Illicit Fin. & Int'l Fin. Insts., *How America and Its Allies Can Stop Hamas, Hezbollah, and Iran from Evading Sanctions and Financing Terror*, 118th Cong. (Oct. 25, 2023) ...................................................................................................8

Hannah Lang, *Tether Is in Talks With "Big Four" Firm About Reserve Audit, CEO Says*, Reuters (Mar. 21, 2025) .............................................10

Krisztian Sandor, *Tether's Paolo Ardoino: "If the US Government Wanted to Kill Us, They Can Press a Button"*, CoinDesk (Oct. 28, 2024) .....................................................................................................10

Letter from Sen. Cynthia Lummis & Rep. French Hill to Att'y Gen. Merrick Garland (Oct. 26, 2023) ..............................................................8

N.Y. Dep't of State, Division of Corporations, apps.dos.ny.gov/publicInquiry/.......................................................................10

Office of Foreign Assets Control, *Iran-Related Designations* (Apr. 24, 2026) .......................................................................................................2

Office of Foreign Assets Control, *Specially Designated Nationals and Blocked Persons List* (Oct. 2025) ..................................................... 18 n.5

David D. Siegel, *New York Practice* § 491 (2d ed. 1991)..............................................18

David D. Siegel, *New York Practice* § 547 (5th ed. 2017) ............................................14

Tether, *Tether Supports Freeze of More Than $344 Million in USDT in Coordination with OFAC and U.S. Law Enforcement* (Apr. 24, 2026)....................8

Tether, *Tether Token Source Code,*
    etherscan.io/token/0xdAC17F958D2ee523a2206206994597C13D831
    ec7#code ................................................................................................................6, 8

TRM Labs, *Iran's Crypto Economy* (Apr. 16, 2023) ......................................................11

U.S. Dep't of State, *State Sponsors of Terrorism* ..........................................................11

v

**INTRODUCTION**

Plaintiffs in this group of related Actions[1] are victims of acts of terrorism committed, or facilitated, by Defendant the Islamic Republic of Iran. Plaintiffs were severely injured, traumatized, and lost loved ones at the hands of Iran, and over several decades they have collectively won judgments in U.S. courts worth $552,315,266 in compensatory damages and $1,864,624,670 in punitive damages. In the years since those judgments issued, Iran has paid nothing towards its victims. Plaintiffs now seek to collect their judgments against Iran's blocked property held by Garnishee Tether International *S.A. de C.V.*

Tether is a Salvadoran company that issues a crypto asset also called Tether (USDT) on the Ethereum and Tron blockchains (among others). Tether calls USDT a "stablecoin" because, according to Tether's terms of service, "[e]ach Tether Token in circulation is 100% backed by an amount of assets . . . equal to the stated value of the

---

[1] This Motion concerns *Campuzano v. Islamic Republic of Iran*, 13-mc-146, *Goldberg-Botvin v. Islamic Republic of Iran*, 13-mc-323, *Ben Haim v. Islamic Republic of Iran*, 16-mc-94, *Ben Haim v. Islamic Republic of Iran*, 16-mc-95, *Kaplan v. Central Bank of The Islamic Republic of Iran*, 26-mc-33, *Braun v. Islamic Republic of Iran*, 26-mc-34, *Botvin v. Islamic Republic of Iran,* 26-mc-35, *Bodoff v. Islamic Republic of Iran*, 26-mc-36, *Ben Yishai v. Syrian Arab Republic*, 26-mc-81, *Borochov v. Islamic Republic of Iran*, 26-mc-82, *Fakhoury v. Islamic Republic of Iran*, 26-mc-83, *Force v. Islamic Republic of Iran*, 26-mc-84, *Fraenkel v. Islamic Republic of Iran*, 26-mc-85, *Jakubowicz v. Islamic Republic of Iran*, 26-mc-86, *Rubin v. Islamic Republic of Iran*, 26-mc-87, *Salzman v. Islamic Republic of Iran*, 26-mc-88, *Stern v. Islamic Republic of Iran*, 26-mc-89, and *Weinstein v. Islamic Republic of Iran*, 26-mc-90.

Tether Token." SUMF ¶ 2.[2] Tether holds the U.S. Dollar-denominated assets backing USDT at Cantor Fitzgerald, which is headquartered in this District.

