**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| HAN KIM, *et al.*, Plaintiffs,<br><br>*v.*<br><br>THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, a.k.a. NORTH KOREA, Defendant<br><br>~~~~~<br><br>IN RE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, et al.<br><br>~~~~~<br><br>RUTH CALDERON-CARDONA, et al., Plaintiffs,<br><br>*v.*<br><br>THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, et al., Defendants,<br><br>&<br><br>AAVE LLC,<br><br>Garnishee (as to all cases) | ) | Case Nos. 25-MC-527-MMG<br>26-MC-033-MMG<br>26-MC-094-MMG |

**PLAINTIFFS' FIRST SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO AAVE LLC'S MOTION TO VACATE RESTRAINING NOTICE**

## TABLE OF CONTENTS

INTRODUCTION ........................................ 1

FACTS ........................................ 3

A. Step One: North Korea obtains rsETH from Kelp and anipulates its value ........................................ 3

B. Step Two: North Korea exchanges rsETH for ETH on Aave ........................................ 5

C. Aave sees the price of rsETH plummet and shuts down the pool. ........................................ 6

D. Aave restores the pool and stabilizes the market. ........................................ 7

LEGAL STANDARD ........................................ 7

ARGUMENT ........................................ 8

I. ANSWERS TO THE COURT'S QUESTIONS ........................................ 9

1. Question 1: The Shelter Principle ........................................ 9

2. Question 2: The Theft/Fraud Distinction ........................................ 9

3. Question 3: The Hackers' Interest ........................................ 10

4. Question 4: Creditor Priority ........................................ 10

5. Question 5: Constructive Trust ........................................ 11

II. THE AAVE TRANSACTION WAS NOT LARCENY, AND SO NORTH KOREA OBTAINED TITLE TO THE IMMOBILIZED ASSETS, WHICH PLAINTIFFS MAY RESTRAIN WITH CPLR 5222. ........................................ 11

A. The Aave transaction was not larceny. ........................................ 12

B. The Aave transaction was not fraud or theft by deception. ........................................ 16

C. The Aave transaction was, at worst, theft by false pretenses or deception, which transfers title. ........................................ 20

D. The shelter principle does not apply, but even though the first transaction did not pass title to rsETH the second transaction passed title to ETH ........................................ 24

III. PLAINTIFFS HAVE LEGAL PRIORITY OVER ANY PERSON WHO SERVES A WRIT OF EXECUTION AFTER THEY DID, BUT A CONSTRUCTIVE TRUST MAY BE APPROPRIATE......................................25

A. Priority is determined by order of service, but that does not alone determine the debtor's property interests and, therefore, the claims of creditors ......................................................................26

B. A constructive trust may be appropriate under state law .....................26

CONCLUSION ..........................................................................................................29

CERTIFICATE OF COMPLIANCE ......................................................................31

## TABLE OF AUTHORITIES

**Cases**


*Anderson v. Gouldberg*, 53 N.W. 636 (Minn. 1892)........................................................24

*Armory v. Delamire*, 1 Strange 505 (King's Bench 1722)...............................................10

*Commodity Futures Trading Commission v. Topworth International, Ltd.*, 205 F.3d 1107 (9th Cir. 2000)..........................................................................................21

*Cunningham v. Brown*, 265 U.S. 1 (1924) .............................................................. 21, 27

*In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) .....................27

*In re First Central Financial Corp.*, 377 F.3d 209 (2d Cir. 2004)...............................28

*Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000) ......................... 25, 27

*In re Miss. Valley Livestock, Inc.*, 745 F.3d 299 (7th Cir. 2014) .................................28

*People v. Ingram*, 65 Cal. App. 4th 500 (1998)...................................................... 20, 23

*People v. Norman*, 650 N.E.2d 1303 (N.Y. 1995)..................................2, 12, 13, 21, 23

*People v. Saia*, 492 N.Y.S.2d 306 (App. Div. 1985) ................................................ 12, 13

*People v. Traster*, 111 Cal. App. 4th 1377 (2003) .................................................. 12, 13

*Phelps v. McQuade*, 115 N.E. 441 (N.Y. 1917) ....................................................... 23, 24

*Plaza Hotel Assocs. v. Wellington Assocs., Inc.*, 378 N.Y.S.2d 859 (N.Y. Sup. Ct. 1975).......................................................................................................................8

*Poggi v. Scott*, 139 P. 815 (Cal. 1914)...........................................................................25

*In re Samuels & Co.*, 526 F.2d 1238 (5th Cir. 1976)....................................................24

*Samuels v. Lido DAO*, 757 F. Supp. 3d 951 (N.D. Cal. 2024) .......................................4

*SEC v. Dorozko*, 574 F.3d 42 (2d Cir. 2009) .................................................................23

*SEC v. Loewenson*, 290 F.3d 80 (2d Cir. 2002)...................................................... 21, 27

*Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311 (1991)....24

*United States v. 13328 and 13324 State Highway 75 North*, 89 F.3d 551 (9th Cir. 1996)....21

*United States v. Brimberry*, 779 F.2d 1339 (8th Cir. 1985)....27

*United States v. Durham*, 86 F.3d 70 (5th Cir. 1996)....22

*United States v. Eisenberg*, 784 F. Supp. 3d 579 (S.D.N.Y. 2025)....*passim*

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008)....19, 20

*United States v. Haqq*, 278 F.3d 44 (2d Cir. 2002)....12, 24

*United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411 (2d Cir. 2001)....27

*United States SEC v. Universal Express, Inc.*, 2008 U.S. Dist. LEXIS 35342 (S.D.N.Y. Apr. 30, 2008)....25, 27

*In re Van Meter*, 135 F. Supp. 781 (D.C. Ark. 1955)....27

*X/L Datacomp v. Wilson (In Re Omegas Grp.)*, 16 F.3d 1443 (6th Cir. 1994)....21

**Statutes**

28 U.S.C. § 1610(a)....8

28 U.S.C. § 1610(g)....2, 8

28 U.S.C. § 1610 note....3

N.Y. C.P.L.R. § 5222(b)....7, 11

N.Y. C.P.L.R. § 5234(b)....26

N.Y. C.P.L.R. § 5239....3, 11

N.Y. U.C.C. § 1-304....9

U.C.C. § 2-403....22

U.C.C. § 12-104(d)....24

TRIA § 201(a), Pub. L. No. 107-297 ........................................................................3, 8

## Rules

Fed. R. Civ. P. 69(a) .......................................................................................26

