**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAN KIM, *et al.*, Plaintiffs, <br><br> *v.* <br><br> THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, a.k.a. NORTH KOREA, Defendant <br><br> ~~~~~ <br><br> IN RE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, et al. <br><br> ~~~~~ <br><br> RUTH CALDERON-CARDONA, et al., Plaintiffs, <br><br> *v.* <br><br> THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, et al., Defendants, <br><br> & <br><br> AAVE LLC, <br><br> Garnishee (as to all cases) | Case Nos.  25-MC-527-MMG <br> 26-MC-033-MMG <br> 26-MC-094-MMG |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TURNOVER
AND TO DETERMINE ADVERSE CLAIMS UNDER N.Y. C.P.L.R. § 5239**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................... iii

INTRODUCTION ................................................................................................1

BACKGROUND ..................................................................................................2

I.      PLAINTIFFS' JUDGMENTS AGAINST NORTH KOREA ..............................2

II.     THE CURRENT ATTEMPT TO RECOVER ON THOSE JUDGMENTS.........4

        A.      Step One: North Korea Obtains rsETH From Kelp And
                Manipulates Its Value ...................................................................4

        B.      Step Two: North Korea Exchanges rsETH for ETH on Aave ..................5

        C.      Aave Sees The Price of rsETH Plummet and Shuts Down the
                Pool...............................................................................................7

        D.      Aave Restores The Pool and Stabilizes the Market.................................8

ARGUMENT.......................................................................................................8

I.      PLAINTIFFS HAVE AN INTEREST IN THE IMMOBILIZED ASSETS
        AND MAY EXECUTE ON THEM IN THIS PROCEEDING ...........................8

        A.      Legal Standard for Turnover and Execution of Terrorism
                Judgments ......................................................................................8

        B.      North Korea is the Perpetrator and Sovereign Immunity Does
                Not Apply.....................................................................................10

        C.      North Korea Has Title to The Immobilized ETH .................................11

                1.      The Aave transaction was not larceny.......................................12

                2.      The Aave transaction was not fraud or theft by deception..........16

                3.      The Aave transaction was, at worst, theft by false
                        pretenses or deception, which transfers title. ............................20

                4.      The shelter principle does not apply, but even though the
                        first transaction did not pass title to rsETH the second
                        transaction passed title to ETH and federal law may
                        prevail anyway ........................................................................24

II.     TO FULLY RESOLVE ALL POSSIBLE CLAIMS ON THE
        IMMOBILIZED ASSETS, A NOTICE AND CLAIMS PROCEDURE
        SHOULD APPLY, AS AUTHORIZED BY CPLR § 5239 ...............................27

        A.     Unknown People May Wish to Bring Constructive Trust Claims ........27

        B.     Notice And an Opportunity to File Claims Is an Appropriate
               Way to "Determine" Rights to The Immobilized Assets.........................29

CONCLUSION ..........................................................................................................31

CERTIFICATE OF COMPLIANCE ........................................................................33

# TABLE OF AUTHORITIES

**Cases**

*ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976) ..................................9

*All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16 (2d Cir. 1999)..................................................................................................................9

*Anderson v. Gouldberg*, 53 N.W. 636 (Minn. 1892)....................................................24

*Bandyopadhyay v. Defendant 1*, No. 22-cv-22907, 2022 WL 17176849 (S.D. Fla. Nov. 22, 2022)...............................................................................................................31

*Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993 (2d Cir. 2014).....................9

*Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010)..............................................................................................................4

*Commodity Futures Trading Commission v. Topworth International, Ltd.*, 205 F.3d 1107 (9th Cir. 2000) .................................................................................................22

*Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61 (2013) ...............................................................29

*Cruz v. TD Bank, N.A.*, 711 F.3d 261 (2d Cir. 2013) ...................................................10

*Cunningham v. Brown*, 265 U.S. 1 (1924) ........................................................... 21, 28

*Don King Prods., Inc. v. Thomas*, 945 F.2d 529 (2d Cir. 1991).....................................9

*In re Celsius Network LLC (Meghji v. Wallet Owner)*, 666 B.R. 28 (Bankr. S.D.N.Y. 2024)...............................................................................................................31

*In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) .....................28

*In re First Central Financial Corp.*, 377 F.3d 209 (2d Cir. 2004).............................28

*In re Miss. Valley Livestock, Inc.*, 745 F.3d 299 (7th Cir. 2014) ................................28

*In re Samuels & Co.*, 526 F.2d 1238 (5th Cir. 1976)...................................................24

*In re Van Meter*, 135 F. Supp. 781 (D.C. Ark. 1955)..................................................28

*Herman v. Siegmund*, 415 N.Y.S.2d 681 (2d Dep't 1979) ...................................... 1, 10

*Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014)...........3

*Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29 (D.D.C. 2013) ......3

*Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000) ......................... 25, 28

*LCX AG v. 1.274M U.S. Dollar Coin*, 2022 NY Slip Op 32834(U) (N.Y. Cnty. Sup. Ct. Aug. 21, 2022).................................................................................................31

*Nat'l Union Fire Ins. Co. v. Eland Motor Car Co.*, 85 N.Y.2d 725 (1995)............ 10, 30

*Patel v. Unknown Def.*, No. 23-cv-24651, 2024 WL 219040 (N.D. Fla. Jan. 16, 2024) .............................................................................................................................31

*People v. Ingram*, 65 Cal. App. 4th 500 (1998)...................................................... 20, 24

*People v. Norman*, 650 N.E.2d 1303 (N.Y. 1995)..................................2, 12, 13, 21, 23

*People v. Saia*, 492 N.Y.S.2d 306 (App. Div. 1985) ............................................... 12, 13

*People v. Traster*, 111 Cal. App. 4th 1377 (2003) .......................................................13

*People v. Unknown Parties in Ownership &/or Control of Dig. Wallet Addresses XXXXXXXXX0B7D*, 238 N.Y.S.3d 113 (Sup. Ct., Queens Cnty. June 9, 2025) .............................................................................................................................30

*People v. Wilson*, 93 N.Y.2d 222 (1999)........................................................................12

*Phelps v. McQuade*, 115 N.E. 441 (N.Y. 1917) .................................................. 2, 23, 24

*Poggi v. Scott*, 139 P. 815 (Cal. 1914)..........................................................................25

*Samuels v. Lido DAO*, 757 F. Supp. 3d 951 (N.D. Cal. 2024) .......................................5

*SEC v. Dorozko*, 574 F.3d 42 (2d Cir. 2009) ...............................................................23

*SEC v. Loewenson*, 290 F.3d 80 (2d Cir. 2002)..................................................... 21, 28

*Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311 (1991)..............................24

*United States v. 13328 and 13324 State Highway 75 North*, 89 F.3d 551 (9th Cir. 1996).....................................................................................................................22

iv

*United States v. Brimberry*, 779 F.2d 1339 (8th Cir. 1985) .........................................28

*United States v. Durham*, 86 F.3d 70 (5th Cir. 1996)...................................................22

*United States v. Eisenberg*, 784 F. Supp. 3d 579 (S.D.N.Y. 2025).......................*passim*

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008) ......................................... 19, 20

