UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| HAN KIM, et al., Plaintiffs, |
| |
| *v.* |
| |
| THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, a.k.a. NORTH KOREA, Defendant |
| |
| ~~~ |
| |
| IN RE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, et al. |
| |
| ~~~ |
| |
| RUTH CALDERON-CARDONA, et al., Plaintiffs, |
| |
| *v.* |
| |
| THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, et al., Defendants |
| |
| & |
| |
| AAVE LLC, Garnishee (as to all cases) |

Case Nos.    25-MC-527-MMG
26-MC-033-MMG
26-MC-094-MMG


# NON-PARTY AAVE LLC'S
## OPPOSITION TO PLAINTIFFS' MOTION FOR TURNOVER


Jason Gottlieb
Michael Mix
Daniel Isaacs
Genny Ngai
William Roth
Vani Upadhyaya
Emma McGrath
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022
212-735-8600

*Attorneys for Non-Party Aave LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................... 1

FACTS ..................................................................................................................................... 4

ARGUMENT ........................................................................................................................... 4

    I.     APPLICABLE LAW GOVERNING JUDGMENT ENFORCEMENT........................... 4

    II.    APPLICABLE LAW GOVERNING TURNOVER ........................................................ 5

    III.   NORTH KOREA DOES NOT "HAVE AN INTEREST" IN THE IMMOBILIZED
    ASSETS ...................................................................................................................... 7

        A.   A Thief Cannot Pass Good Title ....................................................................... 7

        B.   *Eisenberg* Does Not Concern Title or Property Rights, and Is Irrelevant to the April 18
        Incident ............................................................................................................ 8

        C.   Plaintiffs Concede that the April 18 Incident Was Not Fraud......................... 9

        D.   The April 18 Incident Was Pure Theft, and Plaintiffs' Attempt to Characterize the
        Exploit as "False Pretenses" Fails................................................................... 9

        E.   Even If Voidable Title May Pass to a Thief or Fraudster (In Some Circumstances),
        Plaintiffs, Standing in the Shoes of North Korea, Did Not Obtain Free and Clear Title to the
        Immobilized Assets ....................................................................................... 14

        F.   It Would Violate New York Public Policy to Find that North Korea Has an Interest in
        the Immobilized Assets ................................................................................. 15

        G.   The Shelter Principle Is Inapplicable............................................................. 17

        H.   The Terrorism Risk Insurance Act ("TRIA") Is Inapplicable ...................... 17

        I.   Plaintiffs Have Failed to Meet Their Burden to Establish that North Korea Was the
        Thief Behind the April 18 Incident; The Ehrenhofer Declaration Should Not Be Credited. 19

    IV.   PLAINTIFFS HAVE NOT ESTABLISHED THAT NORTH KOREA IS ENTITLED
    TO THE POSSESSION OF THE IMMOBILIZED ASSETS, OR THAT THEY HAVE A
    SUPERIOR INTEREST TO AAVE LLC ................................................................. 21

        A.   North Korea Is Not Entitled to Possession of the Immobilized Assets......................... 22

        B.   Plaintiffs' Claim to the Immobilized Assets Is Not Superior to Aave LLC's Claim .... 22

    V.    PLAINTIFFS' REQUEST UNDER CPLR 5239 SHOULD BE DENIED ...................... 25

CONCLUSION........................................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acmetel USA LLC v. PTGi Int'l Carrier Servs., Inc.*,
2024 WL 4467174 (S.D.N.Y. Oct. 10, 2024) ............................................................5

*AG Worldwide v. Red Cube Mgt AG*,
2002 WL 417251 (S.D.N.Y. March 15, 2022) ...........................................................6

*Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*,
190 F.3d 16 (2d Cir. 1999).........................................................................................4

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002).........................................................................19, 20, 21

*Angiolillo v. Christie's, Inc.*,
64 Misc. 3d 500 (Sup. Ct. N.Y. Cnty. 2019) ..........................................................16

*Axginc Corp. v. Plaza Automall, Ltd.*,
2022 WL 1591054 (E.D.N.Y. May 19, 2022) ...................................................4, 5, 6

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016).................................................................................................18

*Bass v. Bass*,
140 A.D.2d 251 (1st Dep't 1988) .............................................................................5

*Beauvais v. Allegiance Sec., Inc.*,
942 F.2d 838 (2d Cir. 1991).............................................................................. *passim*

*Carr v. Hoy*,
2 N.Y. 2d 185 (1957) ...............................................................................................16

*Cunningham v. Brown*,
265 U.S. 1 (1924)......................................................................................................23

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993).......................................................................................19, 20, 21

*Dussault v. Rep. of Argentina*,
616 Fed. App'x 26 (2d Cir. 2015).............................................................................6

*In re Edwards*,
121 A.D.3d 336 (2d Dep't 2014) .............................................................................17

*EM Ltd. v. Republic of Argentina*,
  473 F.3d 463 (2d Cir. 2007)..................................................................................................5

*Gelbard v. Esses*,
  96 A.D.2d 573 (2d Dep't 1983) ..........................................................................................22

*Glus v. Brooklyn E. Dist. Terminal*,
  359 U.S. 231 (1959)............................................................................................................16

*Hausler v. JPMorgan Chase Bank, N.A.*,
  845 F. Supp. 2d 553 (S.D.N.Y. 2012)................................................................................18

*Heiser v. Islamic Republic of Iran*,
  885 F. Supp. 2d 429 (D.D.C. 2012), *aff'd*, 735 F.3d 934 (D.C. Cir. 2013)...........................18

*Hofferman v. Simmons*,
  290 N.Y. 449 (1943) ...........................................................................................................16

*Hogan v. Supreme Ct. of New York, Bronx Cnty.*,
  295 N.Y. 92 (1946) .............................................................................................................16

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
  Negara*,
  313 F.3d 70 (2d Cir. 2002)....................................................................................................5

*Keawsri v. Ramen-Ya Inc.*,
  2022 WL 17813236 (S.D.N.Y. Dec. 19, 2022) ...................................................................26

*Kirschenbaum v. 650 Fifth Ave.*,
  830 F.3d 107 (2d Cir. 2016)................................................................................................19

*Levin v. Wells Fargo Bank, N.A.*,
  156 F.4th 632 (D.C. Cir. 2025)...........................................................................................18

*Levinson v. Kuwait Fin. House (Malaysia) Berhad*,
  44 F.4th 91 (2d Cir. 2022) .............................................................................................18, 19

*Mitchell v. Garrison Protective Servs., Inc.*,
  579 F. App'x 18 (2d Cir. 2014) .............................................................................................4

*N. Mariana Islands v. Canadian Imperial Bank of Commerce*,
  717 F.3d 266 (2d Cir. 2013)..................................................................................................6

*New York State Tax Commission v. Ritter*,
  101 Misc. 2d 606 (Sup. Ct. Orange Cnty. 1979) ................................................................17

*Newton v. Porter*,
  69 N.Y. 133 (1877) ..........................................................................................................7, 14

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)...........................................................................................20

*People v. Headley*,
    37 Misc. 3d 815 (Sup Ct. Kings Cnty. 2012).................................................................10

*People v. Ingram*,
    65 Cal. App. 4th 500 (1998) ..........................................................................................14

*People v. Norman*,
    85 N.Y.2d 609 (1995) ....................................................................................................10

*People v. Shannon*,
    66 Cal. App. 4th 649 (Cal. Ct. App. 1998) ....................................................................14

