UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HAN KIM, et al.,

Plaintiffs,

v. 25 MC 527 (MMG)

THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,

Defendant.

------------------------------x

New York, N.Y.
May 6, 2026
11:00 a.m.

Before:

HON. MARGARET M. GARNETT,

District Judge

APPEARANCES

GERSTEIN HARROW LLP
Attorneys for Plaintiffs
BY: CHARLES LEWIS GERSTEIN
JASON SETH HARROW

THE BERKMAN LAW OFFICE, LLC
Attorneys for Plaintiffs
BY: ROBERT JOSEPH TOLCHIN

MORRISON COHEN, LLP
Attorneys for Interested Party Aave, LLC
BY: JASON P. GOTTLIEB

(The Court and all parties appearing telephonically)

LAW CLERK: Counsel, please state your appearance for the record starting with the plaintiffs.

MR. GERSTEIN: Good morning, your Honor.

I'm Charlie Gerstein and I'm joined by Jason Harrow and Robert Tolchin for the plaintiffs

THE COURT: Good morning.

MR. TOLCHIN: Good morning, your Honor.

MR. GOTTLIEB: My name is Jason Gottlieb of Morris Cohen LLP, appearing with my partners Michael Mix, M-i-x, and Jenny Ngai, N-g-a-i, representing Aave Labs LLC.

We can't hear you, your Honor.

THE COURT: Sorry. I was muting myself just as I was about to remind everyone, because we have a lot of folks calling in on the public line, it's extremely important that everyone mute themselves when they are not speaking so we can ensure the quality of the audio.

We're here today to address the TRO filed by Aave to lift the current restraint on approximately $71 million of assets that are held on the Arbitrum -- not sure how pronounce it.

Mr. Gottlieb, maybe you can tell me.

MR. GOTTLIEB: We'll go with Arbitrum.

THE COURT: Approximately 71 million in cryptocurrency being held on the Arbitrum platform, already had been frozen,

in effect, or immobilized in the plaintiffs' words, by Arbitrum following exploit that took place in mid April. And then the plaintiffs here, who have a judgment against North Korea, filed a restraint notice and writ of execution against those assets.

The TRO filed by Aave is what has brought us all here today, so I have so many questions that I'm hoping you all can answer. But I think before we do that, we really ought to start with the question of standing, because I have read your papers, Mr. Gottlieb. But it is not at all apparent to me, from those papers, exactly what Aave's standing is. They are clearly not an owner of the money and don't have a claim on the actual immobilized funds themselves in terms of any property interest in getting those funds.

But several things are unclear to me. One, what exactly is the rule of Aave LLC vis-a-vis the activity in the Aave protocol?

And what is Aave's role in the current proposal that I understand has been put to the Arbitrum membership to dispose of these funds?

And what actual harm is Aave suffering in the meantime?

MR. GOTTLIEB: Thank you, your Honor.

Let me take those questions, but first with the standard that we need to apply here, which is the standard under CPLR 5240, the interested party standard, which is what

triggers standing in this case. CPLR 5240 states that the court may at any time on its own initiative or the motion of any interested person upon such notice as it may require make an order denying limiting conditions, regulating, extending, or modifying the use of any enforcement procedure. CPLR 5240, of course, is made applicable in federal court, FRCP Rule 59(a)(1).

Now, the interested person standard is, to be frank, a fairly low standard. If you look at the CPLR, it defines "interested person" as broadly inclusive, it encompasses anyone whose legal, monetary, or presumably even privacy interests are threatened by enforcement proceedings.

CPLR 5240 is very flexible. As Judge Liman said in the *Acmetel* case that you see in our brief, page 16 and 20, it grants a court broad discretionary power to control and regulate the enforcement of a money judgment crafting flexible and equitable response to claims that arise within respect --

THE COURT: I'm sorry, Mr. Gottlieb.

Anyone who is on the line, you must be muted. You cannot speak unless you're recognized by the court. Please mute yourselves.

Again, if further disruptions occur, I'm ending this conference, and we will have to convert this to be an in-person conference.

MR. GOTTLIEB: -- to enforcement of valid money

judgments.

With apologies, your Honor, I think that the court's automated system just automatically announces whoever was joining, so nobody was -- I don't think anyone was trying to be disruptive.

So let's, with that background, your Honor, let's go to the questions you specifically asked the role of Aave, the role of Aave in a the protocol, the proposal and actual harms Aave has suffered.

Aave LLC is certainly an interested party under the standard of 5240 because Aave LLC has interests that are threatened. Aave LLC, and these are all set forth in the affidavit of Luigi DeMeo, which is before the court.

THE COURT: Yet, Mr. Gottlieb, I did read Mr. DeMeo's affidavit very carefully. But I confess that I would say substantial vagueness in what exactly Aave does and what exactly its relationship is to the Aave Protocol and to the function of that protocol.

Because, you know, just looking at Mr. DeMeo's affidavit, the description provided, which is not very illuminating, at paragraph 10, Aave LLC is a software and development services company that contributes to the open source software known as the Aave Protocol. OK.

The Aave Protocol is not a company or legal entity. Decentralizes open systems of smart contracts. Then it mostly

goes on to say all the things that Aave LLC doesn't do. It doesn't approve intervenor control of any of the transactions. It doesn't custody user assets or user transactions.

So, again, I read Mr. DeMeo's affidavit, actually, multiple times. It does not, with respect to you, Mr. Gottlieb, it does not explain to me what Aave LLC is or what its relationship is to the Aave Protocol or to Aave Protocol users.

MR. GOTTLIEB: I'll answer the question directly, your Honor.

So Aave is really a family of companies. Aave LLC is in this family of companies. It is a wholly owned subsidiary of a parent company. All of the companies act as a service provider to work on the protocol. The protocol itself is a public system of smart contracts that runs on a block chain. The Aave companies created the protocol, released the protocol, and users can use that protocol permission-lessly.

What the Aave companies actually do --

THE COURT: And then, I'm sorry, Mr. Gottlieb. You have to forgive my interruptions. It's just this is very complicated for me and I want to make sure I understand.

So how do you make money from --

Is a fee paid when the protocol is used? How do the companies make money?

MR. GOTTLIEB: The companies don't make money directly

from transactions on the protocol. Transactions on the protocol may carry fees in certain instances. Those fees reside in smart contracts that belong to users of the protocol. The Aave company can make money by working on the protocol to improve it to make it better. There are certain people who use the protocol essentially as rails to perform other financial transactions. Aave can assist with those.

Aave also operates its own front-end interface. So if you want to work on the protocol, if you want to do things on the protocol, Aave runs a separate software program that serves as an interface to that protocol and the interface can charge fees of certain types in certain situations.

