**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| HAN KIM, *et al.*, Plaintiffs,<br><br>*v.*<br><br>THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, a.k.a. NORTH KOREA, Defendant,<br><br>TETHER INTERNATIONAL, *S.A. de C.V.*,<br><br>Garnishee (as to all cases) | ) | Case Nos. 25-MC-527-MMG<br>26-MC-033-MMG<br>26-MC-094-MMG<br>26-MC-235-MMG |

**MOTION FOR TURNOVER OF BLOCKED NORTH KOREAN ASSETS HELD BY GARNISHEE TETHER INTERNATIONAL *S.A. DE C.V.***

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 3

I. PLAINTIFFS' JUDGMENTS AGAINST NORTH KOREA ........ 3

A. The Kim and Butler Judgments ........ 3

B. The Kaplan Judgment ........ 4

C. The Calderon-Cardona Judgment ........ 4

II. THE ETHEREUM AND TRON BLOCKCHAINS ........ 5

III. TETHER ........ 6

IV. NORTH KOREA USES USDT TO EVADE SANCTIONS AND FUND ITS NUCLEAR AND BALLISTIC WEAPONS PROGRAM ........ 10

V. NORTH KOREA OWNS AT LEAST 69,773,938.55 USDT ........ 11

ARGUMENT ........ 12

I. SUMMARY OF ARGUMENTS AND LEGAL STANDARDS ........ 12

II. THIS COURT MAY EXERCISE PERSONAL JURISDICTION OVER TETHER ........ 15

III. NORTH KOREA'S USDT ARE THE "BLOCKED ASSETS" OF A "TERRORIST PARTY" AND SO SUBJECT TO EXECUTION HERE ........ 16

IV. NORTH KOREA'S PROPERTY IN THE WALLET ADDRESSES IS SUBJECT TO TURNOVER FROM TETHER TO THE PLAINTIFFS ........ 18

V. THE USDT IN THE WALLET ADDRESSES BELONG TO NORTH KOREA ........ 22

CONCLUSION ........ 22

CERTIFICATE OF COMPLIANCE ........ 24

# TABLE OF AUTHORITIES

## Cases

*ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976) .......... 19, 20

*All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo*, 190 F.3d 16 (2d Cir. 1999) .......... 19, 21

*Butler v. Democratic People's Republic of Korea*, No. 20-cv-2514 (D.D.C. Nov. 4, 2025) .......... 3

*Butler v. Democratic People's Republic of Korea*, No. 26-mc-235 (S.D.N.Y. May 21, 2026) .......... 3–4

*Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010) .......... 5

*Calderon-Cardona v. Democratic People's Republic of Korea*, No. 26-mc-94 (S.D.N.Y. Feb. 25, 2026) .......... 5

*Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025) .......... 15

*CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) .......... 14

*Estate of Levin v. Wells Fargo Bank N.A. ("Levin II")*, 156 F.4th 632 (D.C. Cir. 2025) .......... 13, 17

*Freeman v. Giuliani*, No. 24-MC-353 (S.D.N.Y. Aug. 30, 2024) .......... 20

*Hanson v. Denckla*, 357 U.S. 235 (1958) .......... 15, 16

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) .......... 15

*Kaplan v. Central Bank of the Islamic Republic of Iran*, No. 26-mc-33 (S.D.N.Y. Jan. 23, 2026) .......... 4

*Kaplan v. Hezbollah*, No. 09-cv-646 (D.D.C. July 23, 2014) .......... 4

*Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29 (D.D.C. 2013) .......... 3

*Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) .......... 3

*Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286 (D.D.C. 2015) .......... 3

*Kim v. Democratic People's Republic of Korea*, No. 25-mc-527 (S.D.N.Y. Nov. 20, 2025) .......... 3

*Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107 (2d Cir. 2016) .................................. 18

*Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009) .......................................... 13

*Marshak v. Green*, 746 F.2d 927 (2d Cir. 1984) ........................................................ 13

*Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024) .............................. 13, 15, 16

*United States v. 13.98 Million ("USDT") Cryptocurrency*, No. 25-CV-3943 (D.D.C. Nov. 14, 2025) ........................................................................................ 18–19

*United States v. 164,545 USDT*, No. 25-CV-417 (D. Ariz. Jan. 26, 2026) ............ 9, 19

*United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386 (N.D. Ohio Apr. 25, 2025) ........................................................................ 8, 18

**STATUTES, RULES, AND OTHER PROVISIONS**

31 C.F.R. § 510.201(a)(1) ............................................................................ 18

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq. ....... 17, 18

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201, 116 Stat. 2322 ......................................................................................... 13, 17

N.Y. C.P.L.R. § 5201 ........................................................................................ 14

N.Y. C.P.L.R. § 5225(b) ................................................................................. 2, 14

N.Y. C.P.L.R. § 5232 ........................................................................................ 12

N.Y. C.P.L.R. § 5239 ........................................................................... 2, 14, 22

N.Y. C.P.L.R. § 5240 ........................................................................................ 14

N.Y. U.C.C. § 12-105 ........................................................................................ 20

**OTHER AUTHORITIES**

David D. Siegel, *New York Practice* § 491 (2d ed. 1991) .......................................... 19

