**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

HAN KIM, *et al.*,

Plaintiffs,

*v.*

THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, a.k.a. NORTH KOREA,

Defendant,

Case Nos. 25-MC-527-MMG
26-MC-033-MMG
26-MC-094-MMG
26-MC-235-MMG

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO N.Y. C.P.L.R. § 5239 TO DETERMINE RIGHTS IN PROPERTY AS AGAINST WALLET OWNERS 1–50**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

I. BACKGROUND ..... 2

A. Plaintiffs' Judgments Against North Korea ..... 2

1. The Kim and Butler Judgments ..... 2

2. The Kaplan Judgment ..... 3

3. The Calderon-Cardona Judgment ..... 4

B. The Ethereum and Tron Blockchains ..... 5

C. Tether ..... 6

D. North Korea Uses USDT to Evade Sanctions and Fund Its Nuclear and Ballistic Weapons Program ..... 8

E. North Korea Owns At Least 69,773,938.55 USDT ..... 9

F. Related Motions and Requests ..... 11

1. Filed with this Motion and related to these assets ..... 11

2. Requests to turnover different North Korean assets to these same Plaintiffs ..... 12

3. Requests on this same docket for Iranian-linked assets unrelated to this proceeding ..... 13

II. ARGUMENT ..... 13

A. A Motion Under N.Y. C.P.L.R. Section 5239 Is Appropriate to Determine The Rights to the Crypto Assets ..... 14

B. Plaintiffs Have Met Their Burden by Showing that North Korea Owns the USDT At Issue ..... 16

C. Plaintiffs Have Superior Rights to North Korea's USDT ..... 17

D. The Assets Are Not Protected by Sovereign Immunity ..... 19

CONCLUSION ..... 20

CERTIFICATE OF COMPLIANCE ..... 22

## TABLE OF AUTHORITIES

### CASES

*ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976)............................... 14

*All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16 (2d Cir. 1999) ............................................................................................... 14

*Born to Build, LLC v. Saleh*, 125 A.D.3d 706 (N.Y. 2d Dep't 2015) .......................... 17

*Butler v. Democratic People's Republic of Korea*, No. 20-cv-2514 (D.D.C. Nov. 4, 2025) ............................................................................................... 3

*Butler v. Democratic People's Republic of Korea*, No. 26-mc-235 (S.D.N.Y. May 21, 2026) ............................................................................................... 3

*Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010) .......................................................................................... 4, 5

*Calderon-Cardona v. Democratic People's Republic of Korea*, No. 26-mc-94 (S.D.N.Y. Feb. 25, 2026) .......................................................................................... 5

*Cruz v. TD Bank, N.A.*, 711 F.3d 261 (2d Cir. 2013).................................................. 15

*CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) ........................................................................................................ 16, 17

*Don King Prods., Inc. v. Thomas*, 945 F.2d 529 (2d Cir. 1991)................................ 14

*Dontzin Nagy & Fleissig LLP v. Fieldpoint Private Sec. LLC*, 2021 N.Y. Slip Op. 30861(U) (Sup. Ct. N.Y. Cnty. Mar. 19, 2021) ............................................... 18

*Estate of Levin v. Wells Fargo Bank N.A. ("Levin II")*, 156 F.4th 632 (D.C. Cir. 2025) .......................................................................................................... 19

*Ford Motor Credit Co. v. Astoria Fed.*, 189 Misc. 2d 475 (N.Y. Dist. Ct. 2001)......... 18

*Herman v. Siegmund*, 415 N.Y.S.2d 681 (2d Dep't 1979) ......................................... 15

*Kaplan v. Central Bank of the Islamic Republic of Iran*, No. 26-mc-33 (S.D.N.Y. Jan. 23, 2026) ..................................................................................... 4, 13

*Kaplan v. Hezbollah*, No. 09-cv-646 (D.D.C. July 23, 2014) ................................... 3, 4

*Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29 (D.D.C. 2013) ..... 2

*Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014).......... 3

*Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286 (D.D.C. 2015) ..... 3

*Kim v. Democratic People's Republic of Korea*, No. 25-mc-527 (S.D.N.Y.) ...... 3, 12, 13

*Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107 (2d Cir. 2016) .............................. 2, 20

*Lavi v. Powerserve Int'l, Inc.*, 769 N.Y.S.2d 398 (N.Y. App. Div. 2003)..................... 17

*Matter of Mega Pers. Lines Inc. v. Halton*, 297 A.D.2d 428 (N.Y. 2d Dep't 2002)..... 16

*Matter of Soressi v. SWF, L.P.*, 81 A.D.3d 1143 (N.Y. 3d Dep't 2011)....................... 16