Defendants Iran and its agencies and instrumentalities, including the Islamic Revolutionary Guard Corps (IRGC), uses crypto to evade U.S. sanctions. On April 24, 2026, the Treasury's Office of Foreign Asset Control blocked the USDT balances of two Tron blockchain wallets that collectively hold 344,149,759 USDT because those addresses belong to the Iranian Revolutionary Guard Corps. OFAC, IRAN-RELATED DESIGNATIONS, https://ofac.treasury.gov/recent-actions/20260424 (April 24, 2026) (see bottom section, listing digital currency addresses). The IRGC is an agency or instrumentality of Iran against which Plaintiffs' judgment applies. *See* 28 U.S.C. § 1610(f)(1)(A). Tether froze the USDT balances of those addresses in response to OFAC's action. When Tether freezes the balance of a wallet address, it ensures that the USDT balance of that address will remain the same until the freeze is lifted. On February 3, 2026, Plaintiffs served writs of execution on the Marshal of this District directed to all property interests Iran has with Tether. The USDT balances are thus the "blocked . . . property of" a terrorist party against whom Plaintiffs hold execution liens.

This Motion requests that Tether be ordered to transfer Iran's property interests to Plaintiffs by decreasing Iran's USDT balance to zero and increasing Plaintiffs' by 344,152,813. Under federal law, Defendants' USDT balances are not

---

[2] The Statement Of Undisputed Material Facts For Tether Turnover Of May 14, 2026 filed with this Motion is referred to as SUMF.

immune from execution of these judgments, and indeed the execution of the compensatory-damages portion of these judgments must proceed "notwithstanding any other provision of law," including any attempt by any agency of the Government to seize and forfeit the USDT balances. *Estate of Levin v. Wells Fargo Bank N.A. ("Levin II")*, 156 F.4th 632, 638 (D.C. Cir. 2025). And, under New York law, incorporated here by Rule 69(a), Tether is required to turn over any property of a judgment debtor that it is capable of turning over, and Tether is concededly and obviously capable of turning over USDT because it has done exactly that in response to many U.S. seizure orders. *E.g., United States v. 13.98 Million ("USDT") Cryptocurrency*, No. 25-CV-3943, Dkt. No. 1 ¶ 72 (D.D.C. Nov. 14, 2025) ("On or about March 19, 2025, the FBI provided Tether with a copy of seizure warrant 25-sz-33. Tether then transferred to the United States the equivalent amount of USDT as was associated with the Target Addresses.").

## FACTS AND PROCEDURAL HISTORY[3]

### A.    Background on the Judgments And Their Execution

Each Plaintiff in this case is a survivor of an act of terrorism committed or sponsored by Iran. Over the last 25 years, Plaintiffs have won money judgments

---

[3] This Court applies the familiar summary-judgment standard to determine whether the material facts beyond genuine dispute show that the plaintiffs are entitled to turnover as a matter of law. *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 473 (2d Cir. 2018) (explaining that turnover may be sought by motion and incorporating summary-judgment standard). The facts drawn from the judgment in this case are established as true by that judgment and the remaining facts are not subject to genuine dispute.

3

against Iran in various district courts. SUMF ¶ 29. Starting late last year, Plaintiffs registered their judgments in this Court, and all of the registered cases have been related and assigned before this Court. On February 3, 2026, Plaintiffs served writs of execution on the Marshal regarding all property interests Iran has with Tether, creating an execution lien on those assets. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991); *see also* David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 ST. JOHN'S L. REV. 43, 47–50 (2009) (explaining that New York law creates a lien on property as of the moment the judgment creditor delivers an execution to the executing officer). On February 20, 2026, Plaintiffs sought leave to serve that writ directly on Tether, which would convert the execution lien (which arose when Plaintiffs served writs of execution on the Marshal of this District) into an operative levy. *E.g.*, *id.* Meanwhile, on April 27, 2026, Plaintiffs served a restraining notice on Tether by registered mail, SUMF ¶ 23, which is authorized by New York law, C.P.L.R. § 5222(a). The filing of this Motion will extend the levy until the motion is resolved, Carlson, *supra*; the restraint will operate for one year unless extended or vacated by this Court, C.P.L.R. § 5222(b); and, because the Marshal did not return the executions before the filing of this Motion, Plaintiffs' execution lien will extend until this motion is resolved, Carlson, *supra*.

### B. The Ethereum and Tron Blockchains and the Market for Crypto Assets

A blockchain is a system for a distributed network of machines to keep a ledger of transactions publicly and securely. ECF No. 4-2, Statement of Undisputed Material

Facts For Circle Turnover (Circle SUMF) ¶ 13.[4] To maintain a blockchain, a distributed network of machines uses a cryptographic function called a "hash" to validate a series of transactions (a "block") and connect it to all prior series of transactions (hence "chain") in a way that is verifiable and practically immutable. Circle SUMF ¶ 14.