## Other Authorities

*Aave, Aave 101, Aave Protocol Documentation*, https://aave.com/docs/aave-101 .......18

*Aave*, https://x.com/aave/status/2056049190841594179?s=20 (May 17, 2026)............7

George Gleason Bogert, et al., *The Law of Trusts & Trustees* § 476 (2d ed. rev. 1978) ..........................................................................................................27

David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 St. John's L. Rev. 43 (2009) .........................................................26

Richard A. Epstein, *Torts* (9th ed. 2008) .......................................................25

Willa Gibson, *Untangling the Web of Consignment Law: The Journey From the Common Law & Article 2 to Revised Article 9*, 10 William & Mary Bus. L. Rev. 413 (2022) ...........................................................................................22

Sam Reynolds, *Aave Restores Ether Borrowing Limits After $230 Million Exploit*, CoinDesk (May 18, 2025) ..............................................................................7

## INTRODUCTION

On Friday, May 1, Plaintiffs, who seek to collect on outstanding judgments against North Korea and its agencies and instrumentalities, served a restraining notice pursuant to this Court's order, ECF No. 34, on then-Garnishee Arbitrum DAO, *see* ECF No. 33-7 at 2. That notice restrained a digital ledger balance of 30,766 ETH[1] at a specific blockchain address (the "Immobilized Assets") and, pursuant to an unopposed motion, this Court ordered those assets moved into the control of Garnishee Aave LLC. ECF No. 52. On May 13, this Court denied Aave LLC's emergency request for vacatur and sought additional briefing from the Parties on six specific questions, five of which are directed to both parties and one to Aave LLC alone. ECF No. 55. This response answers the Court's specific questions and provides additional facts and analysis not available in the prior round of briefing, which the Court recognized occurred on an "extremely abbreviated timeline." *Id.* at 2.

The restraining notice should be maintained. When North Korea exchanged stolen assets (rsETH) on the Aave Protocol for the Immobilized Assets (ETH), title to the Immobilized Assets passed to North Korea. This is so for either of two alternative reasons. First, the Aave transaction was neither fraud nor larceny: the suppliers parted with the Immobilized Assets willingly (so it was not larceny) and North Korea made no misrepresentations to them (so it was not fraud). The only court to address

[1] This balance is sometimes referred to as "WETH," for "wrapped" ETH, which is technically accurate for one stage of the transaction. Because Aave LLC referred to the Immobilized Assets as being "ETH" tokens in its initial submissions, Plaintiffs will as well for the Court's convenience.

an analogous situation held exactly that, entering a judgment of acquittal and vacating a wire fraud conviction based on a materially identical transaction. *United States v. Eisenberg*, 784 F. Supp. 3d 579, 615–16 (S.D.N.Y. 2025) (holding that transaction was not fraudulent because it was not wrongful under a DeFi protocol's rules but that it was market manipulation under the commodities laws). And because the Aave transaction was neither fraud nor larceny, title passed.

Alternatively, to the extent the Aave transaction was unlawful, it was theft by false pretenses, which likewise transfers title to the property obtained. *People v. Norman*, 650 N.E.2d 1303, 1308 (N.Y. 1995) ("The gravamen of [false pretenses] was obtaining property, with the intent permanently to deprive the owner, by fraudulently inducing the owner to part with both possession and title through the use of false statements about some prior or existing facts." (emphasis removed)).

Either way, the Aave transaction was not larceny, so North Korea obtained legal title to the Immobilized Assets. To be sure, that title may be subject to equitable claims for constructive trust but as of today, no party with any property interest in the Immobilized Assets has requested a constructive trust, and Aave LLC, the only other party before the Court, expressly disclaims any property interest. *E.g.*, ECF No. 47-6 at 3 ("[N]either [Aave Labs, Inc.] nor any affiliated entity is a party to any transaction on the blockchain networks underlying the Aave Protocol."). Because North Korea has legal title to the Immobilized Assets, Plaintiffs' May 1 execution lien will eventually entitle them to turnover of assets on which no successful constructive-trust claim is made. *See* 28 U.S.C. § 1610(g) (exception to foreign sovereign immunity

that enables judgment creditors holding terrorism judgment to collect against assets of foreign states and agencies or instrumentalities); TRIA § 201(a), *codified at* 28 U.S.C. § 1610 note (same, and granting additional rights). And so Plaintiffs' *prima facie* claim to the Immobilized Assets means the restraining notice should stay in place pending the resolution of a motion for turnover and to determine claims under C.P.L.R. Section 5239, which Plaintiffs are filing alongside this memorandum. That motion will enable interested parties to file claims in this Court. The motion to vacate the restraining notice should be denied.

## FACTS

Plaintiffs' initial memorandum responding to Aave LLC's motion to vacate was filed with less than twenty-four hours to prepare it. Accordingly, Plaintiffs submit with this memorandum an expert declaration precisely explaining the transactions underlying this case and the functioning of the Aave Protocol. This declaration confirms many of the facts the parties explained in the opening round of briefing; indeed, it is consistent in many ways with Aave LLC's own account, submitted with its initial motion. Although the declaration is itself sufficient evidence to support the required *prima facie* case, *see* Decl. of Justin Ehrenhofer ["Expert Report"] ¶¶ 56–68, Plaintiffs' expert will be available to testify at the June 5 conference should the Court have questions.

### A. Step One: North Korea obtains rsETH from Kelp and anipulates its value

The first step of the two transactions underlying this case begins with something called Kelp, operated by a partnership called Kernel DAO (hereafter

"Kelp" or "Kelp DAO"). Expert Report ¶¶ 23–24. Kernel DAO operates Kelp as an Ethereum re-staking business in which it receives assets called sETH, issued by Lido DAO, *see Samuels v. Lido DAO*, 757 F. Supp. 3d 951, 957 (N.D. Cal. 2024) (explaining Ethereum staking businesses), and *re*-stakes them by issuing an asset called rsETH that is then redeemable for sETH, or for ETH itself. Expert Report ¶ 23.[2] On April 18, 2026, North Korean agents[3] caused a company called LayerZero, whose software underlies Kelp DAO, to falsely attest that rsETH on one blockchain had been deposited when it had not, which caused Kelp DAO to release more rsETH than it had ETH to back up. Expert Report ¶ 41. The rsETH released by Kelp DAO was indistinguishable from any other rsETH; there simply was not enough ETH to back it up. *See* Expert Report ¶ 41. The consequence is that the implied value of *all* rsETH across the entire blockchain would decline, because the ratio of rsETH to ETH fell out of balance. *See* Decl. of Luigi D'Onorio DeMeo, ECF No. 41 at ¶ 23.