*United States v. Haqq*, 278 F.3d 44 (2d Cir. 2002) ................................................ 12, 24

*United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411 (2d Cir. 2001)................28

*United States SEC v. Universal Express, Inc.*, 2008 U.S. Dist. LEXIS 35342
    (S.D.N.Y. Apr. 30, 2008) .................................................................................. 25, 27

*X/L Datacomp v. Wilson (In re Omegas Grp.)*, 16 F.3d 1443 (6th Cir. 1994) ............21

## Statutes

28 U.S.C. § 1610 ..........................................................................................................25

28 U.S.C. § 1610(f)(1)(B).......................................................................................... 25, 26

28 U.S.C. § 1610 note..................................................................................................25

International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. ................25

Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322 ...... 11, 25, 26

N.Y. C.P.L.R. § 5225 ................................................................................................1, 9

N.Y. C.P.L.R. § 5239 ............................................................................. 1, 2, 10, 29, 30

U.C.C. § 2-403...........................................................................................................22

U.C.C. § 12-104(d) ....................................................................................................25

## Rules

Fed. R. Civ. P. 69(a) ...................................................................................................8

v

**Other Authorities**

*Aave, Aave 101, Aave Protocol Documentation*, https://aave.com/docs/aave-101 .......18

*Aave*, https://x.com/aave/status/2056049190841594179?s=20 (May 17, 2026).............8

George Gleason Bogert, et al., *The Law of Trusts & Trustees* § 476 (2d ed. rev. 1978) ...............................................................................................................................28

Richard A. Epstein, *Torts* 22 (9th ed. 2008) .............................................................25

Willa Gibson, *Untangling the Web of Consignment Law: The Journey From the Common Law & Article 2 to Revised Article 9*, 10 William & Mary Bus. L. Rev. 413 (2022).........................................................................................................22

Presidential Determination, *Determination to Waive Attachment Provisions Relating to Blocked Property of Terrorist-List States*, 65 Fed. Reg. 66483 (2000)...........................................................................................................................26

Sam Reynolds, *Aave Restores Ether Borrowing Limits After $230 Million Exploit*, CoinDesk (May 18, 2025) .......................................................................................8

David Siegel, *New York Practice* § 486 ........................................................................9

David Siegel, *Practice Commentaries N.Y. C.P.L.R. 5239* (2013)................................10

**INTRODUCTION**

Plaintiffs are the family members of people injured and killed by terrorism committed and sponsored by Defendant the Democratic People's Republic of Korea ("North Korea"). Plaintiffs hold judgments collectively worth $877,439,132 against North Korea, pursuant to which North Korea has so far paid nothing. Plaintiffs seek through this motion to determine who should get 30,766 ETH (the "Immobilized Assets"), crypto assets that are being held as authorized by this Court in an address controlled by Garnishee Aave LLC and against which Plaintiffs have served a writ of execution and a restraining notice. ECF Nos. 52, 34. Plaintiffs bring this motion for turnover and to determine claims under C.P.L.R. Sections 5225 and 5239, which together give this Court "an all-inclusive tool for the settlement of almost any problem that may arise in connection with the enforcement of money judgments," *Herman v. Siegmund*, 415 N.Y.S.2d 681, 682 (2d Dep't 1979).

Plaintiffs have an execution lien on the Immobilized Assets because North Korea obtained title to them before Plaintiffs served a writ of execution. After North Korea wrongfully obtained rsETH from Kelp DAO ("the first transaction"), North Korea then used the Aave protocol to exchange the rsETH for ETH ("the second transaction"). The key point is that the second transaction was not larceny. Whether described as a consensual transaction, fraud, or theft by false pretenses, North Korea used rsETH as collateral on Aave to obtain ETH from willing suppliers in an arm's-length transaction that did not violate any Aave rules. In *United States v. Eisenberg*, another judge of this Court addressed a materially identical transaction and concluded that it was not fraudulent because borrowing against deliberately and

1

wrongfully inflated crypto collateral *is not wrongful* under a decentralized-finance protocol's rules. 784 F. Supp. 3d 579, 615–16 (S.D.N.Y. 2025). So too here. *E.g.*, Expert Report ¶¶ 28–31; ECF No. 41 at ¶¶ 11, 13 ("Transactions on the Aave Protocol are self-executed" such that "if predefined conditions are met, then the programmed outcome occurs automatically."). To the extent that the second transaction was wrongful, it was theft by false pretenses, which involves the transfer of voidable title to the property obtained. *People v. Norman*, 650 N.E.2d 1303, 1308 (N.Y. 1995) ("The gravamen of [false pretenses] was obtaining property, with the intent permanently to deprive the owner, by fraudulently inducing the owner to part with both possession and title through the use of false statements about some prior or existing facts." (emphasis removed)). Because Aave's ETH suppliers intended to part with title, title passed to North Korea, and Plaintiffs' execution lien is valid. *Phelps v. McQuade*, 115 N.E. 441, 442 (N.Y. 1917) (explaining that in theft-by-deception cases whether title passes is determined by transferor's intent).

But there may be others who wish to bring claims to the Immobilized Assets as well. Plaintiffs accordingly request that notice be sent to potential constructive-trust claimants under Section 5239 to "determine" potentially adverse claims to the Immobilized Assets and "foreclose" them, if necessary, after Plaintiffs' opposition.

## BACKGROUND

### I.    PLAINTIFFS' JUDGMENTS AGAINST NORTH KOREA

In 1993, Reverend Dong Shik Kim moved from the U.S., where he was a lawful permanent resident, to China to work as a missionary providing humanitarian and religious services to North Korean families who had fled across the Sino–Korean

2

border. *Kim v. Democratic People's Republic of Korea ["DPRK"]*, 950 F. Supp. 2d 29, 36 (D.D.C. 2013). In 2000, Reverend Kim was abducted by a member of the North Korean security services and secreted across the border into North Korea. *Kim v. DPRK*, 774 F.3d 1044, 1049 (D.C. Cir. 2014). No one outside North Korea has heard from Reverend Kim since. *Id.* Experts in North Korea's human-rights violations testified that North Korea sends those whom it deems to be "opponents of the . . . regime" to torture camps called *kwan-li-sos*. *Id.* at 1050. Experts further testified that Reverend Kim "suffered an untimely death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51.

Between July 12, 2006, and August 14, 2006, Hezbollah—which is a designated foreign terrorist organization under U.S. law—fired thousands of rockets and missiles at civilians in northern Israel. *Kaplan v. Hezbollah et al.*, ECF No. 57, No. 09-cv-646 (D.D.C. July 23, 2014). The rockets that landed in Israel had been sent to Hezbollah in the years prior to 2006 by North Korea, *id.*, and North Korean agents trained Hezbollah agents in military tactics for decades, *id.* The *Kaplan* plaintiffs are U.S. nationals who lived in Israel during Hezbollah's 2006 rocket attacks and were injured or killed. Their individual injuries were evaluated by a special master, whose conclusions were adopted (in large part) by the U.S. District Court for the District of Columbia. *Kaplan*, ECF No. 83 (D.D.C. Sept. 30, 2016).