*Resource Grp. Int'l Ltd. v. Chishti*,
    2026 WL 1192716 (S.D.N.Y. May 1, 2026) ..................................................................22

*Riggs v. Palmer*,
    115 N.Y. 506 (1889) ......................................................................................................16

*S.E.C. v. Amerindo Inv. Advisors Inc.*,
    2014 WL 2112032 (S.D.N.Y. May 6, 2014) ..................................................................23

*S.E.C. v. Credit Bancorp, Ltd.*,
    290 F.3d 80 (2d Cir. 2002)..............................................................................................23

*S.E.C. v. Levine*,
    881 F.2d 1165 (2d Cir. 1989)..........................................................................................15

*S.E.C. v. Universal Exp., Inc.*,
    2008 WL 1944803 (S.D.N.Y. Apr. 30, 2008)...................................................14, 15, 17

*Solomon R. Guggenheim Found. v. Lubell*,
    77 N.Y.2d 311 (1991) ..............................................................................................7, 15

*Stuhler v. State of New York*,
    127 Misc. 2d 390 (Sup. Ct. N.Y. Cnty. 1985), *aff'd*, 113 A.D.2d 1038 (1st
    Dep't 1985) .....................................................................................................................17

*Swezey v. Lynch*,
    87 A.D.3d 119 (1st Dep't 2011) .......................................................................................5

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
    2010 WL 3310262 (E.D.N.Y. Aug. 19, 2010)..................................................................7

*U.S. v. Eisenberg*,
    784 F. Supp. 3d 579 (S.D.N.Y. 2025)...........................................................................8, 9

iv

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008)..................................................................................10

*United States v. Kwok*,
    2024 WL 1773143 (S.D.N.Y. Apr. 24, 2024)..........................................................19

*Vantrel Enterprises, Inc. v. Citibank, N.A.*,
    272 A.D.2d 609 (2d Dep't 2000) ..............................................................................5

*Weinstein v. Islamic Republic of Iran*,
    609 F.3d 43 (2d Cir. 2010)......................................................................................18

*Williams v. Congregation Yetev Lev*,
    2004 WL 2924490 (S.D.N.Y. Dec. 16, 2004) .........................................................22

*XL/DataComp, Inc. v. Wilson (In re Omegas Group, Inc.)*,
    16 F.3d 1443 (6th Cir. 1994) ...................................................................................23

**Statutes**

CPLR 5201(b)...............................................................................................................4

CPLR 5225(b)...........................................................................................................5, 6

CPLR 5234...................................................................................................................26

CPLR 5239............................................................................................................ *passim*

N.Y. Penal Law 170.60................................................................................................12

TRIA § 201(a)..............................................................................................................18

**Other Authorities**

David D. Siegel *et al.*, *N.Y. Practice* § 488 (6th ed. Dec. 2024 Update)........................5

Weinstein Korn Miller, 11 *New York Civil Practice* ¶ 5239.01 (2026).......................25

Interested non-party Aave LLC ("Aave LLC") respectfully writes in opposition to Plaintiffs' Motion for Turnover and to Determine Adverse Claims under N.Y. C.P.L.R. § 5239 (Dkt. No. 60, the "Turnover Motion").[1]

## PRELIMINARY STATEMENT

Plaintiffs' Turnover Motion rests on the legally untenable premise that Plaintiffs' years-old judgments against North Korea entitle them to seize assets that were allegedly stolen and briefly possessed by North Korea years later in an unrelated exploit, but which were subsequently recovered by others, and are now held by Aave LLC as part of a coordinated remediation effort.

The relevant events have been set forth in great detail in Aave LLC's motion to vacate the restraining notice (the "Restraining Notice"). Dkt. Nos. 39-42 (collectively, the "Motion to Vacate").[2] This case involves the decentralized non-custodial protocol known as the "Aave Protocol." One of the Aave Protocol pools permitted users to deposit ETH or rsETH as collateral, and borrow the other asset, as long as the user's position was overcollateralized. rsETH is a token governed by the Kelp DAO that is "backed" 1:1 by real ETH. On April 18, 2026, a thief exploited a vulnerability in Kelp DAO's cross-chain bridge in order to obtain "unbacked" rsETH. The same thief then supplied the unbacked rsETH to the Aave Protocol, and borrowed a significant amount of ETH before the theft could be stopped. As a result, the thief took approximately $180 million worth of digital assets from the Aave Protocol, for no value in return (the "April 18 Incident"). A Good Samaritan subsequently intercepted roughly $71 million worth of those assets (the

---

[1]     References to the "Mot." are to Plaintiffs' Memorandum of Law in Support of the Turnover Motion. Dkt. No. 60-1.

[2]     Pincites to the Motion to Vacate are, unless otherwise stated, to Aave LLC's Memorandum of Law in Support of the Motion to Vacate. Dkt. No. 42.

"Immobilized Assets"), which are now held by Aave LLC, but which Plaintiffs seek for themselves.

Plaintiffs are not victims of the April 18 Incident. They hold default judgments against North Korea dating back to 2010. In the midst of the efforts to remediate the theft from the Aave Protocol, Plaintiffs issued the Restraining Notice to Arbitrum DAO. Dkt. No. 34. Aave LLC, as an interested party, expeditiously filed the Motion to Vacate, which is now fully briefed and *sub judice*. Now, Plaintiffs seek turnover of the Immobilized Assets to Plaintiffs, and alternatively suggest a notice and claims process in order to ensure that Plaintiffs obtain free and clear title to the Immobilized Assets.

Aave LLC fully adopts and incorporates by reference its Motion to Vacate, including the two supplemental briefs that Aave LLC filed in response to the Court's queries. Dkt. Nos. 61, 68. For the same reasons that the Restraining Notice should be vacated, Plaintiffs are not entitled to turnover of the Immobilized Assets. But the Turnover Motion should be denied for additional reasons as well.

First, the Turnover Motion is a "copy and paste" of Plaintiffs' earlier arguments (Dkt. No. 59), and does not engage with the governing two-step analysis articulated by *Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838 (2d Cir. 1991), the touchstone turnover case in the Second Circuit. The Turnover Motion spills significant ink on why the thief supposedly obtained voidable title to the Immobilized Assets, but spends very little time explaining why Plaintiffs are entitled to underline{turnover} of those Immobilized Assets.

There is a reason for that: *Beauvais* establishes a two-step test for turnover that Plaintiffs fail to meet. Under the first prong, Plaintiffs have the burden to establish that North Korea, as judgment debtor, has an "interest" in the Immobilized Assets. North Korea has no such interest,

2

because a thief does not take good title to stolen assets.  Plaintiffs strain to describe the April 18 Incident as anything other than theft.  They compare the April 18 Incident to a criminal action involving an exploit on a different decentralized protocol, but that case found that the defendant committed crimes, just like the thief here.  Plaintiffs also posit that the April 18 Incident was theft by "false pretenses," but the April 18 Incident does not meet the elements of that crime, and the issue of whether voidable title passes as a result of "false pretenses" typically arises in cases between a victim and a downstream bona fide purchaser for value.  Plaintiffs here stand in the shoes of North Korea, and so, in order to prevail, they need to show that North Korea, as thief, retains title to the Immobilized Assets.  Such a notion would flagrantly violate New York policy, which provides that a criminal cannot benefit from crime, and a court should not act as "paymaster of the wages of crime."