Please interrupt me at any time, Judge.

THE COURT: Go ahead, Mr. Gottlieb.

MR. GOTTLIEB: So because of this work -- and Aave LLC is its US entity that also performs work on the protocol in these ways, and it happens to employ the people here in the United States.

Aave LLC, as Mr. DeMeo said, provides technical and operational incident response services related to the Aave Protocol. At a very base level, if the Aave Protocol just failed, if it went away, if it didn't exist anymore, then no one at Aave LLC would have a job anymore. There is a very clear interest in Aave LLC.

Again, they don't have to have the money here. It's

just an interested person standard under 5240. I think that's a very different analysis. The case law that plaintiffs cite all are Article III standing cases like *Lugon*, etc. That's fine. It's *de rigueur* that the court needs Article III standing. But that standing is granted under 5240 through this interested person standard.

Again, I would point to Judge Liman's ruling in the *Acmetel* case. As well, there's a different case that was not cited in our brief, I'll give you the cite now -- apologies for this, we're all obviously racing around the clock so we are finding new good case law as we go -- there's a case called *Export Import Bank of the Republic of China v. Grenada*. It's 768 F.3d 75, 81, n.7 (2d Cir. 2004), where the movants were third-party contract counterparties with the restrained entities, seeking to vacate certain restraining notices under interested parties, and the court said that they had independent standing to challenge the restraining notices.

So the standard here is, if you have an interest, you can come in and challenge, that is sufficient to trigger standing, the requisite Article III standing, and that's exactly why Aave LLC is here.

I will also note, your Honor, that Aave LLC, part of the reason we're here is because this emergency motion that the plaintiffs made last Thursday was served on -- I apologize for the interruptions, your Honor -- which was served on Friday, I

received that at 8:51 p.m. on Friday night. It was not sent to me as counsel for Aave. It was not sent to Aave. It was sent to me for some reason because I'm counsel to someone else in a different case that plaintiffs are involved with.

I, frankly, am still not sure why they sent it to me. By coincidence I happen to be counsel for Aave, so we had notice of it, but it seems difficult to say, well, where are all the users of the protocol. They may not have any notice of this. The notice was not served on them. It just went to me. It was posted on the Arbitrum DAO forum last Friday.

When we saw that, we realized the tremendous harm that that would cause, so we worked around the clock over the weekend to get our papers into the court on Monday morning. So it could be, if everyone had more time, other people might show up. But, frankly, your Honor, Aave LLC has sufficiently shown that we are an interested party sufficient to trigger Article III standing, and that's why we're here. We can be here, and there is no issue on the standing.

THE COURT: OK. Before we go on to talk about the underlying exploit and what is the current proposal that would be done with the money that is being frozen, I just want to give Mr. Gerstein a chance to say anything on standing or right to be heard, that he would like to say.

Go ahead, Mr. Gerstein.

MR. GERSTEIN: Sure. Very briefly, your Honor. I'll

answer any questions, if helpful.

I think what confuses me about standing is that Aave LLC has disclaimed any interest in the assets and claims that its interest is in being able to do future work for, what they call, the Arbitrum Protocol, what I would call the Arbitrum DAO, which is what it calls itself.

Just like Arbitrum -- excuse me -- Aave. Just like Arbitrum is a state law general partnership. And state law cannot create federal standing.

THE COURT: Mr. Gerstein, just speak more slowly. Everyone should make sure that they are muted so we, including you, Mr. Gottlieb, so we can give the court reporter the best chance to have a clear audio for Mr. Gerstein.

If you can just repeat the cite, Mr. Gerstein, and generally speak a little more slowly. Thank you.

MR. GERSTEIN: My apologies, Ms. Frankó, and to the court. I have never met a court reporter who is capable of keeping up with my natural speech. I will speak more slowly. I hope my audio has improved. But, if not, I'll do what I can.

The cite is *Hollingsworth v. Perry*. Again, I'm doing that from memory, your Honor. I haven't read the case in a little while. I believe the rule -- and this was affirmed by the court in *TransUnion* -- is that the mere creation of an interest by a legislature, even a federal legislature, is insufficient to confirm Article III jurisdiction on a court.

The fact that the New York Supreme Court might permit Aave LLC to appear and say, We don't like this restraining notice, does not give their hypothetical interest in future work they may or may not do with an organization they claim doesn't exist regarding property they have no interest in, the right to bring a claim in this court.

THE COURT: Well, I think just to push you on that a little bit, Mr. Gerstein, as I understand Mr. Gottlieb's argument, I mean, I think his last point is probably the most salient, which is that viability of this protocol and the trust of transactors who might want to use it, is their entire business rests on the viability of that protocol. And the uncertainty around what will happen to these immobilized funds is affecting trust in the protocol.

To me, it's kind of like -- again, for all of these things, rest assured there is more analogies to the normal financial markets coming, because that's the best way for me to try to understand what interests are really at stake here.

If NASDAQ said, Listen, you can't seize money that is being held in some kind of escrow account by NASDAQ for its traders because we are a company that is entirely dependent on NASDAQ remaining in business, and the seized money risks the total collapse of this trading platform.

So I think that is really the -- as near as I can tell -- that's kind of the argument that their entire business

depends on the viability of this platform, and the platform is facing radical destabilization or collapse, based on what is going to be done with this approximately $71 million of frozen assets.

So, you know, that, I think that's a little more concrete certainly. I mean, I take your point, Mr. Gerstein, but I just think it's not really fair to characterize that as, We hope to get future business from people who use the platform.

MR. GERSTEIN: I think I agree with that, your Honor. I think, in the NASDAQ example, there would not be Article III standing. The mere fact you might provide all of your services to one entity, in that case, the janitor at NASDAQ would have standing. He doesn't have a job if NASDAQ fails because the escrowed funds go to the wrong party.

Again, I have not researched that specific question. I'm happy to submit a letter brief to your Honor, but that seems to me like something where Article III standing would be lacking.

Also, to be clear, we think we win on the merits, and so -- and I understand, I think, a point Mr. Gottlieb made, if I'm understanding correctly, which I may not be, is that the court is empowered on its own motion to vacate a restraining notice. And so what if you just thought this Aave brief was just an amicus brief. You would still have discussion to

exercise that. I don't think the court should exercise that discretion, but it's unclear to me whether Mr. Gottlieb is making that argument, what exactly Aave's relationship to any of this is, which I remain confused about.

THE COURT: OK. Mr. Gottlieb, anything else you would like to say about that?

MR. GOTTLIEB: Yes. We are making the argument that was just voiced.