David D. Siegel, *New York Practice* § 547 (5th ed. 2017) .......................................... 14

## INTRODUCTION

The Democratic People's Republic of Korea ("North Korea") has a long and brutal history of terrorism. This is an action by the survivors of people who have suffered the evils of North Korean terror—a minister tortured and murdered in a prison camp, people struck by rockets indiscriminately fired at civilians, and people gunned down in cold blood in an airport, all either at the hands of North Korea or with its backing. These individuals (collectively, "Plaintiffs") obtained four separate judgments against North Korea after suffering these atrocities, but North Korea has yet to pay a penny towards these judgments.

Plaintiffs now seek turnover of North Korean assets held by Garnishee Tether International *S.A. de C.V.* ("Tether"). Tether is a company that issues a crypto asset called USDT. Tether calls USDT a "stablecoin" because, according to Tether's terms of service, "[e]ach Tether Token in circulation is 100% backed by an amount of assets . . . equal to the stated value of the Tether Token." Dkt. 56-3, Tether Terms at § 4.1. To assure the public that Tether can meet its redemption obligation, Tether holds reserve assets, and it keeps 99% of its U.S. Dollar-denominated assets at Cantor Fitzgerald, a financial services firm located in this district. *See* Statement of Undisputed Material Facts ("SUMF") at ¶¶ 32–33.

North Korea owns at least 69,773,938.55 USDT across 50 different wallet addresses. North Korea obtained this crypto mostly through a remote IT worker remittance scheme and cybercrime. On various occasions since May 2022, Tether learned that North Korea owned USDT and implemented something that it calls "blacklisting," colloquially known as "freezing," on the North Korean wallet

addresses. When Tether freezes wallet addresses, it ensures that the USDT balance of those addresses will remain the same until the freeze is lifted, ensuring that any USDT in the addresses will never be sold or redeemed. Tether has frozen all the USDT at issue here. Plaintiffs request that Tether be ordered to transfer North Korea's property interests to Plaintiffs by decreasing North Korea's USDT balance to zero and increases Plaintiffs' by 69,773,938.55.

As set out in two motions being filed contemporaneously with this one, Plaintiffs also (1) request that notice be sent to the owner of the wallet addresses, and that (2) this Court declare, under N.Y. C.P.L.R. § 5239, that North Korea is the owner of the wallet addresses and that Plaintiffs are entitled to the USDT in them. Given such a ruling in the § 5239 proceeding, Plaintiffs would then be entitled to an order requiring Tether to turnover these North Korean assets to Plaintiffs. *See* N.Y. C.P.L.R. § 5225(b) ("Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest . . . where it is shown that . . . the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor"). Accordingly, Plaintiffs expect to soon request that this Court hold this motion in abeyance.

## BACKGROUND

### I. PLAINTIFFS' JUDGMENTS AGAINST NORTH KOREA

#### A. The Kim and Butler Judgments

In 1993, Reverend Dong Shik Kim moved from the U.S., where he was a lawful permanent resident, to China to work as a missionary providing humanitarian and religious services to North Korean families who had fled across the Sino–Korean border. *Kim v. Democratic People's Republic of Korea ["DPRK"]*, 950 F. Supp. 2d 29, 36 (D.D.C. 2013). In 2000, Reverend Kim was abducted by a member of the North Korean security services and secreted across the border into North Korea. *Kim v. DPRK*, 774 F.3d 1044, 1049 (D.C. Cir. 2014). No one outside North Korea has heard from Reverend Kim since. *Id.* Experts in North Korea's human-rights violations testified that North Korea sends those whom it deems to be "opponents of the . . . regime" to torture camps called *kwan-li-sos*. *Id.* at 1050. Experts further testified that Reverend Kim "suffered an untimely death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51. In two separate proceedings, the Kim family sued North Korea for the abduction and murder of Reverend Kim, and obtained a total of $96,000,000 in compensatory damages and $600,000,000 in punitive damages. *See Kim v. DPRK*, 87 F. Supp. 3d 286, 291 (D.D.C. April 9, 2015); *Butler v. DPRK*, Dkt. No. 31, 20-cv-2514 (D.D.C. Nov. 04, 2025). On November 20, 2025, the Kims registered their judgment in this Court, Dkt. 1, AO-451, *Kim v. Democratic People's Republic of Korea*, No. 25-mc-527 (S.D.N.Y. Nov. 20, 2025), and on May 21, 2026, the *Butler* plaintiffs did the same, Dkt. 1, AO-451, *Butler*

*v. Democratic People's Republic of Korea*, No. 26-mc-235 (S.D.N.Y. May 21, 2026). North Korea has yet to pay a penny towards either judgment. SUMF ¶ 5.