*Matter of Winston Capital, LLC v. Abadiam*, 70 A.D.3d 414 (N.Y. 1st Dep't 2010) ............................................................................................................ 16, 17

*Nat'l Union Fire Ins. Co. v. Eland Motor Car Co.*, 85 N.Y.2d 725 (1995) .......... 15, 16

*United States v. 13.98 Million ("USDT") Cryptocurrency*, No. 25-CV-3943 (D.D.C. Nov. 14, 2025)........................................................................................ 15

*United States v. 164,545 USDT*, No. 25-CV-417 (D. Ariz. Jan. 26, 2026) ................ 15

*United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386 (N.D. Ohio Apr. 25, 2025) ............................................................................. 15

**STATUTES, RULES, AND OTHER PROVISIONS**

31 C.F.R. § 510.201(a)(1) ............................................................................. 19

Fed. R. Civ. P. 69(a) ............................................................................. 1, 14, 16

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq. ....... 19, 20

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201, 116 Stat. 2322 ............................................................................................................ 2, 13, 19

N.Y. C.P.L.R. § 5225(b)............................................................................. 14, 15

N.Y. C.P.L.R. § 5232(a)............................................................................. 18

N.Y. C.P.L.R. § 5239 ............................................................................. *passim*

**OTHER AUTHORITIES**

David D. Siegel, *New York Practice* § 486 ................................................................ 14

David D. Siegel, *Practice Commentaries*, N.Y. C.P.L.R. 5239 (2013)....................... 15

## INTRODUCTION

The Democratic People's Republic of Korea ("North Korea") has a long and brutal history of terrorism. This is an action by the survivors of people who have suffered the evils of North Korean terror—a minister tortured and murdered in a prison camp, people struck by rockets indiscriminately fired at civilians, and people gunned down in cold blood in an airport, all either at the hands of North Korea or with its backing. These individuals (collectively, "Plaintiffs") obtained four separate judgments against North Korea after suffering these atrocities, but North Korea has yet to pay a penny towards these judgments.

But now an opportunity for Plaintiffs to begin collecting has arisen. The opportunity arises because North Korea is known to use crypto assets in an attempt to evade the near-universal restrictions on its financial activity, and some of those crypto assets are currently both frozen by intermediaries and within the reach of Plaintiffs. In particular, North Korea, as part of a long-running international campaign of hacking, fraud, and sanctions evasion, owns at least $69,773,938 worth of Tether tokens (USDT), a crypto asset issued by Garnishee Tether International *S.A. de C.V.* (Tether), across 50 different blockchain wallet addresses. This Court should determine pursuant to Federal Rule of Civil Procedure 69(a) and N.Y. C.P.L.R. § 5239 that Plaintiffs are entitled to those assets. A motion for an order of turnover thus accompanies this motion, though Plaintiffs expect to ask this Court to hold it in abeyance until the conclusion of this Motion.

In particular, there is strong evidence that these wallet addresses are tied to a North Korean remittance scheme designed to evade sanctions and fund the North

Korean government, Statement of Undisputed Material Facts ("SUMF") ¶¶ 43–55; laundered the proceeds of North Korean cybercrime, *id.* ¶¶ 43–44, 56–78, 81–82; or belong to a North Korean bank operated by and for the benefit of the North Korean government, *id.* ¶¶ 79–80. Put simply, the assets in question here belong to North Korea, Plaintiffs' judgment-debtor. And Plaintiffs are entitled to those assets because North Korean property is "blocked" by operation of United States law, *see Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 137 (2d Cir. 2016) ("[A]ll assets belonging to an entity that satisfies [the] definition of [a terrorist party under an executive order] are automatically blocked."), and such property is subject to execution "[n]otwithstanding any other provision of law," Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 note) ("TRIA"). And because Plaintiffs hold unsatisfied judgments against North Korea, it is appropriate for the Court to rule that the assets in question belong to their judgment-debtor so that Plaintiffs may establish their clear entitlement to them. N.Y. C.P.L.R. § 5239 (permitting this Court "to determine rights in the property").

# I. BACKGROUND

## A. Plaintiffs' Judgments Against North Korea

### *1. The Kim and Butler Judgments*

In 1993, Reverend Dong Shik Kim moved from the U.S., where he was a lawful permanent resident, to China to work as a missionary providing humanitarian and religious services to North Korean families who had fled across the Sino–Korean border. *Kim v. Democratic People's Republic of Korea ["DPRK"]*, 950 F. Supp. 2d 29,