The blockchain at issue in this case is called Tron. SUMF ¶ 24. Users participate in Tron using wallet addresses, which are digital representations of the sending and receiving ends of transactions on the blockchain. SUMF ¶ 25. Tron can record transactions in many different assets using a protocol called the "TRC-20 standard." SUMF ¶ 26. This standard enables anyone on the Tron blockchain to create a "token" using something called a "smart contract." *Id.* All standard tokens have some core functions—all of them have a fixed total supply at any time, may be transferred from one wallet address to another, and are fungible. SUMF ¶ 27. But some TRC-20 tokens have additional functions encoded by their creators, including, for example, the ability for the creator to freeze tokens or to decrease their balances, which allows the issuer to transfer token balances from one wallet address to another. SUMF ¶ 28.

### C.    USDT and Tether's Business

Tether International *S.A. de C.V.* is a Salvadoran company that issues USDT, the world's largest stablecoin by volume. SUMF ¶ 1. Tether's business is

---

[4] Although this Motion does not concern Circle Internet Financial LLC, for the convenience of the Court, Plaintiffs incorporate their statement of undisputed fact and exhibits filed on this docket at ECF No. 4-2 by reference here.

straightforward: It issues USDT in exchange for dollars and redeems them on demand for dollars, always on a one-to-one basis, SUMF ¶ 2. (Tether also issues stablecoins backed by other currencies, like the Euro and Mexican Peso; these assets are not at issue in this Motion.)

To issue USDT, Tether uses its private keys to call the Tether smart contract's "issue" function, which increases the total possible balance of USDT by the issued amount TETHER TOKEN, *Source Code*, available at https://etherscan.io/token/0xdAC17F958D2ee523a2206206994597C13D831ec7#code (last accessed May 11, 2026), and then transfers that amount to the purchaser's wallet, *id.* Then, anyone with the private keys to *that* wallet address can transfer the USDT to any other wallet address using the "transfer" function. *Id.* Tether always retains the power to cause the USDT balance of any wallet address to remain frozen using its "blacklist" function, or to decrease that balance to zero using its "destroyBlackFunds" function. *Id.* At any time, then, anyone who possesses one of two private keys can cause the USDT balance of a wallet address to decrease while simultaneously causing the USDT balance of another wallet address to increase: the person who holds the private keys to the decreasing (or sending) wallet address can decrease the balance unless Tether has frozen the sending address, and Tether can decrease the balance of any address because it holds the private keys to Tether's smart contract code. SUMF ¶¶ 3–4.

Tether's Terms provide that each USDT is backed by "cash, cash equivalents and other assets and may include loan receivables and other assets from [Tether]

Affiliates." SUMF ¶ 5. . Approximately 72.2% of Tether's more than $181.2 billion dollars' worth of reserves are held in cash or cash-equivalents. SUMF ¶ 6. Tether holds reserves for all USDT holders and gives them the right to redeem USDT for reserves provided that they establish a relationship with Tether and prove their identity. SUMF ¶ 7. For this reason, USDT are called "stablecoins": ideally the value of 1 USDT token is always one U.S. dollar. Circle SUMF ¶ 25 (explaining concept for stablecoins generally).

Tether Tokens are issued on multiple blockchains. SUMF ¶ 8. Once USDT is in circulation, it is freely negotiable between any two people with blockchain wallet addresses. SUMF ¶ 9. ("Issuances and redemptions of Tether Tokens may be completed with Tether pursuant to these Terms. Tether Tokens may also be used, kept, or exchanged online wherever parties are willing to accept Tether Tokens."). If Tether discovers that a given blockchain address is attributable to a sanctioned party, or is involved in criminal activity, Tether reserves the right to freeze the USDT balance of the address. SUMF ¶ 10.

Tether has been implicated in illicit finance directly. *E.g.*, Angus Berwick & Tom Wilson, *Crypto Giant Tether Used Fake Documents and Shell Companies to Access Banking*, Wall St. J. (Mar. 3, 2023) (alleging that a Tether account, opened in Turkey in the name of "Denix Royal Dis Ticaret Limited Sirketi," was specifically used by the Izz ad-Din al-Qassam Brigades—the military wing of Hamas—to convert approximately $80 million in crypto donations from USDT into cash and referencing a 2020 FBI affidavit filed in support of a search warrant detailing these transactions).