---

[2] So far as Plaintiffs are aware, no one has yet offered re-re-staked ETH, but Plaintiffs see no reason why someone could not. *Cf., e.g.*, William James, *Rationality, Activity and Faith*, 2 PRINCETON REV. 82 (1882) ("[T]he old woman in the story . . . described the world as resting on a rock, and then explained that rock to be supported by another rock, and finally when pushed with questions said it was 'rocks all the way down.'").

[3] The Expert Report is sufficient evidence to conclude by well more than a preponderance that North Korea conducted these transactions, which easily satisfies the prima facie standard here. Because the Court did not ask any specific questions about attribution, Plaintiffs do not discuss this in detail here. But Plaintiffs' expert will be available to answer any questions related to attribution as well on June 5.

### B. Step Two: North Korea exchanges rsETH for ETH on Aave

North Korean agents then sent rsETH to Aave, a protocol run by Aave DAO. Expert Report ¶ 28. Aave allows what it calls "suppliers" to supply crypto assets into a pool and receive a variable yield for forgoing use of their assets. Here, the "suppliers" supplied ETH. *See* ECF No. 41 at ¶ 15. On the other side of the exchanges, "borrowers" may withdraw ETH by putting into the pool collateral that has a higher value than the amount withdrawn, "as measured by protocol-defined parameters." *Id.* at ¶ 16. Because Aave is "trustless," by its own description, Aave requires that the market value of deposited collateral exceed the value of withdrawn assets in proportion to something it calls a "Health Factor," which is determined by Aave DAO. Expert Report ¶ 31. These features make the Aave protocol very much unlike a traditional savings-and-loan in two important ways.

First, there are no legally enforceable contracts between "supplier" and "borrower"—that is, there is no enforceable obligation to repay or do anything beyond the initial exchange. Instead, the sole consequence of not returning the "borrowed" asset into the pool is that the collateral the "borrower" posted is sold by users referred to as "liquidators"; because the Protocol attempts to ensure that any "borrower" puts into the pool collateral worth more than the assets withdrawn, the liquidation makes the suppliers whole. Expert Report ¶¶ 31, 33. Indeed "the word 'borrow'" in this context just as easily could be the phrase "'Access Collateral,'" or "'Utilize Assets.'" *Eisenberg*, 784 F. Supp. 3d at 616.

Second, as the language of "pooling" indicates, there is no one-to-one correspondence between a single supplier and a single borrower in any transactions.

Rather, "[t]o supply assets, a user transfers a supported digital asset into a pool of smart contracts associated with that asset." ECF No. 41 at ¶ 15. And likewise, "[a] user may borrow digital assets only after supplying collateral with a higher value than the amount borrowed." *Id.* at ¶ 16. In this way, no particular supplier can ever say "I supplied my ETH to this person and got exactly this amount of rsETH in return," nor can any borrower do the inverse. All transactions are processed through the pool of intermingled assets.

When North Korean agents deposited rsETH into Aave's protocol, the protocol functioned exactly as it was designed: It checked the prevailing market price of ETH and rsETH, concluded that North Korea's deposit complied with the required collateral ratio, and released ETH. At that point, North Korea was, consistent with the Aave protocol, free to do whatever it wished with that ETH. Expert Report ¶¶ 31, 33, 47, 51. North Korea chose to launder the ETH through many bridges and mixers, using wallet addresses tied to other known North Korean activity—which supports the case that North Korea was the transactor here—and ultimately consolidated 30,766 ETH in an address on the Arbitrum blockchain that was promptly frozen by Arbitrum DAO. Expert Report ¶¶ 49, 50, 56–68.

### C. Aave sees the price of rsETH plummet and shuts down the pool.

After this transaction occurred, it was revealed that the relationship between rsETH and ETH had been compromised, which meant that "each individual rsETH necessarily represented less value." ECF No. 41 at ¶ 23. This was true for *all* rsETH, not just the "North Korean" rsETH. *See* Expert Report ¶ 41. This meant that the

"rsETH posted as collateral was not fully backed," nor was any other rsETH. ECF No. 41 at ¶ 28. Thus, "the collateral left behind [by any depositor of rsETH, whether North Korean or not] could not cover the outstanding debt, and liquidation would not make Aave Pool depositors whole." *Id.* This caused Aave DAO to "fr[eeze] [its markets], so that the problem could not spread further." *Id.* at ¶ 32. For a time, "all available liquidity was exhausted, meaning any user who wanted to withdraw their assets could not do so." *Id.*

### D. Aave restores the pool and stabilizes the market.

Since the initial transaction, Aave has recently restored access to the pool and, through a series of recoveries and contributions, nearly the full collateral backing rsETH has been restored. According to Aave's official *X* (née Twitter) account, the loan-to-value ratios for the assets in the pools "have been restored to their pre-incident values" so that "[]ETH now operates as normal across all affected V3 deployments." AAVE, https://x.com/aave/status/2056049190841594179?s=20 (May 17, 2026). As one industry publication explains, "Aave's move signals that immediate systemic risk has eased even as legal and liability questions persist." Sam Reynolds, *Aave Restores Ether Borrowing Limits After $230 Million Exploit*, COINDESK, May 18, 2025. And because the markets are back operating as normal, it appears that no protocol users will suffer any direct losses; any user who wants to withdraw ETH supplied before April 18 may now do so at the same "pre-incident" rate. *Id.*

## LEGAL STANDARD

Under New York law, a restraining notice may be served on a garnishee that "is in possession or custody of property" of a judgment debtor. C.P.L.R. § 5222(b). To

preserve the status quo via a restraining notice against a motion to vacate, the creditor serving the notice need make only a "prima facie" case that the entity served with the notice possesses the judgment debtor's property. *Plaza Hotel Assocs. v. Wellington Assocs., Inc.*, 378 N.Y.S.2d 859, 863 (N.Y. Sup. Ct. 1975); *see also* ECF No. 47 at 5–6. It is undisputed at this stage that Plaintiffs have valid, unsatisfied judgments against North Korea for acts of terrorism and that federal law permits execution of those judgments against not only North Korea itself but North Korean agencies and instrumentalities such as the Lazarus Group. *See* 28 U.S.C. § 1610(a); § 1610(g); TRIA § 201(a). And although it appears at this point that no one disputes that Plaintiffs have made at least a *prima facie* case that the Lazarus Group, a North Korean agency or instrumentality, was indeed behind the transactions here, Plaintiffs' expert declaration supports that case. Expert Report ¶¶ 56–68.