On May 30, 1972, American citizens Carmelo Calderon-Molina and Pablo Tirado-Ayala arrived at what was then known as Lod Airport (it is now David Ben-Gurion airport) near Tel Aviv, as part of a large group of Puerto Rican pilgrims

touring Israel and visiting the Christian religious sites in the Holy Land. Three members of the Japanese Red Army, which was a designated foreign terrorist organization under U.S. law from 1997 to 2001, used automatic weapons and explosives that they had hidden in their luggage to indiscriminately murder 26 civilians and wound more than 80. Calderon-Molina was among the former and Tirado-Ayala was among the latter. *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 445 (D.P.R. 2010). North Korea sponsored the attack by providing material support to the Japanese Red Army. *Id.* at 448. The *Calderon-Cardona* Plaintiffs are the loved ones of Calderon-Molina and Tirado-Ayala. (Tirado-Ayala died in 2009 for reasons unrelated to the attack. His Estate joined the case as a Plaintiff thereafter.) The harm they suffered is detailed in the opinion of the United States District Court for the District of Puerto Rico. *Id.*

All Plaintiffs sued North Korea, obtained default judgments, and registered those judgments in this Court. All Plaintiffs have agreed to proportional distribution of any proceeds from collection of the judgments against crypto companies.

## II.    THE CURRENT ATTEMPT TO RECOVER ON THOSE JUDGMENTS[1]

### A.    Step One: North Korea Obtains rsETH From Kelp And Manipulates Its Value

The first step of the two transactions underlying this case begins with something called Kelp, operated by a partnership called Kernel DAO (hereafter "Kelp" or "Kelp DAO"). *See* Expert Report ¶¶ 23–24. Kernel DAO operates Kelp as an

---

[1] General background on blockchain technology and the services and entities underlying this case is available, if necessary, in the attached Expert Declaration.

Ethereum re-staking business in which it receives assets called sETH, issued by Lido DAO, *see Samuels v. Lido DAO*, 757 F. Supp. 3d 951, 957 (N.D. Cal. 2024) (explaining Ethereum staking businesses), and *re*-stakes them by issuing an asset called rsETH that is then redeemable for sETH, or for ETH itself. Expert Report ¶ 23. On April 18, 2026, North Korean agents caused a company called LayerZero, whose software underlies Kelp DAO, to falsely attest that rsETH on one blockchain had been deposited when it had not, which caused Kelp DAO to release more rsETH than it had ETH to back up. *See* Expert Report ¶ 41. The rsETH released by Kelp DAO was indistinguishable from any other rsETH; there simply was not enough ETH to back it up. *Id.* The consequence is that the implied value of *all* rsETH across the entire blockchain would decline, because the ratio of rsETH to ETH fell out of balance. *See* Expert Report ¶ 41.

### B.    Step Two: North Korea Exchanges rsETH for ETH on Aave

North Korean agents then sent rsETH to Aave, a protocol run by Aave DAO. Expert Report ¶¶ 28, 44. Aave allows what it calls "suppliers" to supply crypto assets into a pool and receive a variable yield for forgoing use of their assets. Here, the "suppliers" supplied ETH. ECF No. 41 at ¶ 15. On the other side of the exchanges, "borrowers" may withdraw ETH by putting into the pool collateral that has a higher value than the amount withdrawn, "as measured by protocol-defined parameters." *Id.* at ¶ 16. Because Aave is "trustless," by its own description, Aave requires that the market value of deposited collateral exceed the value of withdrawn assets in proportion to something it calls a "Health Factor," which is determined by Aave DAO.

Expert Report ¶ 31. These features make the Aave protocol very much unlike a traditional savings-and-loan in two important ways.

First, there are no legally enforceable contracts between "supplier" and "borrower"—that is, there is no enforceable obligation to repay or do anything beyond the initial exchange. Instead, the sole consequence of not returning the "borrowed" asset into the pool is that the collateral the "borrower" posted is sold by users referred to as "liquidators"; because the Protocol attempts to ensure that any "borrower" puts into the pool collateral worth more than the assets withdrawn, the liquidation makes the suppliers whole. Expert Report ¶¶ 31, 33. Indeed "the word 'borrow'" in this context just as easily could be the phrase "'Access Collateral,'" or "'Utilize Assets.'" *Eisenberg*, 784 F. Supp. 3d at 616.

Second, as the language of "pooling" indicates, there is no one-to-one correspondence between a single supplier and a single borrower in any transactions. Rather, "[t]o supply assets, a user transfers a supported digital asset into a pool of smart contracts associated with that asset." ECF No. 41 at ¶ 15. And likewise, "[a] user may borrow digital assets only after supplying collateral with a higher value than the amount borrowed." *Id*. at ¶ 16. In this way, no particular supplier can ever say "I supplied my ETH to this person and got exactly this amount of rsETH in return," nor can any borrower do the inverse. All transactions are processed through the pool of intermingled assets.

When North Korean agents deposited rsETH into Aave's protocol, the protocol functioned exactly as it was designed: It checked the prevailing market price of ETH

and rsETH, concluded that North Korea's deposit complied with the required collateral ratio, and released ETH. At that point, North Korea was, consistent with the Aave protocol, free to do whatever it wished with that ETH. Expert Report ¶¶ 31, 33, 47, 51. North Korea chose to launder the ETH through many bridges and mixers, using wallet addresses tied to other known North Korean activity—which supports the case that North Korea was the transactor here—and ultimately consolidated 30,766 ETH in an address on the Arbitrum blockchain that was promptly frozen by Arbitrum DAO. Expert Report ¶¶ 49, 50, 56–68.

### C. Aave Sees The Price of rsETH Plummet and Shuts Down the Pool.

After this transaction occurred, it was revealed that the relationship between rsETH and ETH had been compromised, which meant that "each individual rsETH necessarily represented less value." ECF No. 41 at ¶ 23. This was true for *all* rsETH, not just the "North Korean" rsETH. *See* Expert Report ¶ 41. This meant that the "rsETH posted as collateral was not fully backed," nor was any other rsETH. ECF No. 41 at ¶ 28. Thus, "the collateral left behind [by any depositor of rsETH, whether North Korean or not] could not cover the outstanding debt, and liquidation would not make Aave Pool depositors whole." *Id.* This caused Aave DAO to "fr[eeze] [its markets], so that the problem could not spread further." *Id.* at ¶ 32. For a time, "all available liquidity was exhausted, meaning any user who wanted to withdraw their assets could not do so." *Id.*

7

### D.    Aave Restores The Pool and Stabilizes the Market.

Since the initial transaction, Aave has recently restored access to the pool and, through a series of recoveries and contributions, nearly the full collateral backing rsETH has been restored. According to Aave's official *X* (née Twitter) account, the loan-to-value ratios for the assets in the pools "have been restored to their pre-incident values" so that "[]ETH now operates as normal across all affected V3 deployments." AAVE, https://x.com/aave/status/2056049190841594179?s=20 (May 17, 2026). As an industry publication explains, "Aave's move signals that immediate systemic risk has eased even as legal and liability questions persist." Sam Reynolds, *Aave Restores Ether Borrowing Limits After $230 Million Exploit*, COINDESK, May 18, 2026. And because the markets are back operating as normal, it appears that no protocol users will suffer any direct losses; any user who wants to withdraw ETH supplied before April 18 may now do so at the same "pre-incident" rate. *Id.*