Because Plaintiffs cannot meet the first prong of *Beauvais*, the Court need not reach the second prong.  Nevertheless, for similar reasons, Plaintiffs also have not met their burden to establish the second prong of *Beauvais*: that North Korea is entitled to possession of the Immobilized Assets or Plaintiffs have a greater interest in the Immobilized Assets than Aave LLC.  Plaintiffs cannot seriously argue that North Korea should benefit from their criminal acts by acquiring the right to possess the Immobilized Assets.  And the question of superior interests typically arises in the fraudulent conveyance context, which is not an issue here.  No case entitles Plaintiffs to a court-ordered turnover of assets from one judgment debtor's victim to another such victim.  Such a rule would be nonsensical and would violate public policy; to the contrary, the case law provides that a judgment creditor cannot satisfy their judgment with other victims' money.

As a last gasp, Plaintiffs propose to combine their request for turnover with a notice and claim process under CPLR 5239.  But CPLR 5239 is inapplicable; such a bespoke process is not

supported by the rules, and exemplifies Plaintiffs' stratagem of ignoring Article 52 in favor of a process that benefits Plaintiffs, to the detriment of many others.

In this case, Plaintiffs stand in the shoes of North Korea, and no legal principle allows them to obtain turnover of the Immobilized Assets, which play a crucial part of a remediation process to benefit all of the users of the Aave Protocol.

## FACTS

For brevity, the Court is respectfully referred to the declaration of Luigi D'Onorio DeMeo accompanying this opposition (the "Third DeMeo Decl."), as well as the two prior DeMeo declarations accompanying the Motion to Vacate (Dkt. No. 41, the "First DeMeo Decl." and Dkt. No. 62, the "Second DeMeo Decl."), and the accompanying declarations of Stani Kulechov and Mike Silagadze, who support Aave LLC's right to obtain the Immobilized Assets to remediate the harm caused by the April 18 Incident.

## ARGUMENT

### I.    APPLICABLE LAW GOVERNING JUDGMENT ENFORCEMENT

New York's law on judgment enforcement governs the Turnover Motion. *Axginc Corp. v. Plaza Automall, Ltd.*, 2022 WL 1591054, at *4 (E.D.N.Y. May 19, 2022) (*quoting* Fed. R. Civ. P. 69(a)(1)). Three bedrock judgment enforcement principles apply.

First, CPLR 5201(b) "describes the assets that New York law has made subject to enforcement, and thus available to judgment creditors." *Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 20 (2d Cir. 1999). The Second Circuit has stated that the property subject to enforcement "cannot be a property right that is unassignable … if the debtor's rights in the property do not include the right to assign or transfer it, it is not 'property' for the purposes of § 5201." *Mitchell v. Garrison Protective Servs., Inc.*, 579 F. App'x 18, 22 (2d Cir. 2014).

4

Second, a "judgment creditor stands in the shoes of the judgment debtor, and if a given property, asset, interest, or deposit is unavailable to the debtor, <u>it is unavailable to the creditor</u>." David D. Siegel *et al.*, *N.Y. Practice* § 488 (6th ed. Dec. 2024 Update) (emphasis added). "<u>If the judgment debtor has no right to the money or property, then neither has the judgment creditor</u> … The creditor who steps into the debtor's shoes may walk only on terrain open to the debtor himself." *Id.* (emphasis added). "Any right or interest lodged legitimately in a third person remains there, and a levy can proceed only on the debtor's right as is." *Id.* The standing-in-shoes principle has been affirmed by the Second Circuit, as well as New York state appellate courts. *See, e.g.*, *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 476 n.13 (2d Cir. 2007); *Acmetel USA LLC v. PTGi Int'l Carrier Servs., Inc.*, 2024 WL 4467174, at *5 (S.D.N.Y. Oct. 10, 2024); *Bass v. Bass*, 140 A.D.2d 251, 253 (1st Dep't 1988); *Vantrel Enterprises, Inc. v. Citibank, N.A.*, 272 A.D.2d 609, 610 (2d Dep't 2000).

Third, as a corollary to the standing-in-shoes principle, "because a judgment creditor stands in the shoes of the judgment debtor, the plaintiff here can have no rights greater than [judgment debtor]." *Id.* at 610 (internal citations omitted). *See also Swezey v. Lynch*, 87 A.D.3d 119, 127-28 (1st Dep't 2011) (similar).

## II.    APPLICABLE LAW GOVERNING TURNOVER

Turnover motions in this Court "follow[] the turnover proceeding provided in New York's Civil Practice Law and Rules Section 5225(b), a statutory provision that, *inter alia*, authorizes a judgment creditor's turnover proceedings against a garnishee or a transferee, where the judgment creditor claims an entitlement or superior right to the money." *Axginc*, 2022 WL 1591054, at *4 (citation modified). CPLR 5225(b) "creates a remedy for judgment creditors in situations where

5

property of a judgment debtor is in the possession or custody of a third party." *Dussault v. Rep. of Argentina*, 616 Fed. App'x 26, 27 (2d Cir. 2015).

The Second Circuit applies a two-step framework for turnover motions originating from *Beauvais*. *Beauvais* explained that "[f]irst, it must be shown that the judgment debtor 'has an interest' in the property the creditor seeks to reach." 942 F.2d at 840. Second, "the trial court must … find either that the judgment debtor is entitled to the possession of such property, *or* it must find that the judgment creditor's rights to the property are superior to those of the party in whose possession it is." *Id.* (emphasis in original, internal quotations omitted). "Only after both steps of the analysis are demonstrated may the trial court order the transferee to turn over the property to the judgment creditor." *Id.* at 840-41 (finding that the "district court did not complete both steps of the analysis.") (emphasis added). *See also Dussault*, 616 Fed. App'x at 27 (denying turnover under *Beauvais*). The "connection between the judgment debtor and the assets is an essential component of the turnover proceeding." *AG Worldwide v. Red Cube Mgt AG*, 2002 WL 417251, at *2 (S.D.N.Y. March 15, 2022).

The judgment creditor bears the burden to establish its right to turnover. *See N. Mariana Islands v. Canadian Imperial Bank of Commerce*, 717 F.3d 266, 268 (2d Cir. 2013). A "Rule 69(a) turnover proceeding pursuant to N.Y. C.P.L.R. § 5225(b) is treated as a motion for summary judgment." *Axginc*, 2022 WL 1591054, at *4. "A court is authorized to make a summary determination upon the pleadings, papers and admissions to the extent that no triable issues of fact are raised." *Id.* (citation modified).

Plaintiffs do not even mention *Beauvais*, the touchstone case for any turnover motion in the Second Circuit, likely because they cannot meet their burden to establish either prong.

6

### III.    NORTH KOREA DOES NOT "HAVE AN INTEREST" IN THE IMMOBILIZED ASSETS

Plaintiffs spend numerous pages arguing that title to the Immobilized Assets passed to North Korea. Mot. at 11-27. Although Plaintiffs do not explicitly connect their title argument to *Beauvais*, Plaintiffs nevertheless fail to meet their burden to articulate any theory in which North Korea has an "interest" in the Immobilized Assets, sufficient to meet the first prong of *Beauvais*.