But further, I think if you just look at, for example, the Wall Street Journal article that the plaintiffs attached to the Gerstein declaration, as Exhibit F to the Gerstein declaration, the journal article spells it out pretty clearly. The novel attack -- this is a quote, "The novel attack triggered a panic among Aave depositors, who have withdrawn more than $10 billion since then. As the initial wave of users rush to exit, Aave reached its limit on how much it could lend out, effectively freezing the remaining assets and leaving subsequent users unable to withdraw. Borrowing rates on Aave surged into double digits, as stranded lenders scrambled to borrow stable coins against their locked collateral."

So this article, which is something that plaintiffs submitted to the court, spells out the danger to Aave, to the Aave family of companies, including Aave LLC, as well as going to the irreparable damage that we've been referring to.

As that article continues, an industry player says we

need Aave to survive. It would be bad for defined crypto overall if there was a big hole that scared a lot of what is now coming from Fintechs and institutions. So these issues are much bigger than, more important than plaintiffs may have appreciated when they went to the court on their ex parte emergency motion.

THE COURT: All right. I just want to be clear that the court did not rule on any motion other than alternative service. There is no court --

I know we have many people on the call. We should be absolutely clear that there is no turnover order. No money is about to be transferred to these plaintiffs. They have a right to serve restraint notice and a writ of execution based on the registered judgments, again, so far as they meet the standard. But the court is not involved in that process.

The only thing that was authorized by the court was alternative service, which I think has been at least successful in bringing you here, Mr. Gottlieb. So that's all that has happened. No order of turnover has been entered by the court, and the plaintiffs have proceeded entirely appropriately.

So I don't want there to be any confusion about that, particularly given the number of folks we have listening in on this issue. OK. All right. So, just putting that to the side for the moment, I just want to make sure -- just kind of going back to basics -- that I have at least a correct layperson's

understanding of what the April 18 exploit was and what exactly happened. So, as I understand it, hackers -- and we'll just, for the sake of argument today, we'll refer to them as North Korean hackers, that is what has brought us all here today. I'm not making a finding on that, but just so that we can follow. That's the plaintiffs' claim. Hackers associated with North Korea steal, through false pretenses, some rsETH tokens. I guess tokens is the right word. Then they use that stolen rsETH to borrow other cryptocurrencies and enter into these other cryptocurrency transactions on the Aave Protocol.

And then now some of that fraudulently borrowed money is what is in this frozen pot that's worth approximately $70 million. So, in very basic form, Mr. Gottlieb, is that correct?

Have I correctly described what happened on April 18?

MR. GOTTLIEB: That is directionally correct, your Honor. There may be some details that are slightly different. I'm not sure that they are relevant. We'll see if they become relevant as we go forward.

THE COURT: OK. Mr. Gerstein, do you generally agree with that very basic description of what appears to have happened on April 18?

MR. GERSTEIN: I think a very small modification, your Honor, which is that -- I hate to do this, but I think describing this in the most technical detail possible might be

genuinely helpful. Stop me if it is not, please.

At the first step what happened was, North Korean hackers tricked the Kelp DAO, that is how plaintiffs' expert describes it, into effectively printing counterfeit assets. Assets that were not backed by the real assets they were supposed to be backed by. I don't think I would characterize that as stealing. They defrauded the Kelp DAO.

There is a difference between that, right?

THE COURT: Well --

MR. GERSTEIN: Certainly took property --

THE COURT: Wait. Just, sorry, Mr. Gerstein.

When I put my hand up, that means I need whoever is talking to stop talking, because two people cannot talk at the same time, and because of how video conference works, as you all know, you can't hear me trying to interrupt you. So I'm just going to put my hand up. That means stop talking because I have a question.

We're going to get to the property interests, but I'm not so sure that I agree with you, Mr. Gerstein, that there is a difference -- that there is a meaningful legal difference between theft by deception, an imposter, essentially, and theft by I run into the bank and I grab the money out of the teller's drawer. So I don't -- if you want to say more about what you think the legal significance of that is, I'm happy to hear you. But I don't think, for the transfer of title, that theft by

deception is meaningfully different than theft by force.

MR. GERSTEIN: I agree with that legal statement, your Honor. I don't think it matters for this motion whether, how we characterize that first step transaction, because there is the second step transaction. I'm happy to go into it in more detail about why this might be, again, I'm saying might be different than theft by deception, but rather fraud. We can talk about that as to the first step of the transaction. I don't think it's necessary for the court to reach that because then there was the second step.

THE COURT: Go ahead, Mr. Gerstein. How do you describe the second step?

MR. GERSTEIN: The second step, I agree with your Honor's characterization entirely.

THE COURT: OK. So, in that case, we all know that a thief cannot get good title, right?

A thief does not have title to stolen property. A thief cannot transfer title to stolen property. The exception being s if what the thief steals is money or a negotiable instrument and, you know, I guess we can talk about whether we think that this rsETH token qualifies as a negotiable instrument.

So, I guess part of my question, Mr. Gerstein, and why I was pressing you on whether there is any significance to a theft by fraud or deception and a theft by force, is that here,

when, again, just for sake of argument, North Korean hackers trick Kelp into printing the rsETH that they are not entitled to, when they are holding that rsETH, they do not have good title. I think we can all agree on that. It is stolen property. A thief does not have good title to stolen property.

Now we get to the next step, which is where they use the fraudulently obtained rsETH to enter into other transactions where they are borrowing other kinds of currency. And so I think I agree with you, Mr. Gerstein, that a lot depends on how we characterize that second transaction because, as I understand the way the protocol works -- and I'm happy to be corrected on that understanding -- the counterparties are only entering into those transactions because they believe the transactions are backed by the collateral of these rsETH tokens. In effect, those counterparties are induced to enter the transaction also by fraud. Like, those contracts are obtained by fraud because, in fact, the hacker doesn't have tokens that can actually serve as collateral. They are not good. There is no value there. So they have tricked their counterparties into entering into those transactions.

If that is the case, then the money arising out of those transactions is also stolen funds to which the thief does not acquire title. Talk to me about that framing of the second transaction step, Mr. Gerstein, and where you think Aave has gotten that wrong.

MR. GERSTEIN: So I think there is two points to make.

The first is that when you asked about negotiable instruments, all of these transactions are governed by Article 12 of the UCC which applies to controllable electronic records. So, for relevant purposes, the rule that would apply to a negotiable instrument will apply here. I don't know that that makes a difference at the second step, but it is true, your Honor.

I think the key point to understand about the second step is how Mr. DeMeo characterizes that transaction, which I agree with, which is that collateral was posted for a loan and the collateral was bad. I am merely certain that in litigation between the borrower and North Korea, the borrower would be able to prove that North Korea entered that transaction with fraudulent intent. But if every time somebody borrowed assets based on bad collateral, they didn't get good title to it, the reason why this rule does not apply to fraudulent transactions like this is that then all that person's other creditors, for example, judgment creditors like my clients, people who are victims of arm's length fraud transactions get to jump the line.