### B. The Kaplan Judgment

Between July 12, 2006, and August 14, 2006, Hezbollah—which is a designated foreign terrorist organization under U.S. law—fired thousands of rockets and missiles at civilians in northern Israel. *Kaplan v. Hezbollah et al.*, Dkt. No. 57, No. 09-cv-646 (D.D.C. July 23, 2014). The rockets that landed in Israel had been sent to Hezbollah in the years prior to 2006 by North Korea, *id.*, and North Korean agents trained Hezbollah agents in military tactics for decades, *id.* Some of those rockets injured and killed the *Kaplan* plaintiffs, who are U.S. nationals that lived in Israel during Hezbollah's 2006 rocket attacks. Their individual injuries were evaluated by a special master, whose conclusions were adopted (in large part) by the U.S. District Court for the District of Columbia, which ultimately awarded the plaintiffs a combined $38,161,966.67 in compensatory damages and $131,277,165.34 in punitive damages. *Kaplan*, Dkt No. 83 (D.D.C. Sept. 30, 2016). The *Kaplan* plaintiffs registered their judgment in this Court on January 23, 2026, Dkt. 1, AO-451, *Kaplan v. The Central Bank of the Islamic Republic of Iran*, No. 26-mc-33 (S.D.N.Y. January 23, 2026). North Korea has not paid a single cent towards this judgment. SUMF ¶ 5.

### C. The Calderon-Cardona Judgment

On May 30, 1972, American citizens Carmelo Calderon-Molina and Pablo Tirado-Ayala arrived at what was then known as Lod Airport (it is now David Ben-Gurion airport) near Tel Aviv, as part of a large group of Puerto Rican pilgrims touring Israel and visiting the Christian religious sites in the Holy Land. Three

members of the Japanese Red Army, which was a designated foreign terrorist organization under U.S. law from 1997 to 2001, used automatic weapons and explosives that they had hidden in their luggage to indiscriminately kill 26 civilians and wound more than 80. Calderon-Molina was among the former and Tirado-Ayala was among the latter. *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 445 (D.P.R. 2010). North Korea sponsored the attack by providing material support to the Japanese Red Army, which worked together with the Popular Front for the Liberation of Palestine to commit the attack. *Id*. at 448. The *Calderon-Cardona* Plaintiffs, loved ones of Calderon-Molina and Tirado-Ayala, sued North Korea in the United States District Court for the District of Puerto Rico. North Korea did not appear, and the Court entered a default judgment against it in 2010 for a total of $78 million in compensatory damages and $300 million in punitive damages. *Id*., Dkt. 37. The *Calderon-Cardona* plaintiffs registered their judgment in this Court on February 25, 2026. See Dkt. 1, AO-451, *Calderon-Cardona v. Democratic People's Republic of Korea*, No. 26-mc-94 (S.D.N.Y. Feb. 25, 2026). North Korea has paid nothing towards this judgment. SUMF ¶ 5.

## II. THE ETHEREUM AND TRON BLOCKCHAINS

A blockchain is a system for a distributed network of machines to keep a ledger of transactions publicly and securely. SUMF ¶ 7. To maintain a blockchain, a distributed network of machines uses a cryptographic function called a "hash" to validate a series of transactions (a "block") and connect it to all prior series of transactions (hence "chain") in a way that is verifiable and practically immutable. SUMF ¶ 8.

The blockchains at issue in this case are called Ethereum and Tron. *See* SUMF ¶¶ 9, 47, 62. Users participate in both blockchains using wallet addresses, which are digital representations of the sending and receiving ends of transactions on the blockchain. *Id.* ¶ 10. Ethereum and Tron record transactions in many different assets using protocols called the "ERC-20" and "TRC-20 standard," respectively. *Id.* ¶ 11. These standard enables anyone on the Ethereum and Tron blockchains to create a "token" using something called a "smart contract." *Id.* All standard tokens have some core functions—all of them have a fixed total supply at any time, may be transferred from one wallet address to another, and are fungible. *Id.* ¶ 12. But some ERC-20 and TRC-20 tokens have additional functions encoded by their creators, including, for example, the ability for the creator to freeze tokens or to decrease their balances, which allows the issuer to transfer token balances from one wallet address to another. *Id.* ¶ 13.

**III. TETHER**

Tether International *S.A. de C.V.* is a Salvadoran company that issues USDT, the world's largest stablecoin by volume. *Id.* ¶¶ 14, 15. Tether's business is straightforward: It issues USDT in exchange for dollars and redeems them on demand for dollars, always on a one-to-one basis, *Id.* ¶ 15. (Tether also issues stablecoins backed by other currencies, like the Euro and Mexican Peso; these assets are not at issue in this Motion.)