36 (D.D.C. 2013). In 2000, Reverend Kim was abducted by a member of the North Korean security services and secreted across the border into North Korea. *Kim v. DPRK*, 774 F.3d 1044, 1049 (D.C. Cir. 2014). No one outside North Korea has heard from Reverend Kim since. *Id.* Experts in North Korea's human-rights violations testified that North Korea sends those whom it deems to be "opponents of the . . . regime" to torture camps called *kwan-li-sos*. *Id.* at 1050. Experts further testified that Reverend Kim "suffered an untimely death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51. In two separate proceedings, the Kim family sued North Korea for the abduction and murder of Reverend Kim and obtained a total of $96,000,000 in compensatory damages and $600,000,000 in punitive damages. *See Kim v. DPRK*, 87 F. Supp. 3d 286, 291 (D.D.C. April 9, 2015); *Butler v. DPRK*, Dkt. No. 31, 20-cv-2514 (D.D.C. Nov. 4, 2025). On November 20, 2025, the Kims registered their judgment in this Court, Dkt. 1, AO-451, *Kim v. Democratic People's Republic of Korea*, No. 25-mc-527 (S.D.N.Y. Nov. 20, 2025), and on May 21, 2026, the *Butler* plaintiffs did the same, Dkt. 1, AO-451, *Butler v. Democratic People's Republic of Korea*, No. 26-mc-235 (S.D.N.Y. May 21, 2026). North Korea has yet to pay a penny towards either judgment. SUMF ¶ 5.

*2. The Kaplan Judgment*

Between July 12, 2006, and August 14, 2006, Hezbollah—which is a designated foreign terrorist organization under U.S. law—fired thousands of rockets and missiles at civilians in northern Israel. *Kaplan v. Hezbollah et al.*, Dkt. No. 57, No. 09-cv-646 (D.D.C. July 23, 2014). The rockets that landed in Israel had been sent to Hezbollah in the years prior to 2006 by North Korea, *id.*, and North Korean agents trained

Hezbollah agents in military tactics for decades, *id*. Some of those rockets injured and killed the *Kaplan* plaintiffs, who are U.S. nationals that lived in Israel during Hezbollah's 2006 rocket attacks. Their individual injuries were evaluated by a special master, whose conclusions were adopted (in large part) by the U.S. District Court for the District of Columbia, which ultimately awarded the plaintiffs a combined $38,161,966.67 in compensatory damages and $131,277,165.34 in punitive damages. *Kaplan*, Dkt. No. 83 (D.D.C. Sept. 30, 2016). The *Kaplan* plaintiffs registered their judgment in this Court on January 23, 2026, Dkt. 1, AO-451, *Kaplan v. The Central Bank of the Islamic Republic of Iran*, No. 26-mc-33 (S.D.N.Y. January 23, 2026). North Korea has not paid a single cent towards this judgment. SUMF ¶ 5.

*3. The Calderon-Cardona Judgment*

On May 30, 1972, American citizens Carmelo Calderon-Molina and Pablo Tirado-Ayala arrived at what was then known as Lod Airport (it is now David Ben-Gurion airport) near Tel Aviv, as part of a large group of Puerto Rican pilgrims touring Israel and visiting the Christian religious sites in the Holy Land. Three members of the Japanese Red Army, which was a designated foreign terrorist organization under U.S. law from 1997 to 2001, used automatic weapons and explosives that they had hidden in their luggage to indiscriminately kill 26 civilians and wound more than 80. Calderon-Molina was among the former and Tirado-Ayala was among the latter. *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441, 445 (D.P.R. 2010). North Korea sponsored the attack by providing material support to the Japanese Red Army, which worked together with the Popular Front for the Liberation of Palestine to commit the attack. *Id*. at 448.

The *Calderon-Cardona* Plaintiffs, loved ones of Calderon-Molina and Tirado-Ayala, sued North Korea in the United States District Court for the District of Puerto Rico. North Korea did not appear, and the Court entered a default judgment against it in 2010 for a total of $78 million in compensatory damages and $300 million in punitive damages. *Id*., Dkt. 37. The *Calderon-Cardona* plaintiffs registered their judgment in this Court on February 25, 2026. See Dkt. 1, AO-451, *Calderon-Cardona v. Democratic People's Republic of Korea*, No. 26-mc-94 (S.D.N.Y. Feb. 25, 2026). North Korea has paid nothing towards this judgment. SUMF ¶ 5.

### B. The Ethereum and Tron Blockchains

A blockchain is a system for a distributed network of machines to keep a ledger of transactions publicly and securely. SUMF ¶ 7. To maintain a blockchain, a distributed network of machines uses a cryptographic function called a "hash" to validate a series of transactions (a "block") and connect it to all prior series of transactions (hence "chain") in a way that is verifiable and practically immutable. SUMF ¶ 8.