7

And, after the October 7th attacks in Israel, lawmakers alleged that Tether was "knowingly facilitating violations of the law." *See* Letter from Sen. Cynthia Lummis & Rep. French Hill to Att'y Gen. Merrick Garland (Oct. 26, 2023); *see also* H.R. Subcomm. on Nat'l Sec., Illicit Fin. & Int'l Fin. Insts., *How America and Its Allies Can Stop Hamas, Hezbollah, and Iran from Evading Sanctions and Financing Terror*, 118th Cong. (Oct. 25, 2023). But recently, Tether has been publicly claiming that it "maintains a zero-tolerance policy toward the criminal use of our financial products," and so "work[s] closely with law enforcement globally to identify and, upon request, freeze assets to prevent further movement when they are linked to illegal activity or illicit actors." *See* TETHER, *Tether Supports Freeze of More Than $344 Million in USDT in Coordination with OFAC and U.S. Law Enforcement*, https://tether.io/news/tether-supports-freeze-of-more-than-344-million-in-usdt-in-coordination-with-ofac-and-u-s-law-enforcement/ (April 24, 2026). As of April 24, 2026, Tether has frozen over $4.4 billion in USDT. *Id.*

When Tether freezes the USDT balance of a wallet address, the balance remains the same indefinitely and, thus, the USDT cannot be redeemed. SUMF ¶ 11; TETHER TOKENS, *supra*. When required to comply with seizure orders under U.S. law, Tether zeroes out the USDT balance at one wallet addresses and reissues the same balance to another. *See, e.g., United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 at 3 (N.D. Ohio April 25, 2025) ("[P]ursuant to a federal seizure warrant issued by U.S. Magistrate Judge Jonathan D. Greenberg on August 21, 2024, Tether Limited 'burned' the USDT tokens

8

associated with the cryptocurrency address and, on or about November 20, 2024, reissued the equivalent amount of USDT tokens (namely, 4,340,000 USDT) to a U.S. law enforcement-controlled virtual currency wallet."). Indeed, on at least one publicly known occasion, Tether offered to reissue USDT to someone who alleged that his USDT had been stolen in exchange for an indemnity bond and, although Tether's counsel maintained that Tether's "singular focus . . . is to definitively determine the lawful owner of the frozen tether, not fees or costs," a Tether employee also demanded a "20% fee on all reissued tether." SUMF ¶ 12. There is, thus, no question that Tether is capable—indeed willing—to transfer USDT from one holder to another by reissuing it to the latter. And the process of reissuing USDT from one owner to another transfers whatever interests the first wallet holder had to the second wallet holder. *See, e.g., United States v. 164,545 USDT*, 25-CV-417, ECF No. 10 (D. Ariz. Jan. 26, 2026) (granting default judgment to United States against defendant *in rem* USDT after Tether transferred USDT balance to United States in response to seizure warrant and no claimants appeared); SUMF ¶ 13 (noting that USDT may be purchased wherever available).

To ensure the balances maintain their value and that Tether can meet its redemption obligations, Tether holds reserve assets to support USDT holders' right of redemption. SUMF ¶ 14. Cantor Fitzgerald, which is headquartered in this District, serves as a custodian for and manages more than 99% of Tether's treasury assets. SUMF ¶¶ 15–16. Indeed Tether touts the "Wall Street" backing of its coins publicly for the purpose of assuring the market that the assets are stable and reliable.

*Id.*; *see also* Krisztian Sandor, *Tether's Paolo Ardoino: "If the US Government Wanted to Kill Us, They Can Press a Button"*, COINDESK, Oct. 28, 2024 (quoting Tether CEO describing Cantor as an "Ivy League custodian," and noting that "[w]hat made the difference was [then-Cantor chief and current Secretary of Commerce] Howard [Lutnick] publicly affirming that his firm had done due diligence on Tether and telling everyone 'we have their money'"). There are approximately $186 *billion* tether outstanding today. Hannah Lang, *Tether Is in Talks With "Big Four" Firm About Reserve Audit, CEO Says*, REUTERS (March 21, 2025).

Although Tether updated its terms of service ostensibly to forbid U.S. users from owning USDT, SUMF ¶ 17, Tether makes USDT readily available in the U.S. by allowing it to trade on U.S.-based exchanges and indeed specifically targets New York for USDT sales. SUMF ¶ 18. For example, USDT is currently available for purchase by any U.S. person on Gemini, GEMINI, *Tether Price*, gemini.com/prices/tether (last accessed May 11, 2015 PM), headquartered in this district, NEW YORK DEP'T OF STATE, DIVISION OF CORPORATIONS, https://apps.dos.ny.gov/publicInquiry/ (search: "Gemini Trust Company LLC," returning "County: New York"); and Coinbase, COINBASE, *Tether Price*, coinbase.com/price/tether (last accessed May 11, 2:20 PM), also headquartered in this district, N.Y. DEP'T OF STATE, *supra* (search: "Coinbase Inc.," returning "Principal Executive Office Address . . . New York, NY."). For Tether to be listed on Coinbase in New York, for example, Tether had to submit an application to Coinbase asking to be listed. *E.g.*, COINBASE, *A Guide to the Digital Asset Listing Process at Coinbase*, Sept.