Accordingly, the dispositive question for this motion to vacate is whether Plaintiffs have made at least a *prima facie* showing that the Immobilized Assets are property of North Korea such that the Immobilized Assets are subject to turnover. They have.

## ARGUMENT

Plaintiffs first respond to the Court's five specific questions directed at both parties. Plaintiffs then explain why the Restraining Notice should not be vacated in light of the Court's inquiries, a proper understanding of the facts explained in the expert report, and governing law.

## I. ANSWERS TO THE COURT'S QUESTIONS

### *1. Question 1: The Shelter Principle*

This Court's first question is whether the Uniform Commercial Code's "shelter principle" applies "to the hacking-related transactions given the U.C.C.'s overarching 'obligation of good faith in its performance and enforcement.'" ECF No. 55 ¶ 1 (quoting N.Y. U.C.C. § 1-304). The UCC's shelter principle does not apply here, but not exclusively because of the overarching obligation of good faith. The shelter principle governs the relationship between theft victims and good-faith purchasers of certain property, but this case concerns the relationship between Kelp DAO and its users and North Korea, which has *exchanged* stolen property (rsETH) for *other* property (ETH). Thus, whether the UCC applies to this transaction—which it likely does—will not affect the outcome, and Plaintiffs do not argue for the application of the shelter principle. *See infra* § II.D.

### *2. Question 2: The Theft/Fraud Distinction*

The Court's second question is "[g]iven that a theft can be accomplished through deception, is the distinction between fraud and theft significant with respect to the claims of potential creditors of the assets that are the subject of the restraining notice, or the priority of those claims?" ECF No. 55 ¶ 2. The answer to this question is yes, but equally important are distinctions *within* the category of "theft." The key is that both fraud and theft by false pretenses or deception pass title to the property obtained, while larceny does not. *See infra* § II. As explained below, the Aave transaction was neither fraud nor theft—but to the extent it was theft, it was theft by false pretenses or deception rather than larceny. Either way, title passed. *See id.*

### 3. *Question 3: The Hackers' Interest*

The third question asks "[i]f the hacking transactions can be characterized as theft, what interests do the hackers currently have in the restrained assets given that they were no longer in the hackers' possession at the time the restraining notice was served?" ECF No. 55 ¶ 3. As stated in the answer to Question Two above, the answer initially depends on whether the second transaction was larceny. If it was either not criminal theft or was theft by false pretenses, the hackers obtained a voidable title (that is, a title subject to a potential constructive-trust claim) to the resulting proceeds. If it was larceny—as in Aave LLC's smash-and-grab diamond example—then the thief obtained mere possession. But this was not larceny; to the extent it was theft at all, it was theft by false pretenses. *See infra* § II.C.

Arbitrum DAO's initial act of freezing and immobilizing the assets, therefore, did not change anything about the property's ownership or title. Arbitrum DAO did not purport to take ownership of the Immobilized Assets, nor could it; Arbitrum DAO's act of freezing took possession but not ownership, as Aave LLC concedes. ECF No. 41 ¶ 52; *see, e.g.*, *Armory v. Delamire*, 1 Strange 505 (King's Bench 1722) ("[T]he finder of a jewel . . . does not by such finding acquire an absolute priority or ownership."). If North Korea had no more than possession *ever* it would have no rights now, but because it acquired title, Arbitrum DAO's freezing did not change that.

### 4. *Question 4: Creditor Priority*

This Court's fourth question is "[w]hich law(s) controls the priority of creditors of the assets that are subject to the restraining notice?" ECF No. 55 at ¶ 4. Priority of execution is governed by New York law. It is determined by the order in which a

writ of execution is served, and Plaintiffs' basis for claiming priority is that Plaintiffs served a writ of execution first—and indeed, as far as Plaintiffs are aware, have served the only writ of execution that could apply here. *See infra* § III.A. But the question of priority does not alone determine the outcome here because of potential claims for constructive trust, and the question of priority is logically preceded by the question of the debtor's property interests in the restrained assets.

#### *5. Question 5: Constructive Trust*

The Court's final question directed at both parties is "[w]ould imposing a constructive trust on the assets be an appropriate remedy?" ECF No. 55 at ¶ 5. As of today, Plaintiffs' answer is no. A constructive trust is a remedy, and no party with a property interest in the Immobilized Assets has appeared to request a constructive trust over any of the Immobilized Assets. But Plaintiffs have filed a motion under Section 5239 to provide notice to anyone who wishes to make a constructive-trust claim, and the Restraining Notice should remain in place to facilitate that orderly process—including, as may be necessary, Plaintiffs' opposition to any such claim.

## II. THE AAVE TRANSACTION WAS NOT LARCENY, AND SO NORTH KOREA OBTAINED TITLE TO THE IMMOBILIZED ASSETS, WHICH PLAINTIFFS MAY RESTRAIN WITH CPLR 5222.

The dispositive issue is whether North Korea had title to the Immobilized Assets at the time they were frozen by Arbitrum DAO. The parties appear to agree that if the Aave transaction was larceny, North Korea would not have obtained title. And if it was not larceny—if it was a consensual transaction, fraud, or theft by deception or false pretenses—North Korea would have obtained title. The Aave transaction was not larceny because the Aave suppliers willingly transferred

unrestricted ownership in the Immobilized Assets. *See infra* § II.A. From there, the correct categorization is largely academic, as all other options lead to transfer of title. In Plaintiffs' view, the Aave transaction was neither theft nor fraud; it is best described as the secondary result of market manipulation, which is what the only court to have confronted a similar transaction with a crypto liquidity pool concluded. *See United States v. Eisenberg*, 784 F. Supp. 3d 579, 615–16 (S.D.N.Y. 2025); *see infra* § II.B. But if the transaction were a theft, it would be theft by deception or false pretenses, not larceny. *See infra* § II.C. Either way, title passed to North Korea, subject to any valid constructive-trust claim that may be asserted.