### ARGUMENT

### I.    PLAINTIFFS HAVE AN INTEREST IN THE IMMOBILIZED ASSETS AND MAY EXECUTE ON THEM IN THIS PROCEEDING

#### A.    Legal Standard for Turnover and Execution of Terrorism Judgments

The procedures for enforcing a judgment registered in this Court begin with the Federal Rules, which provide that, absent a governing statute (which does not apply here), "the procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a). Those procedures, in turn, are specified in New York Civil Practice Law and Rules Article 52. Under Article 52, "those property

interests of the judgment debtor 'which by law the debtor may assign or transfer, may be sought for application to the judgment.'" *All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 24 (2d Cir. 1999) (citing David Siegel, *New York Practice*, § 486, at 742; *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674 (1976)). Where those interests are capable of being turned over by a third party—called a "garnishee"—who holds them on the judgment debtor's behalf, the judgment creditor's process begins by serving a writ of execution on the executing officer (in this case the U.S. Marshal), which establishes a lien over the judgment debtors' property. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991) ("Under New York law, a judgment creditor becomes a 'judgment lien creditor' as to personal property . . . after execution is delivered to the sheriff"). This has already happened here. ECF No. 34.

Plaintiffs are thus entitled to turnover of all of North Korea's (or its agencies or instrumentalities') "property interests" held by the Garnishee, which is now Aave LLC as authorized by order of this Court. ECF No. 52. Because Aave is concededly a proper garnishee and because (as explained below) Plaintiffs prove that the entity acquiring the ETH at issue in this case is North Korea, against which Plaintiffs hold a valid judgment to which sovereign immunity does not apply (*see, e.g.*, ECF No. 4-1 at 17), the only questions will be (a) what "property interests" North Korea has in the ETH, C.P.L.R. § 5225; *Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014) (explaining that for purposes of the Foreign Sovereign Immunities Act courts in this Circuit "look to state law to define the 'rights the [judgment debtor] has

9

in the property the [creditor] seeks to reach'"), and (b) whether any other claimant has successfully asserted rights to the ETH, C.P.L.R. § 5239.

Section 5239, under which this motion is filed, "provides for a stakeholder action in which parties may assert competing claims to property owned by the judgment debtor." *Cruz v. TD Bank, N.A.*, 711 F.3d 261, 269 (2d Cir. 2013). Although typically parties with adverse claims to property file special proceedings against garnishees or garnishees implead parties with adverse claims, Section 5239 "is the path to the courthouse for a claimant who wants to have a priority or lien or other dispute with another claimant ironed out," *id.* (citing David Siegel, *Practice Commentaries N.Y. C.P.L.R. 5239* (2013)), and operates as "an all-inclusive tool for the settlement of almost any problem that may arise in connection with the enforcement of money judgments," *Herman v. Siegmund*, 415 N.Y.S.2d 681, 682 (2d Dep't 1979); *see also Nat'l Union Fire Ins. Co. v. Eland Motor Car Co.*, 85 N.Y.2d 725, 729 (1995) (noting that C.P.L.R. § 5239 permits "[r]ival claimants" to be joined in one proceeding "so that the court may prioritize the competing interests"). Plaintiffs thus file this motion under Section 5239 to determine, and if necessary "foreclose," any adverse claims to the immobilized ETH.

### B. North Korea is the Perpetrator and Sovereign Immunity Does Not Apply

Transactions on blockchains are pseudonymous—any person can see that Address A sent a token balance to Address B at a specific time, but without connecting those addresses to specific people, no one knows who conducted the transaction. The process of determining to whom addresses belong is generally called "attribution."

10

Plaintiffs' experts have carefully examined the transactions underlying this case and have found two categories of evidence linking those transactions to North Korea or its agency or instrumentality, the Lazarus Group. First, whoever conducted the transactions underlying this case transferred control of its assets to a wallet address that has been previously attributed to North Korean agents. This is very strong evidence that the person who conducted these transactions is a North Korean agent. Expert Report ¶¶ 61, 65–67. Second, the methods and patterns underlying these transactions match those previously used by North Korean agents. For this reason, it is the opinion of Plaintiffs' experts—who are qualified and who used reliable methods—that the transactions in this case were very likely committed by North Korean agents. Expert Report ¶¶ 58-62, 68. Because this case is governed by the TRIA (*see* ECF No. 4-1, explaining that immobilized North Korean assets in the custody of U.S. garnishee are "blocked") no sovereign immunity bars execution here.

### C.    North Korea Has Title to The Immobilized ETH

The dispositive issue is whether North Korea had title to the Immobilized Assets at the time they were frozen by Arbitrum DAO. The parties appear to agree that if the Aave transaction was larceny, North Korea would not have obtained title. And if it was not larceny—if it was a consensual transaction, fraud, or theft by deception or false pretenses—North Korea would have obtained title. The Aave transaction was not larceny because the Aave suppliers willingly transferred unrestricted ownership in the Immobilized Assets. *See infra* § I.C.1. From there, the correct categorization is largely academic, as all other options lead to transfer of title. In Plaintiffs' view, the Aave transaction was neither theft nor fraud; it is best

11

described as the secondary result of market manipulation, which is what the only court to have confronted a similar transaction with a crypto liquidity pool concluded. *See United States v. Eisenberg*, 784 F. Supp. 3d 579, 615–16 (S.D.N.Y. 2025); *see infra* § I.C.2. But if the transaction were a theft, it would be theft by deception or false pretenses, not larceny. *See infra* § I.C.3. Either way, title passed to North Korea, subject to any valid constructive-trust claim that may be asserted.

Arbitrum DAO's initial act of freezing and immobilizing the assets, therefore, did not change anything about the property's ownership or title. Arbitrum DAO did not purport to take ownership of the Immobilized Assets, nor could it; Arbitrum DAO's act of freezing took possession but not ownership, as Aave LLC concedes. ECF No. 41 ¶ 52. If North Korea had no more than possession ever it would have no rights now, but because it acquired title, Arbitrum DAO's freezing did not change that.

### 1. *The Aave transaction was not larceny.*

At common law, the defining feature of larceny was that it required a "trespassory taking," *i.e.*, the taking of personal property from the owner's possession without consent—as in the classic "smash and grab." *People v. Norman*, 650 N.E.2d 1303, 1307 (N.Y. 1995); *United States v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002) (citing *People v. Wilson*, 93 N.Y.2d 222, 226 (1999), in which the "[d]efendant was convicted of forcibly stealing boots from a shopping mall security guard," *id.* at 223). Over time, the concept of larceny was expanded to include instances where the owner willingly parted with the property but "with the understanding that it was to be used for a particular purpose," and the wrongdoer exceeded that purpose—imagine the coat check attendant who walks off with someone's coat. *People v. Saia*, 492 N.Y.S.2d 306,

12

306 (App. Div. 1985). But it is *not* larceny if the owner willingly "gives the property to the defendant . . . intending the defendant . . . to become the unconditional and unrestricted owner." *People v. Traster*, 111 Cal. App. 4th 1377, 1387 (2003). The latter scenario can be fraud or theft by deception if the owner is induced by a misrepresentation, but it is not larceny, because the owner willingly parted with the property unconditionally. *Norman*, 650 N.E.2d at 1307 (explaining theft by false pretenses)

The Aave transaction was not a larceny. The Aave suppliers willingly parted with their ETH. Nobody hacked their crypto accounts or broke into their houses to steal their hard drives. The suppliers intended to, and did, transfer the Immobilized Assets into the Aave liquidity pool, making those assets available to anyone who posted the required collateral. Indeed, the nature of the protocol renders larceny effectively impossible: ETH suppliers necessarily intend to give the ETH they place into the pool free and clear to any counterparty who posts an amount of collateral set by Aave.