### A.    A Thief Cannot Pass Good Title

"[T]he title of the owner cannot be diverted without his consent [and] … a thief cannot convey good title to stolen property." *Newton v. Porter*, 69 N.Y. 133, 136-37 (1877). Courts have reinforced these principles repeatedly. *See, e.g.*, *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 317 (1991) ("New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value"); *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2010 WL 3310262, at *2 (E.D.N.Y. Aug. 19, 2010) ("The usual principle of risk allocation is *nemo dat quod* non habet— no-one can give what he or she does not have—and the thief has no power to pass title.").

The "purchaser from a thief, however honest and *bona fide* the purchase may have been, cannot hold the stolen chattel against the true proprietor, but the latter may follow and reclaim it wherever or in whoever hands it may be found." *Newton*, 69 N.Y. at 136. "The extent to which the common law goes to protect the title of the true owner has a striking illustration in those cases in which it is held that where a willful trespasser converts a chattel into a different species, as for example, timber into shingles, wood into coal, or corn into whiskey, the product in its improved and changed condition belongs to the owner of the original material." *Id.* at 136-37.

Plaintiffs do not dispute that a thief cannot pass good title.  *See* Mot. at 11 ("The parties appear to agree that if the Aave transaction was larceny, North Korea would not have obtained title").

### B.    *Eisenberg* Does Not Concern Title or Property Rights, and Is Irrelevant to the April 18 Incident

Because, as Plaintiffs concede, a thief cannot pass good title to stolen assets, Plaintiffs grasp at straws to describe the April 18 Incident as anything other than theft.  Those attempts fail.

Plaintiffs heavily rely on *U.S. v. Eisenberg*, 784 F. Supp. 3d 579 (S.D.N.Y. 2025) to argue that the April 18 Incident was the "secondary result of market manipulation," Mot. at 11-12, or maybe even not wrongful at all, Mot. at 1-2.  But *Eisenberg* did not address title issues at all, let alone whether Eisenberg's commodities fraud or manipulation would have conveyed title.

*Eisenberg* – which concerned an exploit on the decentralized protocol known as Mango Markets – also is procedurally and factually inapposite.  Procedurally, *Eisenberg* granted a post-verdict Rule 29 motion, principally on venue grounds.[3]  It found that the specific facts of the Mango Markets exploit did not amount to criminal wire fraud – but sufficed for commodities manipulation and commodities fraud.  *Eisenberg*, 784 F. Supp. 3d at 610, 618-19.  With regard to the commodities manipulation charge, *Eisenberg* explained that "[t]he trial evidence made clear that by manipulating the value of MNGO on the three exchanges that made up the oracle, Eisenberg intentionally manipulated the price used to value MNGO Perpetual positions." *Id.* at 609.  And with regard to the commodities fraud charge, the court explained that "Eisenberg's manipulation increased the value of his collateral on Mango Markets, which in turn caused the platform's algorithm to permit him to borrow and withdraw far more cryptocurrency than he otherwise would

---

[3]    The government appealed *Eisenberg*; that appeal is ongoing.  *See* Second Circuit Court of Appeals Docket No. 25-1782.

have been allowed to. Eisenberg's argument for acquittal on the commodities-fraud charge fails." *Id.* at 619. Accordingly, the fact that the *Eisenberg* court found insufficient evidence of falsity for the government to maintain a wire fraud charge is irrelevant to the instant motion, because the court upheld two criminal counts. Eisenberg committed a crime, just like the thief responsible for the April 18 Incident.

Factually as well, *Eisenberg* is materially different from the April 18 Incident. Eisenberg engaged in spot wash trades of the MNGO token to manipulate the value of his long and short futures positions. He then borrowed against those artificial positions on the Mango Markets platform, withdrawing over $100 million in cryptocurrency. *Id.* at 589. The tokens traded by Eisenberg were genuine MNGO tokens – just price-manipulated. By contrast, the rsETH involved in the April 18 Incident was not genuine rsETH, because the thief exploited the rsETH bridge to unlock unbacked (and thus valueless) rsETH as part of a plot to steal ETH.

### C.    Plaintiffs Concede that the April 18 Incident Was Not Fraud

After originally arguing that the April 18 Incident constituted fraud, and that fraud passes title to the Immobilized Assets to the thief, Dkt. No. 47, Plaintiffs now concede that "there was no fraud or deception," because "North Korea likely engaged in theft in the hacking transaction and then market manipulation, but it did not make any misrepresentation in the Aave transaction." Mot. at 17.

### D.    The April 18 Incident Was Pure Theft, and Plaintiffs' Attempt to Characterize the Exploit as "False Pretenses" Fails

Instead, Plaintiffs now characterize the April 18 Incident as, "at worst," theft by false pretenses. Mot. at 20-24. Plaintiffs' attempt to distinguish false pretenses (which Plaintiffs argue passes voidable title) with larceny (which Plaintiffs concede does not pass title, Mot. at 11), fails

for multiple reasons.  But no matter Plaintiffs' *post-hoc* characterization, North Korea never obtained an interest in the Immobilized Assets.

First, larceny by false pretenses requires that the victim be fraudulently induced through false statements about prior or existing facts to part with both possession and title.  *See People v. Norman*, 85 N.Y.2d 609, 618 (1995).  The elements include:  "1) criminal intent to deprive the owner of property; 2) making a false material representation; 3) obtaining the property of another; and 4) reliance by the victim upon the representation."  *People v. Headley*, 37 Misc. 3d 815, 820 (Sup Ct. Kings Cnty. 2012).  New York courts take the "narrowest possible view" of false pretenses.  *Norman*, 85 N.Y.2d at 618.

Although Plaintiffs no longer assert that the April 18 Incident was fraud, the elements of theft by false pretenses are similar to fraud, and fraud requires "some proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct."  *U.S. v. Finnerty*, 533 F.3d 143, 150 (2d Cir. 2008).  In *Finnerty*, where the government had "identified no way in which Finnerty communicated anything to his customers, let alone anything false" and could not show that Finnerty's customers were misled by his "statement[s] or conduct" the court found that Finnerty could not have committed fraud.  *Id.* at 148-51.

Here, there was no deception or any affirmative action taken in reliance on that deception. The April 18 Incident stripped value from Aave Protocol users without any voluntary or affirmative transfer of ownership made in reliance on any misrepresentation by the thief.  The thief relied on fabricated or unbacked collateral to trigger an <u>automated</u> asset release from the Aave Protocol, which – being just software – cannot be "deceived" in any traditional sense of the word.  Because the Aave Protocol operates according to preconfigured parameters – *i.e.,* the release of ETH in exchange for rsETH and vice versa – the theft did not and could not have required any individual

10

users to rely on the misrepresentations or fraudulent conduct of the thief. The theft was not premised on bilateral transactions between the thief and Aave Protocol users, because users have no ability to enter such transactions.

Second, the mechanics of the Aave Protocol illustrate that the April 18 Incident was pure theft, not false pretenses. The Aave Protocol is not a voluntary, title-transferring exchange from suppliers to the thief. The thief forced the Aave Protocol to execute a transaction that fell outside the conditions under which suppliers made their assets available. That is theft.

Plaintiffs assert that because suppliers "willingly parted" with ETH into a smart contract "making those assets available to anyone who posted the required collateral," larceny is "effectively impossible" and title necessarily passed to the thief. Mot. at 13. But supplying assets is not an unconditional relinquishment "free and clear" to any taker, but rather a conditional participation in a system whose central protection is overcollateralized borrowing. That protection fails when the collateral is worthless when deposited. Aave Protocol users retain the right to "withdraw supplied assets (plus accrued yield) subject to available liquidity in the pool." Third DeMeo Decl. ¶ 18. That is precisely why the April 18 Incident harmed them: the pool was depleted by withdrawals against unbacked collateral, leaving suppliers unable to recover their funds. *Id.* ¶ 38.