So I think the legal characterization of that matches the factual characterization here, which is why fraud passes good title, subject to a lawsuit from the fraud victim to recover it, which the people who made these loans can bring.

People who made these loans can sue their counterparty and say you defrauded me. If they obtain a judgment, they can collect it just as we can.

Instead, they are seeking to jump the line in the collection process and say, we get those assets back because they were stolen from us, but they voluntarily deposited those into a lending pool backed by collateral, and the collateral turned out to be fraudulent. Worthless. That is not a theft. That's a loan.

THE COURT: Mr. Gottlieb.

MR. GOTTLIEB: I think a loan or a borrower without permission and with no intent to return is a theft. This was all a theft, whether you characterize it as the Tiffany smash-and-grab or whether you say there was some scalduggery afoot where somebody forced a skeleton key to unlock the Tiffany safe and steal the diamonds. None of this matters. This is all form over substance. The substance of this is the thief stole value belonging to Aave's users. We can get as technical as you want. I'm happy to do that. It just masks the economic reality of what happened. It is the thief stole value from Aave's users through whatever fraud scalduggery means. It doesn't matter. It doesn't matter. The value was stolen.

THE COURT: Right.

Let me just follow up with Mr. Gerstein on that point,

Mr. Gottlieb, because I think that's right, that the analogy to, like, I borrow money from the bank and I claim, in order to get --

Like, the scenario I think you were laying out, Mr. Gerstein, is one where I go to a bank to get the loan, and I lie on my documents about my ownership, sole ownership of the property I'm putting up for collateral for that loan, and it turns out actually that, like, either I have already sold it or I know that it has several liens on it, and I don't really have full ownership. So I lied about collateral to get the loan.

But there is another step here that I think Mr. Gottlieb has pointed out correctly, which is that based on what we know about these events, the lying was for the purpose of stealing, right. If I lie to the bank about my collateral, but I have every intent of paying the money back, I have certainly engaged in bank fraud because the bank might say, well, we never would have given her the loan if it weren't for this misstatement.

But I haven't stolen the money in the ordinary sense because I had every intent of paying it back when I borrowed it. I definitely engaged in fraud vis-a-vis the bank. I have frauded a financial transaction. But that is not the same as theft under those facts. And I think those facts are sort of similar to what you were identifying, Mr. Gerstein.

But it seems that everything we know about this

April 18 event is that the lying was in service of a theft. For example, when I forged someone else's -- I have stolen the coat check ticket from someone else's pocket at a party, and then I take that coat check and I go to the -- I take that ticket and I go and I take a fur coat that is very valuable that belongs to someone else. My misrepresentation is in service of a theft. I have no intention of returning the coat. I'm stealing it.

I think that does seem to be a meaningful difference here, because everything we know about this event is that the purpose of the lie was to steal, not simply to get a transaction that you wouldn't otherwise have entered into. But with full intent to, you know, perform on your side of the transaction.

MR. GERSTEIN: I think there is two points to make, your Honor.

First, Mr. Gottlieb included something that is not in the record in his answer, which is the phrase "without permission," that these loans took place somehow without the lender's permission. And I think we should be very detailed about what the lenders did here.

The Aave Protocol creates pools that connect borrowers with lenders. These people voluntarily put their money into the pool, voluntarily lending it, and they did so on the belief that they had collateral. That collateral turned out to be

fraudulent. I think in the coat check analogy, the difference is that when you give your coat to the coat check person, you do so for the purpose of exchanging it only with yourself. You don't say someone else is going to take my coat if I trade this little ticket that I have. You're putting it in the coat check for the purpose of recovering it.

This transaction was done to earn interest on a risky loan. There is no without permission. They voluntarily put their money in there. That turned out to have been a poor decision because collateral was not good. And the *Cunningham v. Brown* case, I think, answers your Honor's hypothetical about the misrepresentation to the bank.

In *Cunningham v. Brown*, Charles Ponzi never intended to pay these people back. He was stealing their money by that standard. And yet, he had good title to it for the purpose of distributing it among his many creditors. And that's what is important here. No one is saying North Korea should keep the money. The question is priority among North Korean's victims as between those who have judgments and those who do not, and as between those who are victims of human rights violations and those who are not.

THE COURT: OK. Mr. Gottlieb, do you want to respond on that question?

MR. GOTTLIEB: Yes, your Honor. Several points.

First of all, the structure of how the Aave pools

work, they are not bilateral transactions. Nobody on Aave transacted with a counterparty. They are transactions with smart contracts.

When the thief lied to steal, they operated a protocol. The people who deposited their cryptocurrency on Aave expecting to earn a return, yes, that's true, but they did not sign up to lose their money. They did not sign up to get hacked. Mr. Gerstein is making it seem like, wow, when you put your money into a risky protocol, maybe it's OK that North Korea steals your money. That is absolute nonsense. These are not bilateral transactions.

THE COURT: Well, to be clear, Mr. Gottlieb, just so we're all talking about the same thing, I don't think Mr. Gerstein is saying that such a person has no claim. They are just saying -- he's just saying that it's not a theft if you've been defrauded by false pretenses, but that that should be treated under Article 12 of the UCC as different than a theft.

So, I mean, I think -- I don't think at all he's saying that the people who are on the other side of these contracts -- and I want to ask some questions about that -- are not injured. They definitely were injured. I think we're disputing what the nature of the injury is and what the consequences of that injury for any priority claim to this money.

MR. GOTTLIEB: Let's look at what the law says on this point. Saying that North Korea acquired the immobilized assets through this exchange, there was no exchange. Again, this was a theft of value. And the law, as you said, is clear, a thief doesn't acquire the legal rights to the stolen property. If we look at -- there is another case. This one is also not in our brief. *Solomon R. Guggenheim Foundation v. Lubell*, 77 N.Y.2d 311, the highest court in the State of New York telling us what New York law says, New York law affords the most protection to the true owners of stolen property, and it allows recovery even from a good faith purchaser from value, which is the really important thing to consider here.

One of the cases that plaintiffs rely on is this *SEC v. Universal Express* case, where the S.D.N.Y. held that a thief who purchased goods with stolen money may obtain transferable title from an innocent seller. But you have to read deeper into that case to see what it's relying on.