To issue USDT, Tether uses its private keys to call the Tether smart contract's "issue" function, which increases the total possible balance of USDT by the issued amount, and then transfers that amount to the purchaser's wallet. *Id.* ¶ 16. Then,

anyone with the private keys to *that* wallet address can transfer the USDT to any other wallet address using the "transfer" function. *Id.* Tether always retains the power to cause the USDT balance of any wallet address to remain frozen using its "blacklist" function, or to decrease that balance to zero using its "destroyBlackFunds" function. *Id.* At any time, then, anyone who possesses one of two private keys can cause the USDT balance of a wallet address to decrease while simultaneously causing the USDT balance of another wallet address to increase: the person who holds the private keys to the decreasing (or sending) wallet address can decrease the balance unless Tether has frozen the sending address, and Tether can decrease the balance of any address because it holds the private keys to Tether's smart contract code. *Id.* ¶ 17; Dkt. 56-3 § 5.

Tether's Terms provide that each USDT is backed by "cash, cash equivalents and other assets and may include loan receivables and other assets from [Tether] Affiliates." SUMF ¶ 18. Approximately 72.2% of Tether's more than $181.2 billion dollars' worth of reserves are held in cash or cash-equivalents. *Id.* ¶ 19. Tether holds reserves for all USDT holders and gives them the right to redeem USDT for reserves provided that they establish a relationship with Tether and prove their identity. *Id.* ¶ 20. For this reason, USDT are called "stablecoins": ideally the value of one USDT token is always one U.S. dollar. *See id.* ¶ 15.

Tether Tokens are issued on multiple blockchains, including the Ethereum and Tron blockchains. *Id.* ¶ 21. Once USDT is in circulation, it is freely negotiable between any two people with blockchain wallet addresses. *See* Dkt. 56-3 at § 4.1 ("Issuances

and redemptions of Tether Tokens may be completed with Tether pursuant to these Terms. Tether Tokens may also be used, kept, or exchanged online wherever parties are willing to accept Tether Tokens."). If Tether discovers that a given blockchain address is attributable to a sanctioned party, or is involved in criminal activity, Tether reserves the right to freeze the USDT balance of the address. SUMF ¶¶ 23–25. Recently, Tether has been publicly claiming that it "maintains a zero-tolerance policy toward the criminal use of our financial products," and so "work[s] closely with law enforcement globally to identify and, upon request, freeze assets to prevent further movement when they are linked to illegal activity or illicit actors." *See* TETHER, *Tether Supports Freeze of More Than $344 Million in USDT in Coordination with OFAC and U.S. Law Enforcement*, https://tether.io/news/tether-supports-freeze-of-more-than-344-million-in-usdt-in-coordination-with-ofac-and-u-s-law-enforcement/ (April 24, 2026). As of April 24, 2026, Tether has frozen over $4.4 billion worth of USDT. *Id.*

When Tether freezes the USDT balance of a wallet address, the balance remains the same unless Tether uses causes the balance of that address to go to zero, and thus the USDT cannot be redeemed. SUMF ¶ 28. When required to comply with seizure orders under U.S. law, Tether zeroes out the USDT balance at one wallet addresses and reissues the same balance to another. *See*, *e.g.*, *United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. 1 at 3 (N.D. Ohio April 25, 2025) ("[P]ursuant to a federal seizure warrant issued by U.S. Magistrate Judge Jonathan D. Greenberg on August 21, 2024, Tether Limited 'burned' the USDT

tokens associated with the cryptocurrency address and, on or about November 20, 2024, reissued the equivalent amount of USDT tokens (namely, 4,340,000 USDT) to a U.S. law enforcement-controlled virtual currency wallet."). There is, thus, no question that Tether is capable—indeed willing—to transfer USDT from one holder to another by reissuing it to the latter. And the process of reissuing USDT from one owner to another transfers whatever interests the first wallet holder had to the second wallet holder. *See, e.g.*, *United States v. 164,545 USDT*, 25-CV-417, Dkt. 10 (D. Ariz. Jan. 26, 2026) (granting default judgment to United States against defendant *in rem* USDT after Tether transferred USDT balance to United States in response to seizure warrant and no claimants appeared).

To ensure the balances maintain their value and that Tether can meet its redemption obligations, Tether holds reserve assets to support USDT holders' right of redemption. SUMF ¶ 31. Cantor Fitzgerald, which is headquartered in this District, serves as a custodian for and manages more than 99% of Tether's treasury assets. *Id.* ¶¶ 31–32. Indeed, Tether touts the "Wall Street" backing of its coins publicly for the purpose of assuring the market that the assets are stable and reliable. *Id.* ¶ 33; *see also* Krisztian Sandor, *Tether's Paolo Ardoino: "If the US Government Wanted to Kill Us, They Can Press a Button"*, COINDESK, Oct. 28, 2024 (quoting Tether CEO describing Cantor as an "Ivy League custodian," and noting that "[w]hat made the difference was [then-Cantor chief and current Secretary of Commerce] Howard [Lutnick] publicly affirming that his firm had done due diligence on Tether and telling everyone 'we have their money'"). There are approximately $186 *billion*

tether outstanding today. *See* Hannah Lang, *Tether Is in Talks With "Big Four" Firm About Reserve Audit, CEO Says*, REUTERS (March 21, 2025).