The blockchains at issue in this case are called Ethereum and Tron. *See* SUMF ¶¶ 9, 47, 62. Users participate in both blockchains using wallet addresses, which are digital representations of the sending and receiving ends of transactions on the blockchain. *Id.* ¶ 10. Ethereum and Tron can record transactions in many different assets using protocols called the "ERC-20" and "TRC-20 standard," respectively. *Id.* ¶ 11. These standards enable anyone on the Ethereum and Tron blockchains to create a "token" using something called a "smart contract." *Id.* All standard tokens have some core functions—all of them have a fixed total supply at any time, may be

transferred from one wallet address to another, and are fungible. *Id.* ¶ 12. But some ERC-20 and TRC-20 tokens have additional functions encoded by their creators, including, for example, the ability for the creator to freeze tokens or to decrease their balances, which allows the issuer to transfer token balances from one wallet address to another. *Id.* ¶ 13.

**C. Tether**

Tether International *S.A. de C.V.* is a Salvadoran company that issues USDT, the world's largest stablecoin by volume. *Id.* ¶¶ 14, 15. Tether's business is straightforward: It issues USDT in exchange for dollars and redeems them on demand for dollars, always on a one-to-one basis, *Id.* ¶ 15 (Tether also issues stablecoins backed by other currencies, like the Euro and Mexican Peso; these assets are not at issue in this Motion.)

Tether Tokens are issued on multiple blockchains. *Id.* ¶ 21. To issue USDT, Tether uses its private keys to call the Tether smart contract's "issue" function, which increases the total possible balance of USDT by the issued amount, and then transfers that amount to the purchaser's wallet. *Id.* ¶ 16. Then, anyone with the private keys to *that* wallet address can transfer the USDT to any other wallet address using the "transfer" function. *Id.* Once USDT is in circulation, it is freely negotiable between any two people with blockchain wallet addresses. *Id.* ¶ 22 ("Issuances and redemptions of Tether Tokens may be completed with Tether pursuant to these Terms. Tether Tokens may also be used, kept, or exchanged online wherever parties are willing to accept Tether Tokens.").

Tether always retains the power to cause the USDT balance of any wallet address to remain frozen using its "blacklist" function, or to decrease that balance to zero using its "destroyBlackFunds" function. *Id.* ¶ 17. If Tether discovers that a given blockchain address is attributable to a sanctioned party, or is involved in criminal activity, Tether reserves the right to freeze the USDT balance of the address. *Id.* ¶ 23. Recently, Tether has said that it "maintains a zero-tolerance policy toward the criminal use of our financial products," and so "work[s] closely with law enforcement globally to identify and, upon request, freeze assets to prevent further movement when they are linked to illegal activity or illicit actors." *See* SUMF ¶ 27 (citing TETHER, *Tether Supports Freeze of More Than $344 Million in USDT in Coordination with OFAC and U.S. Law Enforcement*, https://tether.io/news/tether-supports-freeze-of-more-than-344-million-in-usdt-in-coordination-with-ofac-and-u-s-law-enforcement/ (April 24, 2026)). Moreover, Tether will, on its own volition, freeze the USDT balances of wallet addresses that are put on OFAC's Sanctioned Designated Nationals list. SUMF ¶ 24. Thus, Tether's policy commits it to freezing wallet addresses associated with sanctioned individuals or entities and freezing wallet addresses at the request of law enforcement. SUMF ¶¶ 24–26. As of April 24, 2026, Tether has frozen over $4.4 billion in USDT. *Id.* ¶ 27. When Tether freezes the USDT balance of a wallet address, the balance remains the same indefinitely unless Tether unfreezes the balance or executes the destroyBlackFunds function. *Id.* ¶ 28.

### D. North Korea Uses USDT to Evade Sanctions and Fund Its Nuclear and Ballistic Weapons Program

North Korea does not maintain diplomatic or economic relations with much of the world and is cut off from the world's global financial networks. *Id.* ¶ 40. It nonetheless maintains a very expensive nuclear weapons program. *Id* ¶ 44. To fund this program, as well as basic services, North Korea has relied largely on crypto assets to evade international sanctions. *Id*. It obtains crypto assets by, *inter alia*, operating a widespread and an extremely aggressive campaign of cyber-attacks and operating a scheme in which North Korean nationals use false or stolen identities to obtain remote IT employment with companies around the world and remit much of their earnings to the North Korean government using crypto assets. SUMF ¶ 42. North Korea uses USDT (and other crypto assets not at issue here) to both launder its funds and evade international sanctions. *E.g.*, Multilateral Sanctions Monitoring Team, The DPRK's Violation and Evasion of UN Sanctions Through Cyber and Information Technology Worker Activities, MSMT/2025/2 at 83 ("[I]n 2025, some North Korean IT workers sought to convert fiat funds into cryptocurrency, suggesting that they perceive cryptocurrency as more convenient and less risky than using banks or other fiat-based payment service. . . . IT workers . . . converted [funds] to U.S. dollar-pegged stablecoins USDC or USDT."). North Korea conducts its operations through several state instrumentalities, all controlled by the North Korean government. SUMF ¶¶ 43, 44, 45, 79.