10

10, 2025, https://www.coinbase.com/blog/A-Guide-to-the-Digital-Asset-Listing-Process-at-Coinbase. And Tether surely has the technological power to prevent USDT from being traded on these exchanges by freezing the exchanges' balances.

### D.    Iran Uses USDT to Evade Sanctions

Iran is subject to comprehensive primary and secondary U.S. sanctions because it has long been designated a state sponsor of terrorism. U.S. DEP'T OF STATE, STATE SPONSORS OF TERRORISM ("Iran: January 19, 1984."). At the same time, Iran needs to process U.S. dollar transactions for many reasons, including funding its terrorist proxies so that they can buy weapons with which to kill American and Israeli civilians. *E.g.*, TRM Labs, *Iran's Crypto Economy* (Apr. 16, 2023); *See* BitOK, *Analysis of Illicit Flows on the Tron Blockchain* (June 27, 2023). Accordingly, Iran and other terrorist groups have turned to Tether—which is easy to use and reliably maintains a price of one dollar—as a primary means of financing terrorism. *E.g.*, Lummis Letter, *supra*; Elliptic, *How Terrorist Groups Are Exploiting Crypto to Raise Funds and Evade Detection* (Aug. 17, 2023).

### E.    Tether Freezes USDT in Response to an OFAC Designation

On April 24, 2026, the Office of Foreign Asset Control of the United States Treasury Department added two Tron blockchain addresses as blocked property on its Specially Designated Nationals list. SUMF ¶ 21. In response, Tether froze the balances of those addresses. SUMF ¶ 22. On April 27, 2026, Plaintiffs served restraining notices on Tether by registered mail, as permitted by New York Civil Practice Law and Rules Section 5222, and, as of this filing, the frozen addresses contain the same balances they did on April 24, 2026. SUMF ¶ 23.

11

## ARGUMENT

Although the technology underlying this case is novel, the relevant features of the technology are easy to understand, and the legal rules and their application here are straightforward. Tether holds property belonging to Iran. New York and federal law require that Iranian property capable of transfer and possessed by anyone be turned over to those like the Plaintiffs who hold money judgments against Iran. Tether transfers USDT in response to U.S. court orders, and offers from private parties, dozens or hundreds of times a year and, therefore, should be compelled to do so here.

### A.    Summary of Argument and Legal Standards

*First,* this Motion arises from the Plaintiffs' efforts to obtain property that Tether keeps on behalf of Iran and its agencies and instrumentalities whose value is backed by assets in New York and, thus, personal jurisdiction over Tether is proper here. *See, e.g.*, *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024); *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 537 (2009); *infra* § B.

Second, pursuant to the Foreign Sovereign Immunities Act, "any property with respect to which financial transactions are prohibited or regulated pursuant to [the International Emergency Economic Powers Act ('IEEPA')]" is "subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under. . . section 1605A . . . notwithstanding any other provision of law." 28 U.S.C. § 1610(f)(1)(A). Iran is a state sponsor of terrorism and Plaintiffs are collecting terrorism-related judgments from which it is not immune under Section

12

1605A. No sovereign immunity protects the assets. *See infra* § C. And, indeed, the compensatory-damages portion of Plaintiffs' judgment is covered by the Terrorism Risk Insurance Act and, therefore, defeats even the Government's attempt to forfeit Iran's assets if the Government makes such an attempt. *Levin II*, 156 F.4th at 648 (holding that judgment creditors who establish state-law liens on Iranian property that government seeks to forfeit defeat Government's forfeiture).

Third, under New York law, which governs the procedures for execution and the definitions of Iran's property rights, *Marshak v. Green*, 746 F.2d 927, 930 (2d Cir. 1984), people who hold property for judgment debtors, called "garnishees," are compelled to turn over (a) any interests of the judgment debtor that (b) they are capable of turning over, N.Y. C.P.L.R. § 5225(b), and courts are empowered to make any reasonable order necessary to effect a good turnover, *id.* § 5240. Thus, under New York law, Tether must turn over any interest Iran has with Tether, "whether it consists of a present or future right or interest and whether or not it is vested." N.Y. C.P.L.R. § 5201. Tether can, and must, do that by transferring Iran's USDT balance to the Plaintiffs. *See infra* § D.