**A. The Aave transaction was not larceny.**

At common law, the defining feature of larceny was that it required a "trespassory taking," *i.e.*, the taking of personal property from the owner's possession without consent—as in the classic "smash and grab." *People v. Norman*, 650 N.E.2d 1303, 1307 (N.Y. 1995); *United States v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002) (citing *People v. Wilson*, 93 N.Y.2d 222, 226 (1999), in which the "[d]efendant was convicted of forcibly stealing boots from a shopping mall security guard," *id.* at 223). Over time, the concept of larceny was expanded to include instances where the owner willingly parted with the property but "with the understanding that it was to be used for a particular purpose," and the wrongdoer exceeded that purpose—imagine the coat check attendant who walks off with someone's coat. *People v. Saia*, 492 N.Y.S.2d 306, 306 (App. Div. 1985). But it is *not* larceny if the owner willingly "gives the property to the defendant . . . intending the defendant . . . to become the unconditional and unrestricted owner." *People v. Traster*, 111 Cal. App. 4th 1377, 1387 (2003). The latter

scenario can be fraud or theft by deception if the owner is induced by a misrepresentation, but it is not larceny, because the owner willingly parted with the property unconditionally. *Norman*, 650 N.E.2d at 1307 (explaining theft by false pretenses)

The Aave transaction was not a larceny. The Aave suppliers willingly parted with their ETH. Nobody hacked their crypto accounts or broke into their houses to steal their hard drives. Nobody hacked the Aave protocol's smart-contract code. Expert Report ¶ 5. The suppliers intended to, and did, transfer the Immobilized Assets into the Aave liquidity pool, making those assets available to anyone who posted the required collateral. Indeed, the nature of the protocol renders larceny by a "borrower" effectively impossible: ETH suppliers necessarily intend to give the ETH they place into the pool free and clear to any counterparty who posts an amount of collateral set by Aave.

Nor do Aave suppliers place ETH into the liquidity pool "with the understanding that it was to be used for a particular purpose." *Saia*, 492 N.Y.S.2d 306. As described above, Aave suppliers have no rights to compel return of the ETH they supply to the pool; indeed, because of the pooled nature of the protocol, there is not even an identifiable "borrower" paired with any identifiable "supplier." Rather, the ETH recipients in the exchange become the "unrestricted owners" of the ETH they obtain, *Traster*, 111 Cal. App. 4th at 1387, with the value of the rsETH they deposited compensating the supplier. In this sense, the term "borrower" is a misnomer. As the *Eisenberg* court explained in describing a functionally identical

DeFi protocol, "borrowing" in this context does not "entail[] an obligation to repay—or any other obligation for that matter—even if that's how the term is conventionally understood." *Eisenberg*, 784 F. Supp. 3d at 615.

The suppliers participated because they trusted the protocol to properly evaluate the value of rsETH and require sufficient collateral for each exchange—the required ratio, after all, is not determined by supply and demand but rather set by Aave DAO. *See* Expert Report ¶ 40. For a time after North Korea did its transaction with Kelp, the protocol substantially overvalued rsETH relative to what it would later be worth after North Korea's manipulation of Kelp DAO was revealed. That may make the transaction manipulative, fraudulent, or even theft by false pretenses—but not larceny. At all times, Aave suppliers in fact *intended* to pass ownership and possession of the ETH they placed into the pool, because that is the only way the protocol works.

Aave has repeatedly characterized the transaction as akin to a jewel theft and said the ETH was "stolen." ECF No. 42 at 3–4 (discussing diamond theft hypothetical); *id.* at 15 (same). Aave also contended at this Court's recent hearing that an analogy might be that North Korea forged a "skeleton key" to unlock the metaphorical box containing Aave lenders' ETH, *contra* May 6 Tr. at 20. Neither is an apt analogy.

As explained, this is not like a jewelry smash and grab because the protocol users willingly engaged in the transactions. And it is not like a forgery because the rsETH North Korea deposited was real, genuine rsETH. That is, if the Aave suppliers

today presented the rsETH supplied by North Korea to Kelp DAO, Kelp DAO would recognize it as genuine rsETH. Expert Report ¶¶ 41, 55. The rsETH became less valuable moments after the transaction than it appeared at the time of the transaction, but it was still rsETH. North Korea's conduct may have been market manipulation—using a "manipulative device or contrivance" to unfairly inflate the value of its assets for the purpose of borrowing against them. And North Korea's first hacking transaction with Kelp DAO may have been theft (more on that below). But the Aave transaction was not forgery, because the rsETH was real, and it was not larceny because the Aave suppliers intended to part with title to their assets using a protocol that explicitly enabled exactly what happened here. There is no authority for the proposition that depositing a genuine asset into a liquidity pool is garden-variety theft merely because a manipulative transaction committed elsewhere causes the deposited asset's price to decline.

One way to understand why the second transaction was not larceny, then, is to consider the position of people who supplied *other* assets in *other* liquidity pools for which rsETH was the collateral in April of this year—that is, people who never transacted with North Korea *at all*. All of these hypothetical traders suffered the exact same harm the Aave suppliers did: because North Korea inflated the supply of rsETH, the price of all rsETH plummeted, leaving suppliers of ETH all over the market with bad collateral or having made bad trades. That is why Aave froze the entire market. ECF No. 41 ¶ 32. And that is also why, when the market was restored, all users could freely trade again, AAVE, *X*, *supra*, regardless of whether they were,

in some sense, "directly" impacted. North Korea thus did not steal ETH from anyone; it wrongfully tanked the price of rsETH, harming the people with whom it transacted just as it harmed other holders of rsETH. North Korea acquired rsETH illegitimately. But when North Korea exchanged that rsETH on an open, functioning market through arms'-length transactions, North Korea acquired title to the ETH.

To see this clearly from still another perspective, suppose North Korea had illegitimately obtained *one* unbacked rsETH from KelpDAO, rather than hundreds of thousands, then done the same thing it did in its second transaction. In that case, the Aave suppliers could not possibly contend that they had been stolen from: they would have traded one ETH for more than one rsETH, and because that rsETH would be redeemable for ETH with Kelp DAO (whose shortfall would be so trivially small as to have no effect on the price), each rsETH would be worth roughly the same as the traded ETH. No harm, no foul, and so no theft. But nothing about the volume of North Korea's rsETH theft has any bearing on the property rights exchanged during its transaction, and so just as there can be no theft in this hypothetical, there is no theft here. At the end of the day, the harm Aave suppliers suffered was due to the after-the-fact decrease in the market price of rsETH—not because they had anything stolen from them against their wills.

### B. The Aave transaction was not fraud or theft by deception.

Because it was not larceny, it is academic whether the Aave transaction is characterized as consensual, fraud, or theft by deception—in any of those cases, title would have passed. But in Plaintiffs' view, and based on indistinguishable precedent, there was no fraud or deception. North Korea likely engaged in theft in the Kelp

hacking transaction and then market manipulation, but it did not make any misrepresentation in the Aave transaction.