Nor do Aave suppliers place ETH into the liquidity pool "with the understanding that it was to be used for a particular purpose." *Saia*, 492 N.Y.S.2d 306. As described above, Aave suppliers have no rights to compel return of the ETH they supply to the pool; indeed, because of the pooled nature of the protocol, there is not even an identifiable "borrower" paired with any identifiable "supplier." Rather, the ETH recipients in the exchange become the "unrestricted owners" of the ETH they obtain, *Traster*, 111 Cal. App. 4th at 1387, with the value of the rsETH they

13

deposited compensating the supplier. In this sense, the term "borrower" is a misnomer. As the *Eisenberg* court explained in describing a functionally identical DeFi protocol, "borrowing" in this context does not "entail[] an obligation to repay— or any other obligation for that matter—even if that's how the term is conventionally understood." *Eisenberg*, 784 F. Supp. 3d at 615.

The suppliers participated because they trusted the protocol to properly evaluate the value of rsETH and require sufficient collateral for each exchange—the required ratio, after all, is not determined by supply and demand but rather set by Aave DAO. *See* Expert Report ¶ 40. For a time after North Korea did its transaction with Kelp, the protocol substantially overvalued rsETH relative to what it would later be worth when North Korea's manipulation of Kelp DAO was revealed. That may make the transaction manipulative, fraudulent, or even theft by false pretenses—but not larceny. At all times, Aave suppliers in fact *intended* to pass ownership and possession of the ETH they placed into the pool, because that is the only way the protocol works.

Aave has repeatedly characterized the transaction as akin to a jewel theft and said the ETH was "stolen." ECF No. 42 at 3–4 (discussing diamond theft hypothetical); *id.* at 15 (same). Aave also contended at this Court's recent hearing that an analogy might be that North Korea forged a "skeleton key" to unlock the metaphorical box containing Aave lenders' ETH, *contra* May 6 Tr. at 20. Neither is an apt analogy.

14

As explained, this is not like a jewelry smash and grab because the protocol users willingly engaged in the transactions. And it is not like a forgery because the rsETH North Korea deposited was real, genuine rsETH. That is, if the Aave suppliers today presented the rsETH supplied by North Korea to Kelp DAO, Kelp DAO would recognize it as genuine rsETH. Expert Report ¶ 41. The rsETH became less valuable moments after the transaction than it appeared at the time of the transaction, but it was still rsETH. North Korea's conduct may have been market manipulation—using a "manipulative device or contrivance" to unfairly inflate the value of its assets for the purpose of borrowing against them. And North Korea's first hacking transaction with Kelp DAO may have been theft (more on that below). But the Aave transaction was not forgery, because the rsETH was real, and it was not larceny because the Aave suppliers intended to part with title to their assets using a protocol that explicitly enabled exactly what happened here. There is no authority for the proposition that depositing a genuine asset into a liquidity pool is garden-variety theft merely because a manipulative transaction committed elsewhere causes that asset's price to decline.

One way to understand why the second transaction was not larceny, then, is to consider the position of people who supplied *other* assets in *other* liquidity pools for which rsETH was the collateral in April of this year—that is, people who never transacted with North Korea *at all*. All of these hypothetical traders suffered the exact same harm the Aave suppliers did: because North Korea inflated the supply of rsETH, the price of all rsETH plummeted, leaving suppliers of ETH all over the market with bad collateral or having made bad trades. That is why Aave froze the

15

entire market. ECF No. 41 ¶ 32. And that is also why, when the market was restored, all users could freely trade again, AAVE, *X, supra,* regardless of whether they were, in some sense, "directly" impacted. North Korea thus did not steal ETH from anyone; it wrongfully tanked the price of rsETH, harming the people with whom it transacted just as it harmed other holders of rsETH. North Korea acquired rsETH illegitimately. But when North Korea exchanged that rsETH on an open, functioning market through arms'-length transactions, North Korea acquired title to the ETH.

To see this clearly from still another perspective, suppose North Korea had illegitimately obtained *one* unbacked rsETH from KelpDAO, rather than hundreds of millions, then done the same thing it did in its second transaction. In that case, the Aave suppliers could not possibly contend that they had been stolen from: they would have traded one ETH for more than one rsETH, and because that rsETH would be redeemable for ETH with Kelp DAO (whose shortfall would be so trivially small as to have no effect on the price), each rsETH would be worth roughly the same as the traded ETH. No harm, no foul, and so no theft. But nothing about the volume of North Korea's rsETH theft has any bearing on the property rights exchanged during its transaction, and so just as there can be no theft in this hypothetical, there is no theft here. At the end of the day, the harm Aave suppliers suffered was due to the after-the-fact decrease in the market price of rsETH—not because they had anything stolen from them against their wills.

### 2.    *The Aave transaction was not fraud or theft by deception.*

Because it was not larceny, it is academic whether the Aave transaction is characterized as consensual, fraud, or theft by deception—in any of those cases, title

16

would have passed. But in Plaintiffs' view, and based on indistinguishable precedent, there was no fraud or deception. North Korea likely engaged in theft in the hacking transaction and then market manipulation, but it did not make any misrepresentation in the Aave transaction.

As explained in detail in the Expert Report and above, the Aave transaction went like this: North Korea "supplied" rsETH to an Aave liquidity pool and received ETH in return. Before allowing the transaction, the protocol checked the market price of both assets and, finding that the transaction was sufficiently collateralized, released ETH to North Korea. Expert Report ¶¶ 31, 47. North Korea provided the required amount of rsETH and received the corresponding amount of ETH as determined by the protocol. To be sure, the protocol misjudged the value of rsETH because of North Korea's not-yet-discovered market manipulation. But North Korea provided exactly as much rsETH at the protocol required, and in doing so made no representations about whether the protocol was properly assessing its value.