The more accurate analogy is the vending machine. The soda company willingly makes its soda available to anyone who inserts the required payment. But no one would argue that the company "willingly parts" with soda when a thief uses a counterfeit coin to trick the machine into releasing a can. The reason is obvious: the company consented to release soda only in exchange

11

for valid payment.  When a thief uses a slug coin, the company's consent never attaches to the transaction that actually occurs.[4]

The Aave Protocol works the same way (in legally relevant respects).  Suppliers did not intend to give away ETH to anyone who could cause a smart contract to execute.  They consented, if at all, to ETH being released only against genuine, fully-backed collateral, as validated by the protocol's rules; Aave Protocol users did not consent to trade their ETH for unbacked collateral.  For this reason, Plaintiffs are wrong that "[n]or do Aave suppliers place ETH into the liquidity pool 'with the understanding that it was to be used for a particular purpose.'"  Mot. at 13.  Aave Protocol users supplied ETH with the understanding that it be released only under certain conditions, similar to the coat check example the Court provided during May 6 oral argument, which Plaintiffs concede is larceny.  See Mot. at 12.

Plaintiffs cite no authority suggesting that owners lose their property rights merely because they entrust these types of transactions to automated systems.  To hold otherwise would mean that every vending-machine theft, ATM exploit, or software hack is deemed a "willing transaction" because the system was designed to release assets under certain conditions.

Plaintiffs' argument that other Aave Protocol users may have suffered losses when the price of rsETH collapsed (Mot. at 15-16) says nothing about whether ETH was stolen from suppliers.  The rsETH was structurally unbacked, i.e., a counterfeit receipt purporting to represent ETH that did not exist.  Plaintiffs' claim that "it is not like a forgery because the rsETH North Korea deposited was real, genuine rsETH," Mot. at 15, is wrong.  The very nature of rsETH is that it is backed by ETH.  If it is not backed, it is not "real, genuine rsETH."

---

[4]    For good measure, "Unlawfully using slugs in the first degree" is a felony in New York, see N.Y. Penal Law 170.60; the analogy makes clear that the April 18 Incident was a felony theft.

12

Third, to argue that a "theft by false pretenses" occurred, Plaintiffs improperly atomize a single, unified scheme into two artificial "steps." Plaintiffs describe "Step One" as the thief obtaining rsETH from Kelp DAO and manipulating its value, perhaps constituting theft. Mot. at 4-5. At oral argument on June 5, 2026, Plaintiffs conceded that "for purposes of this motion [the Motion to Vacate], we will concede that [Step One] was theft." June 5 Tr. at 36:8-10.

Plaintiffs describe "Step Two" as exchanging rsETH for ETH on the Aave Protocol. Mot. at 5-7. Plaintiffs characterize Step Two as neither fraud nor larceny, but nothing more than an ordinary transaction between willing borrowers and lenders. *Id.* at 13. That theory fails: it improperly treats a thief as an ordinary user of the Aave Protocol who did not violate any Aave rules. *Id*. at 18. The scheme was designed to extract ETH for nothing, and cannot be artificially atomized. Under Plaintiffs' flawed logic, even a smash-and-grab at Tiffany's would not be theft because "step one" (holding a diamond in the store) and "step two" (walking out) are each innocuous in isolation. Courts assess the scheme as a whole, elevating substance over form. Taking property for nothing is theft, no matter how the theft is described.

Even if the Court concluded that there were "two steps" to the overall scheme, the first step (all agree) was a theft. After that, the "*nemo dat*" principle applies: the thief could not use stolen goods to acquire good title, because the thief cannot convey more than he had.

Fourth, Plaintiffs' "one rsETH" hypothetical (Mot. at 16) also rests on the legally irrelevant premise that the amount of value taken determines whether a theft occurred. It does not. The same act does not become "non-theft" merely because the machine is tricked just once, or because the economic impact is small. Plaintiffs' suggestion that the April 18 Incident would have been victimless if the thief had obtained only one ETH is fundamentally incorrect because if all Aave Protocol users attempted to exit their positions and withdraw the ETH that they initially deposited,

13

one user would be unable to withdraw that user's ETH.  A theft of only one ETH may be small, and perhaps would go unnoticed, but such a theft would still victimize someone.

Fifth, Plaintiffs rely on a California case, *People v. Ingram*, 65 Cal. App. 4th 500 (1998), to suggest a standard for false pretenses that fits this case.  Mot. at 20-21.  But there, the appellate court affirmed that failure to rely on the defendant's false representation was "fatal to a cause of action of theft based on a theory of false pretenses."  *Ingram* also was roundly criticized by a sister court in *People v. Shannon*, 66 Cal. App. 4th 649, 655-66 (Cal. Ct. App. 1998), which found that "one need not leave the store, or escape, to complete the theft; any movement with the requisite intent does so. The theft was complete when Ingram put the pants in the bag with the intent to deprive the store of their value."  Here, akin to *Shannon*, the fact that the thief did not escape with the assets (thanks to the Good Samaritan) does not negate the theft.

### E.    Even If Voidable Title May Pass to a Thief or Fraudster (In Some Circumstances), Plaintiffs, Standing in the Shoes of North Korea, Did Not Obtain Free and Clear Title to the Immobilized Assets

Plaintiffs concede that if a thief may obtain title to property acquired via false pretenses, such title is merely voidable title.  *See* Mot. at 2.  Plaintiffs do not allege that someone guilty of false pretenses takes free and clear title.[5]

The issue of "voidable title" typically arises in situations involving a downstream, bona fide purchaser for value.  In that scenario, the "victim of the initial theft of the funds used to purchase the property in the first place has no recourse against a bona fide purchaser for value, and the bona fide purchaser takes good title to the property."  *S.E.C. v. Universal Exp., Inc.*, 2008 WL

---

[5]    Neither party has argued that the Immobilized Assets are "money or negotiable securities." They are not (unlike in *Newton*, where the stolen assets at issue were bonds).  Even if they were, the "right of the owner to pursue and reclaim the money and securities there ends, and the holder is protected in his title."  *Newton*, 69 N.Y. at 137.  Aave LLC, as the holder of the Immobilized Assets, is protected in its title.

1944803, at *4 (S.D.N.Y. Apr. 30, 2008).  "Although the victim of the initial theft may not have recourse against the bona fide purchaser, he would have recourse against the wrongdoer, who now holds the consideration paid by the bona fide purchaser." *Id.  See also Guggenheim*, 77 N.Y.2d at 317 ("New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value"); *S.E.C. v. Levine*, 881 F.2d 1165, 1176 (2d Cir. 1989) ("Under New York law, the culpable party to a voidable transaction acquires title, albeit voidable title, to the property he has received.  He may convey good title to a good-faith purchaser, and an innocent party's lien may attach to the property in the culprit's possession, unencumbered by the equities between the parties on either side of the fraud") (citation modified).

The dispute presented in *Universal Express* and the other cases cited above is not the situation before the Court.  Plaintiffs are <u>not</u> victims of the April 18 Incident; they are victims of unrelated terror incidents dating back decades, and their judgments precede the April 18 Incident by years.  Mot. at 2-4.  North Korea (in whose shoes Plaintiffs stand) is the alleged <u>perpetrator</u> of the April 18 Incident.  We are not aware of any case – and Plaintiffs have not cited a case – holding that a fraudster or a thief who obtained voidable title by false pretenses obtains permanent title to the stolen assets.