*Universal Express* relies on a New York Court of Appeals case from 1877 called *Newton v. Porter*, 69 New York 133 that makes this very, very interesting point. It says, and I quote, as New York's highest court has recognized, the extent to which the common law goes to protect the title of the true owner has a striking illustration in those cases in which it has held that where a willful trespasser converts a channel into a different species as, for example, timber into shingles,

wood into coal, or corn into whiskey. The product in its improved and changed condition belongs to the owner of the original material.

In this case, if North Korea or whatever, whoever it was, came in and converted rsETH into ETH to steal it, that value belongs to its original owners, the user of the Aave Protocol. It doesn't matter if it was changed. It doesn't matter what happened in this secondary transaction.

We can, again, we can explain the technicalities of how that worked. It's perfectly fine. But all of it is form over substance. And the substance is the thief stole people's money, and because that thief stole it for a brief period of time before the $71 million was taken back, they are saying, well, that $71 million now belongs to the creditors of the thief.

Let me pause for a moment on this take back because this is another point that distinguishes every single case that plaintiffs have raised. Even if the thief could somehow acquire some property interest, whether it's possession, whether it's title, whether it's any kind of property interest, all of the arguments that plaintiffs are alleging that would have transferred that property interest to the thief apply equally to the take back to Arbitrum.

So if North Korea acquired title just because -- this is the technical term -- jounced out of the system, when

Arbitrum jounced back -- I'm sorry.

THE COURT: I'm sorry.

MR. GOTTLIEB: Could you go on mute, please.

THE COURT: Yes. I'm so sorry, Mr. Gottlieb.

Let me just repeat my admonition that anyone who is dialed into the call must be muted, and if there are disruptions, we will end the conference. Thank you.

Go ahead, Mr. Gottlieb.

MR. GOTTLIEB: Thank you. Apologies again, your Honor.

So, again, however North Korea, or whatever thief it was, was said to have gotten -- whether it's possession, did they have possession at some point, perhaps, and then possession was taken away -- is it title. Even if they got title, which I do not think that they did, because as you said the thief doesn't get title, that title was taken away from Arbitrum.

Even if the thief possesses the Tiffany's diamond momentarily, it was taken away by the Good Samaritan. Any of the property rights have been removed, have been taken. So this would be like if somebody went to your house, broke in, however they did it, whether it was lying, stealing, scalduggery, separate deals, and grabbed stuff, then on the way out, a bystander stopped them and grabbed some of your jewels back and they ran away into the night with the rest of them,

for some random third party to come and say, oh, that thief, he owed me money, so that jewel, that basically never even made it out of your house, that is mine now. It is preposterous.

Any of the tortured arguments looking at these cases to say, well, in this case, this happened because a property interest may have been transferred through a subsequent legitimate transaction, there were no subsequent legitimate transactions. None of this was legitimate. It's all just theft by deception.

THE COURT: So the analogy that I have been using to think through what these series of events is -- and you'll both correct me about what I'm getting wrong -- is, again, to just put this in the context of more traditional financial markets, let's say I, a bad actor, steal the credentials, like, the trading platform, like, a Bloomberg terminal credentials of a currency trader at UBS. I don't think I'll call it UBS. It might not exist anymore, or its Credit Suisse, but we will say I take the currency trader credentials of a trader at Citibank. And I'm on my Bloomberg terminal with my stolen credentials. And everyone that I'm interacting with, all the other traders, think that I'm a currency trader at Citibank. And so they enter into paired options contracts with me on the presumption that everything I do is backed by the full faith and credit of Citibank. And, but, in fact, I'm an imposter. I'm pretending to be a Citibank trader, and I do these paired options

contracts. And the money that I get from the sell side, I take and I'm depositing into my personal bank account at Chase. But then I disappear and I never pay the buy side of the transaction.

So the traders that I have been trading with, as a Citibank imposter, are out the money because I have just taken the money from my sell side of the paired option, and now it's in my bank account at Chase. And I'm frantically trying to transfer it to my offshore account, and Chase realizes what is happening, and they freeze the remaining funds in the account.

First, just each of you tell me if you think that analogy is, for our purposes today, a good analogy to what happened here on April 18.

Let's start with you, Mr. Gottlieb.

MR. GOTTLIEB: I love the analogy as a fellow Commodities Exchange Act nerd. But, your Honor, I'm not convinced that that's the right analogy.

And the reason for that is, that is governed by the CEA. There are rules for that. There is an entire framework of regulation for that. And, again, you may have arguments under the UCC which would not apply here.

Here, what we are dealing with is a worldwide network that is going to be governed because we're here in New York. I guess we're governed by New York common law on these issues. When we look at the common law of property rights, we just keep

coming back to this very, very basic principle, is the thief doesn't take title.

So in your options contract, whoever the fake options trader was, whatever they did, if they were taking money away from a counterparty, if that person enters into a fake options trade with Citibank and took Citibank's money, it doesn't matter what happened next. That is still Citibank's money. It should go back to them.

One of the points I'll make, just to follow up on that UCC argument, is UCC 12 requires a qualifying purchaser, which is someone who gives value, obtains control, and takes without knowledge of adverse claims. North Korea is not a qualifying purchaser. The thief is not a qualifying purchaser. UCC Article 12 does not apply here.

THE COURT: Right, there is no further transaction. Right, unlike in *United Express* or some of these other -- I mean, I think *United Express* is not really applicable to this case anyway for reasons I'm happy to elaborate on.

But just under the facts of *United Express*, unlike in *United Express* and some of these other cases, there is no second purchaser, right. Like, there is no one who has later received goods or money from the hackers and now we're trying to go after that person. There is no such person. The chain of transactions never goes beyond the bad actors here, whoever they were, except now Arbitrum is holding that money, but not

through any transaction. Through the equivalent in my analogy of Chase realizing that illegal transactions might be happening in my accounts and freezing them.

So there is no other -- there is no good faith purchaser for value. There is no other person who we're now trying to go after.

All right. Mr. Gerstein, let me just hear from you.

MR. GERSTEIN: So, your Honor, I agree with the analogy. And I think in that circumstance, again, I think your Honor was suggesting that we speak about timing later. My initial request to Mr. Gottlieb is we brief this on a schedule consistent with Aave's own submission to Arbitrum. So we are all doing this on the fly. I'm sure your Honor understands that as well.

Second, I went and pulled an old memo I wrote about another circumstance. I have not dug into this in great detail. There's a case at 574 F.3d 42, a Second Circuit case about someone who misrepresented access credentials, was charged with fraud, because that's a fraudulent transaction. He lied and said you had the password, but you didn't. You misrepresented your credentials.

And, again, I think I do want to clarify. Please stop me, your Honor, if this is not responsive to your question. I think the point, again, as you mentioned to Mr. Gottlieb, is not that the counterparty to the option in your hypothetical

has no claims. Of course they had claims. They have been defrauded. They have a claim. They have been defrauded. They have a claim against the counterparty. They even have a claim against The Exchange for failing to prevent that kind of thing.