Although Tether updated its terms of service ostensibly to forbid U.S. users from owning USDT, SUMF ¶ 35, Tether makes USDT readily available in the U.S. by allowing it to trade on U.S.-based exchanges and indeed specifically targets New York for USDT sales, *id.* ¶ 36–39. For example, USDT is currently available for purchase by any U.S. person on Gemini, *id.* ¶ 37, headquartered in this district, NEW YORK DEP'T OF STATE, DIVISION OF CORPORATIONS, https://apps.dos.ny.gov/publicInquiry/ (search: "Gemini Trust Company LLC," returning "County: New York"); and Coinbase, SUMF ¶ 38, also headquartered in this district, N.Y. DEP'T OF STATE, *supra* (search: "Coinbase Inc.," returning "Principal Executive Office Address . . . New York, NY."). For Tether to be listed on Coinbase in New York, for example, Tether had to submit an application to Coinbase asking to be listed. SUMF ¶ 39. And Tether surely has the technological power to prevent USDT from being traded on these exchanges by freezing the exchanges' balances.

## IV. NORTH KOREA USES USDT TO EVADE SANCTIONS AND FUND ITS NUCLEAR AND BALLISTIC WEAPONS PROGRAM

North Korea does not maintain diplomatic or economic relations with much of the world and is cut off from the world's global financial networks. *Id.* ¶ 40. It nonetheless maintains a very expensive nuclear weapons program. *Id.* ¶ 44. To fund this program, as well as basic services, North Korea has relied largely on crypto assets to evade international sanctions. *Id.* It obtains crypto assets by, *inter alia*, operating a widespread and an extremely aggressive campaign of cyber-attacks and operating

a scheme in which North Korean nationals use false or stolen identities to obtain remote IT employment with companies around the world and remit much of their earnings to the North Korean government using crypto assets. SUMF ¶ 42. North Korea uses USDT (and other crypto assets not at issue here) to both launder its funds and evade international sanctions. *Id.* at 83 ("[I]n 2025, some North Korean IT workers sought to convert fiat funds into cryptocurrency, suggesting that they perceive cryptocurrency as more convenient and less risky than using banks or other fiat-based payment service. . . . IT workers . . . converted [funds] to U.S. dollar-pegged stablecoins USDC or USDT."). North Korea conducts its operations through several state instrumentalities, all controlled by the North Korean government. SUMF ¶¶ 43, 44, 45, 79.

## V. NORTH KOREA OWNS AT LEAST 69,773,938.55 USDT

As laid out more extensively in the accompanying statement of undisputed material facts and the memorandum of law in support of Plaintiffs' Section 5239 motion, North Korea owns at least 69,773,938.55 USDT that is frozen by Tether. Much of this crypto is traceable to its primary methods of acquiring crypto assets: cyber-attacks and remittances from its IT workers who fraudulently obtain employment. *Id.* ¶ 45–82. Specifically, North Korea owns 46,189,139.13 USDT in wallet addresses that are associated with its North Korean IT worker remittance scheme, where North Korean workers fraudulently obtain employment abroad and, via complex laundering networks, send their wages back to the North Korean government. *See id.* ¶¶ 45–55. In addition, North Korea owns 18,163,282.39 USDT in wallet addresses traceable to cybercrime, of which 17,454,039.27 USDT is traceable

to North Korea's attempts to launder the proceeds of a $1.5 billion exploit of the Bybit crypto exchange. *Id.* ¶¶ 46–78, 81–82. Finally, the remaining 5,421,517.03 frozen North Korean USDT is owned by a North Korean bank on behalf of North Korea. *Id.* ¶¶ 79–80. Tether has frozen all of the USDT at issue here out of apparent recognition that it belongs to North Korea. *See* SUMF ¶¶ 23–25.

To be clear, the crypto being targeted in this motion very likely represents only a fraction of the USDT that North Korea owns. But because Plaintiffs served Tether with a writ of execution, Tether "is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property" that it knows or has reason to believe may belong to North Korea. N.Y. C.P.L.R. § 5232. As a result, Plaintiffs reserve the right to supplement this motion by targeting additional North Korean assets—whether frozen or unfrozen.

## ARGUMENT

Tether holds property belonging to North Korea. New York and federal law require that North Korean property capable of transfer and possessed by anyone be turned over to those like Plaintiffs who hold money judgments against North Korea. Tether transfers USDT in response to U.S. court orders and offers from private parties dozens or hundreds of times a year and, therefore, should be compelled to do so here or, if ownership of the wallet addresses is disputed, following adjudication of competing claims pursuant to N.Y. C.P.L.R. Section 5239.

### I. SUMMARY OF ARGUMENTS AND LEGAL STANDARDS

*First*, this Motion arises from the Plaintiffs' efforts to obtain property that Tether possesses that is owned by North Korea and whose value is backed by assets

in New York and, thus, personal jurisdiction over Tether is proper here. *See, e.g. Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024); *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 537 (2009); *infra* § II.