### E. North Korea Owns At Least 69,773,938.55 USDT

North Korea owns at least 69,773,938.55 USDT that are traceable to North Korea's typical methods of acquiring crypto assets: cyber-attacks and remittances from its IT workers. *See id.* ¶¶ 45–82. Specifically, North Korea owns 46,189,139.13 USDT in frozen wallet addresses associated with its program to launder assets from remote IT workers. *See id.* ¶¶ 45–55. In addition, North Korea owns 18,163,282.39 USDT in wallet addresses traceable to cybercrime, of which 17,454,039.27 USDT is traceable to North Korea's attempts to launder the proceeds of a $1.5 billion exploit of the Bybit crypto exchange. *Id.* ¶¶ 56–78, 81–82. Finally, the remaining 5,421,517.03 frozen North Korean USDT is owned by a North Korean bank on behalf of the government. *Id.* ¶¶ 79–80.

Most of the crypto assets at issue here are traceable to North Korea's IT worker program. North Korea operates a large-scale scheme in which it deploys IT workers abroad to obtain employment, often fraudulently, to generate revenue for the North Korean government. *Id.* ¶¶ 42, 45. The workers' wages are then consolidated, converted, and laundered through networks designed to return the money to the North Korean government. *Id.* The United States Department of the Treasury has identified one such network involving workers named Lu Huaying, and Zhang Jian; and a DPRK banking representative named Sim Hyon Sop, who is on OFAC's Sanctioned Designated Nationals list. *Id.* According to Treasury, that network laundered funds generated by DPRK IT workers and cybercrime to "funnel[] the illicit proceeds back to Pyongyang." *Id.* Plaintiffs have identified North Korean wallet addresses connected to this scheme by identifying wallet addresses with frozen USDT

balances that interacted with wallet addresses known to be part of the North Korean scheme in a manner that suggested they are part of the scheme. *See* Ehrenhofer Decl. ¶¶ 16–18.

A little over $18 million USDT at issue here are traceable to North Korea's prolific and well-documented cybercrime activities. *See* SUMF ¶¶ 56–78, 81–82. The Treasury has explained that the North Korean government raises revenue using illicit methods and that North Korean hackers, including Lazarus Group and TraderTraitor, are part of and operate for the benefit of the North Korean government. *Id.* ¶ 44. In February 2025, North Korea obtained $1.5 billion in Ether from Bybit, a crypto exchange. *Id.* ¶ 56. The FBI publicly announced that North Korea was responsible for the hack. *Id*. North Korea then undertook an extensive laundering operation, dividing assets among intermediary wallets; moving them through bridges, decentralized exchanges, and mixers; and ultimately, in part, selling them in exchange for USDT. *Id.* ¶ 57. Plaintiffs have identified 17,454,039.27 USDT that is directly traceable to this scheme. SUMF ¶¶ 46–78. In addition, Plaintiffs have identified another 709,243.12 in wallet addresses known to belong to Lazarus Group, a group that the United States government has identified as controlled by North Korea's primary intelligence bureau. SUMF ¶¶ 81–82.

Finally, the remaining 5,421,517.03 USDT at issue here are in wallet addresses on OFAC's SDN list because they are owned by Cheil Credit Bank on behalf of the North Korean government. *Id.* ¶¶ 79–80. Cheil is a North Korean bank owned by the Workers' Party of Korea, which is the ruling party of North Korea and the only

viable party in a country without freedom of political association. *Id.* ¶ 79; *see* U.S. DEP'T OF STATE, 2023 COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES: NORTH KOREA, § 2.B. Cheil Credit Bank operates to provide North Korea access to the international financial system. SUMF ¶ 79. All USDT that is associated with Cheil Bank is frozen and in addresses that are on the OFAC Specially Designated Nationals list. *Id.* ¶ 80.

**F. Related Motions and Requests**

Finally, Plaintiffs thought it worthwhile to place this Motion in the context of several other overlapping requests and motions. There are various requests related to these Plaintiffs and North Korean crypto assets on this docket, and much more besides, so given the limitations of the ECF system, Plaintiffs provide the following brief guidance to relevant docket entries and requests.

*1. Filed with this Motion and related to these assets*

Today, Plaintiffs filed three motions: (1) this motion, which seeks a ruling that the USDT in the wallet addresses identified in the proposed order accompanying this motion belong to North Korea, and that Plaintiffs have a first-priority execution lien and operative levy on those assets; (2) a motion for alternative service to serve this motion on the owner of those wallet addresses, and (3) a motion for turnover of all North Korean assets in Tether International *S.A. de C.V.*'s possession, Plaintiffs in these actions have a levy on all North Korean assets in Tether's possession. SUMF ¶ 6.