Procedurally, New York law enables a judgment creditor to commence a "special proceeding" against a third party who "is in possession or custody of money or other personal property" in which the judgment debtor has an interest. *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 469 (2d Cir. 2018). And, under Second Circuit authority, that proceeding is properly brought by motion, *id.*, and decided under a summary-judgment standard where, as here, the material

13

facts are not in any genuine dispute, *id.* at 469 ("A special proceeding is . . . as plenary as an action, culminating in a judgment, but is brought on with the ease, speed, and economy of a mere motion." (quoting David D. Siegel, *New York Practice* § 547 (5th ed. 2017))). Where there are disputed facts, this Court tries them and decides by a preponderance of the evidence. *Id.*

**B.    This Court May Exercise Personal Jurisdiction Over Tether**

This Court may exercise specific personal jurisdiction over Tether because this action arises from its possession of property in New York on behalf of the judgment debtor, Iran, and its agencies and instrumentalities, including the IRGC. For specific personal jurisdiction to be proper, the defendant must have acted in the forum state and that act must give rise to the suit. Specifically, the defendant must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Those acts must show that the defendant deliberately "reached out beyond" its home—by, for example, "exploi[ting] a market" in the forum State or entering a contractual relationship centered there. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (internal quotation marks and alterations omitted). And the plaintiff's claims "must arise out of or relate to the defendant's contacts" with the forum. *See, e.g., Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 (1984).

In *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), *cert. denied sub nom. Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025), the Second Circuit explained that turnover actions arising from in-state banking activity give rise to personal jurisdiction. There, plaintiffs "[sought] turnover . . . of the contents of

14

an account with Clearstream Banking, a Luxembourg-based financial institution," *id.* at 990, which "[held] securities on behalf of and for the benefit of its clients," *id.* at 991, one of whom was the Central Bank of Iran against which the plaintiffs held a money judgment, *id.* The court held that Article 52 provided a cause of action in favor of the plaintiffs against the bank and that the turnover action arose from the defendant's New York contacts because the "right to payment . . . reflects the proceeds of transactions that [the bank] undertook using [a] New York Account." *Id.* at 1005.

Like *Peterson*, this is an action to compel turnover of property reflecting interests in money held in New York. Indeed the case for personal jurisdiction here is even stronger than it was in *Peterson*—here, Plaintiffs seek turnover of property reflecting a right to payment in New York that, unlike the foreign bank accounts Clearstream held in Luxembourg, is not located abroad. The bulk of Tether's reserves are in the custody of and managed by Cantor Fitzgerald in New York. SUMF ¶¶ 15–16. Tether actively exploits this fact to calm markets into believing that its tokens will be reliably worth a dollar. *Id.* Although Tether has chosen El Salvador as its headquarters, it nonetheless chooses New York to hold its reserves. *Id.* What's more, Tether profits from in-forum activity by selling its tokens on New York exchanges. SUMF ¶ 18. Thus, Tether "purposefully avails itself of the privilege of conducting activities within" New York, *Hanson*, 357 U.S. at 253, and this Article 52 Motion "arises from" that activity, *Peterson*, 121 F.4th at 991. Thus, as in *Peterson*, this Court may exercise specific personal jurisdiction over Tether to compel it to turn over property it possesses on behalf of Iran.

If Tether had previously been served with a writ of execution, because it is a mere garnishee, and this Motion seeks turnover of Iran's assets not Tether's, service of this motion would need only to comply with the notice provisions of Rule 5. *E.g.*, *Harrison v. Republic of Sudan*, 802 F.3d 399, 406 (2d Cir. 2015) ("Service of . . . post-judgment motions . . . [i]s required to adhere only to the notice provisions of the federal rules . . . . [under which a] 'paper is served' by 'mailing it to the person's last known address—in which event service is complete upon mailing.'" (quoting Fed. R. Civ. P. 5(b)(2)(C))). But because Plaintiffs' motion for alternative service remains pending, Plaintiffs will effect service of this Motion (but not of the writs of execution) in compliance with Rule 69(a) and Rule 4 of the Federal Rules of Civil Procedure as if this were a summons and complaint. *E.g.*, *Reich v. Casabella Landscaping, Inc.*, 2024 U.S. Dist. LEXIS 219588, at *9 (S.D.N.Y. Dec. 3, 2024) (noting that turnover motions may be served in the same manner as a summons and collecting cases).