As explained in detail in the Expert Report and above, the Aave transaction went like this: North Korea "supplied" rsETH to an Aave liquidity pool and received ETH in return. Before allowing the transaction, the protocol checked the market price of both assets and, finding that the transaction was sufficiently collateralized, released ETH to North Korea. Expert Report ¶¶ 31, 47. North Korea provided the required amount of rsETH and received the corresponding amount of ETH as determined by the protocol. To be sure, the protocol misjudged the soon-to-be price of rsETH because of North Korea's not-yet-discovered market manipulation. But North Korea provided exactly as much rsETH at the protocol required, and in doing so made no representations about whether the protocol was properly assessing its value.

In *United States v. Eisenberg*, another judge of this court addressed a materially identical transaction. *See* Expert Report ¶¶ 34–36 (opining that the second transaction was materially identical to the facts as described in *Eisenberg*). There, the defendant conducted wash trades on exchanges to manipulatively inflate the price of an asset, MNGO, then borrowed on a liquidity protocol called Mango Markets against the inflated value of that asset. 784 F. Supp. 3d 579, 615–16 (S.D.N.Y. 2025). The court held that the transaction was not fraudulent. *Id.* Even though the *Eisenberg* defendant deposited collateral that appeared to be worth vastly more than it would have been absent the defendant's own wrongful conduct elsewhere, the court held that he made no misrepresentation in doing so. The government argued that his

act of "borrowing" funds with no intention to return them was like "signing a contract with no intent to honor one's obligations under that contract, which the Second Circuit has held can be fraudulent," and the court rejected that argument, explaining that Mango Markets—like Aave—did not "require[] any user to promise that they would repay funds as a condition of borrowing against their assets." *Id.* at 615. Instead, the court held, the "platform [had] no rules, instructions, or prohibitions about borrowing." *Id.* at 617. Even though Eisenberg "knew that the value of his portfolio was the product of his market manipulation, and he knew it wouldn't stay valuable for long," *id.* at 616, he made no "implicit misrepresentation by allowing the algorithm to measure *the actual value of his collateral*" at the time of his transaction. *Id.* at 617 (emphasis added).

So too here. Aave LLC admitted that during the Aave transaction, "Aave's smart contracts were not compromised at any point . . . . All protocol logic, including supply, repayment, and liquidation mechanisms, continued to function as designed. The incident originated entirely outside of Aave, stemming from conditions related to the underlying rsETH asset." Expert Report ¶ 51 (incorporating Aave post-mortem). Aave has no rules forbidding users from offering to exchange assets whose value they have inflated elsewhere for other assets. Expert Report ¶¶ 35–36; *see also* AAVE, *Aave 101, Aave Protocol Documentation*, https://aave.com/docs/aave-101 (describing Aave's "[t]rustless execution" where "[o]perations are executed automatically without relying on a central party"). And Aave LLC's terms warn users that the transactions are permissionless and not subject to insurance or other guarantees. ECF No. 47-5 ¶

3 ("Among other risks, cyberattacks. . . could disrupt these technologies and even result in a total loss of cryptoassets, their market value, or digital funds. We assume no liability or responsibility for any such risks."). The protocol, in other words, allows the transaction that happened here: Anyone who wants to deposit rsETH on Aave in exchange for ETH may do so. Accordingly, like the defendant in *Eisenberg*, North Korea did not make any misrepresentation when it used its rsETH to withdraw ETH as permitted by the protocol. That transaction—neither larcenous nor fraudulent—thus passed title to North Korea, which means Plaintiffs have a prima facie claim sufficient to support maintenance of the Restraining Notice.

Perhaps Aave LLC will argue that although the *Eisenberg* court held that a transaction just like the one underlying this case was not fraudulent, that does not mean the court held that the transaction was not larcenous. In *United States v. Finnerty*, the Second Circuit upheld a judgment of acquittal in a case where the defendant was alleged to have committed fraud by "interpositioning" of trades on the New York stock exchange, a practice that involved intercepting trades before they reached their intended public counterparties. *See, e.g.*, *United States v. Finnerty*, 533 F.3d 143, 149 (2d Cir. 2008). The court said that *Finnerty* instead may have committed "garden-variety conversion," though, because he intercepted trades between intended counterparties. Thus, Aave LLC may argue, the mere fact that the conduct here was not fraudulent under *Eisenberg* does not mean it was not larcenous. But that argument, if Aave LLC makes it, runs headlong into the *Eisenberg* court's reasoning: The *reason* the *Eisenberg* transaction was not fraudulent was that the

platform on which it was made *permitted* it. 784 F. Supp. 3d at 617. And *Finnerty* explained that the interpositioning was not fraud even though it was a violation of stock exchange rules, 533 F.3d at 149, but may instead have been larceny (or "conversion") because the defendant had possession of the assets in trade under NYSE rules solely for the purpose of trading them *with counterparties*, *id.*, unlike in *Eisenberg*, where the "borrowed" assets were, as here, unrestricted, 784 F. Supp. 3d at 617. Therefore, *Eisenberg* cannot have involved a trespassory taking of assets because the taking of assets was, as here, in compliance with the rules governing the platform. *Id. Eisenberg* is squarely on point here.

### C. The Aave transaction was, at worst, theft by false pretenses or deception, which transfers title.

If this Court disagrees with *Eisenberg* and concludes that North Korea's act of depositing rsETH was an implicit false representation about the value of rsETH on which Aave lenders implicitly relied, then the transaction would be fraudulent or deceptive, but still not larcenous—and North Korea thus still would have acquired title to the Immobilized Assets.

"Theft by false pretenses occurs where the defendant makes a false representation with the intent to defraud the owner of his or her property, and the owner is in fact defrauded." *People v. Ingram*, 65 Cal. App. 4th 500, 507 (1998). One who acquires property by virtue of any voluntary or consensual transfer of title—even if that transfer is induced by fraud or false pretenses—acquires title to the property. Indeed, the passing of title is the distinction between fraud or theft by deception on the one hand and larceny on the other: "The distinction between larceny and

obtaining money or property by false pretenses turns on a question of title. The defendant who obtains property by larceny does not obtain title, while the defendant who obtains property by false pretenses does obtain title." *Id.* (citations and quotation marks omitted); *see also Norman*, 650 N.E.2d at 1308 ("The gravamen of [false pretenses] was obtaining property, with the intent permanently to deprive the owner, by fraudulently inducing the owner to part with both possession and title through the use of false statements about some prior or existing facts." (emphasis removed)). Fraud and false pretenses transfer title; larceny does not. *Id.*