In *United States v. Eisenberg*, another judge of this court addressed a materially identical transaction. *See* Expert Report ¶¶ 34–36 (opining that the second transaction was materially identical to the one in *Eisenberg*). There, the defendant conducted wash trades on exchanges to manipulatively inflate the price of an asset, MNGO, then borrowed on a liquidity protocol called Mango Markets against the inflated value of that asset. 784 F. Supp. 3d 579, 615–16 (S.D.N.Y. 2025). The court held that the transaction was not fraudulent. *Id.* Even though the *Eisenberg* defendant deposited collateral that appeared to be worth vastly more than it would

17

have been absent the defendant's own wrongful conduct elsewhere, the court held that he made no misrepresentation in doing so. While the government argued that his act of "borrowing" funds with no intention to return them was like "signing a contract with no intent to honor one's obligations under that contract, which the Second Circuit has held can be fraudulent," the court rejected that argument, explaining that Mango Markets—like Aave—did not "require[] any user to promise that they would repay funds as a condition of borrowing against their assets." *Id.* at 615. Instead, the court held, the "platform [had] no rules, instructions, or prohibitions about borrowing." *Id.* at 617. Even though Eisenberg "knew that the value of his portfolio was the product of his market manipulation, and he knew it wouldn't stay valuable for long," *id.* at 616, he made no "implicit misrepresentation by allowing the algorithm to measure *the actual value of his collateral*" at the time of his transaction. *Id.* at 617 (emphasis added).

So too here. Aave LLC admitted that during the Aave transaction, "Aave's smart contracts were not compromised at any point . . . . All protocol logic, including supply, repayment, and liquidation mechanisms, continued to function as designed. The incident originated entirely outside of Aave, stemming from conditions related to the underlying rsETH asset." Expert Report ¶ 51 (incorporating Aave post-mortem). Aave has no rules forbidding users from offering to exchange assets whose value they have inflated elsewhere for other assets. Expert Report ¶¶ 35–36; *see also* AAVE, *Aave 101, Aave Protocol Documentation*, https://aave.com/docs/aave-101 (describing Aave's "[t]rustless execution" where "[o]perations are executed automatically without

relying on a central party"). And Aave's terms warn users that the transactions are permissionless and not subject to insurance or other guarantees. ECF No. 47-6 at 5 ("Among other risks, cyberattacks. . . could disrupt these technologies and even result in a total loss of cryptoassets, their market value, or digital funds. We assume no liability or responsibility for any such risks."). The protocol, in other words, allows the transaction that happened here: Anyone who wants to deposit rsETH on Aave in exchange for ETH may do so. Accordingly, like the defendant in *Eisenberg*, North Korea did not make any misrepresentation when it used its rsETH to withdraw ETH as permitted by the protocol. That transaction—neither larcenous nor fraudulent— thus passed title to North Korea, which means Plaintiffs have a prima facie claim sufficient to support maintenance of the Restraining Notice.

Perhaps Aave LLC will argue that although the *Eisenberg* court held that a transaction just like the one underlying this case was not fraudulent, that does not mean the court held that the transaction was not larcenous. In *United States v. Finnerty*, the Second Circuit upheld a judgment of acquittal where the defendant was alleged to have committed fraud by "interpositioning" trades on the New York stock exchange, a practice that involved intercepting trades before they reached their intended public counterparties. *See, e.g.*, *United States v. Finnerty*, 533 F.3d 143, 149 (2d Cir. 2008). The court said that *Finnerty* instead may have committed "garden-variety conversion," though, because he intercepted trades between intended counterparties. Thus, Aave LLC may argue, the mere fact that the conduct here was not fraudulent under *Eisenberg* does not mean it was not larcenous. But that

19

argument, if Aave LLC makes it, runs headlong into the *Eisenberg* courts' reasoning: The *reason* the *Eisenberg* transaction was not fraudulent was that the platform on which it was made *permitted* it. 784 F. Supp. 3d at 617. And *Finnerty* explained that the interpositioning was not fraud even though it was a violation of stock exchange rules, 533 F.3d at 149, but may instead have been larceny (or "conversion") because the defendant had possession of the assets in trade under NYSE rules solely for the purpose of trading them *with counterparties*, *id.*, unlike in *Eisenberg*, where the borrowed assets were, as here, unrestricted, 784 F. Supp. 3d at 617. Therefore, *Eisenberg* cannot have involved a trespassory taking of assets because the taking of assets was, as here, in compliance with the rules governing the platform. *Id.* *Eisenberg* is squarely on point here.

    3.  *The Aave transaction was, at worst, theft by false pretenses or deception, which transfers title.*

If this Court disagrees with *Eisenberg* and concludes that North Korea's act of depositing rsETH was an implicit false representation about the value of rsETH on which Aave lenders implicitly relied, then the transaction would be fraudulent, but still not larcenous—and North Korea thus still would have acquired title to the Immobilized Assets.

"Theft by false pretenses occurs where the defendant makes a false representation with the intent to defraud the owner of his or her property, and the owner is in fact defrauded." *People v. Ingram*, 65 Cal. App. 4th 500, 507 (1998). One who acquires property by virtue of any voluntary or consensual transfer of title—even if that transfer is induced by fraud or false pretenses—acquires title to the property.

20

Indeed, the passing of title is the distinction between fraud or theft by deception on the one hand and larceny on the other: "The distinction between larceny and obtaining money or property by false pretenses turns on a question of title. The defendant who obtains property by larceny does not obtain title, while the defendant who obtains property by false pretenses does obtain title." *Id.* (citations and quotation marks omitted); *see also Norman*, 650 N.E.2d at 1308 ("The gravamen of [false pretenses] was obtaining property, with the intent permanently to deprive the owner, by fraudulently inducing the owner to part with both possession and title through the use of false statements about some prior or existing facts." (emphasis removed)). Fraud and false pretenses transfer title; larceny does not. *Id.*

Many cases address this issue when debtors defraud people shortly before seeking bankruptcy protection, leaving a conflict between the fraud victims and the debtors' other creditors. *E.g.*, *X/L Datacomp v. Wilson (In Re Omegas Grp.)*, 16 F.3d 1443, 1449 (6th Cir. 1994). In *Cunningham v. Brown*, for example, the Supreme Court addressed claimants to money withdrawn from Charles Ponzi's fraudulent accounts. 265 U.S. 1, 12 (1924). The Court held that Ponzi obtained "defeasible title" to that property and that although victims who can trace their transactions to specific property may be able to impose constructive trusts, because Ponzi obtained title, the proceeds should be distributed ratably among his victims. *Id.* ("[T]he defrauded lender becomes merely a creditor to the extent of his loss."). Many cases addressing Ponzi schemes follow suit, holding that assets should be distributed ratably among claimants. *See also SEC v. Loewenson*, 290 F.3d 80, 89 (2d Cir. 2002) (citing and

21

quoting *Commodity Futures Trading Commission v. Topworth International, Ltd.*, 205 F.3d 1107, 1115–16 (9th Cir. 2000) (affirming district court's approval of pro rata distribution plan where assets were commingled); *United States v. 13328 and 13324 State Highway 75 North*, 89 F.3d 551, 553–54 (9th Cir. 1996) (same); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (affirming district court's approval of pro rata distribution plan even though the majority of funds were traceable to specific claimants)).

Indeed, the UCC (whose application is discussed in more detail below) supports the distinction drawn by the common law. Courts often look to Article 2 of the UCC to answer questions that are not answered specifically by other articles. *See* Willa Gibson, *Untangling the Web of Consignment Law: The Journey From the Common Law & Article 2 to Revised Article 9*, 10 WILLIAM & MARY BUS. L. REV. 413 (2022) (noting analogies between Article 2 and Article 9). And, under Article 2, "a purchaser . . . acquires all title which his transferor had or had power to transfer . . . even though the transferor was deceived as to the identity of the purchaser, or . . . the delivery was in exchange for a check which is later dishonored, or the delivery was procured through fraud *punishable as larcenous* under the criminal law." U.C.C. § 2-403 (emphasis added). This rule makes sense from a commercial perspective because it is easy for a buyer to determine whether the seller obtained property by larceny (ask for a receipt), but impossible to tell whether the seller may have obtained the property by fraud.