### F.     It Would Violate New York Public Policy to Find that North Korea Has an <u>Interest in the Immobilized Assets</u>

North Korea also lacks any interest in the Immobilized Assets because such interest would violate New York public policy.  New York law has long held that "[n]o one shall be permitted to profit by his own fraud or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime.  These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere

15

been superseded by statutes." *Riggs v. Palmer*, 115 N.Y. 506, 511-12 (1889). In *Riggs*, the Court of Appeals found that a beneficiary to a will who murdered the testator "<u>cannot vest himself with title by crime</u>." *Id.* at 513 (emphasis added).

In *Carr v. Hoy*, 2 N.Y. 2d 185, 187 (1957), the Court of Appeals explained that "[i]t is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object..." The Court of Appeals added that "[t]he money plaintiff sues for was the fruit of an admitted crime and <u>no court should be required to serve as paymaster of the wages of crime</u>." *Id.* (citation and quotation marks omitted) (emphasis added). "And it makes no difference that defendant [the sheriff] has no title to the money." *Id.* (citation and quotation marks omitted). *See also Hofferman v. Simmons*, 290 N.Y. 449, 456-57 (1943) (courts will not give "sanction to titles and possessory rights founded only on lawbreaking.").

Similarly, the United States Supreme Court has stated that "we need look no further than the maxim that no man may take advantage of his own wrong." *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-33 (1959).[6]

No matter whether North Korea is a smash-and-grab thief, a thief by false pretenses, a fraudster, or a commodities market manipulator, it is clear that North Korea committed a crime. For the Court to order that North Korea (in whose shoes Plaintiffs stand) has an interest in the Immobilized Assets such that they should be turned over from innocent victims would flagrantly violate these public policy principles. The Court would be the "paymaster of the wages of crime." *Carr*, 2 N.Y.2d at 187. Put another way, Plaintiffs are asking this Court to aid and abet North Korea's crimes. *See Hogan v. Supreme Ct. of New York, Bronx Cnty.*, 295 N.Y. 92, 96 (1946) ("It

---

[6]    New York further has a policy interest "that New York not become a marketplace for stolen goods." *Angiolillo v. Christie's, Inc.*, 64 Misc. 3d 500, 518 (Sup. Ct. N.Y. Cnty. 2019).

is an old, old principle that a duly constituted court … <u>will not allow itself to be made the instrument of wrong</u>") (citation and quotation marks omitted) (emphasis added); *In re Edwards*, 121 A.D.3d 336, 342 (2d Dep't 2014) ("The Court will not put its imprimatur on Brandon's efforts to gain from his admittedly criminal conduct").[7]

### G.     The Shelter Principle Is Inapplicable

The Parties agree that the shelter principle does not apply, and further seem to agree that the U.C.C. offers no protections to bad faith criminal actors, as North Korea is alleged to be here. *See* Mot. at 24-25.  Instead, the U.C.C. sets out principles which, in certain scenarios, protect and confer rights upon innocent third parties who unwittingly transact in illicitly obtained assets.  One of those rights is to recover "on the proceeds held by the thief or embezzler." *Universal Exp.*, 2008 WL 1944803, at *3.  Here, the Immobilized Assets are not "held by" North Korea.  Thus, the shelter and "take free" principles discussed in *Universal Express* are inapposite, regardless of whether North Korea ever obtained title to the Immobilized Assets North Korea no longer holds.

### H.     The Terrorism Risk Insurance Act ("TRIA") Is Inapplicable

Plaintiffs invoke the TRIA as a reason why the Court should "order the assets turned over to Plaintiffs" even if the Court were to conclude North Korea "never obtained title." Mot. at 26-27.  Plaintiffs are incorrect.

---

[7]     Although there is a dearth of appellate case law in analogous situations where judgment creditors seek turnover of assets resulting from the judgment debtor's crimes, the few trial courts to have considered the issue have uniformly declined to order turnover. *See Stuhler v. State of New York*, 127 Misc. 2d 390, 392 (Sup. Ct. N.Y. Cnty. 1985), *aff'd*, 113 A.D.2d 1038 (1st Dep't 1985) ("Because they are fruits of a crime committed by MRC, MRC, the judgment debtor, can have no interest in those funds."); *New York State Tax Commission v. Ritter*, 101 Misc. 2d 606, 607 (Sup. Ct. Orange Cnty. 1979) ("[t]o declare that Mr. Young had some legal interest in this currency which could be attached is contrary to the strong public policy against recognizing a wrongdoer's interest in the fruits of his crime").

Plaintiffs' argument runs counter to the TRIA's core purpose. Congress enacted the TRIA to make it easier for victims to obtain relief against terrorists by codifying their ability to enforce judgments against frozen terrorist assets otherwise shielded by the Foreign Sovereign Immunity Act of 1976. *See Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016); *see also Weinstein v. Islamic Republic of Iran,* 609 F.3d 43, 50 (2d Cir. 2010); *Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553, 576 (S.D.N.Y. 2012) (explaining TRIA's purpose).

Accordingly, in a typical TRIA case, a judgment creditor seeks to enforce against specific assets frozen by OFAC. *See, e.g.*, *Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 636-37 (D.C. Cir. 2025). In such cases, the TRIA allows victims to recover while also depriving terrorists of their proven funds. The TRIA does not, however, dictate that the Court "rob Peter to pay Paul."

Plaintiffs' insistence that the Immobilized Assets are North Korean and therefore subject to the TRIA is also *ipse dixit*. Section 201 of the TRIA requires a judgment creditor to establish that the sought assets are "blocked assets" owned by a terrorist state or such state's "agency or instrumentality." *Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91, 97 (2d Cir. 2022). Plaintiffs have failed to make any such showing.

First, "blocked assets" are "asset(s) seized or frozen by the United States," and are limited to assets of a "terrorist party," TRIA § 201(a), "within the United States" or "the possession or control of a U.S. person."[8] In turn, "assets of a terrorist party" are limited to assets "belonging to" that party. *Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 438-40 (D.D.C. 2012), *aff'd*, 735 F.3d 934 (D.C. Cir. 2013). Accordingly, even if North Korean assets are "automatically blocked" pursuant to an Executive Order under the IEEPA, that merely raises the question of

---

[8]    Basic    Information    on    OFAC    and    Sanctions,    OFAC,
https://ofac.treasury.gov/faqs/topic/1501 (last visited June 22, 2026) (describing "How does OFAC define 'property'?").

whether the Immobilized Assets here "belong to" North Korea in the first place. *See* Dkt. 67 at 18 (*citing Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 137 (2d Cir. 2016)). For the reasons discussed above, they do not.

Second, as noted *infra*, Plaintiffs have failed to show, as they must, that North Korea, or an agent or instrumentality of North Korea, was even the culprit of the April 18 Incident, a precondition to relief under the TRIA. *See Levinson*, 44 F.4th at 97 ("before ordering assets to be seized under TRIA, a district court must make findings as to whether TRIA indeed permits those assets to be seized").

## I. Plaintiffs Have Failed to Meet Their Burden to Establish that North Korea Was the Thief Behind the April 18 Incident; The Ehrenhofer Declaration Should Not Be Credited

Although the Court can deny the Turnover Motion without any factual findings, Plaintiffs also have failed to meet their burden to establish that North Korea is the thief responsible for the April 18 Incident.