As Mr. Gottlieb notes, the Futures Act -- Exchange Act, excuse me -- are probably entitled to all sorts of remedies against the contract market in which that took place. So, too, here. The people who lent their money to North Korea, lent their money to North Korea and they have a remedy. And the question here is, who prevails? The people with those unsecured fraud claims, or the people with judgments reduced to execution?

And so I think, in your analogy, the answer is reasonably clear that a creditor of the fraudster, if we can characterize that transaction as fraud -- the Second Circuit, I believe, does -- obtained defeasible title to it, as happened in *Cunningham* and as they answered to as creditors to the ordinary order of execution.

I fail to understand it -- and there will, I'm sure, be more questions on this -- what the difference between the second transaction mentioned here and your Honor's hypothetical was. I can point to some factual differences. It's very hard for me to see why this isn't economically the same.

Both involve, as Mr. Gottlieb pains to note, someone

taking value from someone else. That always happens. The question is who is entitled to that value back? The person from whom it was immediately taken, or the person who have judgments against the taker?

And to briefly talk about the jewels hypothetical, your Honor, there are, in fact, a lot of nuanced distinctions here that have real legal differences. If I say I'm going to buy your jewels from you and you hand them to me, and then I don't pay you and declare bankruptcy -- and we cited some of these cases in our papers -- it is often a complicated question about what is supposed to happen to those jewels because there are your nuanced questions of law at work here.

And maybe the best time to answer this will be when we talk about what the actual supposed irreparable harm here. We would love the opportunity to brief that in more detail. But I think your Honor's metaphor is correct and that we prevail under it.

THE COURT: So let's turn, indeed, to what is the urgency.

I have a number of questions about urgency, about remedy, about irreparable harm because I don't understand. You know, again, we're not talking about turnover. It's only, right now, about lifting a restraint until a turnover can be properly adjudicated and whoever has claims on this money can assert those claims in an orderly fashion.

And so, it's not clear to me, Mr. Gottlieb, what otherwise would happen to this money and who is the true owner of it, because there is a lot of reference in Mr. DeMeo's affidavit to the fact that there is no -- I think he says -- there is no ownership solution. Like, which I take to mean, like, there is no -- at paragraph 36, for example, he says that release is not a transfer based on ownership. Similarly, at paragraph 42, that the governance proposal does not rest on any determination of ownership.

I'm very troubled by those representations because I certainly think, as maybe is clear from my questions, that to the extent people who entered into contracts that were fraudulent, who have lost their money, have a particular kind of claim. And it may well be that their claim is superior to the claim of the judgment creditors for a range of reasons.

But here, what seems to be being proposed in the argument that I lift the restraint on these funds has nothing to do with returning money to the people who lost money. But rather, you know, to go back to my UBS -- I mean, Citibank imposter example. Let's say Chase has frozen my funds, and for whatever reason, a total crash of the Bloomberg system, they are not able to identify the specific transactions that I engaged in, but they only can know that I did them on a certain currency desk. You know, all of my bets were on the Argentine peso.

So the proposal of Chase is, well, why don't we just infuse this money as liquidity into this Argentine peso market on our own account to restore confidence and liquidity in this market because we don't have any way of giving the money back to the payor traders that were defrauded by me.

And a court has to decide, OK, a judgment creditor of the imposter versus Chase's proposal of, like, well, we can't give the money back to the people it was stolen from to the individual owners, people who are specifically out a designated amount of money. And so instead, we're just -- we think a better solution is just kind of infusing liquidity into this market that might generally benefit every participant, but isn't tailored to the victim of the theft.

And I just have a hard time seeing how that claim is very compelling, so it may be that I'm not really understanding Mr. DeMeo's references to an ownership or property-based solution is not possible, so this is the next best thing.

So maybe let's start there, Mr. Gottlieb, and just explain to me what is this proposal and who is it intended to benefit?

MR. GOTTLIEB: Happy to explain, your Honor.

So the way the Aave Protocol essentially works is that there are pools of paired assets. So, in this pool, it's rsETH and ETH, and you can lend one and borrow a lesser amount to the other, as a general matter.

After the April 18 incident, what happened was because some of the rsETH that the thief injected into this pool was unbacked, people who were trying to take out ETH eventually couldn't because there is no ETH that they could possibly have gotten back. The rsETH was unbacked and essentially valueless. What this left was a number of identifiable wallets who had lent their ETH into this pool. The pool could no longer support anyone taking ETH out because there wasn't any real ETH for them to take out.

So we actually know -- not by name, I don't know if it's John Smith, I don't know if it's the Acme Corp -- but you know the very specific people by their wallets who were affected by this. Those are the users who are affected.

Now, what Aave decided to do is organize this DeFi United movement in order to, as you said, in some way it's a liquidity infusion, but it's different than the hypothetical that you gave, your Honor, because this isn't a general liquidity infusion into the market more generally. Not for defined generally. Not for ETH generally. It's a very specific liquidity infusion into this pool, which will allow the specific users of the protocol, the people who put their value in the pool, to remove their ETH, to take their ETH back out of pool, and thus be made whole.

Aave has spent the last 17 days basically around the clock trying to rally both grants and loans for this purpose so

that we can restore the liquidity to this pool in order to make the aggrieved users whole. Again, it's not a general overall market liquidity infusion. It is tailored to the victims of the theft. That was the concern that you raised, your Honor. It is tailored to these particular victims.

Now, what is one of the ramifications of not having the $71 million?

So there are a number of commitments to this DeFi United project. The biggest commitment by far is the Arbitrum commitment of the $71 million. Without that $71 million -- I guess I was not interesting enough for him.

without this 71 million, there may not be enough, just as a whole. But also, if that's the biggest contribution and that is blocked, then other people who have pledged these contributions may think to themselves, why am I going to contribute to a failed effort, and they could pull out as well.

Now, again, we are all moving at lightning speed. If we had two weeks, I would love to come in with affidavits. But that would be a mistake of procedure in this case because we may not have those two weeks. People may just leave, and then it's done.

The other problem we have is that many of the positions that are in that pool may be collateral for other position. We don't know because that, of course, will depend on the affected users. It's not surprising in finance that

people use assets to collateralize other transactions. If that's the case and those other transactions are going to come to, that is when you get a cascade of problems.

Again, that Wall Street Journal article that plaintiffs themselves submitted points to exactly that cascading problem fear. These are the issues.

One of the things that we want to say is, the volunteerism here of the broader defy community, obviously very welcome, it's a great thing. But nobody should be relying on that. the plaintiffs don't get to rely on that to say, well, everyone else is chipping in money. We get to take this money. That's not the way the law should work.