*Second*, pursuant to the Terrorism Risk Insurance Act of 2002, "[n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 note) ("TRIA"). North Korea is a state sponsor of terrorism and Plaintiffs are collecting terrorism-related judgments from which North Korea is not immune. No sovereign immunity protects the assets. *See infra* § III. And, indeed, the compensatory-damages portion of Plaintiffs' judgment is covered by the Terrorism Risk Insurance Act and would, therefore, defeat even the Government's attempt to forfeit North Korea's assets if the Government makes such an attempt. *Estate of Levin v. Wells Fargo Bank N.A. ("Levin II")*, 156 F.4th 632, 648 (D.C. Cir. 2025) (holding that judgment creditors who establish state-law liens on Iranian property that government seeks to forfeit defeat Government's forfeiture).

*Third*, under New York law, which governs the procedures for execution and the definitions of North Korea's property rights, *Marshak v. Green*, 746 F.2d 927, 930

(2d Cir. 1984), people who hold property for judgment debtors, called "garnishees," are compelled to turn over (a) any interests of the judgment debtor that (b) they are capable of turning over, N.Y. C.P.L.R. § 5225(b), and courts are empowered to make any reasonable order necessary to effect a good turnover, *id.* § 5240. Thus, under New York law, Tether must turn over any property it possesses in which North Korea has an interest, "whether it consists of a present or future right or interest and whether or not it is vested." N.Y. C.P.L.R. § 5201. Tether can, and must, do that by transferring North Korea's USDT balance to the Plaintiffs, whether that be now or after a C.P.L.R. § 5239 proceeding . *See infra* § IV.

Procedurally, New York law enables a judgment creditor to commence a "special proceeding" against a third party who "is in possession or custody of money or other personal property" in which the judgment debtor has an interest. *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 469 (2d Cir. 2018). And, under Second Circuit authority, that proceeding is properly brought by motion, *id.*, and decided under a summary-judgment standard where, as here, the material facts are not in any genuine dispute, *id.* at 469 ("A special proceeding is . . . as plenary as an action, culminating in a judgment, but is brought on with the ease, speed, and economy of a mere motion." (quoting David D. Siegel, *New York Practice* § 547 (5th ed. 2017))). Where there are disputed facts, this Court tries them and decides by a preponderance of the evidence. *Id.*

## II. THIS COURT MAY EXERCISE PERSONAL JURISDICTION OVER TETHER

This Court may exercise specific personal jurisdiction over Tether because this action arises from its possession of property in New York on behalf of the judgment debtor, North Korea. For specific personal jurisdiction to be proper, the defendant must have acted in the forum state and that act must give rise to the suit. Specifically, the defendant must take "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Those acts must show that the defendant deliberately "reached out beyond" its home—by, for example, "exploi[ting] a market" in the forum State or entering a contractual relationship centered there. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (internal quotation marks and alterations omitted). And the plaintiff's claims "must arise out of or relate to the defendant's contacts" with the forum. *See, e.g.*, *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 (1984).

In *Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), *cert. denied sub nom. Clearstream Banking, S.A. v. Peterson*, 145 S. Ct. 2819 (2025), the Second Circuit explained that turnover actions arising from in-state banking activity give rise to personal jurisdiction. There, plaintiffs "[sought] turnover . . . of the contents of an account with Clearstream Banking, a Luxembourg-based financial institution," *id.* at 990, which "[held] securities on behalf of and for the benefit of its clients," *id.* at 991, one of whom was the Central Bank of Iran against which the plaintiffs held a money judgment, *id.* The court held that Article 52 provided a cause of action in favor of the plaintiffs against the bank and that the turnover action arose from the

defendant's New York contacts because the "right to payment . . . reflects the proceeds of transactions that [the bank] undertook using [a] New York Account." *Id.* at 1005.

Like *Peterson*, this is an action to compel turnover of property reflecting interests in money held in New York. Indeed the case for personal jurisdiction here is even stronger than it was in *Peterson*—here, Plaintiffs seek turnover of property reflecting a right to payment in New York that, unlike the foreign bank accounts Clearstream held in Luxembourg, is not located abroad. The bulk of Tether's reserves are in the custody of and managed by Cantor Fitzgerald in New York. SUMF ¶¶ 32, 33. Tether actively exploits this fact to calm markets into believing that its tokens will be reliably worth a dollar. *Id.* ¶ 34. Although Tether has chosen El Salvador as its headquarters, it nonetheless chooses New York to hold its reserves. *Id.* ¶ 33. What's more, Tether profits from in-forum activity by selling its tokens on New York exchanges. *Id.* ¶¶ 36–39. Thus, Tether "purposefully avails itself of the privilege of conducting activities within" New York, *Hanson*, 357 U.S. at 253, and this Article 52 Motion "arises from" that activity, *Peterson*, 121 F.4th at 991. Thus, as in *Peterson*, this Court may exercise specific personal jurisdiction over Tether to compel it to turn over property it possesses on behalf of North Korea.