*2. Requests to turnover different North Korean assets to these same Plaintiffs*

Plaintiffs have previously sought North Korean assets in an effort to collect their judgments. In December 2025, the *Kim* and *Butler* plaintiffs sought turnover of all North Korean assets in the possession of a different garnishee, Circle Internet Financial, LLC. *See* Dkt. 4, *Kim v. Democratic People's Republic of Korea*, No. 25-cv-527 (S.D.N.Y Dec. 12, 2025). Specifically, that motion identified $2,144,505 worth of crypto assets owned by North Korea and held by Circle. *Id.* That motion is not yet fully briefed and remains pending.

In April 2026, the *Kim*, *Kaplan*, and *Calderon-Cardona* plaintiffs began efforts to execute their judgments against North Korean crypto assets now in the possession of Aave LLC. *See, e.g.*, Dkts. 33, 60, 67, *Kim v. Democratic People's Republic of Korea* (S.D.N.Y.). Plaintiffs in that action seek, under N.Y. C.P.L.R. § 5239, a determination of rights with respect to 30,766 Ether. *See* Dkt. 60 at 1. That request remains pending.

None of these actions affect Plaintiffs' entitlement to relief here. First, all motions referenced above are still pending. But even if Plaintiffs obtain all relief sought to date, Plaintiffs' total compensatory judgments far exceeds the value of the assets sought to be turnover.[1] Thus, each request is independent and can be decided in any sequence.

---

[1] The *Kim*, *Kaplan*, and *Calderon-Cardona* plaintiffs' motion for turnover of the crypto assets in Aave LLC's possession seeks Ether, which is not a stablecoin. Should any Ether be turned over, the Court will have to determine its value for purposes of calculating the amount of Plaintiffs' judgments that remain unsatisfied. Nonetheless, unless Ether increases in value in an unprecedented manner, turnover

*3. Requests on this same docket for Iranian-linked assets unrelated to this proceeding*

On May 14, 2026, various sets of plaintiffs represented by undersigned counsel filed a separate turnover motion against Tether. *See* Dkt. 56, *Kim v. Democratic People's Republic of Korea*. That action seeks the turnover of Iranian assets in Tether's possession, unlike this action, which seeks North Korean assets. *See id.* Of the Plaintiffs in this action, only the *Kaplan* plaintiffs are movants in the Tether–Iran action because the *Kaplan* plaintiffs hold a judgment against both Iran and North Korea. *See* Dkt. 1, AO-451, *Kaplan v. The Central Bank of the Islamic Republic of Iran*, No. 26-mc-33 (S.D.N.Y. January 23, 2026). That pending motion has been held in abeyance. *See* Dkt. 96.

## II. ARGUMENT

This Motion seeks only a declaration of rights in the subject property and not an order of turnover. Accordingly, this Court should declare that the wallet addresses at issue here are presently owned by North Korea. And, given such a finding, this Court should further declare that Plaintiffs have superior rights to the USDT in those addresses because Plaintiffs' judgments against North Korea are not satisfied and the' judgment-debtor, North Korea, is a terrorist state whose blocked assets are subject to execution "[n]otwithstanding any other provision of law." TRIA § 201(a). Thus, Plaintiffs have superior rights in the USDT at issue here.

---

of the assets sought in that action will not come close to satisfying Plaintiffs' combined judgments.

### A. A Motion Under N.Y. C.P.L.R. Section 5239 Is Appropriate to Determine The Rights to the Crypto Assets

The procedures for enforcing a judgment registered in this Court begin with the Federal Rules, which provide that, absent a governing statute (which does not apply here), "the procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a). Those procedures, in turn, are specified in New York Civil Practice Law and Rules Article 52. Under Article 52, "those property interests of the judgment debtor 'which by law the debtor may assign or transfer, may be sought for application to the judgment.'" *All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 24 (2d Cir. 1999) (citing David Siegel, *New York Practice*, § 486, at 742; *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674 (1976)). Where those interests are capable of being turned over by a third party—called a "garnishee"—who holds them on the judgment debtor's behalf, the judgment creditor's process begins by serving a writ of execution on the executing officer (in this case the U.S. Marshal), which establishes a lien over the judgment debtors' property. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991) ("Under New York law, a judgment creditor becomes a 'judgment lien creditor' as to personal property . . . after execution is delivered to the sheriff"). This has already happened here via the alternate means this Court authorized at Dkt. 69. SUMF ¶ 6 (Plaintiffs served copies of their writs of execution on Tether according to this Court's order).