### C. Iranian USDT Are The "Blocked Assets" of a "Terrorist Party" And so Subject to Execution Here

The USDC in the Wallet Addresses belongs to Iran or its agency or instrumentality and is frozen for that reason, *see* OFAC, *supra,* and so, under federal law, it is subject to execution here.

*First*, although some property of foreign governments is immune from execution, the punitive damages portion of the judgment here is not because Iranian property is covered by the International Emergency Economic Powers Act (IEEPA) and, therefore, under the FSIA that property "is subject to execution . . . of any judgment relating to a claim for which a foreign state (including any agency or

16

instrumentality of such state) claiming such property is not immune under . . .

section 1605A [which concerns terrorism-related judgments like Plaintiffs'] . . . ." 28

U.S.C. § 1610(f)(1)(A).

*Second*, a lien to execute the compensatory-damages portion of any terrorism-related judgment against the blocked assets of a state sponsor of terrorism prevails over any other competing interest, including the Government's. *Levin II*, 156 F.4th at 638. Here, the Iranian USDT are blocked assets of a terrorist party and the Plaintiffs' judgment is for an act of terrorism, and so the Plaintiffs' execution lien prevails. Section 201 of the TRIA provides in relevant part that

> Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* (quoting Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322).

The "TRIA defines a 'blocked asset' as 'any asset seized or frozen by the United States' under [IEEPA], but it excludes from the definition assets that are subject to certain licenses or used exclusively for diplomatic purposes." *Id.* (quoting TRIA § 201(d)(2)(A)–(B)). The TRIA "defines a 'terrorist party' to include any foreign country designated as a state sponsor of terrorism." *Id.* (quoting TRIA § 201(d)(4)). And a terrorism-related judgment includes "any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section . . . 28 U.S.C. § 1605A." 28 U.S.C. § 1610.

17

The USDT at issue meets this definition: They have been specifically blocked by OFAC,[5] SUMF ¶¶ 21–22, and no license has issued covering them, *id.* And Plaintiffs' judgments all are for acts of terrorism. SUMF ¶ 29.

**D.    Iran's Property in The Wallet Addresses Is Subject to Turnover From Tether to The Plaintiffs**

Iran's property interests currently in the Wallet Addresses are subject to turnover in favor of the Plaintiffs because USDT are "property" that can be transferred and Tether has the power to transfer it or, in the alternative, USDT represent interests in the reserve assets and there is no question that Tether has the power to transfer those interests. *E.g.*, *United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. No. 1 at 3 (N.D. Ohio April 25, 2025).

Under New York law, "those property interests of the judgment debtor 'which by law the debtor may assign or transfer, may be sought for application to the judgment.'" *All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo*, 190 F.3d 16, 24 (2d Cir. 1999) (citing David D. Siegel, *New York Practice* § 491, at 755 (2d ed. 1991)); *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674 (1976). "New York law contains 'no threshold requirement that the attaching creditor show the value of the

---

[5] These assets would have been "blocked" even if OFAC had not specifically designated the addresses. Iran and IRGC are "designated persons" under IEEPA. *See, e.g.*, OFFICE OF FOREIGN ASSETS CONTROL (OFAC), SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST (Oct. 2025). And the property is "within the United States" because it reflects an interest in assets in New York. The assets are, therefore, automatically blocked. *Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 137 (2d Cir. 2016) ("[A]ll assets belonging to an entity that satisfies [the] definition of [a terrorist party under an executive order] are automatically blocked."). These particular assets have been specifically blocked by OFAC, though, so that "automatically blocked" definition need not enter the analysis.

attached property or indeed that it has any value.'" *All. Bond Fund*, 190 F.3d at 24 (quoting *ABKCO*, 39 N.Y.2d at 674). In *ABKCO*, for example, the plaintiff sought turnover of an English creditor's interest in the as-yet-unrealized profits of a contract to produce a film in New York. 39 N.Y.2d at 674. The Court of Appeals held that this inchoate interest was "property" that could be ordered turned over—the point of New York law is that the judgment creditor gets to decide whether it is commercially reasonable to pursue collection of a property interest and, so long as that interest is assignable, it must be turned over. *All. Bond Fund*, 190 F.3d at 21 ("If from the judgment creditor's point of view the asset is worth pursuing as a matter of economics, *ABKCO* authorizes the pursuit notwithstanding the contingent nature of the asset, and even though nothing may come of the chase.").

Here, the Plaintiffs seek turnover of any and all interests Iran has or may have with Tether. Those interests can be conceptualized in two ways, either of which results in turnover here.