Many cases address this issue when debtors defraud people shortly before seeking bankruptcy protection, leaving a conflict between the fraud victims and the debtors' other creditors. *E.g.*, *X/L Datacomp v. Wilson (In Re Omegas Grp.)*, 16 F.3d 1443, 1449 (6th Cir. 1994). In *Cunningham v. Brown*, for example, the Supreme Court addressed claimants to money withdrawn from Charles Ponzi's fraudulent accounts. 265 U.S. 1, 12 (1924). The Court held that Ponzi obtained "defeasible title" to that property and that although victims who can trace their transactions to specific property may be able to impose constructive trusts, because Ponzi obtained title, the proceeds should be distributed ratably among his victims. *Id.* ("[T]he defrauded lender becomes merely a creditor to the extent of his loss."). Many cases addressing Ponzi schemes follow suit, holding that assets should be distributed ratably among claimants. *See also SEC v. Loewenson*, 290 F.3d 80, 89 (2d Cir. 2002) (citing and quoting *Commodity Futures Trading Commission v. Topworth International, Ltd.*, 205 F.3d 1107, 1115–16 (9th Cir. 2000) (affirming district court's approval of pro rata

distribution plan where assets were commingled); *United States v. 13328 and 13324 State Highway 75 North*, 89 F.3d 551, 553–54 (9th Cir. 1996) (same); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (affirming district court's approval of pro rata distribution plan even though the majority of funds were traceable to specific claimants)).

Indeed, the UCC (whose application is discussed in more detail below) supports the distinction drawn by the common law. Courts often look to Article 2 of the UCC to answer questions that are not answered specifically by other articles. *See* Willa Gibson, *Untangling the Web of Consignment Law: The Journey From the Common Law & Article 2 to Revised Article 9*, 10 WILLIAM & MARY BUS. L. REV. 413 (2022) (noting analogies between Article 2 and Article 9). And, under Article 2, "a purchaser . . . acquires all title which his transferor had or had power to transfer . . . even though the transferor was deceived as to the identity of the purchaser, or . . . the delivery was in exchange for a check which is later dishonored, or the delivery was procured through fraud *punishable as larcenous* under the criminal law." U.C.C. § 2-403 (emphasis added). This rule makes sense from a commercial perspective because it is easy for a buyer to determine whether the seller obtained property by larceny (ask for a receipt), but impossible to rule out whether the seller may have obtained the property by false pretenses.

At the emergency hearing on May 6, this Court asked whether this case might be analogous to a hypothetical where a paired-options trader uses a false access credential to misrepresent that she worked for a bank when in fact she did not. Trans.

at 28. With a fuller understanding of the facts, it is now clear to Plaintiffs that the analogy does not quite fit these facts. The key distinction is that here, North Korea's transactions on the Aave Protocol complied with Aave's rules, unlike (one would think) in the hypothetical. Thus, in the Court's specific hypothetical, the transaction was likely larcenous because although there was a fraudulent misrepresentation, *SEC v. Dorozko*, 574 F.3d 42, 44 (2d Cir. 2009) (holding that stealing access credentials and using them to get insider information was fraud), that misrepresentation was not to the victim and so the transaction likely did not pass title, *see Phelps v. McQuade*, 115 N.E. 441, 442 (N.Y. 1917) (discussing impersonations). The outcomes in cases of impersonation fraud are quite subtle. *Id.* (noting that "[w]here the vendor of personal property intends to sell his goods to the person with whom he deals, then title passes, even though he be deceived as to that person's identity or responsibility"); *see also Norman*, 650 N.E.2d at 1308 (collecting cases); UCC 2-403 (explaining that impersonation doesn't vitiate the passage of title). But here there was no impersonation fraud, and the transaction intentionally occurred on a permissionless and anonymous platform with no rules requiring authentication or preventing manipulation of the kind that occurred here. Expert Report ¶¶ 35–36**.** Aave users all intended to give title to the supplied assets and, therefore, the transaction passed title even if it was induced by a kind of deception in the value of the rsETH North Korea placed into the pool.

In sum, the second transaction is not "trespass in the taking" because it is not even a trespass, *Ingram*, 65 Cal. App. 4th at 507; it is not fraud or "theft by false

pretenses," *id.*, because there were no false pretenses, *Eisenberg*, 784 F. Supp. 3d at 615–17; and even if it were theft by false pretenses, title passed (subject to a claim of constructive trust if one is made), *Phelps*, 115 N.E. at 442.

### D. The shelter principle does not apply, but even though the first transaction did not pass title to rsETH the second transaction passed title to ETH

Returning to Aave's initial, inapt metaphor: suppose a thief smashes a case a Tiffany's, grabs some jewels, and runs out the door. ECF No. 42 at 3. At common law, the thief obtains no title to the jewels. *Phelps v. McQuade*, 220 N.Y. 232, 234 (1917). Instead, the thief acquires mere possession—the thief's rights are good against a subsequent thief, *Anderson v. Gouldberg*, 53 N.W. 636, 637 (Minn. 1892); *see also United States v. Haqq*, 278 F.3d 44, 50–51 (2d Cir. 2002) (explaining that one who commits larceny has "possessory interest" in stolen item), but are otherwise none, *Anderson*, 53 N.W. at 637. At common law, this means that when the thief sells the property to a bona fide purchaser with no notice that it was stolen, the theft victim can prevail in a replevin action *against the bona fide purchaser*. *See, e.g.*, *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 318 (1991).

The Uniform Commercial Code, where it applies, changes the relationship between the theft victim and the good-faith purchaser through the "shelter principle," under which even a rank thief passes good title to property acquired by larceny upon its sale to a good-faith purchaser for value. *In re Samuels & Co.*, 526 F.2d 1238, 1242 (5th Cir. 1976). This means that a theft victim cannot bring an action in replevin (or otherwise) against the purchaser. *E.g.*, U.C.C. § 12-104(d).