At the emergency hearing on May 6, this Court asked whether this case might be analogous to a hypothetical where a paired-options trader uses a false access credential to misrepresent that she worked for a bank when in fact she did not. Trans. at 28. With a fuller understanding of the facts, it is now clear to Plaintiffs that the analogy does not quite fit these facts. The key distinction is that here, North Korea's transactions on the Aave Protocol complied with Aave's rules, unlike (one would think) in the hypothetical. Thus, in the Court's specific hypothetical, the transaction was likely larcenous because although there was a misrepresentation, *SEC v. Dorozko*, 574 F.3d 42, 44 (2d Cir. 2009) (holding that stealing access credentials and using them to get insider information was fraud), that misrepresentation was not to the victim and so the transaction likely did not pass title, *see Phelps v. McQuade*, 115 N.E. 441, 442 (N.Y. 1917) (discussing impersonations). The outcomes in cases of impersonation fraud are quite subtle. *Id.* (noting that "[w]here the vendor of personal property intends to sell his goods to the person with whom he deals, then title passes, even though he be deceived as to that person's identity or responsibility"); *see also Norman*, 650 N.E.2d at 1308 (collecting cases). But here there was no impersonation fraud, and the transaction intentionally occurred on a permissionless and anonymous platform with no rules requiring authentication or preventing manipulation of the kind that occurred here. Expert Report ¶¶ 35-36. Aave users all intended to give title to the supplied assets and, therefore, the transaction passed title even if it was induced by a kind of deception in the value of the rsETH that North Korea placed into the pool.

23

In sum, the second transaction is not "trespass in the taking" because it is not even a trespass, *Ingram*, 65 Cal. App. 4th at 507; it is not fraud or "theft by false pretenses," *id.*, because there were no false pretenses, *Eisenberg*, 784 F. Supp. 3d at 615–17; and even if it were theft by false pretenses, title passed (subject to a claim of constructive trust if one is made), *Phelps*, 115 N.E. at 442.

> 4.      *The shelter principle does not apply, but even though the first transaction did not pass title to rsETH the second transaction passed title to ETH and federal law may prevail anyway*

Returning to Aave's initial, inapt metaphor: suppose a thief smashes a case at Tiffany's, grabs some jewels, and runs out the door. ECF No. 42 at 3. At common law, the thief obtains no title to the jewels. *Phelps v. McQuade*, 220 N.Y. 232, 234 (1917). Instead, the thief acquires mere possession—the thief's rights are good against a subsequent thief, *Anderson v. Gouldberg*, 53 N.W. 636, 637 (Minn. 1892); *see also United States v. Haqq*, 278 F.3d 44, 50–51 (2d Cir. 2002) (explaining that one who commits larceny has "possessory interest" in stolen item), but are otherwise none, *Anderson*, 53 N.W. at 637. At common law, this means that when the thief sells the property to a bona fide purchaser with no notice that it was stolen, the theft victim can prevail in a replevin action *against the bona fide purchaser*. *See, e.g.*, *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 318 (1991).

The Uniform Commercial Code, where it applies, changes the relationship between the theft victim and the good-faith purchaser through the "shelter principle," under which even a rank thief passes good title to property acquired by larceny upon its sale to a good-faith purchaser for value. *In re Samuels & Co.*, 526 F.2d 1238, 1242

24

(5th Cir. 1976). This means that a theft victim cannot bring an action in replevin (or otherwise) against the purchaser. *E.g.*, U.C.C. § 12-104(d).

But the Code does not change the relationship between the victim *and the thief*. *E.g.*, U.C.C. § 12-104(d) (maintaining the common-law rule that "[a] purchaser of a controllable electronic record acquires all rights in the controllable electronic record that the transferor had or had power to transfer"). The rule remains, then, as Plaintiffs explained in their opening submission on this issue, that "[a]ssuming the seller had good title to the property before it was exchanged for the stolen money, that title is conveyed by the sale to the embezzler or thief." *United States SEC v. Universal Express, Inc.*, 2008 U.S. Dist. LEXIS 35342, at *10 (S.D.N.Y. Apr. 30, 2008). The victim can recover against the thief through the imposition of a constructive trust (discussed below), *id.*, or in a tort action for damages, *e.g.*, RICHARD A. EPSTEIN, TORTS 22 (9th ed. 2008) (explaining damages case for converted wine, *Poggi v. Scott*, 139 P. 815 (Cal. 1914)). But the thief is the legal owner of the property acquired in exchange for stolen property. *Universal Express*, 2008 U.S. Dist. LEXIS 35342, at *10 (citing *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 930–31 (6th Cir. 2000)).

Finally on this point, as explained above, this case is governed by the TRIA, which requires that property of terrorist states be subject to execution of judgments for terrorism "notwithstanding *any* other provision of law." TRIA was enacted as a note to Section 1610. Section 1610(f)(1)(B) reads that "Subparagraph (A) [which strips execution immunity for terrorism judgments as to all property regulated by, among other statutes, IEEPA] shall not apply if, at the time the property is expropriated or

25

seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons." This section has little practical implication because the President is permitted to waive it, *id.*, and every President since President Clinton has, *e.g.*, THE PRESIDENT OF THE UNITED STATES, *Determination to Waive Attachment Provisions Relating to Blocked Property of Terrorist-List States*, 65 FR 66483 (2000). But because this specific exception carves out certain property that terrorist states "expropriate[]" or "seize[]" from "natural persons" or from trusts created for their benefit, 28 U.S.C. § 1610(f)(1)(B), Congress clearly knew how to exempt property stolen by terrorist states from execution of terrorism judgments. But in TRIA, Congress's law admits of exactly one exception: "the President may waive [TRIA as to] . . . execution against any property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations."

No court, to counsel's knowledge, has addressed a state that *seizes* property and is then subject to writs of execution from its other victims, but the plain text of Section 1610 as a whole requires this Court to subject even seized property to the execution of terrorism judgments. Because, as explained above, North Korea obtained title to the Immobilized Assets, this Court does not need to address this question. But in the unlikely event that the Court concludes that every transaction in this case is larceny, and that North Korea never obtained title to the Immobilized Assets, Plaintiffs respectfully request that the Court order the assets turned over to Plaintiffs

under TRIA or, in the alternative, provide the parties an opportunity to brief the question if and when any adverse claimants respond to the notice.

## II.    TO FULLY RESOLVE ALL POSSIBLE CLAIMS ON THE IMMOBILIZED ASSETS, A NOTICE AND CLAIMS PROCEDURE SHOULD APPLY, AS AUTHORIZED BY CPLR § 5239

While Plaintiffs have a right to have the property turned over to them for the reasons explained, that turnover should happen with title clear of all possible claims, including the claims of those who think they could assert an ownership interest derived from a state-law constructive trust. Accordingly, without conceding that any other possible claimant has a claim superior to theirs, Plaintiffs suggest this Court adopt a notice and claims procedure before ultimately awarding the assets turned over.