Plaintiffs submit the declaration of Justin Ehrenhofer (Dkt. No. 60-2, the "Ehrenhofer Declaration") contending that the thief was North Korea. This report is unconvincing. Ehrenhofer is not qualified for the specialized task of identifying the culprit behind the April 18 Incident, and his conclusion is not based on reliable methodology. Accordingly, the Court should not credit this report.

To be admissible, expert testimony must be both helpful and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993). Federal Rule of Evidence 702 "governs the admissibility of expert and other scientific or technical expert testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). Under Rule 702, the district court has a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *United States v. Kwok*, 2024 WL 1773143, at *1-2 (S.D.N.Y. Apr.

19

24, 2024).  Under *Daubert*, relevant factors include whether a theory can be and has been tested, whether it has been subjected to peer review and publication, whether it has gained general acceptance in the relevant scientific community, a technique's known or potential rate of error, and the existence of standards controlling a technique's operation.  *Amorgianos*, 303 F.3d at 266.

The Ehrenhofer Declaration boils down to the observation that the April 18 Incident shared certain general characteristics with a February 2025 exploit attributed to the Lazarus Group, and that therefore the April 18 Incident "can be reasonably attributed to North Korea."  Ehrenhofer Decl. ¶ 68.  There are two primary problems with this conclusion.

First, while Ehrenhofer asserts that he has more than five years of experience in cryptocurrency, and holds certifications related to blockchain compliance and investigations, Ehrenhofer does not claim to have any experience in the specific, specialized field of illicit finance or even the broader field of national security-related investigations.[9]  *See Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005) (just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.").

Second, even if Ehrenhofer were qualified, his conclusion that the April 18 Incident can be "reasonably attributed to North Korea" is not premised on any credible basis:

-    Ehrenhofer states that the April 18 Incident thief: (1) used Tornado Cash; (2) used cryptocurrency bridges; and (3) employed "multiple small transfers," all similar to past North Korean hacks.  Ehrenhofer Decl. ¶¶ 61-62, 64.   But they are also similar to many other <u>non</u>-North Korean hackers' past attacks; they are common tactics.

---

[9]    Ehrenhofer claims to attach his CV (*see* Ehrenhofer Decl. ¶ 7), but no such document is attached.

- Ehrenhofer relies on other people's second-hand reporting suggesting that the thief might have been North Korea. *Id.* ¶ 67. But this is hearsay within hearsay, with no analysis of reliability of the underlying reports (which themselves are inconclusive).

- Ehrenhofer argues that the thief sent a *de minimis* amount of ETH and BTC to addresses which also (in the past) received a *de minimis* amount of cryptocurrency from another wallet, which separately transacted with a third wallet allegedly tied to North Korea. *Id*. ¶¶ 65-67. But all this activity shows is that the thief sent assets to a wallet associated with North Korea – which anyone could do – and which could have been done just as easily to throw people off the scent of the real thief.

These scant morsels are insufficiently reliable, non-falsifiable, and not even alleged to be consistent with any proven industry norms or standards. Ehrenhofer's conclusion violates all four *Daubert* reliability factors. *See Amorgianos*, 303 F.3d at 266.[10]

## IV.    PLAINTIFFS HAVE NOT ESTABLISHED THAT NORTH KOREA IS ENTITLED TO THE POSSESSION OF THE IMMOBILIZED ASSETS, OR THAT THEY HAVE A SUPERIOR INTEREST TO AAVE LLC

Even if Plaintiffs could establish that North Korea has some bare interest in the Immobilized Assets, Plaintiffs cannot meet their burden to convince the Court to make one of the two findings that comprise the second prong of the *Beauvais* test: Plaintiffs have not established that North Korea (the judgment debtor) is entitled to the possession of the Immobilized Assets, or that Plaintiffs' rights to the Immobilized Assets are superior to those of Aave LLC, the party that possesses the Immobilized Assets. *See Beauvais*, 942 F.2d at 840.

---

[10]    To the extent the Court determines that an evidentiary hearing would be helpful to adjudicate Plaintiffs' Turnover Motion, Aave LLC reserves the right to move, as appropriate, for the exclusion of the Ehrenhofer Declaration and cross-examine Ehrenhofer.

A.     **North Korea Is Not Entitled to Possession of the Immobilized Assets**

Even assuming *arguendo* that North Korea is the thief, North Korea is not legally "entitled to the possession" of the stolen Immobilized Assets, *Beauvais*, 942 F.2d at 840. Even if a judgment creditor satisfies the first *Beauvais* prong, and the judgment debtor has an interest in property held by a third party, "that does not necessarily mean [the judgment debtor] is entitled to *possession* of that money or property." *Id.* at 841 (emphasis in original).

For the same reasons that North Korea has no interest in the Immobilized Assets, North Korea also is not entitled to possession of the Immobilized Assets, which are no longer in the thief's possession. Indeed, Judge Rakoff recently found that a judgment debtor is not entitled to possession of certain assets under *Beauvais* if those assets are in the possession of a third party and the judgment debtor lacks "capacity to obtain them from [the third party] without [third party's] consent." *Resource Grp. Int'l Ltd. v. Chishti*, 2026 WL 1192716, at *4 (S.D.N.Y. May 1, 2026). And a finding that North Korea is entitled to the possession of the Immobilized Assets would also violate the public policy principles articulated above.

B.     **Plaintiffs' Claim to the Immobilized Assets Is Not Superior to Aave LLC's Claim**

Plaintiffs cannot establish the second finding in the second prong of the *Beauvais* test, that their claim to the Immobilized Assets is superior to Aave LLC's claim.

The "creditor has the burden of establishing that his rights are superior to those of the transferee." *Gelbard v. Esses*, 96 A.D.2d 573, 576 (2d Dep't 1983). The question of superiority "is a matter to be determined by applying the fraudulent conveyance provisions of the Debtor and Creditor Law." *Id. See also Williams v. Congregation Yetev Lev*, 2004 WL 2924490, at *3 (S.D.N.Y. Dec. 16, 2004) (same). Plaintiffs do not assert that Aave LLC is a transferee of North Korea, let alone that the "hack back" of the Immobilized Assets constitutes a fraudulent

22

conveyance, such that the Court can make a determination of superiority. In other words, the prototypical instance in which a judgment creditor has a superior interest in assets subject to turnover arises where the judgment debtor has fraudulently conveyed the assets. That is not the case here.

Even outside the fraudulent conveyance context, Plaintiffs cite no authority that judgment creditors (standing in the shoes of North Korea) have superior rights to the victims of the judgment debtor's subsequent crimes, unrelated to the judgment creditors. The notion that Plaintiffs could win priority simply by being "first to the courthouse" and winning a secret footrace that only they knew about – over countless aggrieved users of the Aave Protocol around the globe, almost all of whom have no notice, let alone formal notice, of this proceeding – would be beyond inequitable. It also would violate the maxim that "under both New York and federal law, courts are not required to favor one victim over others simply because that one raced to the courthouse and obtained a judgment" and that judgment creditors "cannot satisfy their judgment with other investors' money." *S.E.C. v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *16 (S.D.N.Y. May 6, 2014).