Even if the DeFi United rescue fund ultimately exceeds what is necessary to make these particularized Aave Protocol users whole, that money is -- the other money from DeFi United is not North Korean money. You can't appropriate that or count on that to settle the debts of third parties.

THE COURT: All right. Mr. Gerstein, do you want to respond to that?

MR. GERSTEIN: Sure, your Honor.

Well, let me just start by clarifying our argument. Our position is that donations from other parties, the only reason to raise that is to counter Mr. Gottlieb's argument that we need to do this briefing on 24 hours' notice. Right. I don't think that the fact that other parties are donating money

means that we get some sort of an offset. That's not right.

Just to be clear, I'm looking at the DeFi United website right now. Top four contributors are the pending assets at 30,765 ETHs; Consensys and Joseph Lubin 30,000; Mantle pending vote 30,000; Aave DAO pending vote 25,000. To be clear, the Aave DAO has not appeared here. Some company that does business for it has.

Let me just point to the record, your Honor. ECF 33-5 is a copy of the proposal that Mr. Gottlieb's clients submitted and at page -- excuse me -- two, designated recovery address, 2-of-3 Gnosis Safe, which is a type of wallet that multiple people with control with signers from Aave Labs, Kelp DAO and Certora. Another way to phrase that is this proposal transfers the money to Aave.

Now, what they do with it, they may well be charitable. But their own witness said and, quote, ownership based, closed quote, as your Honor pointed out, framework is for some reason not workable here, so they very well might just keep it, right. There is no reason, to my knowledge, why they couldn't just keep it for themselves.

Regardless, all that we are asking for this court now is to allow us to the chance to brief a turnover motion to explain to your Honor the complicated legal and factual questions underlying this, why we believe that this fraudulent transaction is different than a snatch-and-grab, as

Mr. Gottlieb has said.

And what Aave would like this court to do is authorize it to take those assets for itself before we have a chance to write that brief. I also have not heard an answer yet from Mr. Gottlieb about why the statement at page, again, ECF 33-5, timeline 49 days, and it was issued in less than 49 days. Nothing was going to happen anyway.

I fail to understand why we shouldn't just brief this so that everything is concluded by then.

THE COURT: Right. That was going to be my next question, as to what is the emergency.

Again, no one is taking the money right now. It is merely being frozen, so no one else can take it. And I'm obviously, here, things are proceeding in an orderly fashion about who really has title to the money.

So given that reality and given, as Mr. Gerstein pointed out, which was going to be my next question, that the proposal that is before the Arbitrum DAO has an execution date of, I think, sometime in June -- June 13 jumps into my mind, although I don't have the page right in front of me -- why is it an emergency that this matter be resolved today when I think, as is clear from our conversation, it is quite complicated.

Mr. Gottlieb.

MR. GOTTLIEB: I'm happy to address that.

The original proposal for the vote was for a longer period. It was for 49 days because that is the standard on that system of voting through Arbitrum. We just wanted to get the ball rolling.

But there are ways to speed up that vote, and there have been ongoing nonpublic talks to shorten that period to get the funds back to Aave users on a much quicker timeline because of all of the harms that we have been voicing here today and that are in our papers and are in Mr. DeMeo's affidavit.

Several comments in the Arbitrum DAO form, which is where service was made, underlined that exigency. Plaintiffs' counsel knows this. In fact, he relied on this same notion, the notion that things could move much, much faster, to come in here -- to come into court to ask for an ex parte emergency application for the order authorizing alternative service.

In that brief he stated, "Even though the Arbitrum DAO vote concerning the transfer of the $71 million at issue was slated to be complete on May 26, Arbitrum DAO's security counsel is empowered to move the funds immediately, and Arbitrum DAO participants appear to be considering that process which necessitates this court's urgent assistance." That's docket number 33 at page two.

On that same brief, plaintiffs write, Recent comments have indicated that those involved may wish to expedite this transfer and modify the timeline so the asset transfer may

occur even earlier. That's citing the Gerstein declaration at paragraphs seven to nine.

Plaintiffs cannot go get an emergency motion that they need to freeze because something might happen really fast, but then come in and say, whoa, whoa, whoa, what's the rush here? What's with a longer date? This is an emergency.

THE COURT: Well, I mean, to be clear, Mr. Gottlieb, the freezing is what buys us time, because now there is a court order -- again, not issued by me -- arising out of the plaintiffs' executed judgment, but there is a court restraint, so I don't see those positions as inconsistent.

When a person who thinks they have an interest in an asset says it is possible, it could be dissipated sooner, so I need to freeze it so that there can be an orderly process to adjudicate the competing claims on the asset before it's gone and I don't have a chance to articulate my claim, that's not inconsistent with saying now that the assets are frozen, now no one has an emergency, right.

You might think you do have an emergency. You obviously do. But let's not get bogged down in whether -- those positions are not inconsistent. And, in fact, it's happening routinely with most TROs, that we have to stop something from happening so that it is possible to adjudicate competing interests in the thing. That's the whole point of a TRO.

MR. GOTTLIEB: I take your point.

THE COURT: So, go ahead, Mr. Gottlieb.

MR. GOTTLIEB: I'm sorry. I didn't mean to interrupt your Honor.

I take your point, but we have also put in proof, evidence through the DeMeo affidavit, as to why the immobilized assets need to be used to restore rsETH's backing and normalized market conditions immediately.

As Mr. DeMeo said, if cascading liquidations, sustained liquidity outflows, and pronged withdrawal restraints take hold, the effects are not reversible or capable of full remediation. The timing is also critical because ongoing ETH price volatility materially increases risk to Aave Protocol users. That is, if the price of ETH changes and it becomes more expensive, we may not be able to put the assets into this DeFi United effort to make users whole.

And the collateral effect of that, the knock-on effects, could be extremely severe. So we have come here, as is appropriate on a TRO motion, putting in evidence of immediate irreparable harm that is going to be sustained if the TRO is not granted.

So I understand that, in order to get a 5222 order, it's a fairly low standard. It's prima facie standard. We have come in now and said, maintaining that freeze is going to cause irreparable harm and there is an imminence to that, that

justifies lifting that freeze, which frankly it would put plaintiffs back in the position they were in last Wednesday. It doesn't hurt them. They are no worse off than they were last Wednesday.

But maintaining the freeze puts Aave and the users whom Aave is trying to help in a much, much worse position. So when we're maintaining, when we're considering this balance of equities, we really need to consider what are the impacts of action versus inaction. What are the impacts of maintaining the freeze versus lifting the freeze.

So that is really what we're balancing here.