## III. NORTH KOREA'S USDT ARE THE "BLOCKED ASSETS" OF A "TERRORIST PARTY" AND SO SUBJECT TO EXECUTION HERE

The USDT at issue here belongs to North Korea and is frozen for that reason, and so, under federal law, it is subject to execution here.

*First*, although some property of foreign governments is immune from execution, the compensatory damages portion of the judgment here is not because

North Korean property is covered by the International Emergency Economic Powers Act (IEEPA) and, therefore, that property is subject to execution "[n]otwithstanding any other provision of law." TRIA § 201(a).

*Second*, a lien to execute the compensatory-damages portion of any terrorism-related judgment against the blocked assets of a state sponsor of terrorism prevails over any other competing interest, including the Government's. *Levin II*, 156 F.4th at 638. Here, the North Korean USDT are blocked assets of a terrorist party and the Plaintiffs' judgments are for acts of terrorism, and so the Plaintiffs' execution lien prevails.

Section 201 of the TRIA provides in relevant part that

> Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* (quoting TRIA § 201(a)). The "TRIA defines a 'blocked asset' as 'any asset seized or frozen by the United States' under [IEEPA], but it excludes from the definition assets that are subject to certain licenses or used exclusively for diplomatic purposes." *Id.* (quoting TRIA § 201(d)(2)(A)–(B)). The TRIA "defines a 'terrorist party' to include any foreign country designated as a state sponsor of terrorism." *Id.* (quoting TRIA § 201(d)(4)). And TRIA applies for claims "based upon an act of terrorism," TRIA § 201(a), as all judgments here were, SUMF ¶¶ 1–4.

The USDT here is blocked. Specifically, as to all North Korean assets, 31 C.F.R. § 510.201(a)(1) provides that "[a]ll property and interests in property that are in the United States, that come within the United States, or that are or come within the possession or control of any U.S. person of the Government of North Korea or the Workers' Party of Korea are blocked." And more generally, it is well-established that "all assets belonging to an entity that satisfies [the] definition of [a terrorist party under an executive order] are automatically blocked." *See Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 137 (2d Cir. 2016). North Korea meets that definition because it is a state sponsor of terrorism and a "designated person" under IEEPA, *see* Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons List (Oct. 2025), and its assets that reflect an interest in New York are blocked. *See also* SUMF ¶¶ 79–80. To be sure, no issued license covers these assets. Accordingly, these assets are "blocked" and may be used to satisfy Plaintiffs' judgments.

## IV. NORTH KOREA'S PROPERTY IN THE WALLET ADDRESSES IS SUBJECT TO TURNOVER FROM TETHER TO THE PLAINTIFFS

North Korea's property interests currently in the Wallet Addresses are subject to turnover in favor of the Plaintiffs because USDT are "property" that can be transferred and Tether has the power to transfer it or, in the alternative, USDT represent interests in the reserve assets and there is no question that Tether has the power to transfer those interests, as it has demonstrated repeatedly. *E.g., United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. 1 at 3 (N.D. Ohio April 25, 2025); *United States v. 13.98 Million ("USDT") Cryptocurrency*, No. 25-CV-3943, Dkt. No. 1 ¶ 72 (D.D.C. Nov. 14, 2025) ("On or about March 19, 2025, the

FBI provided Tether with a copy of seizure warrant 25-sz-33. Tether then transferred to the United States the equivalent amount of USDT as was associated with the Target Addresses."); *United States v. 164,545 USDT*, 25-CV-417, ECF No. 10 (D. Ariz. Jan. 26, 2026) (Tether transferred USDT balance to United States).

Under New York law, "those property interests of the judgment debtor 'which by law the debtor may assign or transfer, may be sought for application to the judgment.'" *All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo*, 190 F.3d 16, 24 (2d Cir. 1999) (citing David D. Siegel, *New York Practice* § 491, at 755 (2d ed. 1991)); *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674 (1976). "New York law contains 'no threshold requirement that the attaching creditor show the value of the attached property or indeed that it has any value.'" *All. Bond Fund*, 190 F.3d at 24 (quoting *ABKCO*, 39 N.Y.2d at 674). In *ABKCO*, for example, the plaintiff sought turnover of an English creditor's interest in the as-yet-unrealized profits of a contract to produce a film in New York. 39 N.Y.2d at 674. The Court of Appeals held that this inchoate interest was "property" that could be ordered turned over—the point of New York law is that the judgment creditor gets to decide whether it is commercially reasonable to pursue collection of a property interest and, so long as that interest is assignable, it must be turned over. *All. Bond Fund*, 190 F.3d at 21 ("If from the judgment creditor's point of view the asset is worth pursuing as a matter of economics, *ABKCO* authorizes the pursuit notwithstanding the contingent nature of the asset, and even though nothing may come of the chase.").