In a separate motion, Plaintiffs have moved for turnover of all North Korean assets held by Tether International *S.A. de C.V.*, the Garnishee, under N.Y. C.P.L.R.

Section 5225(b). Tether is a proper garnishee because, among other reasons, it is capable of turning over USDT. *See, e.g.*, *United States v. 4,340,000 Tether ("USDT") Cryptocurrency*, No. 25-CV-386, Dkt. 1 at 3 (N.D. Ohio April 25, 2025); *United States v. 13.98 Million ("USDT") Cryptocurrency*, No. 25-CV-3943, Dkt. 1 ¶ 72 (D.D.C. Nov. 14, 2025) ("On or about March 19, 2025, the FBI provided Tether with a copy of seizure warrant 25-sz-33. Tether then transferred to the United States the equivalent amount of USDT as was associated with the Target Addresses."); *United States v. 164,545 USDT*, 25-CV-417, Dkt. 10 (D. Ariz. Jan. 26, 2026) (Tether transferred USDT balance to United States). To be entitled to turnover under § 5225(b), Plaintiffs must prove that the entity having an "interest" in that USDT or the reserves underlying it is North Korea. *See* N.Y. C.P.L.R. § 5225(b).

Section 5239, under which this motion is filed, "provides for a stakeholder action in which parties may assert competing claims to property owned by the judgment debtor." *Cruz v. TD Bank, N.A.*, 711 F.3d 261, 269 (2d Cir. 2013). Although typically parties with adverse claims to property file special proceedings against garnishees or garnishees implead parties with adverse claims, Section 5239 "is the path to the courthouse for a claimant who wants to have a priority or lien or other dispute with another claimant ironed out," *id.* (citing David Siegel, *Practice Commentaries N.Y. C.P.L.R. 5239* (2013)), and operates as "an all-inclusive tool for the settlement of almost any problem that may arise in connection with the enforcement of money judgments," *Herman v. Siegmund*, 415 N.Y.S.2d 681, 682 (2d Dep't 1979); *see also Nat'l Union Fire Ins. Co. v. Eland Motor Car Co.*, 85 N.Y.2d 725,

729 (1995) (noting that C.P.L.R. § 5239 permits "[r]ival claimants" to be joined in one proceeding "so that the court may prioritize the competing interests"). Under Second Circuit authority, Section 5239 actions may be brought by motion. *See CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 470 (2d Cir. 2018) (explaining that an Article 52 movant in federal court "was not required to institute a separate proceeding . . . and could proceed by motion under Rule 69(a)"). Thus, Plaintiffs file this motion under Section 5239 for a ruling that North Korea owns the USDT in Wallet Addresses 1–50 and that Plaintiffs have superior priority and rights to those assets. Plaintiffs have separately moved to serve the wallet addresses' owners by alternative service.

### B. Plaintiffs Have Met Their Burden by Showing that North Korea Owns the USDT At Issue

As explained in this memorandum, *see supra* § I.E, and laid out more extensively in the statement of undisputed material facts and the declaration of Justin Ehrenhofer, there is ample evidence that the crypto assets at issue here belong to North Korea. But Plaintiffs need not prove ownership decisively at this juncture. Rather, because this motion is analyzed according to the same standards as those "applied to a motion for summary judgment," *Matter of Mega Pers. Lines Inc. v. Halton*, 297 A.D.2d 428, 429 (N.Y. 2d Dep't 2002) (citation and internal quotation marks omitted), Plaintiffs need only meet their "burden to proffer evidence demonstrating that the property" belongs to their judgment debtor, North Korea. *Matter of Soressi v SWF, L.P.*, 81 A.D.3d 1143, 1144 (N.Y. 3d Dep't 2011); *see also Matter of Winston Capital, LLC v. Abadiam,* 70 A.D.3d 414, 414 (N.Y. 1st Dep't 2010)

(explaining that movants met their burden and were entitled to a trial notwithstanding the response because movants "established their prima facie" case). The evidence here more than satisfies Plaintiffs' initial burden.

Because Plaintiffs' evidence is sufficient to show that North Korea owns the USDT, the burden now shifts to the owner of the wallet addresses to raise a triable issue that the crypto assets in those addresses do not belong to North Korea.[2] *See Born to Build, LLC v. Saleh*, 125 A.D.3d 706, 708 (N.Y. 2d Dep't 2015) (applying this burden-shifting structure); *Matter of Winston Capital*, 70 A.D. at 414 (putting the onus on respondent to "raise[] a triable issue"). If the wallet addresses' owners come forward and raise a triable issue as to the wallets' ownership, this Court must resolve any outstanding issues in a hearing. *See Matter of Winston Capital*, 70 A.D. at 414 (holding that because there existed genuine factual disputes that could not be resolved on the papers, the Supreme Court should have ordered disclosure and a trial); *Lavi v. Powerserve Int'l, Inc.*, 769 N.Y.S.2d 398, 398 (N.Y. App. Div. 2003) (explaining that "where there are disputed issues of material fact" in a § 5239 proceeding, "a hearing is required").