*First*, the digital ledger balances are themselves property that can be turned over. There is no question that the balances themselves are "assignable" as that term is used in *ABKCO* because they can be, and indeed very frequently are, transferred between complete strangers. The Plaintiffs are thus entitled to turnover of Iran's USDT regardless whether those USDT carry with them *any* rights as against Tether or any other entity, just as the Plaintiffs would be entitled to the turnover of, say, baseball cards issued by Topps and possessed by a garnishee, *e.g.*, *Freeman v. Giuliani*, No. 24-MC-353, Dkt. No. 10-2 at 4 (S.D.N.Y. Aug. 30, 2024) (seeking

19

turnover of, among other things sports memorabilia), even though those cards carry with them no rights against Topps. To the extent Tether quibbles that it does not "possess" USDT and that turnover requires "possession," New York law requires turnover of any economic interests that can be turned over—in *ABKCO*, no one can possibly "possess" the inchoate interest in an as-yet unmade film, and yet it was ordered turned over, 39 N.Y.2d at 674—and regardless Tether in fact does possess all USDT under New York law. *See* N.Y. Unif. Comm. Code § 12-105 (explaining that exclusive power to control a "controllable electronic record" like USDT is exclusive even in some circumstances where another person can also exercise it).

*Second*, even though the Plaintiffs are entitled to turnover of USDT even if they carry with them no rights as against Tether, in fact holders of USDT are entitled under Tether's terms of service to an assignable interest in the reserves backing those coins. Under Tether's terms of service, the right to redeem USDT directly with the company is limited to non-U.S. persons who establish a relationship with Tether, and that relationship is "personal" and "non-assignable." *See* Gerstein Decl. Ex. A, Tether Terms, at § 4.1. But the non-assignability of Tether's terms is limited only to the provision of services to "Tether Token Wallets," which are those with which users *directly* transact with Tether. *Id.* at § 1.1.40. All USDT holders on the secondary market—that is those who have bought or sold USDT to or from parties other than Tether—have the explicitly *assignable* right to compel Tether to "back[]" each USDT with "an amount of assets ('Reserves') equal to the stated value of the Tether Token[s]" because Tether's terms distinguish between the right to *redeem* reserves

20

(which is not assignable) and the right to hold tokens *backed by* reserves (which is): "Issuances and redemptions of Tether Tokens may be completed with Tether pursuant to these Terms. Tether Tokens may also be used, kept, *or exchanged* online *wherever* parties are willing to accept Tether Tokens." *Id.* (emphasis added).

Straightforwardly, then, the interest that any USDT holder has in Tether's reserves—even if that interest is merely the right to ensure that the reserves remain held by Tether to support the value of the coins—is assignable, *id.* Perhaps Tether will contend that because terms of service give it discretion to deny redemption in certain circumstances, Tether therefore has no valuable obligations to its coinholders. But under New York law, that does not matter—Tether is required to turnover any assignable interest, *All. Bond Fund*, 190 F.3d at 21, and whatever rights USDT give their holders those rights are assignable and are indeed very frequently assigned: Between $80 billion and $120 billion worth of USDT change hands *every day*. *E.g.*, COINGECKO, *Tether*, https://www.coingecko.com/en/coins/tether (last accessed Dec. 16, 2025). They always do so for a dollar. *Id.*

### E.    The USDT in The Wallet Addresses Belong to Iran

Finally, the Plaintiffs are entitled to turnover of USDT that are property of Iran or its agencies or instrumentalities, including the Iranian Revolutionary Guard Corps. *E.g.*, N.Y. C.P.L.R. § 5225. There is no question that the USDT balances of the addresses at issue in this Motion belong to Iran or its agencies or instrumentalities. SUMF ¶¶ 20–22. And Plaintiffs' judgments against Iran (and against the IRGC) are enforceable directly against IRGC property because that property is "blocked" as well.

21

*E.g.*, *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 211 (2018) (explaining that Congress in 28 U.S.C. § 1610(g) made terrorism judgments enforceable against otherwise not-immune property of agencies or instrumentalities regardless of the relationship between the agency or instrumentality and the judgment debtor state).

## CONCLUSION

For the foregoing reasons, this Court should grant turnover and require Tether to transfer the USDT balances of Wallet Addresses to the Plaintiffs at an address to be specified in a sealed filing if this Motion is granted.

Respectfully submitted,


*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1629 Columbia Road NW, Suite 302
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*
**CERTIFICATE OF COMPLIANCE**

22

23

I certify that the foregoing memorandum contains 6,107 words using Microsoft's word count tool.

/s/ Charles Gerstein