But the Code does not change the relationship between the victim *and the thief*. *E.g.*, U.C.C. § 12-104(d) (maintaining the common-law rule that "[a] purchaser of a controllable electronic record acquires all rights in the controllable electronic record that the transferor had or had power to transfer"). The rule remains, then, as Plaintiffs explained in their opening submission on this issue, that "[a]ssuming the seller had good title to the property before it was exchanged for the stolen money, that title is conveyed by the sale to the embezzler or thief." *United States SEC v. Universal Express, Inc.*, 2008 U.S. Dist. LEXIS 35342, at *10 (S.D.N.Y. Apr. 30, 2008). The victim can recover against the thief through the imposition of a constructive trust (discussed below), *id.*, or in a tort action for damages, *e.g.*, RICHARD A. EPSTEIN, TORTS 22 (9th ed. 2008) (explaining damages case for converted wine, *Poggi v. Scott*, 139 P. 815 (Cal. 1914)). But the thief is the legal owner of the property acquired in exchange for stolen property. *Universal Express*, 2008 U.S. Dist. LEXIS 35342, at *10 (citing *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 930–31 (6th Cir. 2000)).[4]

## III. PLAINTIFFS HAVE LEGAL PRIORITY OVER ANY PERSON WHO SERVES A WRIT OF EXECUTION AFTER THEY DID, BUT A CONSTRUCTIVE TRUST MAY BE APPROPRIATE

As mentioned in response to this Court's questions, priority of execution is governed by New York law, and Plaintiffs' basis for claiming priority is that Plaintiffs served a writ of execution first. But given the nature of the transactions here, some

[4] As explained in the accompanying motion for turnover and to determine claims, this case is governed by the TRIA and Plaintiffs argue there in the alternative that they prevail even if both transactions were larcenous and title did not pass under state law.

people may want to bring constructive trust claims. Because the restraining notice should remain pending the resolution of those potential claims, this Court does not need to determine who might be a beneficiary of a constructive trust at this stage.

### A. Priority is determined by order of service, but that does not alone determine the debtor's property interests and, therefore, the claims of creditors

Under New York law, incorporated here by Rule 69(a), where a garnishee holds property in which a judgment debtor has an interest, the executing officer is directed (with exceptions not relevant here) to levy the property in the order in which she received writs of execution. N.Y. C.P.L.R. § 5234(b). New York law creates an execution lien on property upon service of the writ of execution. David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 St. John's L. Rev. 43, 48 (2009).[5] And so Plaintiffs, when they served the writ of execution pursuant to authorization from this Court, established a first-priority lien on all property interests of the judgment debtor that are held by Aave LLC. *Id.* To be clear, the service of the writ of execution would not alone create "priority" over property in which North Korea does *not* have an attachable interest. But because North Korea does have an interest here, Plaintiffs' execution takes priority over all others to follow.

### B. A constructive trust may be appropriate under state law

Courts may impose constructive trusts in two circumstances that are potentially relevant here. But constructive trusts are never imposed unless a party with a legal interest in the *res* asks for a trust. And so the Court should deny the

[5] This article is an indispensable guide to post-judgment practice in New York.

motion to vacate because no party with a legal interest has asked for a constructive trust, and then consider Plaintiffs' separately filed request to determine claims after notice and an opportunity for other potential interested parties to file claims.

First, where a thief steals property and exchanges it for other property, the thief may receive the second property subject to a constructive trust for the theft victim. As Judge Lynch explained in *Universal Express*, "[a]lthough the victim of the theft may not recover the stolen money from a good faith seller, he may be able to recover the property purchased with the stolen money (and over which the thief has title) by virtue of 'a constructive trust . . . imposed on the proceeds held by the thief or embezzler.'" 2008 U.S. Dist. LEXIS 35342, at *11 (quoting *In re Newpower*, 233 F.3d at 931, and citing GEORGE GLEASON BOGERT, ET AL., THE LAW OF TRUSTS & TRUSTEES § 476 (2d ed. rev. 1978); *United States v. Brimberry*, 779 F.2d 1339, 1347–49 (8th Cir. 1985)). In these circumstances, "[c]ourts will generally impose a constructive trust on property 'traceable' to the stolen or misappropriated property." *Id.* (citing *United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 416 (2d Cir. 2001); *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880, 891 (11th Cir. 2003); *In re Van Meter*, 135 F. Supp. 781, 785–86 (D.C. Ark. 1955)).

Second, courts impose constructive trusts on property given to a fraudster who lacks sufficient assets to pay back all the victims. *See, e.g.*, *Loewenson*, 290 F.3d at 89 (collecting cases). Courts do this to promote the rule that "equality is equity," *Cunningham*, 265 U.S. at 13, and victims should be compensated in proportionate shares out of what remains of the fraudster's assets, *id.*

But constructive trusts are *remedies* available to people with property interests in the *res* who *ask for a trust*. *In re Miss. Valley Livestock, Inc.*, 745 F.3d 299, 304–05 (7th Cir. 2014). (explaining that constructive trust allows people to "demand" property and that a "restitution claimant must at a minimum prove its interest in specific property in the estate's possession to warrant the remedy of constructive trust"); *In re First Central Financial Corp.*, 377 F.3d 209, 215 (2d Cir. 2004) (explaining that constructive trust is an "equitable remedy"). Counsel, after a thorough search, has found no case imposing a constructive trust when no one asked for one.

And whoever else may claim an interest in the Immobilized Assets, Aave LLC does not and cannot. Aave LLC says in its own terms of service that "[i]t is important to understand that neither we nor any affiliated entity is a party to any transaction on the blockchain networks underlying the Aave Protocol; we do not have possession, custody or control over any cryptoassets, or any user's funds." ECF No. 47-6 at 3. Instead, Aave LLC, which has no legal relationship to the eponymous protocol, Expert Report ¶ 35, contends that "[t]he [Immobilized Assets] belong[] to Aave Protocol users." ECF No. 41 at ¶ 39. And Aave LLC contends that "user losses arising from this type of exploit are not readily reversible through later monetary compensation," *id.* at ¶ 30, which means what whatever Aave LLC's answer to this Court's Question Six is, users cannot be made whole with a simple transfer of the Immobilized Assets to their accounts.

So far, then, Plaintiffs are the only people with any legal or beneficial interest who are before the Court, and so their answer to the Court's question whether a constructive trust is an appropriate remedy is: maybe later, but for now no. To determine whether a constructive trust is appropriate the Court will have to evaluate any constructive-trust claims on the Immobilized Assets, and so far no one has made one. Plaintiffs propose a procedure for doing so in a separately filed motion, and in the meantime this Court should deny Aave LLC's motion to vacate the restraining notice.

**CONCLUSION**

Plaintiffs respectfully request that the Court deny the motion to vacate the restraining notice or, at minimum, hold it in abeyance pending full consideration of the rights of all possible claimants.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1319 F St. NW, Suite 301
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Robert Tolchin*

Robert Tolchin
The Berkman Law Office LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum is within the 30-page limit for briefing imposed by this Court. ECF No. 55 at 3.

/s/ Charles Gerstein