### A.    Unknown People May Wish to Bring Constructive Trust Claims

Courts may impose constructive trusts in two circumstances that are potentially relevant here. But constructive trusts are never imposed unless a party with a legal interest in the *res* asks for a trust. And so the Court should deny the separately filed motion to vacate because no party with a legal interest has asked for a constructive trust, and then grant this request to determine claims after notice and an opportunity for other potential interested parties to file claims.

First, where a thief steals property and exchanges it for other property, the thief may receive the second property subject to a constructive trust for the theft victim. As Judge Lynch explained in *Universal Express*, "[a]lthough the victim of the theft may not recover the stolen money from a good faith seller, he may be able to recover the property purchased with the stolen money (and over which the thief has

27

title) by virtue of 'a constructive trust . . . imposed on the proceeds held by the thief or embezzler.'" 2008 U.S. Dist. LEXIS 35342, at *11 (quoting *In re Newpower*, 233 F.3d at 931, and citing GEORGE GLEASON BOGERT, ET AL., THE LAW OF TRUSTS & TRUSTEES § 476 (2d ed. rev. 1978); *United States v. Brimberry*, 779 F.2d 1339, 1347–49 (8th Cir. 1985)). In these circumstances, "[c]ourts will generally impose a constructive trust on property 'traceable' to the stolen or misappropriated property." *Id.* (citing *United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 416 (2d Cir. 2001); *In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880, 891 (11th Cir. 2003); *In re Van Meter*, 135 F. Supp. 781, 785–86 (D.C. Ark. 1955)).

Second, courts impose constructive trusts on property given to a fraudster who lacks sufficient assets to pay back all the victims. *See, e.g.*, *Loewenson*, 290 F.3d at 89 (collecting cases). Courts do this to promote the rule that "equality is equity," *Cunningham*, 265 U.S. at 13, and a fraudster's victims should be compensated in proportionate shares out of what remains of the fraudster's assets, *id.*

But constructive trusts are *remedies* available to people with property interests in the *res* who *ask for a trust*. *In re Miss. Valley Livestock, Inc.*, 745 F.3d 299, 304–05 (7th Cir. 2014). (explaining that constructive trust allows people to "demand" property and that a "restitution claimant must at a minimum prove its interest in specific property in the estate's possession to warrant the remedy of constructive trust"); *First Central*, 377 F.3d 209, 215 (2d Cir. 2004) (explaining that constructive trust is an "equitable remedy"). Counsel, after a thorough search, has found no case imposing a constructive trust when no one asked for one.

28

And whoever else may claim an interest in the Immobilized Assets, Aave LLC does not and cannot. Aave LLC says in its own terms of service that "[i]t is important to understand that neither we nor any affiliated entity is a party to any transaction on the blockchain networks underlying the Aave Protocol; we do not have possession, custody or control over any cryptoassets, or any user's funds." ECF No. 47-6 at 3. Instead, Aave LLC, which has no legal relationship to the eponymous protocol, Expert Report ¶ 35, contends that "[t]he [Immobilized Assets] belong[] to Aave Protocol users." ECF No. 41 at ¶ 39. And Aave LLC contends that "user losses arising from this type of exploit are not readily reversible through later monetary compensation," *id.* at ¶ 30, which means whatever Aave LLC's response to this Court's Question Six is (for the supplemental brief), users cannot be made whole with a simple transfer of the Immobilized Assets to their accounts.

So far, then, Plaintiffs are the only people with any legal or beneficial interest who are before the Court. To determine whether a constructive trust is appropriate the Court will have to evaluate any constructive-trust claims on the Immobilized Assets, and so far no one has made one. But there may be someone out there who wishes to make one. That is why Plaintiffs suggest a notice procedure below.

**B.      Notice And an Opportunity to File Claims Is an Appropriate Way to "Determine" Rights to The Immobilized Assets**

Under Section 5239, this Court is empowered to "determine" the claims of rival claimants by "joining" them in a special proceeding. *E.g.*, *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 74 (2013); *Nat'l Union Fire Ins. Co. v. Eland Motor Car Co.*, 85 N.Y.2d 725, 729 (1995) ("Rival claimants to the assets or funds may be joined in that proceeding

29

so that the court may prioritize the competing interests."). Courts are empowered to notice rival claimants for the purpose of joining them in the proceeding. C.P.L.R. § 5239 ("Service of process in such a proceeding shall be made by service of a notice of petition upon . . . such other person as the court directs, in the same manner as a notice of motion.").

So far, no one other than Aave LLC has appeared before this Court, and Aave LLC (as Plaintiffs explain in response to the motion to vacate the restraining notice) has no claim on the Immobilized Assets. To ensure an orderly and fair process, Plaintiffs request that this Court order that notice be given to any claimants who may wish to make claims, which will allow this Court to "determine" the claimants' interests in the Immobilized Assets and "foreclose" any unasserted claims or claims that are asserted and fail. N.Y. C.P.L.R. § 5239.

Because crypto users' names and identities are unknown, and because it is unclear if anyone may assert a constructive trust claim, Plaintiffs respectfully suggest that notice of this proceeding be sent to any potential claimants by (a) posting on Aave's governance forum, (b) posting on Kernel DAO's governance forum, and (c) if Aave LLC will agree, posting on Aave LLC's website, via its *X* account, and via non-fungible token to Aave suppliers in the affected rsETH–ETH pool. *See, e.g.*, ECF No. 34 (concluding forum postings reasonably likely to notice a DAO); *People v. Unknown Parties in Ownership &/or Control of Dig. Wallet Addresses XXXXXXXXX0B7D*, 2025 NY Slip Op 25143, 2, 238 N.Y.S.3d 113, 117 (Sup. Ct., Queens County, June 9, 2025) (granting alternative service by NFT message to anonymous blockchain wallet

address); *Patel v. Unknown Def.*, No. 23-cv-24651, 2024 WL 219040, at *3 (N.D. Fla. Jan. 16, 2024) (same); *Meghji v. Wallet Owner (In re Celsius Network LLC)*, 666 B.R. 28, 31 (Bankr. S.D.N.Y. 2024) (same); *LCX AG v. 1.274M U.S. Dollar Coin*, 2022 NY Slip Op 32834(U), 6 (N.Y. County Sup. Ct. Aug. 21, 2022) (same); *Bandyopadhyay v. Defendant 1*, No. 22-cv-22907, 2022 WL 17176849, at *3 (S.D. Fla. Nov. 22, 2022) (same). Plaintiffs respectfully suggest that potential claimants be given sixty or ninety days within which to file any claims. If any claims are filed, Plaintiffs respectfully request the opportunity to evaluate them and, if necessary, propose a procedure to resolve competing claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court direct that notice be sent as explained above and set a deadline for the assertion of potential claims to the Immobilized Assets and order them turned over to Plaintiffs.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1319 F St. NW, Suite 301
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

31

*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum contains 8,725 words using Microsoft's word count tool.

/s/ Charles Gerstein