Plaintiffs rely on cases addressing distribution of recovered assets among victims of the same crime. Their cases do not hold that one judgment creditor may seek turnover of assets currently held by other victims of a different scheme supposedly perpetrated by the judgment debtor. *Cunningham v. Brown*, 265 U.S. 1, 13 (1924) established an "equality is equity" principle for the victims of Charles Ponzi's fraud, but it was all the same fraud; the victims were all similarly situated by shared circumstances. *XL/DataComp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1451 (6th Cir. 1994) involved inapplicable bankruptcy principles, specifically that one creditor's "claim of entitlement to a constructive trust" is not an "equitable interest" under the Bankruptcy Code. *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002) held that

23

"Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders."   The victims here, however, are not "similarly situated."

That is especially true because Aave LLC is working diligently on behalf of Aave LLC victims to restore the damages resulting from the April 18 Incident.  The recovery plan "address[es] the remaining consequences of the April 18 incident, including the outstanding deficit and normalizing the affected Aave Protocol markets at the protocol level."  Second DeMeo Decl. ¶ 20. The "Immobilized Assets are expected to be applied to reduce the remaining protocol-level deficit in the Aave Protocol."  *Id.* ¶ 22.

Victims of the April 18 Incident fully support Aave LLC's efforts.  With this opposition, Aave LLC submits the Declaration of Mike Silagadze, founder and Chief Executive Officer of Ether.Fi, a protocol whose users maintained substantial positions on the Aave Protocol and were affected by the April 18 Incident.  EtherFi pledged approximately 5,000 ETH as part of the coordinated "DeFi United" effort, and fully supported Aave LLC's right to the Immobilized Assets in order to fully remediate the harm.  Stani Kulechov, founder and Chief Executive Officer of Aave Labs, submits a declaration explaining the damages to Aave users, as well as to himself personally. And the Arbitrum community, who unquestionably had possession of the Immobilized Assets, overwhelmingly voted to provide the Immobilized Assets to Aave LLC, because they knew that Aave LLC had a plan to make blameless Aave Protocol users whole.  Second DeMeo Decl. ¶ 7.

Accordingly, to the extent the Court makes an equitable determination of who has the greater interest in the Immobilized Assets, the answer should be Aave LLC, the entity working diligently to remediate the harm to the Aave Protocol users.  Under New York law, the equities strongly favor returning stolen assets to the victims of the theft.  While Aave LLC's mechanism is

24

structurally complex, the various declarations leave no doubt that Aave LLC has been working to do just that.

## V.     PLAINTIFFS' REQUEST UNDER CPLR 5239 SHOULD BE DENIED

Plaintiffs' Turnover Motion is procedurally confusing.  Plaintiffs assert that their motion is for turnover, and spend over twenty-five pages of their brief explaining why they believe that the Immobilized Assets should be turned over to them.  Then, over the last few pages of the brief, Plaintiffs pivot and argue that there should be a "notice and claims procedure" under CPLR 5239.  Plaintiffs are attempting to invent a bespoke process, untethered from Article 52 and intended to benefit themselves at the expense of the victims of the Aave Protocol.

CPLR 5239 provides that "[p]rior to the application of property or debt by a sheriff or receiver to the satisfaction of a judgment, any interested person may commence a special proceeding against the judgment creditor or other person with whom a dispute exists to determine rights in the property or debt" (emphasis added).  As such, CPLR 5239 applies "to property or a debt under the control of a sheriff or receiver" or "in 'turnover' situations" where a "claimant does intervene in a turnover proceeding."  Weinstein Korn Miller, 11 *New York Civil Practice* ¶ 5239.01 (2026).

Plaintiffs attempt to turn CPLR 5239 on its head with its argument that the judgment creditor can request such a procedure, so that "turnover should happen with title clear of all possible claims."  Mot. at 27.  That is not the law.  A CPLR 5239 framework presupposes a properly framed dispute over identified property in which the judgment debtor has an interest.  Here, Plaintiffs seek to short-circuit that process entirely, skipping the showing required under *Beauvais*.

Moreover, the CPLR provides that "[s]ervice of process in such a proceeding shall be made by service of a notice of petition upon the respondent, the sheriff or receiver, and such other person as the court directs, in the same manner as a notice of motion."  CPLR 5239.  Plaintiffs have not

25

stated that they served their request on the sheriff.  Even worse, Plaintiffs suggest a process by which "notice of this proceeding be sent to any potential claimants by (a) posting on Aave's governance forum, (b) posting on Kernel DAO's governance forum, and (c) if Aave LLC will agree, posting on Aave LLC's website, via its *X* account, and via non-fungible token to Aave suppliers in the affected rsETH-ETH pool."  Mot. at 30.  Subsections (a) and (b) of Plaintiffs' proposal would at most reach a subset of Aave and Kelp DAO <u>governance participants</u>; that is not meaningful service on the individuals who used the Aave Protocol and whose assets are actually at stake.  And proposal (c) would put the onus on <u>Aave LLC</u> to provide notice to users.  As explained in the Second DeMeo Declaration, it would be inordinately difficult to determine what users should be contacted, especially because users' exposure and harm arose at the protocol level.  Second DeMeo Decl. ¶¶ 23-25.  Worse, under Plaintiffs' own (incorrect) theory, <u>every</u> judgment creditor of North Korea has a right to the Immobilized Assets, so the class of potential claimants is not limited to Aave Protocol users.  Plaintiffs' proposal makes no attempt to address that reality, presumably to try to keep the Immobilized Assets themselves.

Plaintiffs also cannot reframe this as a priority dispute.  CPLR 5234 governs priority among competing judgment creditors, but there are no competing judgment creditors here.  *See Keawsri v. Ramen-Ya Inc.*, 2022 WL 17813236, at *4 (S.D.N.Y. Dec. 19, 2022) ("[T]he motion of Judgment Creditors under CPLR 5234 for an order granting Judgment Creditors priority over other creditors over the property of Judgment Debtors is denied as not ripe for consideration. Judgment Creditors have not, at this point, identified any particular creditor who has claimed priority to any of Judgment Debtors' property.").

At bottom, Plaintiffs' "procedure" is not a procedure at all.  It is an attempt to bypass Article 52.  It shifts the burden away from Plaintiffs, deprives affected parties of a meaningful opportunity

26

to be heard, and seeks to propel the Court to a merits determination without satisfying the statutory predicates for turnover.  The Court should reject Plaintiffs' gambit and deny the Turnover Motion, which will allow Aave LLC to continue the remediation efforts resulting from the devastating April 18 Incident.

## CONCLUSION

For the foregoing reasons, the Turnover Motion should be denied.  The denial of the Turnover Motion necessitates that the Restraining Notice should be vacated and that Aave LLC is entitled to utilize the Immobilized Assets free and clear.

Dated:  New York, New York
      June 22, 2026

**MORRISON COHEN LLP**

By:  */s/ Jason Gottlieb*
    Jason Gottlieb
    Michael Mix
    Daniel Isaacs
    Genny Ngai
    William Roth
    Vani Upadhyaya
    Emma McGrath

909 Third Avenue
New York, NY 10022
Telephone: 212-735-8600
Facsimile:  212-735-8708

*Attorneys for Non-Party Aave LLC*

27

## WORD COUNT CERTIFICATION

Pursuant to Section II.B.2 of the Court's Individual Rules & Practices, the undersigned hereby certifies that this memorandum of law contains 8,678 words.  I utilized the word count of the word-processing program used to prepare the document in order to obtain that word count.

*/s/ Jason Gottlieb*
Jason Gottlieb