THE COURT: Right. But, again, the proposal that has been approved is one that doesn't take effect until June 13. So I recognize, well, we could speed it up if we wanted to, but that's not on the table right now. Right. So why isn't --

Again, assuming that I accept plaintiffs' view that there is title, the title at some point rested with whoever the hacker was, that which is a precondition to all of this, right. I just am not seeing the emergency, in terms of emergency today, of lifting the freeze as opposed to an emergency in the sense that there is a very compressed time period to resolve that. But that's very different than today. The emergency is today.

MR. GOTTLIEB: I will respond to that, your Honor.

Speeding that vote up is absolutely unobtainable.

That is being discussed and those discussions, some of those discussions are in evidence, submitted by plaintiffs, because that's the Arbitrum DAO forum. It's been on the forum where there are other nonpublic discussions going on to try to speed up that process because all of the people who are involved in these markets deeply understand the immediate impacts, the immediacy that is going on here.

I know normally you say, well, let's just put it on hold for three weeks. Let's figure it out. But sadly, that may not be the right answer here, if we're weighing essentially what is a binary. Either we vacate the restraining notice or we leave the restraining notice in place.

THE COURT: Well, I'm not so sure about that Mr. Gottlieb, right. Because there's, I mean, why isn't the remedy some kind of constructive trust in which people who can demonstrate their claim to the money can get it. But that's quite different than saying, OK, the restraint is totally lifted and Arbitrum can give the money to whoever it wants without any kind of court involvement.

MR. GOTTLIEB: I think because trying to gather who the people are when they are essentially wallet addresses and doing the work for constructive trust would eat up quite the time that we would be doing it. I mean, that would take longer than anything else.

I really do think, we have proposed a bond, if it's

going to be maintained. Then the plaintiffs are the ones who should be essentially forced to insure what is going on here. That is why we asked for the bond, if the freeze is going to be maintained.

But I think the immediate -- we have come in with evidence of that immediacy, and the plaintiffs have not responded with anything, nor could they. If this money went back to the Aave Protocol users, again, there is no harm to the plaintiffs. They are put in exactly the position they were in on April 17. They could still go and enforce against North Korean assets, wherever they can find them in the world.

But in order to maintain the restraining notice here, they have to show -- to the burdens required by the rules because a restraining notice is an injunction. They have to show that they've satisfied the standards for injunction, that they will suffer irreparable injury and harm, they have to show there is imminence. They have to show that their judgment debtor is the right party in interest. They have to show that that person had the property interests.

All this is for plaintiffs to show. And to maintain the restraining notice while we give them a chance to brief that, risks the irreparable harm to Aave users. So if we want to set a briefing schedule two weeks, four weeks, six weeks, a year, while there is no restraining notice in place, that's perfectly fine with me. We can hash this all out.

But if there is going to be this excruciating imminent risk of harm to Aave Protocol users and the collateral impact to the DeFi system as a whole, then there needs to be some sort of a bond to secure that. Because otherwise we're giving plaintiffs representing judgment creditors the ability to throw wrenches into the financial system on the barest of evidence and hold up things for much longer than would be healthy.

I think the incentives here are really terrible and the equities here are really terrible. I think we need to lift the restraining notice.

THE COURT: All right. So I have another matter at 12:30, so let me just hear from you, briefly, Mr. Gerstein, on that last set of questions about the imminence problem.

And then I'm going to have to end the conference. And certainly, I'll try to get you an answer as quickly as I can, including if the answer is I need more information or we need an evidentiary hearing or something like that.

Go ahead, Mr. Gerstein. I'll give you a couple of minutes.

MR. GERSTEIN: Thank you, your Honor.

I want to be as responsive as I can because I think I might have missed some of what Mr. Gottlieb was saying there.

My understanding is that there are, quote -- somebody stop me if I'm getting this wrong -- nonpublic talks, closed quote, of the disposition of these assets.

Where are they going to go, right? I mean, this looks an awful lot like Aave is going to take them if this restraint is lifted. We certainly have no reason to believe that's not the case. We don't have to show irreparable harm. This is a restraining notice. We have to show a prima facie case that a garnishee is holding our judgment debtors' assets. That I think we have done.

I understand the court has complicated legal questions about exactly what transaction took place here. I think there are factual questions underlying them. I have spoken to an expert. We are commissioning an expert report. I would like to represent to the court, a restraining notice is presumptively valid for a year. We will do our level best to get a turnover motion before this court on an orderly schedule. We have no desire to throw wrenches into anybody's system. We have a desire to collect assets that are due to our clients.

But to be clear, our clients would suffer instantaneous irreparable harm. There is a writ of execution served on a party holding $71 million. Mr. Gottlieb's client has a pending proposal and is engaged in nonpublic talks to speed that proposal up to transfer those assets to Mr. Gottlieb's client. I don't think we're going to see those again. That is the point of the restraining notice proceeding. We get a chance to try to turn these over. If we lose, they get released. If we don't lose, it gets sent to us. That is

how this is supposed to work.

If there are other financial consequences that befall that, well, if we didn't make a prima facie showing, they should not suffer those consequences. But we have made that showing. We have made a prima facie showing that these are North Korean assets. We have a judgment against North Korea. We have served a writ of execution.

All of this, of course, is protected by the Terrorism Risk Insurance Act, which I don't believe Mr. Gottlieb has addressed. These are terrorism victims, your Honor. I don't know how much more irreparable harm gets.

THE COURT: Right. I mean, I understand all of that, Mr. Gerstein, so I don't think we should use our remaining one minute on that.

So anything you want to say, Mr. Gerstein, about the remedy question I posed in terms of some kind of constructive trust where the court can oversee some orderly distribution of the assets.

MR. GERSTEIN: I don't have any objection to that, your Honor. The objection we have is to them being released into the care of Aave LLC. As long as we will have an opportunity to brief a turnover motion with assets that are still there, I have no objection to any such process.

THE COURT: OK. All right. I found this very helpful. I do need to think about what you have all said and

assess whether I need more information before I can make a decision, or whether I'm prepared to make that decision as soon as I can.

So I understand the urgency, Mr. Gottlieb. I will do my best to get you an update as soon as I can.

All right?

MR. GOTTLIEB: Your Honor, thank you very much.

THE COURT: Thank you very much. This has been very helpful.

MR. TOLCHIN: Your Honor, Robert Tolchin here. I just have a public service announcement for the court.

I e-mailed your chambers the instructions for how to turn off the announcements when people enter into these conferences.

THE COURT: I appreciate it, Mr. Tolchin. I appreciate it very much.

All right. Thank you all. I will be in touch shortly. We're adjourned.

MR. GOTTLIEB: Thank you, your Honor.

(Adjourned)