Here, the Plaintiffs seek turnover of any and all interests North Korea has or may have with Tether. Those interests can be conceptualized in two ways, either of which results in turnover here.

*First*, the digital ledger balances are themselves property that can be turned over. There is no question that the balances themselves are "assignable" as that term is used in *ABKCO* because they can be, and indeed very frequently are, transferred between complete strangers. The Plaintiffs are thus entitled to turnover of North Korea's USDT regardless whether those USDT carry with them *any* rights as against Tether or any other entity, just as the Plaintiffs would be entitled to the turnover of, say, baseball cards issued by Topps and possessed by a garnishee, *e.g.*, *Freeman v. Giuliani*, No. 24-MC-353, Dkt. No. 10-2 at 4 (S.D.N.Y. Aug. 30, 2024) (seeking turnover of, among other things sports memorabilia), even though those cards carry with them no rights against Topps. To the extent Tether quibbles that it does not "possess" USDT and that turnover requires "possession," New York law requires turnover of any economic interests that can be turned over—in *ABKCO*, no one can possibly "possess" the inchoate interest in an as-yet unmade film, and yet it was ordered turned over, 39 N.Y.2d at 674—and regardless Tether in fact does possess all USDT under New York law. *See* N.Y. Unif. Comm. Code § 12-105 (explaining that exclusive power to control a "controllable electronic record" like USDT is exclusive even in some circumstances where another person can also exercise it).

*Second*, even though the Plaintiffs are entitled to turnover of USDT even if they carry with them no rights as against Tether, in fact holders of USDT are entitled

under Tether's terms of service to an assignable interest in the reserves backing those coins. Under Tether's terms of service, the right to redeem USDT directly with the company is limited to non-U.S. persons who establish a relationship with Tether, and that relationship is "personal" and "non-assignable." *See* Dkt. 56-3, Tether Terms, at § 4.1. But the non-assignability of Tether's terms is limited only to the provision of services to "Tether Token Wallets," which are those with which users *directly* transact with Tether. *Id.* at § 1.1.40. All USDT holders on the secondary market—that is those who have bought or sold USDT to or from parties other than Tether—have the explicitly *assignable* right to compel Tether to "back[]" each USDT with "an amount of assets ('Reserves') equal to the stated value of the Tether Token[s]" because Tether's terms distinguish between the right to *redeem* reserves (which is not assignable) and the right to hold tokens *backed by* reserves (which is): "Issuances and redemptions of Tether Tokens may be completed with Tether pursuant to these Terms. Tether Tokens may also be used, kept, *or exchanged* online *wherever* parties are willing to accept Tether Tokens." *Id.* (emphasis added).

Straightforwardly, then, the interest that any USDT holder has in Tether's reserves—even if that interest is merely the right to ensure that the reserves remain held by Tether to support the value of the coins—is assignable, *id.* Perhaps Tether will contend that because terms of service give it discretion to deny redemption in certain circumstances, Tether therefore has no valuable obligations to its coinholders. But under New York law, that does not matter—Tether is required to turnover any assignable interest, *All. Bond Fund*, 190 F.3d at 21, and whatever rights USDT give

their holders those rights are assignable and are indeed very frequently assigned: Between $80 billion and $120 billion worth of USDT change hands *every day*. *E.g.*, COINGECKO, *Tether*, https://www.coingecko.com/en/coins/tether (last accessed Dec. 16, 2025). They always do so for a dollar. *Id.*

## V. THE USDT IN THE WALLET ADDRESSES BELONG TO NORTH KOREA

Plaintiffs are entitled to turnover of USDT that are property of North Korea. As explained earlier, the USDT at issue here is held in wallet addresses that are: demonstrably involved in laundering North Korean assets from remote IT workers to the government of North Korea, SUMF ¶¶ 45–55; laundering the proceeds of North Korea's cybercrime, *id.* ¶¶ 46–78, 81–82; held by a North Korean banked owned and operated by the controlling party of North Korea, *id.* ¶ 79–80.

To definitively establish that these wallet addresses belong to North Korea and that Plaintiffs are entitled to them, Plaintiffs are, in a motion filed contemporaneously with this one, moving under N.Y. C.P.L.R. Section 5239 to "determine rights" in the USDT at issue. Plaintiffs are also moving to serve the owners of the wallet addresses via alternative means. Plaintiffs expect that this Court will rule that the USDT at issue here belongs to North Korea and that Plaintiffs are entitled to it.

## CONCLUSION

For the foregoing reasons, this Court should grant turnover and require Tether to transfer the USDT balances of Wallet Addresses or the reserves underlying them

to the Plaintiffs at an address to be specified in a sealed filing if this Motion is granted.

Respectfully submitted,

*/s/ Charlie Gerstein*
Charlie Gerstein
GERSTEIN HARROW LLP
1319 F St NW, Suite 301
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293
*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum contains 6,209 words using Microsoft's word count tool.

/s/ Charlie Gerstein