### C. Plaintiffs Have Superior Rights to North Korea's USDT

Plaintiffs expect that a hearing will not be necessary here because the unrebutted evidence will point unequivocally to North Korea owning these assets. *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 473 (2d Cir. 2018)

[2] As explained above, Plaintiffs have moved this Court for permission to serve the wallet addresses via alternative service.

(explaining that "[a]bsent a factual issue concerning damages . . . a hearing is not required"); *Ford Motor Credit Co. v. Astoria Fed.*, 189 Misc. 2d 475, 476 (N.Y. Dist. Ct. 2001) (in an Article 52 turnover proceeding, explaining that "default is deemed an admission and/or concession that the [proceeds in question] belong to the judgment debtor"). And because Plaintiffs served a writ of execution directed to these assets on the Marshal before any other creditor (and have served that writ on the garnishee pursuant to an order of this Court, ECF No. 76–77), Plaintiffs have priority over the assets in question. *See* N.Y. C.P.L.R. § 5232(a) ("The sheriff . . . shall levy upon any interest of the judgment debtor . . . in personal property not capable of delivery, or upon any debt owed to the judgment debtor, by serving a copy of the execution upon the garnishee"); SUMF ¶ 6 (Plaintiffs served copies of their writs of execution on Tether according to this Court's order). Thus, should the Court conclude that North Korea owns the USDT here, Plaintiffs will be entitled to a determination that Plaintiffs' perfected interest in the crypto assets in Wallet Addresses 1–50 is prior and superior to North Korea's or any of its judgment-creditors. *See Dontzin Nagy & Fleissig LLP v. Fieldpoint Private Sec. LLC*, 2021 N.Y. Slip Op. 30861(U), at *5 (Sup. Ct. N.Y. Cnty. Mar. 19, 2021) (declaring, pursuant to CPLR § 5239, that claimant with a perfected security interest in disputed property had an interest that was "prior and superior to" that of the petitioner "and any other judgment creditor" of the judgment debtor). Plaintiffs will then be entitled to obtain turnover of the USDT at issue, which they have moved for in a separate motion.

### D. The Assets Are Not Protected by Sovereign Immunity

Finally, Plaintiffs must also establish that sovereign immunity does not bar execution against the assets at issue.

Federal law makes clear that these assets are not immune from Plaintiffs' execution efforts here. This case is governed by the TRIA, which provides in relevant part:

> Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a). "TRIA defines a 'blocked asset' as 'any asset seized or frozen by the United States' under [IEEPA]." *Estate of Levin v. Wells Fargo Bank N.A.* ("Levin II"), 156 F.4th 632, 638 (D.C. Cir. 2025) (quoting TRIA § 201(d)(2)(A)–(B)). TRIA "defines a 'terrorist party' to include any foreign country designated as a state sponsor of terrorism." *Id.* (quoting TRIA § 201(d)(4)). And TRIA applies for claims "based upon an act of terrorism," TRIA § 201(a), as all judgments here were, *see* SUMF ¶¶ 1–4.

Additionally, the USDT here is blocked by law. Specifically, as to all North Korean assets, 31 C.F.R. § 510.201(a)(1) provides that "[a]ll property and interests in property that are in the United States, that come within the United States, or that are or come within the possession or control of any U.S. person of the Government of North Korea or the Workers' Party of Korea are blocked." And, more generally, it is well-established that "all assets belonging to an entity that satisfies [the] definition

of [a terrorist party under an executive order] are automatically blocked." *See Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 137 (2d Cir. 2016). North Korea meets that definition because it is a state sponsor of terrorism and a "designated person" under IEEPA, *see* Office of Foreign Assets Control (OFAC), Specially Designated Nationals and Blocked Persons List (Oct. 2025), and its assets that reflect an interest in New York are blocked. *See also* SUMF ¶ 80. No issued license covers these assets. Accordingly, these assets are "blocked" and may be used to satisfy Plaintiffs' judgments.

## CONCLUSION

For the foregoing reasons, this Court should declare that the USDT in the wallet addresses at issue here belong to North Korea and that Plaintiffs have superior rights to them.

Respectfully submitted,

*/s/ Charlie Gerstein*
Charlie Gerstein
GERSTEIN HARROW LLP
1319 F St NW, Suite 301
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC

829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing memorandum contains 5,409 words using Microsoft's word count tool.

/s/ Charlie Gerstein